1  Bruce A. Fields (102426)
2  bfields@bfieldslaw.com
   Bruce A. Fields A.P.C.
3  1801 Century Park East, 24th Floor
4  Los Angeles, California 90067
   Telephone:   310-552-7832
5  Facsimile:     800-279-4830

6  Attorneys for Plaintiff
7  Dream Marriage Group, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10 Dream Marriage Group, Inc.,              Case no. CV 10-5034 RSWL (FFMx)

11                       Plaintiff,         **Joint Stipulation Pursuant to Local**
                                            **Rule 37-2 Re Plaintiff's Motion To**
12          v.                              **Compel Fed. R. Civ. P. 30(b)(6)**
                                            **Deposition and Production of**
13 Anastasia International, Inc.,           **Documents Requested and Not**
                                            **Produced**
14                       Defendant.
15                                          Judge:   Hon. Frederick F. Mumm
16
17 And related cross-action                 Date:     February 14, 2012
                                            Time:    10:00 a.m.
18                                          Court:   E-9th Floor
19                                          DISCOVERY MATTER
20
21                                          Discovery Cutoff:     March 23, 2012
                                            Pretrial Conf. Date:  October 16, 2012
22                                          Trial Date:           December 4, 2012

23        Pursuant to Federal Rule of Civil Procedure 37(c) and Local Rule 37-2, Plaintiff

24 Dream Marriage Group, Inc. ("DMG" or "Plaintiff"), and Defendant Anastasia

25 International, Inc. ("Anastasia" or "Defendant"), respectfully submit the following

26 Joint Stipulation Regarding DMG's Motion to Compel Fed. R. Civ. P. 30(b)(6)

27 Deposition and Production of Documents Requested and Not Produced.

28

BH8255.1
1003-30730

# TABLE OF CONTENTS

I.   Introductory Statements ..................................................................1

   A.   DMG's Introductory Statement ....................................................1

      1.   Brief Statement of the Case ...................................................1

      2.   Defendant's Discovery Failures Giving Rise to this Motion ............................2

   B.   Anastasia's Introductory Statement ...............................................4

      1.   The Parties-In-Suit ...........................................................4

      2.   DMG's Claims ...............................................................6

      3.   Discovery At Issue ..........................................................6

II.   Issue No. 1: Request no. 2 for Production of Documents at Deposition .................7

   A.   Disputed Request for Production and Defendant's Response ...........................7

   B.   DMG's Contentions and Points and Authorities ...................................8

   C.   Anastasia's Contentions and Points and Authorities ..............................17

III.   Issue No. 2: Request no. 4 for Production of Documents at Deposition ...............35

   A.   Disputed Request for Production and Defendant's Response ...........................35

   B.   DMG's Contentions and Points and Authorities ...................................36

   C.   Anastasia's Contentions and Points and Authorities ..............................43

IV.   Issue No. 3: Request no. 5 for Production of Documents at Deposition ...............59

   A.   Disputed Request for Production and Defendant's Response ...........................59

   B.   DMG's Contentions and Points and Authorities ...................................59

   C.   Anastasia's Contentions and Points and Authorities ..............................69

V.   Issue No. 4: Request no. 6 for Production of Documents at Deposition ................84

   A.   Disputed Request for Production and Defendant's Response ...........................84

   B.   DMG's Contentions and Points and Authorities ...................................84

   C.   Anastasia's Contentions and Points and Authorities ..............................94

VI.   Issue No. 5: Request no. 9 for Production of Documents at Deposition ............109

   A.   Disputed Request for Production and Defendant's Response .........................109

   B.   DMG's Contentions and Points and Authorities .................................110

BH8255.1
1003-30730

C.   Anastasia's Contentions and Points and Authorities ...........................................119

VII.   Issue No. 6: Request No. 10 for Production of Documents at Deposition ....134

A.   Disputed Request for Production and Defendant's Response ........................134

B.   DMG's Contentions and Points and Authorities ................................................135

C.   Anastasia's Contentions and Points and Authorities ...........................................144

VIII.   Issue No. 7: Request no. 20 for Production of Documents at Deposition .159

A.   Disputed Request for Production and Defendant's Response ........................159

B.   DMG's Contentions and Points and Authorities ................................................160

C.   Anastasia's Contentions and Points and Authorities ...........................................168

IX. Issue No. 8: Request no. 21 for Production of Documents at Deposition ..........183

A.   Disputed Request for Production and Defendant's Response ........................183

B.   DMG's Contentions and Points and Authorities ................................................183

C.   Anastasia's Contentions and Points and Authorities ...........................................191

X.   Issue No. 9: Request no. 23 for Production of Documents at Deposition ..........206

A.   Disputed Request for Production and Defendant's Response ........................206

B.   DMG's Contentions and Points and Authorities ................................................207

C.   Anastasia's Contentions and Points and Authorities ...........................................216

XI. Issue No. 10: Matters for Examination At Deposition, Category no. 2................231

A.   Disputed Matter for Examination at Deposition .................................................231

B.   DMG's Contentions and Points and Authorities ................................................232

C.   Anastasia's Contentions and Points and Authorities ...........................................239

XII.   Issue No. 11: Matters for Examination At Deposition, Category no. 5............251

A.   Disputed Matter for Examination at Deposition .................................................251

B.   DMG's Contentions and Points and Authorities ................................................252

C.   Anastasia's Contentions and Points and Authorities ...........................................259

XIII.   Issue No. 12: Matters for Examination At Deposition, Category no. 6........267

A.   Disputed Matter for Examination at Deposition .................................................267

B.   DMG's Contentions and Points and Authorities ................................................268

C.    Anastasia's Contentions and Points and Authorities ..........................274

XIV.     Issue No. 13: Matters for Examination At Deposition, Category no. 12.....282

A.   Disputed Matter for Examination at Deposition ................................282

B.   DMG's Contentions and Points and Authorities ...............................283

C.   Anastasia's Contentions and Points and Authorities ..........................289

XV.   Issue No. 14: Matters for Examination At Deposition, Category no. 15.........297

A.   Disputed Matter for Examination at Deposition ................................297

B.   DMG's Contentions and Points and Authorities ...............................298

C.   Anastasia's Contentions and Points and Authorities ..........................305

XVI.     Issue No. 15: Matters for Examination At Deposition, Category no. 16.....313

A.   Disputed Matter for Examination at Deposition ................................313

B.   DMG's Contentions and Points and Authorities ...............................314

C.   Anastasia's Contentions and Points and Authorities ..........................320

XVII.     Issue No. 16: Matters for Examination At Deposition, Category no. 30.....328

A.   Disputed Matter for Examination at Deposition ................................328

B.   DMG's Contentions and Points and Authorities ...............................329

C.   Anastasia's Contentions and Points and Authorities ..........................336

XVIII.    Sanctions ...................................................................343

A.   DMG's Contentions and Points and Authorities ...............................343

B.   Anastasia's Contentions and Points and Authorities ..........................344

XIX.     Conclusion .................................................................346

A.   DMG's Conclusion .........................................................346

B.   Anastasia's Conclusion......................................................346

BH8255.1
1003-30730

# I. INTRODUCTORY STATEMENTS

## A. DMG's Introductory Statement

### 1. Brief Statement of the Case

The parties to this lawsuit are direct competitors, both operating websites and related services that connect women from the CIS to men worldwide. Since launching its website in 2003, DMG has continually commercially employed the word mark Dream Marriage in connection with its websites and promotional material; for more than two years, Dream Marriage[1] has been a service mark registered with the United States Patent and Trademark Office, Registration no. 3,760,949. In 2009, however, Defendant or entities acting at Defendant's direction and/or on Defendant's behalf purchased at least a dozen domain names containing DMG's mark (the "Infringing Domain Names"), either verbatim or with minor deviations, and used those Infringing Domain Names, confusingly similar to DMG's registered mark and website, to pull customers to Defendant's competing website(s).

If that wasn't enough, shortly thereafter the Defendant, or entities acting at Defendant's direction and/or on Defendant's behalf began a concerted campaign of screen-scraping information from DMG's website, compiling (at least) a database of women featured on DMG's website (the "Screen Scraping"). That database, in turn, was used by the Defendant, or entities acting at Defendant's direction and/or on Defendant's behalf, to launch a campaign of harassment and intimidation aimed at driving those women off of DMG's website and into an exclusive relationship with the Defendant.

The Defendant's operations are tightly intertwined with those of a Russian company, "IT Online," from which the Infringing Domain Names were managed, and from which most – if not all – of the Screen Scraping originated, either directly

---

[1] Recently amended to reflect DMG's actual use of the Dream Marriage mark (earlier registered as Dream-Marriage)

[2] DMG previously had served a first set of requests for production of documents under Rule 34 on Anastasia on March 15, 2011, and Anastasia responded to those requests. Instead of serving a second set of requests for production under Rule 34, DMG chose to serve requests under Rule

from servers owned and operated by IT Online, or from servers co-located in remote datacenters and controlled and/or managed by IT Online. The Defendant also alleges the involvement of a Russian entity identified by Anastasia as "Stolitza," whose operations appear to overlap completely with IT Online (collectively, Stolitza and IT Online are hereinafter the "Moscow Entities").

Defendant contends that in November, 2010, months after this lawsuit was filed, control of Anastasia passed to its newly installed President, Secretary and Treasurer, Alexey Eremin ("Eremin"), whose office shares an address with IT Online; Eremin was evidently the liaison between Defendant and IT Online.

The Moscow Entities apparently have *carte blanche* with regards to the services they perform on Anastasia's behalf; indeed, they hold themselves out as *being* Anastasia, creating and managing Internet and business activities in Anastasia's name, including operating its principal website, anastasiadate.com. The Defendant receives the revenues related to these activities, making disbursements at the direction of the Moscow Entities. Elena Sykes, the Defendant's founder, owner, and until the pendency of this litigation, sole officer and director ("Sykes"), has never had a problem with the conduct of the Moscow Entities, nor has she ever objected to their activities, despite multiple lawsuits stemming directly therefrom. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; 290:17-20; 334:22-335:4; 351:24-354:2.)

## 2. *Defendant's Discovery Failures Giving Rise to this Motion*

On July 28, 2011, DMG served Defendant via overnight mail with a notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), identifying certain specific categories of inquiry and requesting the production of certain documents. On August 17, 2011, Defendant's counsel advised that Sykes had been designated by Defendant to testify as to all matters noticed. (D.E. 66, ¶ 7.)

This deposition, originally scheduled for August 30, 2011, a few miles from the

1  Defendant's place of business in Bangor, Maine, was delayed by the disruption of

2  Hurricane Irene. On September 1, 2011, Defendant served objections to Plaintiff's

3  Requests for Production of Documents at Deposition, via regular mail.

4  As stipulated between counsel, the above deposition was instead held on

5  October 26 and 27, 2011 (the "PMK Deposition"), after DMG again served the

6  notice of deposition together with the categories of inquiry and requests for

7  production of documents.

8  However, at the PMK Deposition, DMG was dismayed to learn that

9  Defendant's designated witness was, in fact, not prepared as she was required to be,

10  claiming ignorance and acknowledging a complete lack of preparation on several

11  highly relevant areas of inquiry. In particular, Sykes claimed no ability to respond to

12  questions from November 2010 through the date of the deposition, the time period in

13  which Eremin, Defendant's conveniently installed President, had purportedly taken

14  over control of Anastasia. Sykes stated that she had made no inquiry of Eremin

15  because she was aware Plaintiff intended to depose Eremin. However, in October

16  2011, Eremin purportedly resigned from Anastasia, and indeed, Defendant is

17  currently seeking this Court's approval of its maneuvering, with its pending

18  application for a protective order blocking Plaintiff from taking Eremin's deposition.

19  (D.E. 81.) Sykes did not disclose the fact of Eremin's resignation during the PMK

20  Deposition. Sykes additionally deliberately did not prepare to respond to specific

21  categories of inquiry noticed, at the instruction of her counsel. (Ex. 5, 13:10-15:8;

22  96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15; 258:22-262:5.)

23  Finally, during the PMK Deposition, Plaintiff's counsel identified multiple

24  documents responsive to the served requests for production that should have been

25  produced by the Defendant, which were not produced. (Ex. 6, 12:20-23; 87:17-88:11;

26  93:25-95:6; 123:17-125:12; 212:4-25; 243:22-245:4, 247:9-248:3; 249:12-250:13;

27  256:16-258:3; 281:22-283:23; 290:17-20; 291:9-293:19; 296:3-299:11; 325:1-326:2;

28  360:1-21.) Exactly 12 hours and 9 minutes were spent on the record for the PMK

1  deposition. Plaintiff's counsel has been prejudiced by being unable to examine the
2  Defendant's designated witness as to those documents, and seeks production of same
3  and an opportunity to reconvene the PMK Deposition to address the deficiencies set
4  forth above. Defendant's counsel has not responded to requests to meet and confer
5  (Ex. 7, 8, 9, 10, 11); as such, Plaintiff now seeks this Court's assistance.

6      Plaintiff seeks fundamental information necessary to DMG's investigation into
7  Anastasia's activities and for the preparation of its expert witnesses and for trial.

8      **B.    Anastasia's Introductory Statement**

9      DMG initially served a joint stipulation on December 27, 2011. Exh. L. After
10  Anastasia served its portion of the joint stipulation on January 3, 2012, DMG
11  informed Anastasia that it was further revising its portion of the joint stipulation.
12  DMG's revised joint stipulation included several changes including significant changes
13  to its "relevancy" arguments.

14      Still, the "DMG's Introductory Statement" remains fraught with factual
15  misrepresentations. Anastasia will address these generally in its Introductory
16  Statement, and will address specific misrepresentations concerning deposition
17  testimony of Ms. Sykes in response to DMG's specific discovery requests.

18      ***1.    The Parties-In-Suit***

19      **(a)    Anastasia**

20      Anastasia is a small "mom-and-pop" company located in Bangor, Maine that
21  assists Western men in meeting and communicating with Russian and Eastern
22  European women. Exh. E (Tr. 200:10-16). Formed in 1993 by Elena Sykes, Anastasia
23  is one of the oldest and best known companies in the industry. Initially, the business
24  model primarily involved the sale and distribution by mail of catalogs that contained
25  photographs and profiles of Russian women submitted to Anastasia. Most of the
26  women use Russian or Ukrainian agencies ("Agencies") to assist them with getting
27  their profiles distributed. In 1997, Anastasia went online with the domain
28  russianbride.com, which offered online versions of the previously mailed catalogs.

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

Several years later, some of the Russian programmers who had helped Anastasia with the russianbride.com website came up with the idea for a new internet-based business in which both profiles and communications with the women would occur online. Exh. D (Tr. 147-149). Anastasia was not a technical or web-savvy company, and was skeptical of the concept, so the Russian programmers developed the website on their own, and later formed Stolitza LLC and other entities (herein collectively referred to as "the Moscow Entities") to exploit the concept. *Id.* Anastasia entered into agreements with Stolitza as an independent contractor to operate the website under the anastasiaweb.com domain name. *Id.* The Moscow Entities took over most other aspects of the business, including the collection of profiles and the creation of web content, as well as interactions with the Agencies. *Id.* The website later became known as anastasiadate.com.

Since then, Anastasia's role has primarily been limited to the men's side of the business, including customer service with men in the U.S., and arranging for overseas tours. Anastasia discontinued publishing the catalogs around 2005. Anastasia's five employees (three customer service employees who answer telephone calls, one tour salesperson, and an office manager) contrasts with the Moscow Entities who currently employ over 240 persons. Anastasia receives bills from Stolitza for the work performed by the Moscow Entities. Tr. 124 (Exh. 5).

Having contracted out all the website functions and agency interactions to the Moscow Entities, Anastasia only has access to information that the Moscow Entities are willing to share, and the Moscow Entities have been unwilling to provide information in response to discovery served on Anastasia in this litigation.

### (b)   DMG

DMG was formed in 2006, and is a newer player in the online introduction business. Exh. D (Tr. 218). DMG lists several Russian nationals as officers and directors. Exh. G. Since its inception, DMG has attempted to copy Anastasia's business model. Starting in 2010, the dream-marriage.com website, which DMG

5

claims to own, began offering Russian and Ukrainian Agencies an "invisibility" feature to allow women from these Agencies to remain on the website while hiding that fact from Anastasia. Exh. H (DM157-161, 165 and 167). This was done in order to help the Agencies evade their contractual obligations with some of the Moscow Entities who had contracted to have the women appear exclusively on the anastasiadate.com website . This technological solution apparently proved less than ideal, so DMG filed the instant action on July 8, 2010, apparently out of frustration at its inability to compete with the Moscow Entities in recruiting women for the dream-marriage.com website.

From the outset, DMG has been using discovery in this action to seek information from Anastasia concerning matters that are unrelated to the two specific claims asserted in its Complaint. Anastasia believes that DMG is using this action as a fishing expedition to obtain information about the business practices of a competitor.

### 2.    *DMG's Claims*

Generally speaking, DMG has asserted two narrow types of claims.

First, DMG asserts that the Moscow Entities previously purchased and used domain names that infringed DMG's DREAM-MARRIAGE trademark. (Dkt. 52). Those domain names are no longer in use, and they provided less than $2000 in total sales during the brief period of time they were in use.

Second, DMG asserts a computer-fraud-and-abuse (CFAA) claim, alleging that the Moscow Entities gained unauthorized access to the dream-marriage.com website in a campaign of harassment against the women found on the site. (Dkt. 52).

Significantly, the anastasiadate.com domain name and the operation of that website are not at issue in this action. Nor are Anastasia's customer service and tour functions.

### 3.    *Discovery At Issue*

For Issues 1 through 9, DMG repeats the same arguments over and over again in seeking to compel production of documents that are not relevant to any of DMG's

1   claims. The requests are facially over broad, and seek information which DMG could

2   use for competitive business purposes.

3     For Issues 10 through 16, DMG also repeats the same arguments for each in

4   seeking to compel further deposition testimony from Anastasia's 30(b)(6) witness. But

5   DMG already has had two full days to conduct that deposition, and can point to no

6   relevant question that was asked and not answered based on information reasonably

7   within Anastasia's possession, custody or control.

8

9   **II. ISSUE NO. 1: REQUEST NO. 2 FOR PRODUCTION OF**

10    **DOCUMENTS AT DEPOSITION**

11    **A. Disputed Request for Production and Defendant's Response**

12  REQUEST FOR PRODUCTION NO. 2

13    All DOCUMENTS relative to Communications and means of communications

14  with any person or entity that provides services of generating revenue, monitoring

15  competitors and competitors' websites, registering domain names on behalf of AI or

16  as a source of referral customers for AI from January 1, 2009 to present.

17  RESPONSE TO REQUEST NO. 2

18    In addition to its General Objections incorporated herein, Anastasia objects to

19  this request on the grounds that it is confusingly written and unintelligible. The terms

20  and phrases "All DOCUMENTS," "relative to," and "Communications and means of

21  communications with any person or entity that provides services of generating

22  revenue, monitoring competitors and competitors' websites, registering domain

23  names on behalf of AI or as a source of referral customers for AI" are vague,

24  ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead

25  to the discovery of admissible evidence. Anastasia further objects to the extent that

26  this request is directed to documents outside the subject matter and temporal scope of

27  the acts alleged in the Complaint, and is therefore overly broad, unduly burdensome,

28  and not likely to lead to the discovery of admissible evidence. Anastasia further

objects to the extent that this request is directed to documents not within the possession, custody or control of Anastasia. Anastasia further objects to the extent this Request seeks information that is protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of its General Objections and the immediately preceding specific objections and with the exception of documents subject to the attorney-client privilege or work product immunity, Anastasia answers as follows: Other than documents already produced or being produced to other requests, Anastasia will not produce additional documents to this request as currently understood.

## B.    DMG's Contentions and Points and Authorities

The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms. Sykes testified that the companies in Moscow known as Stolitza and IT-Online (together referenced by the witness as the "Moscow Entities") have carte blanche to perform any service on behalf of AI, knows that these two companies hold themselves out as being AI, that they created and manage all internet activities and business activities of AI including and not limited to AI's primary website Anastasiadate as well as all of AI's affiliates, that all customer service calls are answered at their offices, that AI receives all revenues and makes disbursements at their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. Exh. 4 (44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices

1  requesting wire transfers and bank records showing wire transfers to companies

2  Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to

3  interference with contractual relations between Plaintiff and Plaintiff's agencies as well

4  as unauthorized access to Plaintiff's website and the screen scraping thereof. The

5  witness confirmed that wire transfers were made to these entities by AI at the request

6  of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-

7  299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that

8  she has provided invoices to her counsel, but no invoices were produced at the

9  deposition. (Ex. 6, 123:17-125:12.) Plaintiff's counsel also requested phone records for

10  (800) numbers relative to AI's business to establish that AI was paying for the phone

11  bills for the customer service of AI which was being handled out of the Moscow

12  offices. (Ex. 6, 281:22-283:13.) Email correspondence was also requested with respect

13  to communications between Elena Sykes and Andrey Ryabchikov and Oleg Nochka

14  who managed the Moscow office. (Ex. 6, 212:4-25; 249:12-250:13, 256:16-258:3.)

15  Additionally emails between Elena Sykes and Lydia Kara of the Moscow office were

16  requested because Ms. Sykes testified that Ms. Kara requested assistance with placing

17  ads in the United States. (Ex. 6, 243-22-245:4, 247:9-248:3.) Again, AI gave carte

18  blanche to IT-Online (Moscow entity) to handle all of its internet activities, including

19  complete access to it Google Analytics accounts. At the deposition Plaintiff's counsel

20  also requested copies of the invoices and payment records with respect to the Google

21  Analytic accounts 2981669 and 1020911 because the accounts are presumed to be in

22  AI's name. (Ex. 6, 290:17-20; 291:9-293:19.)

23       Following the deposition, on November 7, 2011 Plaintiff sent a letter to

24  Defendant's counsel with the following request:

25

26       To follow up the PMK deposition document requests, as referenced at

27       the deposition of your client, specific documents responsive to the

28       document categories were requested to be produced, most relating to

your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;
- All emails between your client and Andrey Ryabichikov from January 2009 to present;
- All emails between your client and Oleg Nochka from January 2009 to present;
- All emails between your client and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and
- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

On November 9, 2011, Plaintiff's counsel again requested copies of the invoices for Google accounts 2961669 and 1020911 to be produced responsive to the PMK document requests. (Ex. 8.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to production of the Person Most Knowledgeable ("PMK") documents that were requested at the deposition of your client and further identified in my November 7, 2011 letter and November 9,

10

2011 email, you advised that you will have to confer with your client with respect all the business emails between your client and Andrey Ryabichikov, Oleg Nochka and Alexey Eremin between January 1, 2009 to present, as well as with regard to the (800) phone number records. As we discussed, if there are no records of (800) phone bills to your client from January 2009 to present, we will accept exemplars of bills dating back to January 2006, as we have your client's internet website pages dating back to 2006 that are relevant in this case. We do need verification from you that your client does not have the (800) phone number records requested. You advised that you will advise me by November 21, 2011 regarding the above.

With respect to all the other documents requested, you advised that the documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton. (Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer has been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Defendant's objections are also disingenuous:

**Privilege**: Parties withholding documents as privileged should identify and

1  describe the documents in sufficient detail to enable the demanding party to contest

2  the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena);

3  *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.*

4  185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege

5  log for documents withheld on grounds of privilege or work product). Defendant has

6  not provided a privilege log, nor has it identified documents with sufficient detail or

7  stated the specific privilege applicable to each identified document that was withheld.

8  *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996).

9  Defendant's generalized, nonspecific claims of privilege constitute an implied waiver

10  of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem.*

11  *Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges

12  are not permitted to provide mere 'blanket objections' to discovery requests." *Am.*

13  *Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July

14  14, 2003).

15      **Oppressive and Burdensome**: With respect to Defendant's objection that

16  this Request is "overbroad" and "burdensome", where a party resists a discovery

17  request claiming that it is unduly burdensome, the burden rests on the party raising

18  the objection to show that responding would be *unduly* burdensome. *Snowden v.*

19  *Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp.

20  2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient

21  basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137

22  F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is

23  overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium*

24  *Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection

25  must be supported by affidavits or other evidence which demonstrates the burden.

26  *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60

27  (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection

28  lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate

attempts to obtain discovery and prepare this case. This objection was improperly asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon burdensomeness the objecting party must particularize the basis for the objection as generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

**Vague and Ambiguous**: "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity . . . Respondents should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories. To clarify their answers, respondents may include any necessary, reasonable definition of such terms or phrases." *Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677 (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

**Relevance**: AI and the Moscow entities formed the internet business together. Since the internet business was formed, AI has known and has authorized the Moscow entities represent to the public that the Moscow entities were and are AI. There is an implication that the Moscow entities provide exclusive services for AI. AI cannot assess or distinguish the division of ownership of business assets or the rights of ownership thereto. AI pays the Moscow entities a percentage of all revenues and AI accepts the benefits of all services provided by the Moscow entities. AI has given carte blanche to the Moscow entities to manage all internet and agency activities. AI never objected to the Moscow entities activities, including the activities that form the basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20, 334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-

13

25, 296:6-298:14, 325:5-24)

Further, The PMK witness testified that records exist or may exist with respect to many of the documents that have been requested to be produced. See Exh. 6 (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24, 360:5-21)

Plaintiff's investigation has revealed that the Moscow entities have conducted the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the discovery sought herein to establish a partnership between AI and the Moscow entities, or alternatively, that AI ratified the activities of the Moscow relative to Plaintiff's complaint, which is relevant.

"Under California Corporations Code section 16202(a), 'the association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a). 'Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973). 'Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.' *Connolly,* 111 Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to have been organized from a reasonable deduction from the acts and declarations of the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a] joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing & Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

relationship such as that of partners has been created, the courts are guided not only by the spoken or written words of the contracting parties, but also by their acts." *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners, Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

"The issues we deal with involve the application of traditional principles of agency law. Two basic rules are involved: (1) ratification by a person of an act purportedly done on his behalf not only creates the relationship of principal and agent but also constitutes approval by the ratifier of the purported agent's act, relieving such agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby relieving the wrongdoer agent of liability to the principal. "

"The first rule is embodied in Civil Code section 2307 which provides: 'An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification.'"… 'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' (Ballard v. Nye (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App. 420, 428, 267 P. 356; Rest.2d Agency, § 83.)

"Generally, the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act. (Ballard v. Nye, supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100" *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

"Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be adopted expressly or ... by implication based on conduct of the purported principal

from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

*Relevant* information may be discoverable if it "appears *reasonably calculated to lead* to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added). Plaintiff has the *right* to discover non-privileged information "relevant to the claim or defense of *any party,* including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed R. Civ. P. 26(b)(1), (emphasis added). This includes information that Plaintiff may use to support its claims or defenses of Defendant, including the *identity* of any *witness or document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment to Fed R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if there is <u>any</u> possibility that the information sought may be relevant to the subject matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

**Duty to Inquire:** DMG contends that with respect to Defendant's agents, partners and affiliates, Defendant has a duty to "secure all information available to" the corporation, including "information within the personal knowledge of former ... employees, employed ... at the time this action commenced [and even] information possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such information as is available from the corporation itself or from sources under its control ... [i]f the corporation can obtain the information from sources under its control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all responsive information available from [it] or from sources under [its] control."

*Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D. Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection.

## C.     Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims. DMG's Request No. 2 is typical.

In response to DMG's long-winded, rambling and disjointed contentions regarding its self-styled "Issue No. 1" concerning Request For Production No. 2, Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

### 1.     Discovery At Issue

17

On its face, DMG's Request No. 2 seeks "all documents relative to communications and means of communication with any person or entity that provides services of generating revenue, monitoring competitors and competitors' websites, registering domain names on behalf of AI or as a source of referral customers for AI from January 1, 2009 to present," regardless of whether they are connected in any way to the two narrow claims asserted by DMG in this action. Anastasia obejcted to this overbroad fishing expedition by a competitor to obtain commercially sensitive information that was irrelevant to DMG's claims, but which DMG could use for competitive business purposes.

A request to produce all communications by and between a party and another entity with whom it does business is facially over broad and not reasonably calculated to lead to the discovery of relevant admissible evidence.

DMG's motion to compel should be denied because:

- Anastasia has already produced documents responsive to this request;
- DMG now seeks additional documents that are not relevant to any claim or defense in the present action;
- the request is unduly burdensome because a Rule 30(b)(2) request should be limited to a few and simple documents;
- the request as written is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and
- the documents DMG now seeks to compel are not reasonably responsive to this particular request.

To provide further context, Anastasia will briefly outline the relevant sequence of discovery which led to this discovery request.

### (a)      DMG's Original Notice of Deposition

On July 28, 2011, DMG served a notice of deposition for Anastasia under Rule 30(b)(6) to take place in Bangor, Maine on August 31, 2011. The notice also included

18

twenty-two requests for production of documents under Rule 30(b)(2) with production to take place at the deposition.[2] Anastasia later served objections to the Rule 30(b)(6) categories and the Rule 30(b)(2) requests.

Prior to the deposition, the Court issued an order allowing DMG two days to conduct the 30(b)(6) deposition, even though DMG had been notified that a single witness (Elena Sykes) would be produced. (Dkt. 64).

On August 28, 2011, while in route to Bangor for the deposition, Plaintiff's counsel Bruce Fields and Defendant's counsel Craig Bailey became stranded in Detroit, Michigan because the connecting flight from Detroit to Bangor had been cancelled due to Hurricane Irene. Counsel were unable to secure alternative transportation to Bangor to proceed with the scheduled deposition, so the parties agreed to reschedule the deposition for October 26th and 27th in Bangor, Maine. (Dkt. 76).

### (b)    DMG's New Notice of Deposition

On September 27, 2011, DMG served a new notice for the deposition . Again, the new notice included twenty-three requests for production of documents under Rule 30(b)(2) with production to take place at the deposition in Bangor, Maine. The deposition categories and requests for production were nearly identical to DMG's original notice. Anastasia later served objections to both the Rule 30(b)(6) topics and to the Rule 30(b)(2) requests. Exhs. A and B. As noted earlier, Anastasia previously had served objections to the Rule 30(b)(6) categories and to the Rule 30(b)(2) requests set forth in DMG's original notice.

### (c)    The 30(b)(2) Production At The Deposition

Anastasia produced several hundred pages of documents (production numbers AD00192-AD00679) at the 30(b)(6) deposition, which was taken on October 26 and

---

[2] DMG previously had served a first set of requests for production of documents under Rule 34 on Anastasia on March 15, 2011, and Anastasia responded to those requests. Instead of serving a second set of requests for production under Rule 34, DMG chose to serve requests under Rule 30(b)(2) for production at the 30(b)(6) deposition.

27. Anastasia also produced a list identifying numerous previously-produced documents responsive to DMG's 30(b)(2) document production requests. Over the two day period, DMG made various verbal requests for additional documents, but did not link them to any specific 30(b)(2) request.

### 2.     Legal Standards

DMG's portion of the joint stipulation consists almost entirely of abstract legal arguments that are not linked to the specific document production requests or documents that DMG seeks to compel.

### (a)     Rule 26(b)

Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses," and not merely the "subject matter" of the case. Only relevant information can be discovered—not all information that might lead to the discovery of admissible evidence. Advisory Committee notes to Fed. R. Civ. P. 26(b)(1) (2000). With the 2000 amendments to Rule 26(b)(1), the Advisory Committee acknowledged that concerns among the bench and bar over cost, delay, and "over-discovery" in general had become persistent. Indeed, Rule 26 expressly prohibits discovery that is overly broad, unduly burdensome, costly, duplicative or unnecessary.

The party requesting discovery bears the burden of establishing relevancy of the requested discovery to the claims or defenses in the action. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Where a discovery request is overly broad on its face, the party resisting discovery has no need to support its objections. *Id.* Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

DMG's motion fails to make any case for the relevance of the documents it seeks. Instead, DMG seems to merely assume their relevance. As such, DMG has failed to meet its burden.

### (b)     Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents.

Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for Documents at a deposition are appropriate where "the documents are few and simple"); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's twenty-three convoluted, overly broad and ambiguous requests were completely inappropriate under Rule 30(b)(2).

### 3. DMG's Rule 30(b)(2) Request For Production No. 2

As previously discussed, DMG's Request No. 2 on its face seeks "all" documents "relative to" communications and means of communications with "any person or entity that provides services of generating revenue, monitoring competitors and competitors' websites, registering domain names on behalf of AI or as a source of referral customers for AI from January 1, 2009 to present." DMG's motion does not even try to explain away the numerous ambiguities inherent in this request. Indeed, the actual wording of the request as written is never discussed in DMG's argument.

There is no reasonable interpretation of this request that would be commensurate with the eight specific demands for production being made by DMG in this motion and discussed in the section 4.

Anastasia has already produced documents (AD108-129 and AD689-938) in response to this request. DMG's motion to compel additional production should be denied.

### (a) DMG Has Not Established That Request No. 2 Seeks Relevant Discovery

As the party seeking to compel production, DMG has the burden of establishing that the requested discovery is relevant to a claim or defense in this action. During the meet-and-confer process for this motion, DMG erroneously stated that it was "not required to educate [Anastasia] on the relevancy" of the discovery it was seeking. Exh. J.

In its first joint stipulation (Exh. L), DMG's only relevancy argument was that "sales information requested is clearly relevant in a trademark claim." But DMG's

BH8255.1
1003-30730

Request No. 2 is not directed in any meaningful way to sales information relating to the use of the allegedly infringed mark, but generally to "any person or entity that provides services of generating revenue." A trademark claim does not give *carte blanche* to discovery of a party's sales. Moreover, Anastasia has already produced documents regarding the sales associated with the websites that DMG has accused of infringing its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

In dropping the trademark argument, DMG has effectively conceded that the discovery its seeks to compel is not relevant to the trademark claim (which is consistent with the fact that none of the discovery requests at issue are directed to DMG's trademark). That leaves the claim based on unauthorized access and harassment. DMG has alleged that these activities were undertaken by persons acting in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for production is not limited to the facts surrounding these particular claims. Instead, it is broadly directed toward Anastasia's business in general. DMG fails to show how the specific information it seeks is relevant to DMG's claims. It also fails to explain how

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1   the information sought will lead to admissible evidence.

2         DMG misrepresents the record in an attempt to support its belated agency

3   argument.

4         For example, DMG claims that it needs discovery regarding the business

5   relationship between Anastasia and the Moscow Entities because of an "implication"

6   that they provide "exclusive services" to Anastasia. In addition to the dubious

7   relevancy of this allegation, the fact is that Anastasia already has produced copies of

8   its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

9   and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

10   ranging discovery. While DMG cites a large number of cases for abstract principles of

11   agency law, DMG fails to apply any of those principles to the facts of this case.

12   DMG's legal theories appear to be nothing more than post-hoc rationalizations to

13   justify intrusive discovery into a competitor's business.

14         DMG also attempts to suggest that one is an agent "at all times," but one "may

15   be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

16   *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

17   part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

18   Ct. 1380, 143 L. Ed. 2d 462 (1999).

19         In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

20   DMG has refused to provide Anastasia with even basic information concerning the

21   formation, ownership and management structure of various DMG-related entities

22   who also have claimed ownership of the DREAM MARRIAGE trademark and

23   website that DMG now claims to own. For example, in response to Anastasia's

24   requests for production of documents concerning DMG's relationship with a

25   company called Dream Marriage, Inc. that previously owned the DREAM-

26   MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

27   dream-marriage.com website, DMG has either refused to produce any documents at

28   all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

has only produced license agreements or assignments. Yet DMG hypocritically finds that Anastasia's production of similar documents concerning the relationship with the Moscow Entities somehow inadequate.

DMG also claims that Anastasia "pays the Moscow entities a percentage of all revenues," in an apparent attempt by DMG to create the illusion of a partnership. This allegation is completely false. The Moscow entity sends invoices to Anastasia for services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is now seeking the attachments to these invoices which give details of the work underlying the invoices, even though such attachments would not be necessary if Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG. Even if DMG's allegation were true, which it is not, it does nothing to support the relevancy of the overly broad and intrusive discovery that DMG now seeks.

Nor do the deposition transcript pages cited by DMG support its wild accusations.

For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by DMG for the proposition that the Moscow entities are Anastasia's agents, actually establish that Anastasia does not control the activities of the Moscow Entities, and this lack of control is contrary to DMG's agency theory.

Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies and women, while Anastasia handles the US customer relationships. This contradicts DMG's assertion that Anastasia "cannot assess or distinguish the division of [business]" between Anastasia and the Moscow Entities.

Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on page 162 (Exh. E), suggests that employees of the Moscow Entities occasionally represent themselves to be part of "Anastasia Date" in media publications and for

customer relations purposes, and that this sometimes leads to confusion as to who "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4) cited by DMG also concern similar issues.

Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its GoDaddy registration account in order to manage of the websites as authorized under the service agreement.

Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's periodically sends money to other Moscow entities as requested by Stoliza as general payments for amounts owed to Stolitza. DMG attempts to mischaracterize these payments as "making disbursements at the direction of the Moscow Entities" in its Introductory Statement to suggest erroneously that the Moscow Entities controlled Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's request under its Service Agreement is not relevant to any of the acts alleged in DMG's complaint.

At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the services we have received from the Russian entity." She did not say, as DMG suggests, that she condoned or even had knowledge of the acts alleged in the complaint.

At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same building" as the Moscow Entities, but not that he shares the same office with the Moscow Entities as DMG erroneously implies.

DMG also relies on deposition testimony that certain documents may exist, and appears to suggest that "relevance" is established merely because DMG has demanded their production. By DMG's circular reasoning, a document is relevant if DMG demands its production, and that document must be produced if DMG can establish its existence. But this is not the law. As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery to the claims or

1  defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

2  To the extent DMG may later try to argue that other entities such as IT Online,

3  Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's

4  Complaint, DMG's request for production No. 2 is not limited to DMG's claims, but

5  is broadly directed toward all documents concerning an individual or entity who

6  provides "services of generating revenue." There is simply no basis for DMG, a

7  competitor, to demand that Anastasia provide such sweeping information, including

8  information having nothing to do with DMG's claims.

9  **(b)     Specific Objections To DMG's Request No. 2**

10  Anastasia's objections to DMG's Request No. 2 were particularized, well-

11  founded, and reasonable.

12  **(i)     DMG's Improper Use Of Rule 30(b)(2)**

13  Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2)

14  requests as being improper because a request for documents at a deposition is

15  appropriate only where "the documents are few and simple." Advisory Committee's

16  Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No.

17  98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an

18  overly broad and excessively numerous production of documents at a deposition was

19  an abuse of Rule 30(b)(2).

20  Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production

21  requests appear to be part of a ploy by DMG to demand so many documents at the

22  30(b)(6) deposition, in a vague and incomprehensible manner, that it would

23  impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an

24  opportunity to demand that the deposition be resumed to ask about additional

25  documents. Such a ploy is contrary to the rules.

26  **(ii)     Privilege**

27  Anastasia made a general objection to each of DMG's document production

28  requests that placing documents generated after the filing of DMG's Complaint on a

1   privilege log would be unduly burdensome. Clearly, requiring that every

2   communication between Anastasia and its counsel, or between counsel and expert

3   consultants be recorded on a privilege log would be unreasonable and unduly

4   burdensome.

5        DMG has made a similar objection in response to Anastasia document requests

6   (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one

7   would have expected DMG to have generated many attorney-client privileged or work

8   product documents prior to filing suit.

9        In any event, neither DMG nor Anastasia have produced a privilege log

10  identifying any post-filing documents. This is a non-issue.

11       **(iii)   Request No. 2 Is Overly Broad And Burdensome**

12       As previously discussed, a request for production of documents at a deposition

13  under Rule 30(b)(2) is appropriate only where "the documents are few and simple."

14  Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL

15  817853, at *5.

16       Rather than seek a few and simple documents, DMG's Request No. 2 seeks

17  production of "All DOCUMENTS" on a wide range of topics. Such a request is

18  overly broad and unduly burdensome, and therefore objectionable where, as here, the

19  request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist.

20  LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in

21  making a similar objection to Anastasia's request for production of "all" documents.

22  Exh. F at 5 et al.

23       Moreover, if a party's request for information is overly broad or otherwise

24  objectionable on its face, the burden is not shifted to the party resisting discovery.

25  *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). DMG's approach

26  here appears to be to make overly broad requests and improperly place the burden on

27  Anastasia as a set-up in order to then blame Anastasia for failing to produce specific

28  documents in response.

Furthermore, as previously discussed, Anastasia has produced documents responsive to this request, which is more than can be said of DMG's responses to Anastasia's requests for similar basic information about entities related to DMG.

### (iv)    Request No. 2 Is Vague And Ambiguous

On its face, DMG's Request No. 2 is convoluted, vague, ambiguous, and confusingly framed. For example, it is unclear whether the request seeks documents that are communications, documents referencing a communication, documents that reference the means used to send communications, and/or some other variation or subset. Moreover, it is unclear what the phrase "services of generating revenue" is intended to mean. This appears to be a fictitious term made up by DMG.

### (v)    Duty To Inquire

DMG argues that Anastasia has a duty to inquire of "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. at 14-15, 258-259 and 261-262). DMG's assertions to the contrary are based on misrepresentations of deposition testimony.

### 4.    DMG's Disconnected Demand For Production

Anastasia has already produced documents (e.g., AD108-AD129, AD192-AD679, and AD689-AD938) that are responsive to DMG's document production request, a fact which DMG ignores. Instead, DMG now seeks additional documents that are not responsive to the request, and not relevant to any claim or defense in this action.

While denominated as a motion to compel production in response to DMG's Request No. 2 , a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6)

1  deposition).

2  •      All invoices from Stolitza and IT-Online from January 2009 to present

3         together with all attachments to invoices referencing analytical service,

4         customer service, programming service and server lease and hosting;

5  •      All emails between Defendant and Andrey Ryabichikov from January 2009

6         to present;

7  •      All emails between Defendant and Oleg Nochka from January 2009 to

8         present;

9  •      All emails between Defendant and Alexey Eremin from January 2009 to

10        present;

11 •      All documents, invoices, emails, bank records, accounting records that

12        relate to any funds or wire transfers from Defendant to Lookintom from

13        January 2009 to present;

14 •      All documents, invoices, emails, bank records, accounting records that

15        relate to any funds or wire transfers from Defendant to Krypton from

16        January 2009 to present;

17 •      All phone billing records for any (800) number used by Defendant or with

18        reference to Defendant's business activities from January 2009 to present,

19        and to the extent that no billing records exist, exemplars of bills dating

20        back to January 2006; and

21 •      All invoices for Google accounts 2961669 and 1020911.

22        These overly broad categories of documents are neither relevant to DMG's

23 claims in this action, nor responsive to Request No. 2. DMG has demanded these

24 documents in connection with this particular request, but has made no effort to

25 establish how those documents are allegedly responsive to this request. Nevertheless,

26 Anastasia will address each in turn.

27                    **(a)    All Invoice Attachments From Stolitza and IT Online**

28        In an attempt to resolve a dispute over the production of Stolitza's invoices,

29

Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's requests or claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the running of anastasiadate.com website. There is no reference to the accused domain names, or to any accessing or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or to any accessing or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

The subject matter of DMG's demands is, simply put, untethered to the claims in this action. Instead, DMG's demand appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the two narrow claims DMG is asserting in this action.

### (b)    All emails with Andrey Ryabichikov

None of the requests for production that DMG seeks to compel refers to Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr. Ryabichikov without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Ryabichikov.

1    In short, DMG has made yet another overly broad demand for production of

2    documents without making any attempt to establish relevancy. DMG's demand

3    appears to be designed for harassment and to seek information regarding the

4    operation of a competitor's business unrelated to the claims DMG is asserting in this

5    action.

6              **(c)     All emails with Oleg Nochka**

7    DMG also is demanding production of all emails with Oleg Nochka without

8    any subject matter limitation over a three-year period of time.

9    During the 30(b)(6) deposition, there were no questions or answers establishing

10   any relevant email communication between Anastasia and Mr. Nochka.

11   Again, DMG has made an overly broad demand for production of documents

12   without making any attempt to establish relevancy. DMG's demand appears to be

13   designed for harassment and to seek information regarding the operation of a

14   competitor's business unrelated to the claims DMG is asserting in this action.

15             **(d)     All emails with Alexey Eremin**

16   None of the requests for production that DMG seeks to compel refers to

17   Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's

18   former President, Mr. Eremin, without any subject matter limitation over a three-year

19   period of time. Mr. Eremin was not even President of Anastasia until November

20   2010, and he had no involvement in Anastasia's business activities prior to that time.

21   Exh. D (Tr. 99, and 329).

22   Again, DMG has made an overly broad demand for production of documents

23   without making any attempt to establish their relevancy to this action. Testimony was

24   given by Ms. Sykes at the 30(b)(6) deposition that Mr. Eremin was in fact contacted

25   and had indicated having no knowledge relating to the claims being asserted by DMG

26   in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover, testimony was

27   given that there were no email communications between Anastasia and Mr. Eremin

28   except for a few litigation-related matters that are immune from discovery as work

31

1 | product and the attorney-client privilege. Exh. D (Tr. 104).

2 | **(e)    All wire transfers to Lookintom**

3 |     DMG also is demanding "[a]ll documents, invoices, emails, bank records,

4 | accounting records that relate to any funds or wire transfers from Defendant to

5 | Lookintom from January 2009 to present." DMG has made no showing why such a

6 | broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of*

7 | *P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

8 | financial condition was not relevant to issues of whether contractor was fully

9 | compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

10 | ed.).

11 |     At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been

12 | made to Lookintom at the request of Stolitza. These payments were not linked to any

13 | specific Stolitza invoice, but were applied against the outstanding balances due Stoliza

14 | by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion

15 | in its motion, there are no invoices from Lookintom to Anastasia, and no invoices

16 | requesting payment to Lookintom.

17 |     The history of payments made by Anastasia to Lookintom to satisfy amounts

18 | owed to Stolitza is not relevant to any claim or defense in this action, and DMG has

19 | made no attempt to establish any. The fact that Anastasia made payments to

20 | Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to

21 | any claim or defense in this action. Nor would the specific amounts paid as reflected

22 | in bank statements be relevant.

23 | **(f)    All wire transfers to Kirpton**

24 |     DMG also is demanding "[a]ll documents, invoices, emails, bank records,

25 | accounting records that relate to any funds or wire transfers from Defendant to [sic]

26 | Krypton from January 2009 to present," but has made no showing why such a broad

27 | demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W.*

28 | *Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

32

financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

As an initial matter, Anastasia has made no payments to "Krypton." At Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of a document identifying Kirpton and could have served discovery requests directed towards Kirpton prior to the deposition, but chose not to do so, apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted claims or document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

**(g)    All Phone Billing Records For Any (800) Number**

DMG has given no reason why "[a]ll phone billing records for any (800)

number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006" are relevant to this action. As previously indicated, customer service is not at issue in this action. Moreover, these phone records are not responsive to DMG's Request No. 2. In any event, Anastasia has already informed DMG that Anastasia has no relevant phone billing records to produce.

### (f)     All invoices for Google Accounts

DMG also has given no reason why "[a]ll invoices for Google accounts 2961669 and 1020911" are relevant to this action. Google was not involved in the acts alleged in its Complaint, and these invoices are not relevant to the claims or defenses in this action. Moreover, these Google documents do not appear responsive to DMG's Request No. 2.

### 5.     Concluding Statement Re DMG's Issue No. 1

As has become its custom in this action, DMG's counsel opens his declaration in support of DMG's motion to compel with a diatribe against what he claims to be Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery conduct. Anastasia has actually produced more documents to DMG than DMG has produced to Anastasia in this action (not including computer logs that DMG produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's requests for production, DMG stated that "DMG will not produce documents responsive to this request." Exh F.

DMG's motion to compel production in response to its Request No. 2 should be denied because the additional documents that DMG seeks are not relevant to any claim or defense in the present action. In any event, responsive documents have already been produced by Anastasia, and DMG's relevancy argument does not apply to the additional documents that it now seeks.

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

III.    **ISSUE NO. 2: REQUEST NO. 4 FOR PRODUCTION OF DOCUMENTS AT DEPOSITION**

A.    **Disputed Request for Production and Defendant's Response**

REQUEST FOR PRODUCTION NO. 4

All DOCUMENTS relative to the sources, including the name address and phone number, and the nature of the business relationship between AI and its sources for which AI acquires women featured on the AI website, or websites that refer customers to AI, or are a source of revenue to AI, or to any partner of AI since January 1, 2009 to present.

RESPONSE TO REQUEST NO. 4

In addition to its General Objections incorporated herein, Anastasia objects to this request on the grounds that the request is confusingly written and unintelligible. The terms and phrases "All DOCUMENTS," "relative to," "the sources," "name address," "the nature of the business relationship," "its sources," "the AI website, or websites that refer customers to AI, or a source of revenue to AI, or to any partner of AI" are vague, ambiguous, overly broad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Seeking all documents regarding all sources of women, customers, or revenue, is not relevant to the acts alleged in the Complaint.

Anastasia further objects to the extent that this request is directed to Documents not within the possession, custody or control of Anastasia.

Anastasia further objects to the extent that this request is directed to documents outside the subject matter or temporal scope of the acts alleged in the Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead to the discovery of admissible evidence.

Subject to and without waiver of its General Objections and the immediately preceding specific objections and with the exception of documents subject to the attorney-client privilege or work product immunity, Anastasia answers as follows:

Anastasia has no additional documents to produce.

**B.      DMG's Contentions and Points and Authorities**

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition.

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;

- All emails between your client and Andrey Ryabichikov from January 2009 to present;

- All emails between your client and Oleg Nochka from January 2009 to present;

- All emails between your client and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and
- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to all the other documents requested, you advised that the documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton.

(Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested.(Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested. Defendant's objections are also disingenuous:

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

**Privilege**: Parties withholding documents as privileged should identify and describe the documents in sufficient detail to enable the demanding party to contest the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena); *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.* 185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege log for documents withheld on grounds of privilege or work product). Defendant has not provided a privilege log, nor has it identified documents with sufficient detail or stated the specific privilege applicable to each identified document that was withheld. *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996). Defendant's generalized, nonspecific claims of privilege constitute an implied waiver of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem. Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges are not permitted to provide mere 'blanket objections' to discovery requests." *Am. Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July 14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that this Request is "overbroad" and "burdensome", where a party resists a discovery request claiming that it is unduly burdensome, the burden rests on the party raising the objection to show that responding would be *unduly* burdensome. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137 F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection must be supported by affidavits or other evidence which demonstrates the burden. *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection

lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate attempts to obtain discovery and prepare this case. This objection was improperly asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon burdensomeness the objecting party must particularize the basis for the objection as generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

**Vague and Ambiguous**: "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity . . . Respondents should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories. To clarify their answers, respondents may include any necessary, reasonable definition of such terms or phrases." *Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677 (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

**Relevance**: AI and the Moscow entities formed the internet business together. Since the internet business was formed, AI has known and has authorized the Moscow entities represent to the public that the Moscow entities were and are AI. There is an implication that the Moscow entities provide exclusive services for AI. AI cannot assess or distinguish the division of ownership of business assets or the rights of ownership thereto. AI pays the Moscow entities a percentage of all revenues and AI accepts the benefits of all services provided by the Moscow entities. AI has given carte blanche to the Moscow entities to manage all internet and agency activities. AI never objected to the Moscow entities activities, including the activities that form the basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See

39

Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20, 334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-25, 296:6-298:14, 325:5-24)

Further, The PMK witness testified that records exist or may exist with respect to many of the documents that have been requested to be produced. See Exh. 6 (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24, 360:5-21)

Plaintiff's investigation has revealed that the Moscow entities have conducted the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the discovery sought herein to establish a partnership between AI and the Moscow entities, or alternatively, that AI ratified the activities of the Moscow relative to Plaintiff's complaint, which is relevant.

"Under California Corporations Code section 16202(a), 'the association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a). 'Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973). 'Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.' *Connolly,* 111 Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to have been organized from a reasonable deduction from the acts and declarations of the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a] joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of

1   joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing &*

2   *Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

3   relationship such as that of partners has been created, the courts are guided not only

4   by the spoken or written words of the contracting parties, but also by their acts."

5   *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners,*

6   *Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

7   "The issues we deal with involve the application of traditional principles of

8   agency law. Two basic rules are involved: (1) ratification by a person of an act

9   purportedly done on his behalf not only creates the relationship of principal and agent

10   but also constitutes approval by the ratifier of the purported agent's act, relieving such

11   agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby

12   relieving the wrongdoer agent of liability to the principal. "

13   "The first rule is embodied in Civil Code section 2307 which provides: 'An

14   agency may be created, and an authority may be conferred, by a precedent

15   authorization or a subsequent ratification.'"… 'A purported agent's act may be

16   adopted expressly or it may be adopted by implication based on conduct of the

17   purported principal from which an intention to consent to or adopt the act may be

18   fairly inferred, including conduct which is 'inconsistent with any reasonable intention

19   on his part, other than that he intended approving and adopting it.' (Ballard v. Nye

20   (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App.

21   420, 428, 267 P. 356; Rest.2d Agency, § 83.)

22   "Generally, the effect of a ratification is that the authority which is given to the

23   purported agent relates back to the time when he performed the act. (Ballard v. Nye,

24   supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100"

25   *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

26   "Where the acts by the agent were not within the scope of the agency

27   relationship, if they are not disavowed by the principal, failure to disavow may

28   constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187

1   Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be

2   adopted expressly or ... by implication based on conduct of the purported principal

3   from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto*

4   *v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see

5   *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

6        *Relevant* information may be discoverable if it "appears *reasonably calculated to lead*

7   to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added).

8   Plaintiff has the *right* to discover non-privileged information "relevant to the claim or

9   defense of *any party,* including the existence, description, nature, custody, condition

10  and location of any books, documents, or other tangible things and the identity and

11  location of persons having knowledge of any discoverable matter." Fed R. Civ. P.

12  26(b)(1), (emphasis added). This includes information that Plaintiff may use to

13  support its claims or defenses of Defendant, including the *identity* of any *witness or*

14  *document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

15  to Fed R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if

16  there is <u>any</u> possibility that the information sought may be relevant to the subject

17  matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D.

18  52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

19       **Duty to Inquire:** DMG contends that with respect to Defendant's agents,

20  partners and affiliates, Defendant has a duty to "secure all information available to"

21  the corporation, including "information within the personal knowledge of former ...

22  employees, employed ... at the time this action commenced [and even] information

23  possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d

24  1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*,

25  709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such

26  information as is available from the corporation itself or from sources under its

27  control ... [i]f the corporation can obtain the information from sources under its

28  control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki*

42

*Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all responsive information available from [it] or from sources under [its] control." *Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D. Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection.

## C.   Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims.

In response to DMG's long-winded, disconnected and rambling contentions regarding its self-styled "Issue No. 2" concerning Request No. 4, Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel production of; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

### 1.    Discovery At Issue

On its face, DMG's Request No. 4 seeks "all" documents "relative to the sources, . . . for which AI acquires women featured on the AI website, or websites that refer customers to AI, or are a source of revenue to AI, or to any partner of AI from January 1, 2009 to present."

DMG's motion to compel should be denied because:

- Anastasia has already produced documents responsive to this request;
- DMG now seeks additional documents that are not relevant to any claim or defense in the present action;
- the request is unduly burdensome, especially since a Rule 30(b)(2) request should be limited to a few and simple documents;
- the request as written is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and
- the documents DMG now seeks to compel are not reasonably responsive to this request.

To avoid unnecessary repetition, Anastasia refers back to the section covering DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of discovery which led to this discovery request. .

### 2.    Legal Standards

Again, as previously discussed in connection with DMG's "Issue No. 1," DMG's portion of the joint stipulation consists of abstract legal arguments that are not linked to the specific request or topics that are the subject of DMG's motion to compel. DMG's motion fails to make any case for the relevance of the documents it now seeks to the claims or defenses at issue in the litigation. DMG instead seems to merely assume their relevance, and thus has failed to meet its burden.

### (a)    Rule 26(b)

As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and

BH8255.1
1003-30730

1    requires the party requesting discovery to establish the relevancy of the requested

2    discovery sought to the claims or defenses in the action. If a party's request for

3    relevant information is overly broad or otherwise objectionable on its face, the burden

4    is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D.

5    581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to

6    the party resisting discovery. *Id.*

### (b)    Rule 30(b)(2)

8    Rule 30(b)(2) is intended to be used when seeking a few and simple documents.

9    Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for

10   Documents at a deposition are appropriate where "the documents are few and

11   simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and

12   ambiguous requests seek far more than a few and simple documents.

13   Moreover, as the party seeking production of documents not in the possession

14   or custody of Anastasia, DMG bears the burden of proving that Anastasia has control

15   or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d

16   1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not

17   have the legal right to obtain will oftentimes be futile, precisely because the party has

18   no certain way of getting those documents."). "[P]roof of theoretical control is

19   insufficient; a showing of actual control is required." *Id.* at 1107.

### 3.    DMG's Rule 30(b)(2) Request For Production No. 4

21   As previously discussed, DMG's Request No. 4 seeks "all" documents

22   concerning "the sources, . . . for which AI acquires women featured on the AI

23   website, or websites that refer customers to AI, or are a source of revenue to AI, or to

24   any partner of AI from January 1, 2009 to present."

25   DMG's motion does not even try to explain away the numerous ambiguities

26   inherent in this request. Indeed, the actual wording of the request as written is never

27   discussed in DMG's section.

28   There is no reasonable interpretation of this request that would be

commensurate with the eight specific demands for production being made by DMG in this motion and discussed below,

Anastasia has already produced documents (AD108-129 and AD689-938) in response to this request. DMG's motion to compel additional production should therefore be denied.

### (a)    DMG Has Not Established That Request No. 4 Seeks Relevant Discovery

As the party seeking to compel production, DMG has the burden of establishing that the requested discovery is relevant to a claim or defense in this action. During the meet-and-confer process for this motion, DMG erroneously stated that it was "not required to educate [Anastasia] on the relevancy" of the discovery it was seeking. Exh. J.

In its first joint stipulation (Exh. L), DMG's only relevancy argument was that "sales information requested is clearly relevant in a trademark claim." But DMG's Request No. 4 is not directed in any meaningful way to sales information relating to the use of the allegedly infringed mark, but generally to "any person or entity that provides services of generating revenue." A trademark claim does not give *carte blanche* to discovery of a party's sales. Moreover, Anastasia has already produced documents regarding the sales associated with the websites that DMG has accused of infringing its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a

dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

In dropping the trademark argument, DMG has effectively conceded that the discovery its seeks to compel is not relevant to the trademark claim (which is consistent with the fact that none of the discovery requests at issue are directed to DMG's trademark). That leaves the claim based on unauthorized access and harassment. DMG has alleged that these activities were undertaken by persons acting in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for production is not limited to the facts surrounding these particular claims. Instead, it is broadly directed toward Anastasia's business in general. DMG fails to show how the specific information it seeks is relevant to DMG's claims. It also fails to explain how the information sought will lead to admissible evidence.

DMG misrepresents the record in an attempt to support its belated agency argument.

For example, DMG claims that it needs discovery regarding the business relationship between Anastasia and the Moscow Entities because of an "implication" that they provide "exclusive services" to Anastasia. In addition to the dubious relevancy of this allegation, the fact is that Anastasia already has produced copies of its Service Agreements with the Moscow Entity. DMG has ignored these agreements, and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-ranging discovery. While DMG cites a large number of cases for abstract principles of agency law, DMG fails to apply any of those principles to the facts of this case. DMG's legal theories appear to be nothing more than post-hoc rationalizations to justify intrusive discovery into a competitor's business.

DMG also attempts to suggest that one is an agent "at all times," but one "may

47

1   be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

2   *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

3   part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

4   Ct. 1380, 143 L. Ed. 2d 462 (1999).

5       In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

6   DMG has refused to provide Anastasia with even basic information concerning the

7   formation, ownership and management structure of various DMG-related entities

8   who also have claimed ownership of the DREAM MARRIAGE trademark and

9   website that DMG now claims to own. For example, in response to Anastasia's

10  requests for production of documents concerning DMG's relationship with a

11  company called Dream Marriage, Inc. that previously owned the DREAM-

12  MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

13  dream-marriage.com website, DMG has either refused to produce any documents at

14  all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

15  has only produced license agreements or assignments. Yet DMG hypocritically finds

16  that Anastasia's production of similar documents concerning the relationship with the

17  Moscow Entities somehow inadequate.

18      DMG also claims that Anastasia "pays the Moscow entities a percentage of all

19  revenues," in an apparent attempt by DMG to create the illusion of a partnership.

20  This allegation is completely false. The Moscow entity sends invoices to Anastasia for

21  services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

22  invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

23  produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is

24  now seeking the attachments to these invoices which give details of the work

25  underlying the invoices, even though such attachments would not be necessary if

26  Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG.

27  Even if DMG's allegation were true, which it is not, it does nothing to support the

28  relevancy of the overly broad and intrusive discovery that DMG now seeks.

1    Nor do the deposition transcript pages cited by DMG support its wild

2    accusations.

3    For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by

4    DMG for the proposition that the Moscow entities are Anastasia's agents, actually

5    establish that Anastasia does not control the activities of the Moscow Entities, and

6    this lack of control is contrary to DMG's agency theory.

7    Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship

8    with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies

9    and women, while Anastasia handles the US customer relationships. This contradicts

10   DMG's assertion that Anastasia "cannot assess or distinguish the division of

11   [business]" between Anastasia and the Moscow Entities.

12   Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on

13   page 162 (Exh. E), suggests that employees of the Moscow Entities occassionally

14   represent themselves to be part of "Anastasia Date" in media publications and for

15   customer relations purposes, and that this sometimes leads to confusion as to who

16   "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4)

17   cited by DMG also concern similar issues.

18   Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-

19   25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its

20   GoDaddy registration account in order to manage of the websites as authorized under

21   the service agreement.

22   Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices

23   Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's

24   periodically sends money to other Moscow entities as requested by Stoliza as general

25   payments for amounts owed to Stolitza. DMG attempts to mischaracterize these

26   payments as "making disbursements at the direction of the Moscow Entities" in its

27   Introductory Statement to suggest erroneously that the Moscow Entities controlled

28   Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1   request under its Service Agreement is not relevant to any of the acts alleged in

2   DMG's complaint.

3       At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the

4   services we have received from the Russian entity." She did not say, as DMG suggests,

5   that she condoned or even had knowledge of the acts alleged in the complaint.

6       At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same

7   building" as the Moscow Entities, but not that he shares the same office with the

8   Moscow Entities as DMG erroneously implies.

9       DMG also relies on deposition testimony that certain documents may exist,

10   and appears to suggest that "relevance" is established merely because DMG has

11   demanded their production. By DMG's circular reasoning, a document is relevant if

12   DMG demands its production, and that document must be produced if DMG can

13   establish its existence. But this is not the law. As the party requesting discovery, DMG

14   bears the burden of establishing relevancy of the requested discovery to the claims or

15   defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

16       To the extent DMG may later try to argue that other entities such as IT Online,

17   Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's

18   Complaint, DMG's request for production is not limited to DMG's claims, but is

19   broadly directed toward all documents concerning an individual or entity who

20   provides "services of generating revenue." There is simply no basis for DMG, a

21   competitor, to demand that Anastasia provide such sweeping information, including

22   information having nothing to do with DMG's claims.

23           **(b)   Anastastia's Objections To DMG's Request No. 4**

24       Anastasia's objections to DMG's Request No. 4 were particularized, well-

25   founded, and reasonable.

26               **(i)   DMG's Improper Rule 30(b)(2) Requests**

27       Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2)

28   requests as being improper because a request for documents at a deposition is

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an overly broad and excessively numerous production of documents at a deposition was an abuse of Rule 30(b)(2).

Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production requests appear to be part of a ploy by DMG to demand so many documents at the 30(b)(6) deposition, in a vague and incomprehensible manner, that it would impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an opportunity to demand that the deposition be resumed to ask about additional documents. Such a ploy is contrary to the rules.

### (ii)   Privilege

Anastasia made a general objection to each of DMG's document production requests that placing documents generated after the filing of DMG's Complaint on a privilege log would be unduly burdensome. Clearly, requiring that every communication between Anastasia and its counsel, or between counsel and expert consultants be recorded on a privilege log would be unreasonable and unduly burdensome.

DMG has made a similar objection in response to Anastasia document requests (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one would have expected DMG to have generated many attorney-client privileged or work product documents prior to filing suit.

In any event, neither DMG nor Anastasia have produced a privilege log identifying any post-filing documents. This is a non-issue.

### (iii)   Request No. 4 Is Oppressive And Burdensome

As previously discussed, a request for production of documents at a deposition under Rule 30(b)(2) is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL

817853, at *5.

Rather than seek a few and simple documents, DMG's Request No. 4 seeks production of "All DOCUMENTS" on a wide range of topics. Such a request is overly broad and unduly burdensome, and therefore objectionable where, as here, the request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist. LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in making a similar objection to Anastasia's request for production of "all" documents. Exh. F at 5 et al.

### (iv)    Request No. 4 Is Vague And Ambiguous

On its face, DMG's Request No. 4 is vague, ambiguous, and confusingly framed. For example, the compound phrase "the AI website, or websites that refer customers to AI, or a source of revenue to AI, or to any partner of AI" is simply unintelligible. In addition, it is unclear whether the vague and ambiguous term "sources" is intended to refer to the Russian Entities, the Agencies, customers, credit card companies, or any entity that happens to send money to Anastasia.

### (v)    Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.    DMG's Disconnected Demand For Production

Anastasia has already produced documents (e.g., AD108-AD129, AD192-AD679, and AD689-AD938) that are responsive to DMG's document production request, a fact which DMG ignores. Instead, DMG now seeks additional documents that are not responsive to the request, and not relevant to any claim or defense in this action.

While denominated as a motion to compel production in response to DMG's 30(b)(2) document production requests, a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;
- All emails between Defendant and Andrey Ryabichikov from January 2009 to present;
- All emails between Defendant and Oleg Nochka from January 2009 to present;
- All emails between Defendant and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;
- All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and
- All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's claims in this action, nor responsive to Request No. 4. DMG has demanded these documents in connection with this particular request, but has made no effort to

establish how those documents are allegedly responsive to this request. Nevertheless , Anastasia will address each in turn.

### (a)    All Invoice Attachments From Stolitza and IT Online

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

The subject matter of DMG's demand is, simply put, untethered to the claims in this action. Instead, DMG's demand appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

### (b)    All emails with Andrey Ryabichikov

None of the requests for production that DMG seeks to compel refers to

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

1  Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr.

2  Ryabichikov without any subject matter limitation over a three-year period of time.

3  During the 30(b)(6) deposition, there were no questions or answers establishing

4  any relevant email communication between Anastasia and Mr. Ryabichikov.

5  In short, DMG has made another overly broad demand for production of

6  documents without making any attempt to establish relevancy. DMG's demand

7  appears to be designed for harassment and to seek information regarding the

8  operation of a competitor's business unrelated to the claims DMG is asserting in this

9  action.

10  ### (c)    All emails with Oleg Nochka

11  DMG also is demanding production of all emails with Oleg Nochka without

12  any subject matter limitation over a three-year period of time.

13  During the 30(b)(6) deposition, there were no questions or answers establishing

14  any relevant email communication between Anastasia and Mr. Nochka.

15  Again, DMG has made an overly broad demand for production of documents

16  without making any attempt to establish relevancy. DMG's demand appears to be

17  designed for harassment and to seek information regarding the operation of a

18  competitor's business unrelated to the claims DMG is asserting in this action.

19  ### (d)    All emails with Alexey Eremin

20  None of the requests for production that DMG seeks to compel refers to

21  Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's

22  former President, Mr. Eremin, without any subject matter limitation over a three-year

23  period of time. Mr. Eremin was not even President of Anastasia until November

24  2010, and he had no involvement in Anastasia's business activities prior to that time.

25  Exh. D (Tr. 99, and 329).

26  Again, DMG has made an overly broad demand for production of documents

27  without making any attempt to establish their relevancy to this action. Testimony was

28  given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters

BH8255.1
1003-30730

raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover, testimony was given that there were no email communications between Anastasia and Mr. Eremin except for a few litigation-related matters that are immune from discovery as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)   All wire transfers to Lookintom

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present." DMG has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been made to Lookintom at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Lookintom to Anastasia, and no invoices requesting payment to Lookintom.

The history of payments made by Anastasia to Lookintom to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (f)   All wire transfers to Kirpton

DMG also is demanding "[a]ll documents, invoices, emails, bank records,

BH8255.1
1003-30730

accounting records that relate to any funds or wire transfers from Defendant to [sic] Krypton from January 2009 to present," but has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

As an initial matter, Anastasia has made no payments to "Krypton." At Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1    specific amounts paid as reflected in bank statements be relevant.

2              **(g)    All Phone Billing Records For Any (800) Number**

3         DMG has given no reason why "[a]ll phone billing records for any (800)

4    number used by Defendant or with reference to Defendant's business activities from

5    January 2009 to present, and to the extent that no billing records exist, exemplars of

6    bills dating back to January 2006" are relevant to this action. Moreover, these phone

7    records are not responsive to DMG's Request No. 4. In any event, Anastasia has

8    already informed DMG that Anastasia has no relevant phone billing records to

9    produce.

10             **(f)    All invoices for Google Accounts**

11        DMG also has given no reason why "[a]ll invoices for Google accounts

12   2961669 and 1020911" are relevant to this action. Google was not involved in the acts

13   alleged in its Complaint, and these invoices are not relevant to the claims or defenses

14   in this action. Moreover, these Google documents do not appear responsive to

15   DMG's Request No. 4.

16        **5.    Concluding Statement Re DMG's Issue No. 2**

17        As has become its custom in this action, DMG's counsel opens his declaration

18   in support of DMG's motion to compel with a diatribe against what he claims to be

19   Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery

20   conduct. Anastasia has actually produced more documents to DMG than DMG has

21   produced to Anastasia in this action (not including computer logs that DMG

22   produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's

23   requests for production, DMG stated that "DMG will not produce documents

24   responsive to this request." Exh F.

25        DMG's motion to compel production in response to its Request No. 4 should

26   be denied because the additional documents that DMG seeks are not relevant to any

27   claim or defense in the present action. These documents have already been produced

28   by Anastasia, and DMG's relevancy argument does not apply to the additional

BH8255.1
1003-30730

1  documents that it now seeks.

2

3  **IV.   ISSUE NO. 3: REQUEST NO. 5 FOR PRODUCTION OF**

4  **DOCUMENTS AT DEPOSITION**

5      **A.   Disputed Request for Production and Defendant's Response**

6  REQUEST FOR PRODUCTION NO. 5

7      All DOCUMENTS relative to the nature and history of the business model of

8  AI.

9  RESPONSE TO REQUEST NO. 5

10     In addition to its General Objections incorporated herein, Anastasia objects to

11 this request on the grounds that the terms and phrases "all DOCUMENTS," "relative

12 to," and "the nature and history of the business model of AI," are vague, ambiguous,

13 overly broad, unduly burdensome, and not likely to lead to the discovery of admissible

14 evidence. Anastasia will interpret this this request as being limited to documents

15 describing Anastasia's business. Anastasia further objects to the extent that this

16 request is directed to documents not within the possession, custody or control of

17 Anastasia. Anastasia further objects to the extent that this request is directed to

18 documents outside the subject matter or temporal scope of the acts alleged in the

19 Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead

20 to the discovery of admissible evidence. Subject to and without waiver of its General

21 Objections and the immediately preceding specific objections and with the exception

22 of documents subject to the attorney-client privilege or work product immunity,

23 Anastasia answers as follows: Other than documents already produced, Anastasia will

24 produce representative documents within its possession, custody or control that are

25 responsive and non-privileged.

26     **B.   DMG's Contentions and Points and Authorities**

27     The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

28 the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.

59

Sykes testified that the companies in Moscow known as Stolitza and IT-Online (together referenced by the witness as the "Moscow Entities") have carte blanche to perform any service on behalf of AI, knows that these two companies hold themselves out as being AI, that they created and manage all internet activities and business activities of AI including and not limited to AI's primary website Anastasiadate as well as all of AI's affiliates, that all customer service calls are answered at their offices, that AI receives all revenues and makes disbursements at their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition. (Ex. 6, 123:17-125:12.) Plaintiff's counsel also requested phone records for (800) numbers relative to AI's business to establish that AI was paying for the phone bills for the customer service of AI which was being handled out of the Moscow offices. (Ex. 6, 281:22-283:13.) Email correspondence was also requested with respect to communications between Elena Sykes and Andrey Ryabchikov and Oleg Nochka

BH8255.1
1003-30730

who managed the Moscow office. (Ex. 6, 212:4-25; 249:12-250:13, 256:16-258:3.) Additionally emails between Elena Sykes and Lydia Kara of the Moscow office were requested because Ms. Sykes testified that Ms. Kara requested assistance with placing ads in the United States. (Ex. 6, 243-22-245:4, 247:9-248:3.) Again, AI gave carte blanche to IT-Online (Moscow entity) to handle all of its internet activities, including complete access to it Google Analytics accounts. At the deposition Plaintiff's counsel also requested copies of the invoices and payment records with respect to the Google Analytic accounts 2981669 and 1020911 because the accounts are presumed to be in AI's name. (Ex. 6, 290:17-20; 291:9-293:19.)

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;
- All emails between your client and Andrey Ryabichikov from January 2009 to present;
- All emails between your client and Oleg Nochka from January 2009 to present;
- All emails between your client and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records

61

that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and

- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

On November 9, 2011, Plaintiff's counsel again requested copies of the invoices for Google accounts 2961669 and 1020911 to be produced responsive to the PMK document requests. (Ex. 8.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to production of the Person Most Knowledgeable ("PMK") documents that were requested at the deposition of your client and further identified in my November 7, 2011 letter and November 9, 2011 email, you advised that you will have to confer with your client with respect all the business emails between your client and Andrey Ryabichikov, Oleg Nochka and Alexey Eremin between January 1, 2009 to present, as well as with regard to the (800) phone number records. As we discussed, if there are no records of (800) phone bills to your client from January 2009 to present, we will accept exemplars of bills dating back to January 2006, as we have your client's internet website pages dating back to 2006 that are relevant in this case. We do need verification from you that your client does not have the (800) phone number records requested. You advised that you will advise me by November 21, 2011 regarding the above.

With respect to all the other documents requested, you advised that the

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton. (Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Defendant's objections are also disingenuous:

**Privilege**: Parties withholding documents as privileged should identify and describe the documents in sufficient detail to enable the demanding party to contest the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena); *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.* 185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege log for documents withheld on grounds of privilege or work product). Defendant has not provided a privilege log, nor has it identified documents with sufficient detail or stated the specific privilege applicable to each identified document that was withheld. *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996). Defendant's generalized, nonspecific claims of privilege constitute an implied waiver of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem. Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges are not permitted to provide mere 'blanket objections' to discovery requests." *Am. Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July

14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that this Request is "overbroad" and "burdensome", where a party resists a discovery request claiming that it is unduly burdensome, the burden rests on the party raising the objection to show that responding would be *unduly* burdensome. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137 F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection must be supported by affidavits or other evidence which demonstrates the burden. *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate attempts to obtain discovery and prepare this case. This objection was improperly asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon burdensomeness the objecting party must particularize the basis for the objection as generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

**Vague and Ambiguous**: "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity . . . Respondents should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories. To clarify their answers, respondents may include any necessary, reasonable definition of such terms or phrases." *Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677 (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D.

295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

**Relevance**: AI and the Moscow entities formed the internet business together. Since the internet business was formed, AI has known and has authorized the Moscow entities represent to the public that the Moscow entities were and are AI. There is an implication that the Moscow entities provide exclusive services for AI. AI cannot assess or distinguish the division of ownership of business assets or the rights of ownership thereto. AI pays the Moscow entities a percentage of all revenues and AI accepts the benefits of all services provided by the Moscow entities. AI has given carte blanche to the Moscow entities to manage all internet and agency activities. AI never objected to the Moscow entities activities, including the activities that form the basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20, 334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-25, 296:6-298:14, 325:5-24)

Further, The PMK witness testified that records exist or may exist with respect to many of the documents that have been requested to be produced. See Exh. 6 (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24, 360:5-21)

Plaintiff's investigation has revealed that the Moscow entities have conducted the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the discovery sought herein to establish a partnership between AI and the Moscow entities, or alternatively, that AI ratified the activities of the Moscow relative to Plaintiff's complaint, which is relevant.

"Under California Corporations Code section 16202(a), 'the association of two or more persons to carry on as co-owners of a business for profit forms a partnership,

1   whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a).

2   'Whether a partnership or joint venture exists is primarily a factual question to be

3   determined by the trier of fact from the evidence and inferences to be drawn

4   therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973).

5   'Although a partnership ordinarily involves a continuing business, whereas a joint

6   venture is usually formed for a specific transaction or a single series of transactions,

7   the incidents of both relationships are the same in all essential respects.' *Connolly,* 111

8   Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to

9   have been organized from a reasonable deduction from the acts and declarations of

10   the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a]

11   joint venture exists where there is an 'agreement between the parties under which they

12   have a community of interest, that is, joint interest, in a common business

13   undertaking, an understanding as to the sharing of profits and losses, and a right of

14   joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing &*

15   *Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

16   relationship such as that of partners has been created, the courts are guided not only

17   by the spoken or written words of the contracting parties, but also by their acts."

18   *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners,*

19   *Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

20       "The issues we deal with involve the application of traditional principles of

21   agency law. Two basic rules are involved: (1) ratification by a person of an act

22   purportedly done on his behalf not only creates the relationship of principal and agent

23   but also constitutes approval by the ratifier of the purported agent's act, relieving such

24   agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby

25   relieving the wrongdoer agent of liability to the principal. "

26        "The first rule is embodied in Civil Code section 2307 which provides: 'An

27   agency may be created, and an authority may be conferred, by a precedent

28   authorization or a subsequent ratification.'"… 'A purported agent's act may be

1  adopted expressly or it may be adopted by implication based on conduct of the

2  purported principal from which an intention to consent to or adopt the act may be

3  fairly inferred, including conduct which is 'inconsistent with any reasonable intention

4  on his part, other than that he intended approving and adopting it.' (Ballard v. Nye

5  (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App.

6  420, 428, 267 P. 356; Rest.2d Agency, § 83.)

7        "Generally, the effect of a ratification is that the authority which is given to the

8  purported agent relates back to the time when he performed the act. (Ballard v. Nye,

9  supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100"

10  *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

11        "Where the acts by the agent were not within the scope of the agency

12  relationship, if they are not disavowed by the principal, failure to disavow may

13  constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187

14  Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be

15  adopted expressly or ... by implication based on conduct of the purported principal

16  from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto*

17  *v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see

18  *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

19        *Relevant* information may be discoverable if it "appears *reasonably calculated to lead*

20  to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added).

21  Plaintiff has the *right* to discover non-privileged information "relevant to the claim or

22  defense of *any party,* including the existence, description, nature, custody, condition

23  and location of any books, documents, or other tangible things and the identity and

24  location of persons having knowledge of any discoverable matter." Fed R. Civ. P.

25  26(b)(1), (emphasis added). This includes information that Plaintiff may use to

26  support its claims or defenses of Defendant, including the *identity* of any *witness or*

27  *document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

28  to Fed R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if

1    there is <u>any</u> possibility that the information sought may be relevant to the subject

2    matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D.

3    52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

4        **Duty to Inquire:** DMG contends that with respect to Defendant's agents,

5    partners and affiliates, Defendant has a duty to "secure all information available to"

6    the corporation, including "information within the personal knowledge of former ...

7    employees, employed ... at the time this action commenced [and even] information

8    possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d

9    1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*,

10    709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such

11    information as is available from the corporation itself or from sources under its

12    control ... [i]f the corporation can obtain the information from sources under its

13    control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki*

14    *Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all

15    responsive information available from [it] or from sources under [its] control."

16    *Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D.

17    Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently

18    held that documents are deemed to be within [a party's] 'possession, custody or

19    control' for purposes of Rule 34 if the party has actual possession, custody, or control,

20    or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording*

21    *Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing

22    In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

23        **Matters not produced must be identified:** The responding party must

24    identify, by category or type, the sources containing potentially responsive

25    information that it is neither searching nor producing. Enough detail should be

26    provided to enable the requesting party to evaluate the burdens and costs of providing

27    the discovery and the likelihood of finding responsive information on the identified

28    sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

1   Based on the foregoing, the court should order Defendant to provide a further

2   response and produce documents without objection.

3   **C.    Anastasia's Contentions and Points and Authorities**

4   DMG served twenty-three document production requests under Rule 30(b)(2)

5   as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and

6   vague that one has to question whether they were designed more for harassment than

7   to seek information relevant to DMG's two narrow claims.

8   In response to DMG's long-winded, rambling and disjointed contentions

9   regarding its self-styled "Issue No. 3" concerning Request No. 5, Anastasia will (1)

10  briefly outline the relevant discovery served, and then (2) set forth the appropriate

11  legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to

12  compel production of; and then (4) discuss DMG's original request which does not

13  appear to support production of the documents that DMG is now seeking.

14  **1.    Discovery At Issue**

15  On its face, DMG's Request No. 5 seeks "all" documents "relative to the nature

16  and history of the business model of AI."

17  DMG's motion to compel should be denied because:

18  • Anastasia has already produced documents responsive to this request;

19  • DMG now seeks additional documents that are not relevant to any claim

20  or defense in the present action;

21  • the request is unduly burdensome, especially since a Rule 30(b)(2)

22  request should be limited to a few and simple documents;

23  • the request is confusingly framed and not reasonably particularized so as

24  to give fair notice of the documents being sought; and

25  • the documents DMG now seeks to compel are not reasonably

26  responsive to this request.

27  To avoid unnecessary repetition, Anastasia refers back to the section covering

28  DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of

69

1  discovery which led to this discovery request. .

2          **2.**     **Legal Standards**

3      Again, as previously discussed in connection with DMG's "Issue No. 1,"

4  DMG's portion of the joint stipulation consists of abstract legal arguments that are

5  not linked to the specific request or topics that are the subject of DMG's motion to

6  compel. DMG's motion fails to make any case for the relevance of the documents it

7  now seeks to the claims or defenses at issue in the litigation. DMG instead seems to

8  merely assume their relevance, and thus has failed to meet its burden.

9          **(a)**     **Rule 26(b)**

10      As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and

11  requires the party requesting discovery to establish the relevancy of the requested

12  discovery sought to the claims or defenses in the action. If a party's request for

13  relevant information is overly broad or otherwise objectionable on its face, the burden

14  is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D.

15  581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to

16  the party resisting discovery. *Id.*

17          **(b)**     **Rule 30(b)(2)**

18      Rule 30(b)(2) is intended to be used when seeking a few and simple documents.

19  Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for

20  Documents at a deposition are appropriate where "the documents are few and

21  simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and

22  ambiguous requests seek far more than a few and simple documents.

23      Moreover, as the party seeking production of documents not in the possession

24  or custody of Anastasia, DMG bears the burden of proving that Anastasia has control

25  or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d

26  1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not

27  have the legal right to obtain will oftentimes be futile, precisely because the party has

28  no certain way of getting those documents."). "[P]roof of theoretical control is

1  insufficient; a showing of actual control is required." *Id.* at 1107.

2     **3.  DMG's Rule 30(b)(2) Request For Production No. 5**

3    As previously discussed, DMG's Request No. 5 seeks "all" documents relative

4  to the nature and history of the business model of AI.

5    DMG's motion does not even try to explain away the numerous ambiguities

6  inherent in this request. Indeed, the actual wording of the request as written is never

7  discussed in DMG's section.

8    There is no reasonable interpretation of this request that would be

9  commensurate with the eight specific demands for production being made by DMG

10  in this motion and discussed below,

11    Anastasia has already produced documents (AD108-129 and AD689-938) in

12  response to this request. DMG's motion to compel additional production should

13  therefore be denied.

14     **(a)  DMG Has Not Established That Request No. 5 Seeks**

15      **Relevant Discovery**

16    As the party seeking to compel production, DMG has the burden of

17  establishing that the requested discovery is relevant to a claim or defense in this

18  action. During the meet-and-confer process for this motion, DMG erroneously stated

19  that it was "not required to educate [Anastasia] on the relevancy" of the discovery it

20  was seeking. Exh. J.

21    In its first joint stipulation (Exh. L), DMG's only relevancy argument was that

22  "sales information requested is clearly relevant in a trademark claim." But DMG's

23  Request No. 5 is not directed in any meaningful way to sales information relating to

24  the use of the allegedly infringed mark, but generally to "any person or entity that

25  provides services of generating revenue." A trademark claim does not give *carte blanche*

26  to discovery of a party's sales. Moreover, Anastasia has already produced documents

27  regarding the sales associated with the websites that DMG has accused of infringing

28  its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

In dropping the trademark argument, DMG has effectively conceded that the discovery its seeks to compel is not relevant to the trademark claim (which is consistent with the fact that none of the discovery requests at issue are directed to DMG's trademark). That leaves the claim based on unauthorized access and harassment. DMG has alleged that these activities were undertaken by persons acting in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for production is not limited to the facts surrounding these particular claims. Instead, it is broadly directed toward Anastasia's business in general. DMG fails to show how the specific information it seeks is relevant to DMG's claims. It also fails to explain how the information sought will lead to admissible evidence.

DMG misrepresents the record in an attempt to support its belated agency argument.

For example, DMG claims that it needs discovery regarding the business relationship between Anastasia and the Moscow Entities because of an "implication" that they provide "exclusive services" to Anastasia. In addition to the dubious

1   relevancy of this allegation, the fact is that Anastasia already has produced copies of

2   its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

3   and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

4   ranging discovery. While DMG cites a large number of cases for abstract principles of

5   agency law, DMG fails to apply any of those principles to the facts of this case.

6   DMG's legal theories appear to be nothing more than post-hoc rationalizations to

7   justify intrusive discovery into a competitor's business.

8       DMG also attempts to suggest that one is an agent "at all times," but one "may

9   be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

10  *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

11  part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

12  Ct. 1380, 143 L. Ed. 2d 462 (1999).

13      In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

14  DMG has refused to provide Anastasia with even basic information concerning the

15  formation, ownership and management structure of various DMG-related entities

16  who also have claimed ownership of the DREAM MARRIAGE trademark and

17  website that DMG now claims to own. For example, in response to Anastasia's

18  requests for production of documents concerning DMG's relationship with a

19  company called Dream Marriage, Inc. that previously owned the DREAM-

20  MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

21  dream-marriage.com website, DMG has either refused to produce any documents at

22  all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

23  has only produced license agreements or assignments. Yet DMG hypocritically finds

24  that Anastasia's production of similar documents concerning the relationship with the

25  Moscow Entities somehow inadequate.

26      DMG also claims that Anastasia "pays the Moscow entities a percentage of all

27  revenues," in an apparent attempt by DMG to create the illusion of a partnership.

28  This allegation is completely false. The Moscow entity sends invoices to Anastasia for

1  services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

2  invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

3  produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is

4  now seeking the attachments to these invoices which give details of the work

5  underlying the invoices, even though such attachments would not be necessary if

6  Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG.

7  Even if DMG's allegation were true, which it is not, it does nothing to support the

8  relevancy of the overly broad and intrusive discovery that DMG now seeks.

9       Nor do the deposition transcript pages cited by DMG support its wild

10  accusations.

11      For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by

12  DMG for the proposition that the Moscow entities are Anastasia's agents, actually

13  establish that Anastasia does not control the activities of the Moscow Entities, and

14  this lack of control is contrary to DMG's agency theory.

15      Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship

16  with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies

17  and women, while Anastasia handles the US customer relationships. This contradicts

18  DMG's assertion that Anastasia "cannot assess or distinguish the division of

19  [business]" between Anastasia and the Moscow Entities.

20      Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on

21  page 162 (Exh. E), suggests that employees of the Moscow Entities occassionally

22  represent themselves to be part of "Anastasia Date" in media publications and for

23  customer relations purposes, and that this sometimes leads to confusion as to who

24  "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4)

25  cited by DMG also concern similar issues.

26      Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-

27  25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its

28  GoDaddy registration account in order to manage of the websites as authorized under

the service agreement.

Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's periodically sends money to other Moscow entities as requested by Stoliza as general payments for amounts owed to Stolitza. DMG attempts to mischaracterize these payments as "making disbursements at the direction of the Moscow Entities" in its Introductory Statement to suggest erroneously that the Moscow Entities controlled Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's request under its Service Agreement is not relevant to any of the acts alleged in DMG's complaint.

At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the services we have received from the Russian entity." She did not say, as DMG suggests, that she condoned or even had knowledge of the acts alleged in the complaint.

At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same building" as the Moscow Entities, but not that he shares the same office with the Moscow Entities as DMG erroneously implies.

DMG also relies on deposition testimony that certain documents may exist, and appears to suggest that "relevance" is established merely because DMG has demanded their production. By DMG's circular reasoning, a document is relevant if DMG demands its production, and that document must be produced if DMG can establish its existence. But this is not the law. As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery to the claims or defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

To the extent DMG may later try to argue that other entities such as IT Online, Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's Complaint, DMG's request for production is not limited to DMG's claims, but is broadly directed toward all documents concerning an individual or entity who provides "services of generating revenue." There is simply no basis for DMG, a

1  competitor, to demand that Anastasia provide such sweeping information, including

2  information having nothing to do with DMG's claims.

3       **(b)   Anastastia's Objections To DMG's Request No. 5**

4       Anastasia's objections to DMG's Request No. 5 were particularized, well-

5  founded, and reasonable.

6            **(i)   DMG's Improper Rule 30(b)(2) Requests**

7       Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2)

8  requests as being improper because a request for documents at a deposition is

9  appropriate only where "the documents are few and simple." Advisory Committee's

10  Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No.

11  98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an

12  overly broad and excessively numerous production of documents at a deposition was

13  an abuse of Rule 30(b)(2).

14       Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production

15  requests appear to be part of a ploy by DMG to demand so many documents at the

16  30(b)(6) deposition, in a vague and incomprehensible manner, that it would

17  impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an

18  opportunity to demand that the deposition be resumed to ask about additional

19  documents. Such a ploy is contrary to the rules.

20            **(ii)   Privilege**

21       Anastasia made a general objection to each of DMG's document production

22  requests that placing documents generated after the filing of DMG's Complaint on a

23  privilege log would be unduly burdensome. Clearly, requiring that every

24  communication between Anastasia and its counsel, or between counsel and expert

25  consultants be recorded on a privilege log would be unreasonable and unduly

26  burdensome.

27       DMG has made a similar objection in response to Anastasia document requests

28  (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one

1  would have expected DMG to have generated many attorney-client privileged or work
2  product documents prior to filing suit.

3      In any event, neither DMG nor Anastasia have produced a privilege log
4  identifying any post-filing documents. This is a non-issue.

5              **(iii)    Request No. 5 Is Oppressive And Burdensome**

6      As previously discussed, a request for production of documents at a deposition
7  under Rule 30(b)(2) is appropriate only where "the documents are few and simple."
8  Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL
9  817853, at *5.

10     Rather than seek a few and simple documents, DMG's Request No. 5 seeks
11 production of "All DOCUMENTS" on a wide range of topics. Such a request is
12 overly broad and unduly burdensome, and therefore objectionable where, as here, the
13 request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist.
14 LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in
15 making a similar objection to Anastasia's request for production of "all" documents.
16 Exh. F at 5 et al.

17              **(iv)    Request No. 5 Is Overly Broad**

18     On its face, DMG's Request No. 5 is overly broad in seeking the entire
19 business model of Anastasia without limitation. Production to a competitor of all
20 documents "relative to" Anastasia's business model in response to such an overly
21 broad request by a competitor would be unduly burdensome, oppressive, and not
22 relevant to the claims and defenses in this action.

23              **(v)    Duty To Inquire**

24     DMG argues that Anastasia has a duty to inquire "sources under its control"
25 for available information in response to a request for production. But that does not
26 discount Anastasia's valid objection to producing documents that are not in the
27 possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of
28 the Moscow Entities, but documents were not obtained because Anastasia does not

control the Moscow Entities. Exh. D (Tr. 13-15).

### 4. DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions regarding Request No. 5, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;

- All emails between Defendant and Andrey Ryabichikov from January 2009 to present;

- All emails between Defendant and Oleg Nochka from January 2009 to present;

- All emails between Defendant and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;

- All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and

- All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's

78

claims in this action, nor responsive to Request No. 5. DMG has demanded these documents in connection with this particular request, but has made no effort to establish how those documents are allegedly responsive to this request. Nevertheless, Anastasia will address each in turn.

(a)    **All Invoice Attachments From Stolitza and IT Online**

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

DMG's demand for these attachments appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

1

**(b)     All emails with Andrey Ryabichikov**

2       None of the requests for production that DMG seeks to compel refers to

3   Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr.

4   Ryabichikov without any subject matter limitation over a three-year period of time.

5       During the 30(b)(6) deposition, there were no questions or answers establishing

6   any relevant email communication between Anastasia and Mr. Ryabichikov.

7       In short, DMG has made another overly broad demand for production of

8   documents without making any attempt to establish relevancy. DMG's demand

9   appears to be designed for harassment and to seek information regarding the

10   operation of a competitor's business unrelated to the claims DMG is asserting in this

11   action.

12

**(c)     All emails with Oleg Nochka**

13       DMG also is demanding production of all emails with Oleg Nochka without

14   any subject matter limitation over a three-year period of time.

15       During the 30(b)(6) deposition, there were no questions or answers establishing

16   any relevant email communication between Anastasia and Mr. Nochka.

17       Again, DMG has made an overly broad demand for production of documents

18   without making any attempt to establish relevancy. DMG's demand appears to be

19   designed for harassment and to seek information regarding the operation of a

20   competitor's business unrelated to the claims DMG is asserting in this action.

21

**(d)     All emails with Alexey Eremin**

22       None of the requests for production that DMG seeks to compel refers to

23   Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's

24   former President, Mr. Eremin, without any subject matter limitation over a three-

25   period of time. Mr. Eremin was not even President of Anastasia until November

26   2010, and he had no involvement in Anastasia's business activities prior to that time.

27   Exh. D (Tr. 99, and 329).

28       Again, DMG has made an overly broad demand for production of documents

without making any attempt to establish their relevancy to this action. Testimony was given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover, testimony was given that there were no email communications between Anastasia and Mr. Eremin except for a few litigation-related matters that are immune from discovery as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)   All wire transfers to Lookintom

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present." DMG has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been made to Lookintom at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Lookintom to Anastasia, and no invoices requesting payment to Lookintom.

The history of payments made by Anastasia to Lookintom to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

**Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents**

**(f)     All wire transfers to Kirpton**

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to [sic] Krypton from January 2009 to present," but has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

As an initial matter, Anastasia has made no payments to "Krypton." At Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The

fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (g)   All Phone Billing Records For Any (800) Number

DMG has given no reason why "[a]ll phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006" are relevant to this action. Moreover, these phone records are not responsive to DMG's Request No. 5. In any event, Anastasia has already informed DMG that Anastasia has no relevant phone billing records to produce.

### (f)   All invoices for Google Accounts

DMG also has given no reason why "[a]ll invoices for Google accounts 2961669 and 1020911" are relevant to this action. Google was not involved in the acts alleged in its Complaint, and these invoices are not relevant to the claims or defenses in this action. Moreover, these Google documents do not appear responsive to DMG's Request No. 5.

### 5.   Concluding Statement Re DMG's Issue No. 3

As has become its custom in this action, DMG's counsel opens his declaration in support of DMG's motion to compel with a diatribe against what he claims to be Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery conduct. Anastasia has actually produced more documents to DMG than DMG has produced to Anastasia in this action (not including computer logs that DMG produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's requests for production, DMG stated that "DMG will not produce documents responsive to this request." Exh F.

DMG's motion to compel production in response to its Request No. 5 should be denied because the additional documents that DMG seeks are not relevant to any

claim or defense in the present action. These documents have already been produced by Anastasia, and DMG's relevancy argument does not apply to the additional documents that it now seeks.

## V.  ISSUE NO. 4: REQUEST NO. 6 FOR PRODUCTION OF DOCUMENTS AT DEPOSITION

### A.   Disputed Request for Production and Defendant's Response

REQUEST FOR PRODUCTION NO. 6

All DOCUMENTS relative to the nature and history of the business relationship between AI and IT Online.

RESPONSE TO REQUEST NO. 6

In addition to its General Objections incorporated herein, Anastasia objects to this request on the grounds that the terms and phrases "all DOCUMENTS," "relative to," and "the nature and history of the business relationship between AI and IT Online," are vague and ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Anastasia will interpret this this request as being limited to documents describing a business relationship with IT Online. Anastasia further objects to the extent that this request is directed to documents not within the possession, custody or control of Anastasia. Anastasia further objects to the extent that this request is directed to documents and things outside the subject matter or temporal scope of the acts alleged in the Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead to the discovery of admissible evidence.

Subject to and without waiver of its General Objections and the immediately preceding specific objections, Anastasia answers as follows: Other than documents already produced, Anastasia has no additional documents to produce.

### B.   DMG's Contentions and Points and Authorities

The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

84

the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms. Sykes testified that the companies in Moscow known as Stolitza and IT-Online (together referenced by the witness as the "Moscow Entities") have carte blanche to perform any service on behalf of AI, knows that these two companies hold themselves out as being AI, that they created and manage all internet activities and business activities of AI including and not limited to AI's primary website Anastasiadate as well as all of AI's affiliates, that all customer service calls are answered at their offices, that AI receives all revenues and makes disbursements at their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition. (Ex. 6, 123:17-125:12.) Plaintiff's counsel also requested phone records for (800) numbers relative to AI's business to establish that AI was paying for the phone bills for the customer service of AI which was being handled out of the Moscow offices. (Ex. 6, 281:22-283:13.) Email correspondence was also requested with respect

85

BH8255.1
1003-30730

to communications between Elena Sykes and Andrey Ryabchikov and Oleg Nochka who managed the Moscow office. (Ex. 6, 212:4-25; 249:12-250:13, 256:16-258:3.) Additionally emails between Elena Sykes and Lydia Kara of the Moscow office were requested because Ms. Sykes testified that Ms. Kara requested assistance with placing ads in the United States. (Ex. 6, 243-22-245:4, 247:9-248:3.) Again, AI gave carte blanche to IT-Online (Moscow entity) to handle all of its Internet activities, including complete access to it Google Analytics accounts. At the deposition Plaintiff's counsel also requested copies of the invoices and payment records with respect to the Google Analytic accounts 2981669 and 1020911 because the accounts are presumed to be in AI's name. (Ex. 6, 290:17-20; 291:9-293:19.)

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

> To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:
> - All invoices from Stolitza and IT-Online from January 2009 to present;
> - All emails between your client and Andrey Ryabichikov from January 2009 to present;
> - All emails between your client and Oleg Nochka from January 2009 to present;
> - All emails between your client and Alexey Eremin from January 2009 to present;
> - All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and

- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

On November 9, 2011, Plaintiff's counsel again requested copies of the invoices for Google accounts 2961669 and 1020911to be produced responsive to the PMK document requests. (Ex. 8.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to production of the Person Most Knowledgeable ("PMK") documents that were requested at the deposition of your client and further identified in my November 7, 2011 letter and November 9, 2011 email, you advised that you will have to confer with your client with respect all the business emails between your client and Andrey Ryabichikov, Oleg Nochka and Alexey Eremin between January 1, 2009 to present, as well as with regard to the (800) phone number records. As we discussed, if there are no records of (800) phone bills to your client from January 2009 to present, we will accept exemplars of bills dating back to January 2006, as we have your client's internet website pages dating back to 2006 that are relevant in this case. We do need verification from you that your client does not have the (800) phone number records requested. You advised that you will advise me by November 21, 2011 regarding the above.

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

1   With respect to all the other documents requested, you advised that the
2   documents will be produced by November 30, 2011. With respect to the
3   invoices requested, amounts can be redacted except as to the amounts
4   that relate to infringing websites identified in our 3rd Amended
5   Complaint and with respect to payments to Lookintom and Kyrpton.
6   (Ex. 9.)

7       Defendant's counsel did not respond as requested, other than forwarding some
8   redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent
9   an email on 12-2-11 advising that AI failed to produce all documents requested as
10  agreed by November 30, 2011 and a further meet and confer was requested with
11  respect to the PMK deposition. ((Ex. 10.).)

12      Plaintiff's counsel again sent an email on December 8, 2011, reminding
13  Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

14      Defendant's counsel did not meet and confer within (10) days as requested.

15      Defendant's objections are also disingenuous:

16      **Privilege**: Parties withholding documents as privileged should identify and
17  describe the documents in sufficient detail to enable the demanding party to contest
18  the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena);
19  *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.*
20  185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege
21  log for documents withheld on grounds of privilege or work product). Defendant has
22  not provided a privilege log, nor has it identified documents with sufficient detail or
23  stated the specific privilege applicable to each identified document that was withheld.
24  *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996).
25  Defendant's generalized, nonspecific claims of privilege constitute an implied waiver
26  of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem.*
27  *Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges
28  are not permitted to provide mere 'blanket objections' to discovery requests." *Am.*

88

1  *Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July
2  14, 2003).

3      **Oppressive and Burdensome**: With respect to Defendant's objection that
4  this Request is "overbroad" and "burdensome", where a party resists a discovery
5  request claiming that it is unduly burdensome, the burden rests on the party raising
6  the objection to show that responding would be *unduly* burdensome. *Snowden v.*
7  *Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp.
8  2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient
9  basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137
10  F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is
11  overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium*
12  *Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection
13  must be supported by affidavits or other evidence which demonstrates the burden.
14  *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60
15  (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection
16  lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate
17  attempts to obtain discovery and prepare this case. This objection was improperly
18  asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193
19  F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon
20  burdensomeness the objecting party must particularize the basis for the objection as
21  generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289
22  (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

23      **Vague and Ambiguous**: "The party objecting to discovery as vague or
24  ambiguous has the burden to show such vagueness or ambiguity . . . Respondents
25  should exercise reason and common sense to attribute ordinary definitions to terms
26  and phrases utilized in interrogatories. To clarify their answers, respondents may
27  include any necessary, reasonable definition of such terms or phrases." *Santana Row*
28  *Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677

1    (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D.

2    295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is

3    unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an

4    intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

5        **Relevance**: AI and the Moscow entities formed the internet business together.

6    Since the internet business was formed, AI has known and has authorized the

7    Moscow entities represent to the public that the Moscow entities were and are AI.

8    There is an implication that the Moscow entities provide exclusive services for AI. AI

9    cannot assess or distinguish the division of ownership of business assets or the rights

10   of ownership thereto. AI pays the Moscow entities a percentage of all revenues and

11   AI accepts the benefits of all services provided by the Moscow entities. AI has given

12   carte blanche to the Moscow entities to manage all internet and agency activities. AI

13   never objected to the Moscow entities activities, including the activities that form the

14   basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See

15   Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20,

16   334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-

17   25, 296:6-298:14, 325:5-24)

18       Further, The PMK witness testified that records exist or may exist with respect

19   to many of the documents that have been requested to be produced. See Exh. 6

20   (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24,

21   360:5-21)

22       Plaintiff's investigation has revealed that the Moscow entities have conducted

23   the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged

24   that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the

25   discovery sought herein to establish a partnership between AI and the Moscow

26   entities, or alternatively, that AI ratified the activities of the Moscow relative to

27   Plaintiff's complaint, which is relevant.

28       "Under California Corporations Code section 16202(a), 'the association of two

1  or more persons to carry on as co-owners of a business for profit forms a partnership,

2  whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a).

3  'Whether a partnership or joint venture exists is primarily a factual question to be

4  determined by the trier of fact from the evidence and inferences to be drawn

5  therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973).

6  'Although a partnership ordinarily involves a continuing business, whereas a joint

7  venture is usually formed for a specific transaction or a single series of transactions,

8  the incidents of both relationships are the same in all essential respects.' *Connolly,* 111

9  Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to

10  have been organized from a reasonable deduction from the acts and declarations of

11  the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a]

12  joint venture exists where there is an 'agreement between the parties under which they

13  have a community of interest, that is, joint interest, in a common business

14  undertaking, an understanding as to the sharing of profits and losses, and a right of

15  joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing &*

16  *Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

17  relationship such as that of partners has been created, the courts are guided not only

18  by the spoken or written words of the contracting parties, but also by their acts."

19  *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners,*

20  *Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

21      "The issues we deal with involve the application of traditional principles of

22  agency law. Two basic rules are involved: (1) ratification by a person of an act

23  purportedly done on his behalf not only creates the relationship of principal and agent

24  but also constitutes approval by the ratifier of the purported agent's act, relieving such

25  agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby

26  relieving the wrongdoer agent of liability to the principal. "

27          "The first rule is embodied in Civil Code section 2307 which provides: 'An

28  agency may be created, and an authority may be conferred, by a precedent

authorization or a subsequent ratification.'"… 'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' (Ballard v. Nye (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App. 420, 428, 267 P. 356; Rest.2d Agency, § 83.)

"Generally, the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act. (Ballard v. Nye, supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100" *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

"Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be adopted expressly or ... by implication based on conduct of the purported principal from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

*Relevant* information may be discoverable if it "appears *reasonably calculated to lead* to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added). Plaintiff has the *right* to discover non-privileged information "relevant to the claim or defense of *any party,* including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed R. Civ. P. 26(b)(1), (emphasis added). This includes information that Plaintiff may use to support its claims or defenses of Defendant, including the *identity* of any *witness or document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

92

to Fed. R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if there is <u>any</u> possibility that the information sought may be relevant to the subject matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

**Duty to Inquire:** DMG contends that with respect to Defendant's agents, partners and affiliates, Defendant has a duty to "secure all information available to" the corporation, including "information within the personal knowledge of former ... employees, employed ... at the time this action commenced [and even] information possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such information as is available from the corporation itself or from sources under its control ... [i]f the corporation can obtain the information from sources under its control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all responsive information available from [it] or from sources under [its] control." *Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D. Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified

sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection.

## C.   Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims.

In response to DMG's long-winded, rambling and disjointed contentions regarding its self-styled "Issue No. 4" concerning its Request No. 6, Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel production of; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

## 1.   Discovery At Issue

On its face, DMG's Request No. 6 seeks "all" documents "relative to the nature and business relationship between AI and IT Online."

DMG's motion to compel should be denied because:

- Anastasia has already produced documents responsive to this request;
- DMG now seeks additional documents that are not relevant to any claim or defense in the present action;
- the request is unduly burdensome, especially since a Rule 30(b)(2) request should be limited to a few and simple documents;
- the request is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and
- the documents DMG now seeks to compel are not reasonably responsive to this request.

To avoid unnecessary repetition, Anastasia refers back to the section covering

94

DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of
discovery which led to this discovery request. .

### 2.   Legal Standards

Again, as previously discussed in connection with DMG's "Issue No. 1,"
DMG's portion of the joint stipulation consists of abstract legal arguments that are
not linked to the specific request or topics that are the subject of DMG's motion to
compel. DMG's motion fails to make any case for the relevance of the documents it
now seeks to the claims or defenses at issue in the litigation. DMG instead seems to
merely assume their relevance, and thus has failed to meet its burden.

### (a)   Rule 26(b)

As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and
requires the party requesting discovery to establish the relevancy of the requested
discovery sought to the claims or defenses in the action. If a party's request for
relevant information is overly broad or otherwise objectionable on its face, the burden
is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D.
581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to
the party resisting discovery. *Id.*

### (b)   Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents.
Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for
Documents at a deposition are appropriate where "the documents are few and
simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and
ambiguous requests seek far more than a few and simple documents.

Moreover, as the party seeking production of documents not in the possession
or custody of Anastasia, DMG bears the burden of proving that Anastasia has control
or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d
1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not
have the legal right to obtain will oftentimes be futile, precisely because the party has

95

no certain way of getting those documents."). "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

### 3.   DMG's Rule 30(b)(2) Request For Production No. 6

As previously discussed, DMG's Request No. 6 seeks "all" documents relative to the nature and history of the business model of AI.

There is no reasonable interpretation of this request that would be commensurate with the eight specific demands for production being made by DMG in this motion and discussed below,

Anastasia has already produced documents (AD108-129 and AD689-938) in response to this request. DMG's motion to compel additional production should therefore be denied.

### (a)   DMG Has Not Established That Request No. 6 Seeks Relevant Discovery

As the party seeking to compel production, DMG has the burden of establishing that the requested discovery is relevant to a claim or defense in this action. During the meet-and-confer process for this motion, DMG erroneously stated that it was "not required to educate [Anastasia] on the relevancy" of the discovery it was seeking. Exh. J.

In its first joint stipulation (Exh. L), DMG's only relevancy argument was that "sales information requested is clearly relevant in a trademark claim." But DMG's Request No. 6 is not directed in any meaningful way to sales information relating to the use of the allegedly infringed mark, but generally to "any person or entity that provides services of generating revenue." A trademark claim does not give *carte blanche* to discovery of a party's sales. Moreover, Anastasia has already produced documents regarding the sales associated with the websites that DMG has accused of infringing its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG

then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

In dropping the trademark argument, DMG has effectively conceded that the discovery its seeks to compel is not relevant to the trademark claim (which is consistent with the fact that none of the discovery requests at issue are directed to DMG's trademark). That leaves the claim based on unauthorized access and harassment. DMG has alleged that these activities were undertaken by persons acting in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for production is not limited to the facts surrounding these particular claims. Instead, it is broadly directed toward Anastasia's business in general. DMG fails to show how the specific information it seeks is relevant to DMG's claims. It also fails to explain how the information sought will lead to admissible evidence.

DMG misrepresents the record in an attempt to support its belated agency argument.

For example, DMG claims that it needs discovery regarding the business relationship between Anastasia and the Moscow Entities because of an "implication" that they provide "exclusive services" to Anastasia. In addition to the dubious relevancy of this allegation, the fact is that Anastasia already has produced copies of its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

97

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1   and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

2   ranging discovery. While DMG cites a large number of cases for abstract principles of

3   agency law, DMG fails to apply any of those principles to the facts of this case.

4   DMG's legal theories appear to be nothing more than post-hoc rationalizations to

5   justify intrusive discovery into a competitor's business.

6       DMG also attempts to suggest that one is an agent "at all times," but one "may

7   be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

8   *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

9   part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

10  Ct. 1380, 143 L. Ed. 2d 462 (1999).

11      In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

12  DMG has refused to provide Anastasia with even basic information concerning the

13  formation, ownership and management structure of various DMG-related entities

14  who also have claimed ownership of the DREAM MARRIAGE trademark and

15  website that DMG now claims to own. For example, in response to Anastasia's

16  requests for production of documents concerning DMG's relationship with a

17  company called Dream Marriage, Inc. that previously owned the DREAM-

18  MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

19  dream-marriage.com website, DMG has either refused to produce any documents at

20  all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

21  has only produced license agreements or assignments. Yet DMG hypocritically finds

22  that Anastasia's production of similar documents concerning the relationship with the

23  Moscow Entities somehow inadequate.

24      DMG also claims that Anastasia "pays the Moscow entities a percentage of all

25  revenues," in an apparent attempt by DMG to create the illusion of a partnership.

26  This allegation is completely false. The Moscow entity sends invoices to Anastasia for

27  services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

28  invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is now seeking the attachments to these invoices which give details of the work underlying the invoices, even though such attachments would not be necessary if Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG. Even if DMG's allegation were true, which it is not, it does nothing to support the relevancy of the overly broad and intrusive discovery that DMG now seeks.

Nor do the deposition transcript pages cited by DMG support its wild accusations.

For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by DMG for the proposition that the Moscow entities are Anastasia's agents, actually establish that Anastasia does not control the activities of the Moscow Entities, and this lack of control is contrary to DMG's agency theory.

Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies and women, while Anastasia handles the US customer relationships. This contradicts DMG's assertion that Anastasia "cannot assess or distinguish the division of [business]" between Anastasia and the Moscow Entities.

Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on page 162 (Exh. E), suggests that employees of the Moscow Entities occasionally represent themselves to be part of "Anastasia Date" in media publications and for customer relations purposes, and that this sometimes leads to confusion as to who "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4) cited by DMG also concern similar issues.

Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its GoDaddy registration account in order to manage of the websites as authorized under the service agreement.

Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices

Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's periodically sends money to other Moscow entities as requested by Stoliza as general payments for amounts owed to Stolitza. DMG attempts to mischaracterize these payments as "making disbursements at the direction of the Moscow Entities" in its Introductory Statement to suggest erroneously that the Moscow Entities controlled Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's request under its Service Agreement is not relevant to any of the acts alleged in DMG's complaint.

At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the services we have received from the Russian entity." She did not say, as DMG suggests, that she condoned or even had knowledge of the acts alleged in the complaint.

At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same building" as the Moscow Entities, but not that he shares the same office with the Moscow Entities as DMG erroneously implies.

DMG also relies on deposition testimony that certain documents may exist, and appears to suggest that "relevance" is established merely because DMG has demanded their production. By DMG's circular reasoning, a document is relevant if DMG demands its production, and that document must be produced if DMG can establish its existence. But this is not the law. As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery to the claims or defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

To the extent DMG may later try to argue that other entities such as IT Online, Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's Complaint, DMG's request for production is not limited to DMG's claims, but is broadly directed toward all documents concerning an individual or entity who provides "services of generating revenue." There is simply no basis for DMG, a competitor, to demand that Anastasia provide such sweeping information, including information having nothing to do with DMG's claims.

BH8255.1
1003-30730

### (b)   Anastastia's Objections To DMG's Request No. 6

Anastasia's objections to DMG's Request No. 6 were particularized, well-founded, and reasonable.

### (i)   DMG's Improper Rule 30(b)(2) Requests

Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2) requests as being improper because a request for documents at a deposition is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an overly broad and excessively numerous production of documents at a deposition was an abuse of Rule 30(b)(2).

Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production requests appear to be part of a ploy by DMG to demand so many documents at the 30(b)(6) deposition, in a vague and incomprehensible manner, that it would impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an opportunity to demand that the deposition be resumed to ask about additional documents. Such a ploy is contrary to the rules.

### (ii)   Privilege

Anastasia made a general objection to each of DMG's document production requests that placing documents generated after the filing of DMG's Complaint on a privilege log would be unduly burdensome. Clearly, requiring that every communication between Anastasia and its counsel, or between counsel and expert consultants be recorded on a privilege log would be unreasonable and unduly burdensome.

DMG has made a similar objection in response to Anastasia document requests (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one would have expected DMG to have generated many attorney-client privileged or work product documents prior to filing suit.

In any event, neither DMG nor Anastasia have produced a privilege log identifying any post-filing documents. This is a non-issue.

### (iii)   Request No. 6 Is Oppressive And Burdensome

As previously discussed, a request for production of documents at a deposition under Rule 30(b)(2) is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL 817853, at *5.

Rather than seek a few and simple documents, DMG's Request No. 6 seeks production of "All DOCUMENTS" on a wide range of topics. Such a request is overly broad and unduly burdensome, and therefore objectionable where, as here, the request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist. LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in making a similar objection to Anastasia's request for production of "all" documents. Exh. F at 5 et al.

### (iv)   Request No. 6 Is Overly Broad

On its face, DMG's Request No. 6 is overly broad in seeking the entire business relationship between Anastasia and IT Online without limitation. Production to a competitor of all documents "relative to" this business relationship in response to such an overly broad request would be unduly burdensome and not relevant to the claims and defenses in this action.

The overly broad nature of this request is also illustrated by Exh. 6 (Tr. 247:23-248:24) which DMG has cited in support of its motion to compel. During the deposition, counsel for DMG asserted that all emails concerning U.S. advertising between Elena Sykes and a pregnant woman named Lidia who had an "IT Online" address was response to DMG's Request No. 6 for "All DOCUMENTS relative to the nature and history of the business relationship between AI and IT Online."

If a party's request for information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride v.*

*Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). DMG's approach here appears to be to make overly broad requests and improperly place the burden on Anastasia as a set-up in order to then blame Anastasia for failing to produce specific documents in response.

### (v)   Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.   DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions regarding Request No. 6, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;
- All emails between Defendant and Andrey Ryabichikov from January 2009 to present;
- All emails between Defendant and Oleg Nochka from January 2009 to present;
- All emails between Defendant and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from

January 2009 to present;

•       All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;

•       All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and

•       All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's claims in this action, nor responsive to Request No. 6. DMG has demanded these documents in connection with this particular request, but has made no effort to establish how those documents are allegedly responsive to this request. Nevertheless, Anastasia will address each in turn.

(a)       **All Invoice Attachments From Stolitza and IT Online**

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

DMG's demand for these attachments appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

### (b)    All emails with Andrey Ryabichikov

None of the requests for production that DMG seeks to compel refers to Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr. Ryabichikov without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Ryabichikov.

In short, DMG has made another overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

### (c)    All emails with Oleg Nochka

DMG also is demanding production of all emails with Oleg Nochka without any subject matter limitation over a three-year period of time, which predates DMG's Complaint by over a year-and-a-half.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Nochka.

Again, DMG has made an overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1   designed for harassment and to seek information regarding the operation of a

2   competitor's business unrelated to the claims DMG is asserting in this action.

3   **(d)     All emails with Alexey Eremin**

4   None of the requests for production that DMG seeks to compel refers to

5   Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's

6   former President, Mr. Eremin, without any subject matter limitation over a three-year

7   period of time. Mr. Eremin was not even President of Anastasia until November

8   2010, and he had no involvement in Anastasia's business activities prior to that time.

9   Exh. D (Tr. 99, and 329).

10   Again, DMG has made an overly broad demand for production of documents

11   without making any attempt to establish their relevancy to this action. Testimony was

12   given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters

13   raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover,

14   testimony was given that there were no email communications between Anastasia and

15   Mr. Eremin except for a few litigation-related matters that are immune from discovery

16   as work product and the attorney-client privilege. Exh. D (Tr. 104).

17   **(e)     All wire transfers to Lookintom**

18   DMG also is demanding "[a]ll documents, invoices, emails, bank records,

19   accounting records that relate to any funds or wire transfers from Defendant to

20   Lookintom from January 2009 to present." DMG has made no showing why such a

21   broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of*

22   *P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

23   financial condition was not relevant to issues of whether contractor was fully

24   compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

25   ed.).

26   At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been

27   made to Lookintom at the request of Stolitza in order to satisfy amounts due to

28   Stolitza. These payments were not linked to any specific Stolitza invoice, but were

applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Lookintom to Anastasia, and no invoices requesting payment to Lookintom.

The history of payments made by Anastasia to Lookintom to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (f) All wire transfers to Kirpton

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to [sic] Krypton from January 2009 to present," but has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); *see also* 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

As an initial matter, Anastasia has made no payments to "Krypton." At Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified

1   that she did not recall seeing that particular document before. Nevertheless, it shows

2   that DMG had possession of this document identifying Kirpton prior to the

3   deposition, but did not serve any discovery requests directed towards Kirpton

4   apparently in an attempt to catch Anastasia by surprise at the deposition. Having

5   failed to obtain anything significant at the deposition, DMG is now seeking to

6   shoehorn its present demand for production into one of its prior requests without any

7   attempt to establish the relevancy of the documents to any claim or defense in this

8   action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

9         The history of payments made to Kirpton by Anastasia is not relevant to any

10  claim or defense in this action, and DMG has made no attempt to establish any. The

11  fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts

12  owed to Stolitza is not relevant to any claim or defense in this action. Nor would the

13  specific amounts paid as reflected in bank statements be relevant.

14        **(g)    All Phone Billing Records For Any (800) Number**

15        DMG has given no reason why "[a]ll phone billing records for any (800)

16  number used by Defendant or with reference to Defendant's business activities from

17  January 2009 to present, and to the extent that no billing records exist, exemplars of

18  bills dating back to January 2006" are relevant to this action. Moreover, these phone

19  records are not responsive to DMG's Request No. 6. In any event, Anastasia has

20  already informed DMG that Anastasia has no relevant phone billing records to

21  produce.

22        **(f)    All invoices for Google Accounts**

23        DMG also has given no reason why "[a]ll invoices for Google accounts

24  2961669 and 1020911" are relevant to this action. Google was not involved in the acts

25  alleged in its Complaint, and these invoices are not relevant to the claims or defenses

26  in this action. Moreover, these Google documents do not appear responsive to

27  DMG's Request No. 6.

28

### 5.      Concluding Statement Re DMG's Issue No. 4

As has become its custom in this action, DMG's counsel opens his declaration in support of DMG's motion to compel with a diatribe against what he claims to be Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery conduct. Anastasia has actually produced more documents to DMG than DMG has produced to Anastasia in this action (not including computer logs that DMG produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's requests for production, DMG stated that "DMG will not produce documents responsive to this request." Exh F.

DMG's motion to compel production in response to its Request No. 6 should be denied because the additional documents that DMG seeks are not relevant to any claim or defense in the present action. These documents have already been produced by Anastasia, and DMG's relevancy argument does not apply to the additional documents that it now seeks.

## VI.   ISSUE NO. 5: REQUEST NO. 9 FOR PRODUCTION OF DOCUMENTS AT DEPOSITION

### A.      Disputed Request for Production and Defendant's Response

<u>REQUEST FOR PRODUCTION NO. 9</u>

All DOCUMENTS relative to the nature and history of the business relationship between AI and Stolitza, LLC.

<u>RESPONSE TO REQUEST NO. 9</u>

In addition to its General Objections incorporated herein, Anastasia objects to this request on the grounds that the terms and phrases "all DOCUMENTS," "relative to," "the nature and history of the business relationship," and "between AI and Stolitza, LLC," are vague and ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Anastasia will interpret this this request as being limited to documents describing the business

1   relationship between Anastasia and Stolitza. Anastasia further objects to the extent

2   that this request is directed to activities by third parties and to information not within

3   the possession, custody or control of Anastasia. Anastasia further objects to the extent

4   that this request is directed to documents outside the subject matter or temporal

5   scope of the acts alleged in the Complaint, and is therefore overly broad, unduly

6   burdensome, and not likely to lead to the discovery of admissible evidence. Subject to

7   and without waiver of its General Objections and the immediately preceding specific

8   objections, Anastasia answers as follows: Other than documents already produced,

9   Anastasia has no additional documents to produce.

### B.   DMG's Contentions and Points and Authorities

11      The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

12   the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.

13   Sykes testified that the companies in Moscow known as Stolitza and IT-Online

14   (together referenced by the witness as the "Moscow Entities") have carte blanche to

15   perform any service on behalf of AI, knows that these two companies hold

16   themselves out as being AI, that they created and manage all internet activities and

17   business activities of AI including and not limited to AI's primary website

18   Anastasiadate as well as all of AI's affiliates, that all customer service calls are

19   answered at their offices, that AI receives all revenues and makes disbursements at

20   their direction and that she has never had a problem with their conduct or objected to

21   their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9;

22   64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-

23   202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-**

24   **354:2**.)

25      At the deposition, Plaintiff requested specific documents responsive to several

26   document requests to be produced that were not produced at the deposition. The

27   documents also were relevant to the witnesses' testimony. This included invoices

28   requesting wire transfers and bank records showing wire transfers to companies

1   Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to
2   interference with contractual relations between Plaintiff and Plaintiff's agencies as well
3   as unauthorized access to Plaintiff's website and the screen scraping thereof. The
4   witness confirmed that wire transfers were made to these entities by AI at the request
5   of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-
6   299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that
7   she has provided invoices to her counsel, but no invoices were produced at the
8   deposition. (Ex. 6, 123:17-125:12.) Plaintiff's counsel also requested phone records for
9   (800) numbers relative to AI's business to establish that AI was paying for the phone
10  bills for the customer service of AI which was being handled out of the Moscow
11  offices. (Ex. 6, 281:22-283:13.) Email correspondence was also requested with respect
12  to communications between Elena Sykes and Andrey Ryabchikov and Oleg Nochka
13  who managed the Moscow office. (Ex. 6, 212:4-25; 249:12-250:13, 256:16-258:3.)
14  Additionally emails between Elena Sykes and Lydia Kara of the Moscow office were
15  requested because Ms. Sykes testified that Ms. Kara requested assistance with placing
16  ads in the United States. (Ex. 6, 243:22-245:4, 247:9-248:3.) Again, AI gave carte
17  blanche to IT-Online (Moscow entity) to handle all of its internet activities, including
18  complete access to it Google Analytics accounts. At the deposition Plaintiff's counsel
19  also requested copies of the invoices and payment records with respect to the Google
20  Analytic accounts 2981669 and 1020911 because the accounts are presumed to be in
21  AI's name. (Ex. 6, 290:17-20; 291:9-293:19.)

22      Following the deposition, on November 7, 2011 Plaintiff sent a letter to
23  Defendant's counsel with the following request:

24

25      To follow up the PMK deposition document requests, as referenced at
26      the deposition of your client, specific documents responsive to the
27      document categories were requested to be produced, most relating to
28      your client's relationship to Stolitza and IT-Online as follows:

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

- All invoices from Stolitza and IT-Online from January 2009 to present;

- All emails between your client and Andrey Ryabichikov from January 2009 to present;

- All emails between your client and Oleg Nochka from January 2009 to present;

- All emails between your client and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and

- All phone billing records for any (800) number used by your client from January 2009 to present.

((Ex. 7.).)

On November 9, 2011, Plaintiff's counsel again requested copies of the invoices for Google accounts 2961669 and 1020911to be produced responsive to the PMK document requests. (Ex. 8.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to production of the Person Most Knowledgeable ("PMK") documents that were requested at the deposition of your client and further identified in my November 7, 2011 letter and November 9, 2011 email, you advised that you will have to confer with your client

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

with respect all the business emails between your client and Andrey Ryabichikov, Oleg Nochka and Alexey Eremin between January 1, 2009 to present, as well as with regard to the (800) phone number records. As we discussed, if there are no records of (800) phone bills to your client from January 2009 to present, we will accept exemplars of bills dating back to January 2006, as we have your client's internet website pages dating back to 2006 that are relevant in this case. We do need verification from you that your client does not have the (800) phone number records requested. You advised that you will advise me by November 21, 2011 regarding the above.

With respect to all the other documents requested, you advised that the documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton.

(Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Defendant's objections are also disingenuous:

**Privilege**: Parties withholding documents as privileged should identify and describe the documents in sufficient detail to enable the demanding party to contest

the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena); *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.* 185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege log for documents withheld on grounds of privilege or work product). Defendant has not provided a privilege log, nor has it identified documents with sufficient detail or stated the specific privilege applicable to each identified document that was withheld. *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996). Defendant's generalized, nonspecific claims of privilege constitute an implied waiver of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem. Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges are not permitted to provide mere 'blanket objections' to discovery requests." *Am. Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July 14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that this Request is "overbroad" and "burdensome", where a party resists a discovery request claiming that it is unduly burdensome, the burden rests on the party raising the objection to show that responding would be *unduly* burdensome. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137 F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection must be supported by affidavits or other evidence which demonstrates the burden. *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate attempts to obtain discovery and prepare this case. This objection was improperly

1   asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193

2   F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon

3   burdensomeness the objecting party must particularize the basis for the objection as

4   generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289

5   (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

6   **Vague and Ambiguous**: "The party objecting to discovery as vague or

7   ambiguous has the burden to show such vagueness or ambiguity . . . Respondents

8   should exercise reason and common sense to attribute ordinary definitions to terms

9   and phrases utilized in interrogatories. To clarify their answers, respondents may

10  include any necessary, reasonable definition of such terms or phrases." *Santana Row*

11  *Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677

12  (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D.

13  295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is

14  unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an

15  intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

16  **Relevance**: AI and the Moscow entities formed the internet business together.

17  Since the internet business was formed, AI has known and has authorized the

18  Moscow entities represent to the public that the Moscow entities were and are AI.

19  There is an implication that the Moscow entities provide exclusive services for AI. AI

20  cannot assess or distinguish the division of ownership of business assets or the rights

21  of ownership thereto. AI pays the Moscow entities a percentage of all revenues and

22  AI accepts the benefits of all services provided by the Moscow entities. AI has given

23  carte blanche to the Moscow entities to manage all internet and agency activities. AI

24  never objected to the Moscow entities activities, including the activities that form the

25  basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See

26  Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20,

27  334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-

28  25, 296:6-298:14, 325:5-24)

1    Further, The PMK witness testified that records exist or may exist with respect

2  to many of the documents that have been requested to be produced. See Exh. 6

3  (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24,

4  360:5-21)

5    Plaintiff's investigation has revealed that the Moscow entities have conducted

6  the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged

7  that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the

8  discovery sought herein to establish a partnership between AI and the Moscow

9  entities, or alternatively, that AI ratified the activities of the Moscow relative to

10  Plaintiff's complaint, which is relevant.

11    "Under California Corporations Code section 16202(a), 'the association of two

12  or more persons to carry on as co-owners of a business for profit forms a partnership,

13  whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a).

14  'Whether a partnership or joint venture exists is primarily a factual question to be

15  determined by the trier of fact from the evidence and inferences to be drawn

16  therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973).

17  'Although a partnership ordinarily involves a continuing business, whereas a joint

18  venture is usually formed for a specific transaction or a single series of transactions,

19  the incidents of both relationships are the same in all essential respects.' *Connolly,* 111

20  Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to

21  have been organized from a reasonable deduction from the acts and declarations of

22  the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a]

23  joint venture exists where there is an 'agreement between the parties under which they

24  have a community of interest, that is, joint interest, in a common business

25  undertaking, an understanding as to the sharing of profits and losses, and a right of

26  joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing &*

27  *Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

28  relationship such as that of partners has been created, the courts are guided not only

by the spoken or written words of the contracting parties, but also by their acts."
*Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners, Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

"The issues we deal with involve the application of traditional principles of agency law. Two basic rules are involved: (1) ratification by a person of an act purportedly done on his behalf not only creates the relationship of principal and agent but also constitutes approval by the ratifier of the purported agent's act, relieving such agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby relieving the wrongdoer agent of liability to the principal. "

"The first rule is embodied in Civil Code section 2307 which provides: 'An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification.'"… 'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' (Ballard v. Nye (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App. 420, 428, 267 P. 356; Rest.2d Agency, § 83.)

"Generally, the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act. (Ballard v. Nye, supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100" *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

"Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be adopted expressly or ... by implication based on conduct of the purported principal from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto*

117

1  *v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see

2  *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

3      *Relevant* information may be discoverable if it "appears *reasonably calculated to lead*

4  to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added).

5  Plaintiff has the *right* to discover non-privileged information "relevant to the claim or

6  defense of *any party,* including the existence, description, nature, custody, condition

7  and location of any books, documents, or other tangible things and the identity and

8  location of persons having knowledge of any discoverable matter." Fed R. Civ. P.

9  26(b)(1), (emphasis added). This includes information that Plaintiff may use to

10  support its claims or defenses of Defendant, including the *identity* of any *witness or*

11  *document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

12  to Fed R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if

13  there is <u>any</u> possibility that the information sought may be relevant to the subject

14  matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington,* 103 F.R.D.

15  52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

16      **Duty to Inquire:** DMG contends that with respect to Defendant's agents,

17  partners and affiliates, Defendant has a duty to "secure all information available to"

18  the corporation, including "information within the personal knowledge of former ...

19  employees, employed ... at the time this action commenced [and even] information

20  possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d

21  1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.,*

22  709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such

23  information as is available from the corporation itself or from sources under its

24  control ... [i]f the corporation can obtain the information from sources under its

25  control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki*

26  *Motor Co., Ltd.,* 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all

27  responsive information available from [it] or from sources under [its] control."

28  *Goodrich Corp. v. Emhart Indus., Inc.,* EDCV0400759VAPSSX, 2005 WL 6440828 (C.D.

Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection.

### C.    Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims.

In response to DMG's long-winded, rambling and disjointed contentions regarding its self-styled "Issue No. 5" concerning its Request No. 9 under Rule 30(b)(2), Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel production of; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

### 1.    Discovery At Issue

On its face, DMG's Request No. 9 seeks "all" documents "relative to the nature

119

and business relationship between AI and Stolitza."

DMG's motion to compel should be denied because:

- Anastasia has already produced documents responsive to this request;

- DMG now seeks additional documents that are not relevant to any claim or defense in the present action;

- the request is unduly burdensome, especially since a Rule 30(b)(2) request should be limited to a few and simple documents;

- the request is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and

- the documents DMG now seeks to compel are not reasonably responsive to this request.

To avoid unnecessary repetition, Anastasia refers back to the section covering DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of discovery which led to this discovery request. .

### 2.     Legal Standards

Again, as previously discussed in connection with DMG's "Issue No. 1," DMG's portion of the joint stipulation consists of abstract legal arguments that are not linked to the specific request or topics that are the subject of DMG's motion to compel. DMG's motion fails to make any case for the relevance of the documents it now seeks to the claims or defenses at issue in the litigation. DMG instead seems to merely assume their relevance, and thus has failed to meet its burden.

### (a)     Rule 26(b)

As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and requires the party requesting discovery to establish the relevancy of the requested discovery sought to the claims or defenses in the action. If a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to

1    the party resisting discovery. *Id.*

2                        **(b)      Rule 30(b)(2)**

3          Rule 30(b)(2) is intended to be used when seeking a few and simple documents.

4    Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for

5    Documents at a deposition are appropriate where "the documents are few and

6    simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and

7    ambiguous requests seek far more than a few and simple documents.

8          Moreover, as the party seeking production of documents not in the possession

9    or custody of Anastasia, DMG bears the burden of proving that Anastasia has control

10   or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d

11   1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not

12   have the legal right to obtain will oftentimes be futile, precisely because the party has

13   no certain way of getting those documents."). "[P]roof of theoretical control is

14   insufficient; a showing of actual control is required." *Id.* at 1107.

15               **3.      DMG's Rule 30(b)(2) Document Request No. 9**

16         As previously discussed, DMG's Request No. 9 seeks "all" documents relative

17   to the business relationship between Anastasia and Stolitza.

18         There is no reasonable interpretation of this request that would be

19   commensurate with the eight specific demands for production being made by DMG

20   in this motion and discussed below,

21         Anastasia has already produced documents (AD108-129 and AD689-938) in

22   response to this request. DMG's motion to compel additional production should

23   therefore be denied.

24                   **(a)      DMG Has Not Established That Request No. 9 Seeks**

25                              **Relevant Discovery**

26         As the party seeking to compel production, DMG has the burden of

27   establishing that the requested discovery is relevant to a claim or defense in this

28   action. During the meet-and-confer process for this motion, DMG erroneously stated

                                               121

1    that it was "not required to educate [Anastasia] on the relevancy" of the discovery it
2    was seeking. Exh. J.

3           In its first joint stipulation (Exh. L), DMG's only relevancy argument was that
4    "sales information requested is clearly relevant in a trademark claim." But DMG's
5    Request No. 9 is not directed in any meaningful way to sales information relating to
6    the use of the allegedly infringed mark, but generally to "any person or entity that
7    provides services of generating revenue." A trademark claim does not give *carte blanche*
8    to discovery of a party's sales. Moreover, Anastasia has already produced documents
9    regarding the sales associated with the websites that DMG has accused of infringing
10   its trademark, in response to other requests.

11          After reading Anastasia's portion of the joint stipulation, DMG realized that it
12   had utterly failed to address the relevancy of the documents it was now seeking. DMG
13   then revised its portion of the joint stipulation to add a legal discussion of agency
14   theory, and to delete its failed "trademark" argument. But DMG's revised relevancy
15   argument still misses the mark because it remains untethered to the two narrow claims
16   asserted by DMG in this action.

17          As discussed in Anatasia's Introductory Statement, DMG has assserted
18   essentially two claims—(1) a trademark claim based on the registration and use of a
19   dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA
20   claim based on alleged attempts to make unauthorized access to the dream-
21   marriage.com website and to harass the women who had profiles on that website.
22   Notably, the anastasiadate.com website and the operation of that website are not at
23   issue.

24          In dropping the trademark argument, DMG has effectively conceded that the
25   discovery its seeks to compel is not relevant to the trademark claim (which is
26   consistent with the fact that none of the discovery requests at issue are directed to
27   DMG's trademark). That leaves the claim based on unauthorized access and
28   harassment. DMG has alleged that these activities were undertaken by persons acting

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1  in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for

2  production is not limited to the facts surrounding these particular claims. Instead, it is

3  broadly directed toward Anastasia's business in general. DMG fails to show how the

4  specific information it seeks is relevant to DMG's claims. It also fails to explain how

5  the information sought will lead to admissible evidence.

6      DMG misrepresents the record in an attempt to support its belated agency

7  argument.

8      For example, DMG claims that it needs discovery regarding the business

9  relationship between Anastasia and the Moscow Entities because of an "implication"

10  that they provide "exclusive services" to Anastasia. In addition to the dubious

11  relevancy of this allegation, the fact is that Anastasia already has produced copies of

12  its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

13  and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

14  ranging discovery. While DMG cites a large number of cases for abstract principles of

15  agency law, DMG fails to apply any of those principles to the facts of this case.

16  DMG's legal theories appear to be nothing more than post-hoc rationalizations to

17  justify intrusive discovery into a competitor's business.

18      DMG also attempts to suggest that one is an agent "at all times," but one "may

19  be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

20  *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

21  part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

22  Ct. 1380, 143 L. Ed. 2d 462 (1999).

23      In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

24  DMG has refused to provide Anastasia with even basic information concerning the

25  formation, ownership and management structure of various DMG-related entities

26  who also have claimed ownership of the DREAM MARRIAGE trademark and

27  website that DMG now claims to own. For example, in response to Anastasia's

28  requests for production of documents concerning DMG's relationship with a

1   company called Dream Marriage, Inc. that previously owned the DREAM-

2   MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

3   dream-marriage.com website, DMG has either refused to produce any documents at

4   all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

5   has only produced license agreements or assignments. Yet DMG hypocritically finds

6   that Anastasia's production of similar documents concerning the relationship with the

7   Moscow Entities somehow inadequate.

8       DMG also claims that Anastasia "pays the Moscow entities a percentage of all

9   revenues," in an apparent attempt by DMG to create the illusion of a partnership.

10  This allegation is completely false. The Moscow entity sends invoices to Anastasia for

11  services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

12  invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

13  produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is

14  now seeking the attachments to these invoices which give details of the work

15  underlying the invoices, even though such attachments would not be necessary if

16  Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG.

17  Even if DMG's allegation were true, which it is not, it does nothing to support the

18  relevancy of the overly broad and intrusive discovery that DMG now seeks.

19      Nor do the deposition transcript pages cited by DMG support its wild

20  accusations.

21      For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by

22  DMG for the proposition that the Moscow entities are Anastasia's agents, actually

23  establish that Anastasia does not control the activities of the Moscow Entities, and

24  this lack of control is contrary to DMG's agency theory.

25      Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship

26  with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies

27  and women, while Anastasia handles the US customer relationships. This contradicts

28  DMG's assertion that Anastasia "cannot assess or distinguish the division of

124

[business]" between Anastasia and the Moscow Entities.

Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on page 162 (Exh. E), suggests that employees of the Moscow Entities occasionally represent themselves to be part of "Anastasia Date" in media publications and for customer relations purposes, and that this sometimes leads to confusion as to who "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4) cited by DMG also concern similar issues.

Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its GoDaddy registration account in order to manage of the websites as authorized under the service agreement.

Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's periodically sends money to other Moscow entities as requested by Stoliza as general payments for amounts owed to Stolitza. DMG attempts to mischaracterize these payments as "making disbursements at the direction of the Moscow Entities" in its Introductory Statement to suggest erroneously that the Moscow Entities controlled Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's request under its Service Agreement is not relevant to any of the acts alleged in DMG's complaint.

At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the services we have received from the Russian entity." She did not say, as DMG suggests, that she condoned or even had knowledge of the acts alleged in the complaint.

At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same building" as the Moscow Entities, but not that he shares the same office with the Moscow Entities as DMG erroneously implies.

DMG also relies on deposition testimony that certain documents may exist, and appears to suggest that "relevance" is established merely because DMG has

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1  demanded their production. By DMG's circular reasoning, a document is relevant if

2  DMG demands its production, and that document must be produced if DMG can

3  establish its existence. But this is not the law. As the party requesting discovery, DMG

4  bears the burden of establishing relevancy of the requested discovery to the claims or

5  defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

6        To the extent DMG may later try to argue that other entities such as IT Online,

7  Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's

8  Complaint, DMG's request for production is not limited to DMG's claims, but is

9  broadly directed toward all documents concerning an individual or entity who

10  provides "services of generating revenue." There is simply no basis for DMG, a

11  competitor, to demand that Anastasia provide such sweeping information, including

12  information having nothing to do with DMG's claims.

13        **(b)   Anastastia's Objections To DMG's Request No. 9**

14        Anastasia's objections to DMG's Request No. 9 were particularized, well-

15  founded, and reasonable.

16        **(i)   DMG's Improper Rule 30(b)(2) Requests**

17        Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2)

18  requests as being improper because a request for documents at a deposition is

19  appropriate only where "the documents are few and simple." Advisory Committee's

20  Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No.

21  98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an

22  overly broad and excessively numerous production of documents at a deposition was

23  an abuse of Rule 30(b)(2).

24        Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production

25  requests appear to be part of a ploy by DMG to demand so many documents at the

26  30(b)(6) deposition, in a vague and incomprehensible manner, that it would

27  impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an

28  opportunity to demand that the deposition be resumed to ask about additional

1    documents. Such a ploy is contrary to the rules.

2                         **(ii)     Privilege**

3          Anastasia made a general objection to each of DMG's document production

4    requests that placing documents generated after the filing of DMG's Complaint on a

5    privilege log would be unduly burdensome. Clearly, requiring that every

6    communication between Anastasia and its counsel, or between counsel and expert

7    consultants be recorded on a privilege log would be unreasonable and unduly

8    burdensome.

9          DMG has made a similar objection in response to Anastasia document requests

10   (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one

11   would have expected DMG to have generated many attorney-client privileged or work

12   product documents prior to filing suit.

13         In any event, neither DMG nor Anastasia have produced a privilege log

14   identifying any post-filing documents. This is a non-issue.

15                        **(iii)    Request No. 9 Is Oppressive And Burdensome**

16         As previously discussed, a request for production of documents at a deposition

17   under Rule 30(b)(2) is appropriate only where "the documents are few and simple."

18   Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL

19   817853, at *5.

20         Rather than seek a few and simple documents, DMG's Request No. 9 seeks

21   production of "All DOCUMENTS" on a wide range of topics. Such a request is

22   overly broad and unduly burdensome, and therefore objectionable where, as here, the

23   request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist.

24   LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in

25   making a similar objection to Anastasia's request for production of "all" documents.

26   Exh. F at 5 et al.

27                        **(iv)    Request No. 9 Is Overly Broad**

28         On its face, DMG's Request No. 9 is overly broad in seeking the entire

business relationship between Anastasia and Stolitza without limitation to relevant information to the claims and defenses in this action. Production of all documents "relative to" this business relationship in response to such an overly broad request would be oppressive and unduly burdensome.

### (v)    Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.    DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;
- All emails between Defendant and Andrey Ryabichikov from January 2009 to present;
- All emails between Defendant and Oleg Nochka from January 2009 to present;
- All emails between Defendant and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from

1    January 2009 to present;

2    •    All documents, invoices, emails, bank records, accounting records that

3         relate to any funds or wire transfers from Defendant to Krypton from

4         January 2009 to present;

5    •    All phone billing records for any (800) number used by Defendant or with

6         reference to Defendant's business activities from January 2009 to present,

7         and to the extent that no billing records exist, exemplars of bills dating

8         back to January 2006; and

9    •    All invoices for Google accounts 2961669 and 1020911.

10       These overly broad categories of documents are neither relevant to DMG's

11   claims in this action, nor responsive to Request No. 10. DMG has demanded these

12   documents in connection with this particular request, but has made no effort to

13   establish how those documents are allegedly responsive to this request. Nevertheless,

14   Anastasia will address each in turn.

15              **(a)    All Invoice Attachments From Stolitza and IT Online**

16       In an attempt to resolve a dispute over the production of Stolitza's invoices,

17   Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there

18   are no invoices from IT Online), even though Anastasia believed that the invoices

19   were not relevant to any of DMG's claims in this action. But after Anastasia made its

20   good faith production of documents (AD689-938, see also Exh. K) based on this

21   compromise, DMG turned around and demanded production of all the attachments

22   that had been redacted by agreement of the parties.

23       The attachments for programming services are detailed itemizations of

24   programming work performed for the anastasiadate.com website. There is no

25   reference to the accused domain names or websites, or to any monitoring or screen

26   scraping of a competitor's website. Thus, these documents are not relevant to DMG's

27   claims, and DMG has made no attempt to establish their relevancy to this action. This

28   is highly sensitive technical information that would be of great value to a competitor.

1    The invoice attachments for analytical services and customer service likewise

2    contain no reference to the accused domain names or websites or to any monitoring

3    or screen scraping of a competitor's website (there are no attachments to the invoices

4    for server leasing and hosting). Again, DMG has not established the relevancy of

5    these commercially sensitive documents to this action.

6    DMG's demand for these attachments appears to be motivated more by a

7    desire to seek sensitive commercial information regarding the operation of a

8    competitor's business and websites than to seek information actually relevant to the

9    claims DMG is asserting in this action.

10                        **(b)    All emails with Andrey Ryabichikov**

11    None of the requests for production that DMG seeks to compel refers to

12    Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr.

13    Ryabichikov without any subject matter limitation over a three-year period of time,

14    which predates DMG's Complaint by over a year-and-a-half.

15    During the 30(b)(6) deposition, there were no questions or answers establishing

16    any relevant email communication between Anastasia and Mr. Ryabichikov.

17    In short, DMG has made another overly broad demand for production of

18    documents without making any attempt to establish relevancy. DMG's demand

19    appears to be designed for harassment and to seek information regarding the

20    operation of a competitor's business unrelated to the claims DMG is asserting in this

21    action.

22                        **(c)    All emails with Oleg Nochka**

23    DMG also is demanding production of all emails with Oleg Nochka without

24    any subject matter limitation over a three-year period of time, which predates DMG's

25    Complaint by over a year-and-a-half.

26    During the 30(b)(6) deposition, there were no questions or answers establishing

27    any relevant email communication between Anastasia and Mr. Nochka.

28    Again, DMG has made an overly broad demand for production of documents

1   without making any attempt to establish relevancy. DMG's demand appears to be

2   designed for harassment and to seek information regarding the operation of a

3   competitor's business unrelated to the claims DMG is asserting in this action.

### (d)     All emails with Alexey Eremin

5   None of the requests for production that DMG seeks to compel refers to

6   Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's

7   former President, Mr. Eremin, without any subject matter limitation over a three-year

8   period of time. Mr. Eremin was not even President of Anastasia until November

9   2010, and he had no involvement in Anastasia's business activities prior to that time.

10  Exh. D (Tr. 99, and 329).

11  Again, DMG has made an overly broad demand for production of documents

12  without making any attempt to establish their relevancy to this action. Testimony was

13  given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters

14  raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover,

15  testimony was given that there were no email communications between Anastasia and

16  Mr. Eremin except for a few litigation-related matters that are immune from discovery

17  as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)     All wire transfers to Lookintom

19  DMG also is demanding "[a]ll documents, invoices, emails, bank records,

20  accounting records that relate to any funds or wire transfers from Defendant to

21  Lookintom from January 2009 to present." DMG has made no showing why such a

22  broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of*

23  *P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

24  financial condition was not relevant to issues of whether contractor was fully

25  compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

26  ed.).

27  At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been

28  made to Lookintom at the request of Stolitza in order to satisfy amounts due to

BH8255.1
1003-30730

Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Lookintom to Anastasia, and no invoices requesting payment to Lookintom.

The history of payments made by Anastasia to Lookintom to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (f)      All wire transfers to Kirpton

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to [sic] Krypton from January 2009 to present," but has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

As an initial matter, Anastasia has made no payments to "Krypton." At Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton. Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy

of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (g)    All Phone Billing Records For Any (800) Number

DMG has given no reason why "[a]ll phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006" are relevant to this action. Moreover, these phone records are not responsive to DMG's Request No. 9. In any event, Anastasia has already informed DMG that Anastasia has no relevant phone billing records to produce.

### (f)    All invoices for Google Accounts

DMG also has given no reason why "[a]ll invoices for Google accounts 2961669 and 1020911" are relevant to this action. Google was not involved in the acts alleged in its Complaint, and these invoices are not relevant to the claims or defenses in this action. Moreover, these Google documents do not appear responsive to DMG's Request No. 9.

**5.      Concluding Statement Re DMG's Issue No. 5**

As has become its custom in this action, DMG's counsel opens his declaration in support of DMG's motion to compel with a diatribe against what he claims to be Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery conduct. Anastasia has actually produced more documents to DMG than DMG has produced to Anastasia in this action (not including computer logs that DMG produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's requests for production, DMG stated that "DMG will not produce documents responsive to this request." Exh F.

DMG's motion to compel production in response to its Request No. 9 should be denied because the additional documents that DMG seeks are not relevant to any claim or defense in the present action. These documents have already been produced by Anastasia, and DMG's relevancy argument does not apply to the additional documents that it now seeks.

## VII.    ISSUE NO. 6: REQUEST NO. 10 FOR PRODUCTION OF DOCUMENTS AT DEPOSITION

**A.      Disputed Request for Production and Defendant's Response**

REQUEST FOR PRODUCTION NO. 10

All DOCUMENTS relative to the nature and history of the business relationship between Stolitza, LLC and IT Online.

RESPONSE TO REQUEST NO. 10

In addition to its General Objections incorporated herein, Anastasia objects to this request on the grounds that the terms and phrases "all DOCUMENTS," "relative to," "the nature and history of the business relationship," and "between Stolitza, LLC and IT Online," are vague and ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Anastasia will interpret this this request as being limited to documents describing a business

relationship between Stolitza and IT Online. Anastasia further objects to the extent that this request is directed to activities by third parties and to information not within the possession, custody or control of Anastasia. Anastasia further objects to the extent that this request is directed to documents outside the subject matter or temporal scope of the acts alleged in the Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. Subject to and without waiver of its General Objections and the immediately preceding specific objections, Anastasia answers as follows: Anastasia has no additional documents to produce.

## B.    DMG's Contentions and Points and Authorities

The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms. Sykes testified that the companies in Moscow known as Stolitza and IT-Online (together referenced by the witness as the "Moscow Entities") have carte blanche to perform any service on behalf of AI, knows that these two companies hold themselves out as being AI, that they created and manage all internet activities and business activities of AI including and not limited to AI's primary website Anastasiadate as well as all of AI's affiliates, that all customer service calls are answered at their offices, that AI receives all revenues and makes disbursements at their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; 290:17-20; 334:22-335:4; 351:24-354:2.)

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies

Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition. (Ex. 6, 123:17-125:12.) Plaintiff's counsel also requested phone records for (800) numbers relative to AI's business to establish that AI was paying for the phone bills for the customer service of AI which was being handled out of the Moscow offices. (Ex. 6, 281:22-283:13.) Email correspondence was also requested with respect to communications between Elena Sykes and Andrey Ryabchikov and Oleg Nochka who managed the Moscow office. (Ex. 6, 212:4-25; 249:12-250:13, 256:16-258:3.) Additionally emails between Elena Sykes and Lydia Kara of the Moscow office were requested because Ms. Sykes testified that Ms. Kara requested assistance with placing ads in the United States. (Ex. 6, 243-22-245:4, 247:9-248:3.) Again, AI gave carte blanche to IT-Online (Moscow entity) to handle all of its internet activities, including complete access to it Google Analytics accounts. At the deposition Plaintiff's counsel also requested copies of the invoices and payment records with respect to the Google Analytic accounts 2981669 and 1020911 because the accounts are presumed to be in AI's name. (Ex. 6, 290:17-20; 291:9-293:19.)

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

> To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;

- All emails between your client and Andrey Ryabichikov from January 2009 to present;

- All emails between your client and Oleg Nochka from January 2009 to present;

- All emails between your client and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and

- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

On November 9, 2011, Plaintiff's counsel again requested copies of the invoices for Google accounts 2961669 and 1020911to be produced responsive to the PMK document requests. (Ex. 8.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to production of the Person Most Knowledgeable ("PMK") documents that were requested at the deposition of your client and further identified in my November 7, 2011 letter and November 9, 2011 email, you advised that you will have to confer with your client

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

with respect all the business emails between your client and Andrey Ryabichikov, Oleg Nochka and Alexey Eremin between January 1, 2009 to present, as well as with regard to the (800) phone number records. As we discussed, if there are no records of (800) phone bills to your client from January 2009 to present, we will accept exemplars of bills dating back to January 2006, as we have your client's internet website pages dating back to 2006 that are relevant in this case. We do need verification from you that your client does not have the (800) phone number records requested. You advised that you will advise me by November 21, 2011 regarding the above.

With respect to all the other documents requested, you advised that the documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton.
(Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Defendant's objections are also disingenuous:

**Privilege**: Parties withholding documents as privileged should identify and describe the documents in sufficient detail to enable the demanding party to contest

the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena);
*Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.*
185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege
log for documents withheld on grounds of privilege or work product). Defendant has
not provided a privilege log, nor has it identified documents with sufficient detail or
stated the specific privilege applicable to each identified document that was withheld.
*United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996).
Defendant's generalized, nonspecific claims of privilege constitute an implied waiver
of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem.
Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges
are not permitted to provide mere 'blanket objections' to discovery requests." *Am.
Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July
14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that
this Request is "overbroad" and "burdensome", where a party resists a discovery
request claiming that it is unduly burdensome, the burden rests on the party raising
the objection to show that responding would be *unduly* burdensome. *Snowden v.
Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp.
2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient
basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137
F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is
overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium
Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection
must be supported by affidavits or other evidence which demonstrates the burden.
*Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60
(D.D.C. 1984). No such showing was made by Defendant. Defendant's objection
lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate
attempts to obtain discovery and prepare this case. This objection was improperly

1  asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193

2  F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon

3  burdensomeness the objecting party must particularize the basis for the objection as

4  generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289

5  (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

6      **Vague and Ambiguous**: "The party objecting to discovery as vague or

7  ambiguous has the burden to show such vagueness or ambiguity . . . Respondents

8  should exercise reason and common sense to attribute ordinary definitions to terms

9  and phrases utilized in interrogatories. To clarify their answers, respondents may

10  include any necessary, reasonable definition of such terms or phrases." *Santana Row*

11  *Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677

12  (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D.

13  295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is

14  unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an

15  intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

16      **Relevance**: AI and the Moscow entities formed the internet business together.

17  Since the internet business was formed, AI has known and has authorized the

18  Moscow entities represent to the public that the Moscow entities were and are AI.

19  There is an implication that the Moscow entities provide exclusive services for AI. AI

20  cannot assess or distinguish the division of ownership of business assets or the rights

21  of ownership thereto. AI pays the Moscow entities a percentage of all revenues and

22  AI accepts the benefits of all services provided by the Moscow entities. AI has given

23  carte blanche to the Moscow entities to manage all internet and agency activities. AI

24  never objected to the Moscow entities activities, including the activities that form the

25  basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See

26  Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20,

27  334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-

28  25, 296:6-298:14, 325:5-24)

1    Further, The PMK witness testified that records exist or may exist with respect

2    to many of the documents that have been requested to be produced. See Exh. 6

3    (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24,

4    360:5-21)

5    Plaintiff's investigation has revealed that the Moscow entities have conducted

6    the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged

7    that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the

8    discovery sought herein to establish a partnership between AI and the Moscow

9    entities, or alternatively, that AI ratified the activities of the Moscow relative to

10   Plaintiff's complaint, which is relevant.

11   "Under California Corporations Code section 16202(a), 'the association of two

12   or more persons to carry on as co-owners of a business for profit forms a partnership,

13   whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a).

14   'Whether a partnership or joint venture exists is primarily a factual question to be

15   determined by the trier of fact from the evidence and inferences to be drawn

16   therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973).

17   'Although a partnership ordinarily involves a continuing business, whereas a joint

18   venture is usually formed for a specific transaction or a single series of transactions,

19   the incidents of both relationships are the same in all essential respects.' *Connolly,* 111

20   Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to

21   have been organized from a reasonable deduction from the acts and declarations of

22   the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a]

23   joint venture exists where there is an 'agreement between the parties under which they

24   have a community of interest, that is, joint interest, in a common business

25   undertaking, an understanding as to the sharing of profits and losses, and a right of

26   joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing &*

27   *Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

28   relationship such as that of partners has been created, the courts are guided not only

by the spoken or written words of the contracting parties, but also by their acts."
*Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners,*
*Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

"The issues we deal with involve the application of traditional principles of agency law. Two basic rules are involved: (1) ratification by a person of an act purportedly done on his behalf not only creates the relationship of principal and agent but also constitutes approval by the ratifier of the purported agent's act, relieving such agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby relieving the wrongdoer agent of liability to the principal. "

"The first rule is embodied in Civil Code section 2307 which provides: 'An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification.'"… 'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' (Ballard v. Nye (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App. 420, 428, 267 P. 356; Rest.2d Agency, § 83.)

"Generally, the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act. (Ballard v. Nye, supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100" *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

"Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be adopted expressly or ... by implication based on conduct of the purported principal from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto*

142

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

1   *v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see

2   *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

3          *Relevant* information may be discoverable if it "appears *reasonably calculated to lead*

4   to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added).

5   Plaintiff has the *right* to discover non-privileged information "relevant to the claim or

6   defense of *any party,* including the existence, description, nature, custody, condition

7   and location of any books, documents, or other tangible things and the identity and

8   location of persons having knowledge of any discoverable matter." Fed R. Civ. P.

9   26(b)(1), (emphasis added). This includes information that Plaintiff may use to

10  support its claims or defenses of Defendant, including the *identity* of any *witness or*

11  *document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

12  to Fed R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if

13  there is <u>any</u> possibility that the information sought may be relevant to the subject

14  matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington,* 103 F.R.D.

15  52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

16         **Duty to Inquire:** DMG contends that with respect to Defendant's agents,

17  partners and affiliates, Defendant has a duty to "secure all information available to"

18  the corporation, including "information within the personal knowledge of former ...

19  employees, employed ... at the time this action commenced [and even] information

20  possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d

21  1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.,*

22  709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such

23  information as is available from the corporation itself or from sources under its

24  control ... [i]f the corporation can obtain the information from sources under its

25  control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki*

26  *Motor Co., Ltd.,* 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all

27  responsive information available from [it] or from sources under [its] control."

28  *Goodrich Corp. v. Emhart Indus., Inc.,* EDCV0400759VAPSSX, 2005 WL 6440828 (C.D.

Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection

## C.     Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims.

In response to DMG's long-winded, rambling and disjointed contentions regarding its self-styled "Issue No. 6" concerning its Request No. 10 under Rule 30(b)(2), Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel production of; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

### 1.     Discovery At Issue

On its face, DMG's Request No. 10 seeks "all" documents "relative to" the

BH8255.1
1003-30730

1    nature and business relationship between Stolitza and IT Online.

2         DMG's motion to compel should be denied because:

3        •   Anastasia has already produced documents responsive to this request;

4        •   DMG now seeks additional documents that are not relevant to any claim

5             or defense in the present action;

6        •   the request is unduly burdensome, especially since a Rule 30(b)(2)

7             request should be limited to a few and simple documents;

8        •   the request is confusingly framed and not reasonably particularized so as

9             to give fair notice of the documents being sought; and

10       •   the documents DMG now seeks to compel are not reasonably

11            responsive to this request.

12        To avoid unnecessary repetition, Anastasia refers back to the section covering

13   DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of

14   discovery which led to this discovery request. .

15          **2.**     **Legal Standards**

16        Again, as previously discussed in connection with DMG's "Issue No. 1,"

17   DMG's portion of the joint stipulation consists of abstract legal arguments that are

18   not linked to the specific request or topics that are the subject of DMG's motion to

19   compel. DMG's motion fails to make any case for the relevance of the documents it

20   now seeks to the claims or defenses at issue in the litigation. DMG instead seems to

21   merely assume their relevance, and thus has failed to meet its burden.

22          **(a)**     **Rule 26(b)**

23        As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and

24   requires the party requesting discovery to establish the relevancy of the requested

25   discovery sought to the claims or defenses in the action. If a party's request for

26   relevant information is overly broad or otherwise objectionable on its face, the burden

27   is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D.

28   581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to

the party resisting discovery. *Id.*

### (b)     Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents. Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for Documents at a deposition are appropriate where "the documents are few and simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and ambiguous requests seek far more than a few and simple documents.

Moreover, as the party seeking production of documents not in the possession or custody of Anastasia, DMG bears the burden of proving that Anastasia has control or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d 1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents."). "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

### 3.     DMG's Rule 30(b)(2) Document Request No. 10

As previously discussed, DMG's Request No. 10 seeks "all" documents relative to the business relationship between Stolitza and IT Online.

DMG's motion does not even try to explain away the numerous ambiguities inherent in this request. Indeed, the actual wording of the request as written is never discussed in DMG's section.

There is no reasonable interpretation of this request that would be commensurate with the eight specific demands for production being made by DMG in this motion and discussed below.

Anastasia has already produced documents (AD108-129 and AD689-938) in response to this request. DMG's motion to compel additional production should therefore be denied.

BH8255.1
1003-30730

**(a)  DMG Has Not Established That Request No. 10 Seeks Relevant Discovery**

As the party seeking to compel production, DMG has the burden of establishing that the requested discovery is relevant to a claim or defense in this action. During the meet-and-confer process for this motion, DMG erroneously stated that it was "not required to educate [Anastasia] on the relevancy" of the discovery it was seeking. Exh. J.

In its first joint stipulation (Exh. L), DMG's only relevancy argument was that "sales information requested is clearly relevant in a trademark claim." But DMG's Request No. 10 is not directed in any meaningful way to sales information relating to the use of the allegedly infringed mark, but generally to "any person or entity that provides services of generating revenue." A trademark claim does not give *carte blanche* to discovery of a party's sales. Moreover, Anastasia has already produced documents regarding the sales associated with the websites that DMG has accused of infringing its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

147

1   In dropping the trademark argument, DMG has effectively conceded that the

2   discovery its seeks to compel is not relevant to the trademark claim (which is

3   consistent with the fact that none of the discovery requests at issue are directed to

4   DMG's trademark). That leaves the claim based on unauthorized access and

5   harassment. DMG has alleged that these activities were undertaken by persons acting

6   in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for

7   production is not limited to the facts surrounding these particular claims. Instead, it is

8   broadly directed toward Anastasia's business in general. DMG fails to show how the

9   specific information it seeks is relevant to DMG's claims. It also fails to explain how

10   the information sought will lead to admissible evidence.

11   DMG misrepresents the record in an attempt to support its belated agency

12   argument.

13   For example, DMG claims that it needs discovery regarding the business

14   relationship between Anastasia and the Moscow Entities because of an "implication"

15   that they provide "exclusive services" to Anastasia. In addition to the dubious

16   relevancy of this allegation, the fact is that Anastasia already has produced copies of

17   its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

18   and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

19   ranging discovery. While DMG cites a large number of cases for abstract principles of

20   agency law, DMG fails to apply any of those principles to the facts of this case.

21   DMG's legal theories appear to be nothing more than post-hoc rationalizations to

22   justify intrusive discovery into a competitor's business.

23   DMG also attempts to suggest that one is an agent "at all times," but one "may

24   be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

25   *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

26   part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

27   Ct. 1380, 143 L. Ed. 2d 462 (1999).

28   In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

1   DMG has refused to provide Anastasia with even basic information concerning the

2   formation, ownership and management structure of various DMG-related entities

3   who also have claimed ownership of the DREAM MARRIAGE trademark and

4   website that DMG now claims to own. For example, in response to Anastasia's

5   requests for production of documents concerning DMG's relationship with a

6   company called Dream Marriage, Inc. that previously owned the DREAM-

7   MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

8   dream-marriage.com website, DMG has either refused to produce any documents at

9   all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

10  has only produced license agreements or assignments. Yet DMG hypocritically finds

11  that Anastasia's production of similar documents concerning the relationship with the

12  Moscow Entities somehow inadequate.

13      DMG also claims that Anastasia "pays the Moscow entities a percentage of all

14  revenues," in an apparent attempt by DMG to create the illusion of a partnership.

15  This allegation is completely false. The Moscow entity sends invoices to Anastasia for

16  services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

17  invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

18  produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is

19  now seeking the attachments to these invoices which give details of the work

20  underlying the invoices, even though such attachments would not be necessary if

21  Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG.

22  Even if DMG's allegation were true, which it is not, it does nothing to support the

23  relevancy of the overly broad and intrusive discovery that DMG now seeks.

24      Nor do the deposition transcript pages cited by DMG support its wild

25  accusations.

26      For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by

27  DMG for the proposition that the Moscow entities are Anastasia's agents, actually

28  establish that Anastasia does not control the activities of the Moscow Entities, and

this lack of control is contrary to DMG's agency theory.

Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies and women, while Anastasia handles the US customer relationships. This contradicts DMG's assertion that Anastasia "cannot assess or distinguish the division of [business]" between Anastasia and the Moscow Entities.

Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on page 162 (Exh. E), suggests that employees of the Moscow Entities occassionally represent themselves to be part of "Anastasia Date" in media publications and for customer relations purposes, and that this sometimes leads to confusion as to who "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4) cited by DMG also concern similar issues.

Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its GoDaddy registration account in order to manage of the websites as authorized under the service agreement.

Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's periodically sends money to other Moscow entities as requested by Stoliza as general payments for amounts owed to Stolitza. DMG attempts to mischaracterize these payments as "making disbursements at the direction of the Moscow Entities" in its Introductory Statement to suggest erroneously that the Moscow Entities controlled Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's request under its Service Agreement is not relevant to any of the acts alleged in DMG's complaint.

At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the services we have received from the Russian entity." She did not say, as DMG suggests, that she condoned or even had knowledge of the acts alleged in the complaint.

At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same building" as the Moscow Entities, but not that he shares the same office with the Moscow Entities as DMG erroneously implies.

DMG also relies on deposition testimony that certain documents may exist, and appears to suggest that "relevance" is established merely because DMG has demanded their production. By DMG's circular reasoning, a document is relevant if DMG demands its production, and that document must be produced if DMG can establish its existence. But this is not the law. As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery to the claims or defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

To the extent DMG may later try to argue that other entities such as IT Online, Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's Complaint, DMG's request for production is not limited to DMG's claims, but is broadly directed toward all documents concerning an individual or entity who provides "services of generating revenue." There is simply no basis for DMG, a competitor, to demand that Anastasia provide such sweeping information, including information having nothing to do with DMG's claims.

### (b)   Anastastia's Objections To DMG's Request No. 10

Anastasia's objections to DMG's Request No. 10 were particularized, well-founded, and reasonable.

### (i)   DMG's Improper Rule 30(b)(2) Requests

Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2) requests as being improper because a request for documents at a deposition is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an overly broad and excessively numerous production of documents at a deposition was an abuse of Rule 30(b)(2).

1    Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production

2  requests appear to be part of a ploy by DMG to demand so many documents at the

3  30(b)(6) deposition, in a vague and incomprehensible manner, that it would

4  impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an

5  opportunity to demand that the deposition be resumed to ask about additional

6  documents. Such a ploy is contrary to the rules.

7                              **(ii)    Privilege**

8    Anastasia made a general objection to each of DMG's document production

9  requests that placing documents generated after the filing of DMG's Complaint on a

10  privilege log would be unduly burdensome. Clearly, requiring that every

11  communication between Anastasia and its counsel, or between counsel and expert

12  consultants be recorded on a privilege log would be unreasonable and unduly

13  burdensome.

14    DMG has made a similar objection in response to Anastasia document requests

15  (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one

16  would have expected DMG to have generated many attorney-client privileged or work

17  product documents prior to filing suit.

18    In any event, neither DMG nor Anastasia have produced a privilege log

19  identifying any post-filing documents. This is a non-issue.

20                  **(iii)    Request No. 10 Is Oppressive And Burdensome**

21    As previously discussed, a request for production of documents at a deposition

22  under Rule 30(b)(2) is appropriate only where "the documents are few and simple."

23  Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL

24  817853, at *5.

25    Rather than seek a few and simple documents, DMG's Request No. 10 seeks

26  production of "All DOCUMENTS" on a wide range. Such a request is overly broad

27  and unduly burdensome, and therefore objectionable where, as here, the request does

28  not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist. LEXIS

18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in making a similar objection to Anastasia's request for production of "all" documents. Exh. F at 5 et al.

### (iv)   Request No. 10 Is Overly Broad

On its face, DMG's Request No. 10 is overly broad in seeking the entire business relationship between Stolitza and IT Online, two third parties, without limitation to relevant information to the claims and defenses in this action. Production to a competitor of all documents "relative to" this business relationship in response to such an overly broad request would be oppressive and unduly burdensome.

### (v)   Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.   DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- • All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;

- • All emails between Defendant and Andrey Ryabichikov from January 2009 to present;

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

- All emails between Defendant and Oleg Nochka from January 2009 to present;

- All emails between Defendant and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;

- All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and

- All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's claims in this action, nor responsive to Request No. 10. DMG has demanded these documents in connection with this particular request, but has made no effort to establish how those documents are allegedly responsive to this request. Nevertheless, Anastasia will address each in turn.

(a)    **All Invoice Attachments From Stolitza and IT Online**

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

DMG's demand for these attachments appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

### (b)    All emails with Andrey Ryabichikov

None of the requests for production that DMG seeks to compel refers to Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr. Ryabichikov without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Ryabichikov.

In short, DMG has made another overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

### (c)    All emails with Oleg Nochka

DMG also is demanding production of all emails with Oleg Nochka without

BH8255.1
1003-30730

any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Nochka.

Again, DMG has made an overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

### (d)     All emails with Alexey Eremin

None of the requests for production that DMG seeks to compel refers to Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's former President, Mr. Eremin, without any subject matter limitation over a three-year period of time. Mr. Eremin was not even President of Anastasia until November 2010, and he had no involvement in Anastasia's business activities prior to that time. Exh. D (Tr. 99, and 329).

Again, DMG has made an overly broad demand for production of documents without making any attempt to establish their relevancy to this action. Testimony was given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover, testimony was given that there were no email communications between Anastasia and Mr. Eremin except for a few litigation-related matters that are immune from discovery as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)     All wire transfers to Lookintom

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present." DMG has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully

1   compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d
2   ed.).

3   At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been
4   made to Lookintom at the request of Stolitza in order to satisfy amounts due to
5   Stolitza. These payments were not linked to any specific Stolitza invoice, but were
6   applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr.
7   296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no
8   invoices from Lookintom to Anastasia, and no invoices requesting payment to
9   Lookintom.

10   The history of payments made by Anastasia to Lookintom to satisfy amounts
11   owed to Stolitza is not relevant to any claim or defense in this action, and DMG has
12   made no attempt to establish any. The fact that Anastasia made payments to
13   Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to
14   any claim or defense in this action. Nor would the specific amounts paid as reflected
15   in bank statements be relevant.

16   **(f)     All wire transfers to [sic] Krypton**

17   DMG also is demanding "[a]ll documents, invoices, emails, bank records,
18   accounting records that relate to any funds or wire transfers from Defendant to [sic]
19   Krypton from January 2009 to present," but has made no showing why such a broad
20   demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W.*
21   *Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's
22   financial condition was not relevant to issues of whether contractor was fully
23   compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d
24   ed.).

25   As an initial matter, Anastasia has made no payments to "Krypton." At
26   Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been
27   made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to
28   Stolitza. These payments were not linked to any specific Stolitza invoice, but were

157

BH8255.1
1003-30730

applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (g)     All Phone Billing Records For Any (800) Number

DMG has given no reason why "[a]ll phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006" are relevant to this action. Moreover, these phone records are not responsive to DMG's Request No. 10. In any event, Anastasia has already informed DMG that Anastasia has no relevant phone billing records to produce.

### (f)     All invoices for Google Accounts

DMG also has given no reason why "[a]ll invoices for Google accounts

1    2961669 and 1020911" are relevant to this action. Google was not involved in the acts

2    alleged in its Complaint, and these invoices are not relevant to the claims or defenses

3    in this action. Moreover, these Google documents do not appear responsive to

4    DMG's Request No. 10.

5                    **5.      Concluding Statement Re DMG's Issue No. 6**

6            As has become its custom in this action, DMG's counsel opens his declaration

7    in support of DMG's motion to compel with a diatribe against what he claims to be

8    Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery

9    conduct. Anastasia has actually produced more documents to DMG than DMG has

10   produced to Anastasia in this action (not including computer logs that DMG

11   produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's

12   requests for production, DMG stated that "DMG will not produce documents

13   responsive to this request." Exh F.

14           DMG's motion to compel production in response to its Request No. 10 should

15   be denied because the additional documents that DMG seeks are not relevant to any

16   claim or defense in the present action. These documents have already been produced

17   by Anastasia, and DMG's relevancy argument does not apply to the additional

18   documents that it now seeks.

19

20   **VIII.   Issue No. 7: Request no. 20 for Production of**

21            **Documents at Deposition**

22           **A.      Disputed Request for Production and Defendant's Response**

23   REQUEST FOR PRODUCTION NO. 20

24           All DOCUMENTS relative to the history and business relationship of AD to

25   Lookintom Consolidated Limited and/or Alfred Victor Brewster.

26   RESPONSE TO REQUEST NO. 20

27           In addition to its General Objections incorporated herein, Anastasia objects to

28   this request on the grounds that the terms and phrases "all DOCUMENTS," "relative

to," "the history and business relationship," and "AD to Lookintom Consolidated Limited and/or Alfred Victor Brewster," are vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Anastasia will interpret this this request as being limited to documents describing a business relationship with Lookintom. Anastasia further objects to the extent that this request is directed to documents outside the subject matter or temporal scope of the acts alleged in the Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. Anastasia further objects to the extent that this request is directed to activities by third parties, to information and documents not within the possession, custody or control of Anastasia, or to matters for which Anastasia has no relevant knowledge. Subject to and without waiver of its General Objections and the immediately preceding specific objections, Anastasia answers as follows: Other than documents already produced, Anastasia has no additional documents to produce.

### B.    DMG's Contentions and Points and Authorities

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition.

Following the deposition, on November 7, 2011 Plaintiff sent a letter to

Defendant's counsel with the following request:

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;
- All emails between your client and Andrey Ryabichikov from January 2009 to present;
- All emails between your client and Oleg Nochka from January 2009 to present;
- All emails between your client and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and
- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

161

With respect to all the other documents requested, you advised that the documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton.

(Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Defendant's objections are also disingenuous:

**Privilege**: Parties withholding documents as privileged should identify and describe the documents in sufficient detail to enable the demanding party to contest the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena); *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.* 185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege log for documents withheld on grounds of privilege or work product). Defendant has not provided a privilege log, nor has it identified documents with sufficient detail or stated the specific privilege applicable to each identified document that was withheld. *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996). Defendant's generalized, nonspecific claims of privilege constitute an implied waiver of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem. Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges are not permitted to provide mere 'blanket objections' to discovery requests." *Am.*

*Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July 14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that this Request is "overbroad" and "burdensome", where a party resists a discovery request claiming that it is unduly burdensome, the burden rests on the party raising the objection to show that responding would be *unduly* burdensome. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137 F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection must be supported by affidavits or other evidence which demonstrates the burden. *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate attempts to obtain discovery and prepare this case. This objection was improperly asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon burdensomeness the objecting party must particularize the basis for the objection as generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

**Vague and Ambiguous**: "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity . . . Respondents should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories. To clarify their answers, respondents may include any necessary, reasonable definition of such terms or phrases." *Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677

163

1   (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D.

2   295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is

3   unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an

4   intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

5   **Relevance**: AI and the Moscow entities formed the internet business together.

6   Since the internet business was formed, AI has known and has authorized the

7   Moscow entities represent to the public that the Moscow entities were and are AI.

8   There is an implication that the Moscow entities provide exclusive services for AI. AI

9   cannot assess or distinguish the division of ownership of business assets or the rights

10   of ownership thereto. AI pays the Moscow entities a percentage of all revenues and

11   AI accepts the benefits of all services provided by the Moscow entities. AI has given

12   carte blanche to the Moscow entities to manage all internet and agency activities. AI

13   never objected to the Moscow entities activities, including the activities that form the

14   basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See

15   Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20,

16   334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-

17   25, 296:6-298:14, 325:5-24)

18   Further, The PMK witness testified that records exist or may exist with respect

19   to many of the documents that have been requested to be produced. See Exh. 6

20   (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24,

21   360:5-21)

22   Plaintiff's investigation has revealed that the Moscow entities have conducted

23   the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged

24   that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the

25   discovery sought herein to establish a partnership between AI and the Moscow

26   entities, or alternatively, that AI ratified the activities of the Moscow relative to

27   Plaintiff's complaint, which is relevant.

28   "Under California Corporations Code section 16202(a), 'the association of two

or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a). 'Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973). 'Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.' *Connolly,* 111 Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to have been organized from a reasonable deduction from the acts and declarations of the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a] joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing & Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a relationship such as that of partners has been created, the courts are guided not only by the spoken or written words of the contracting parties, but also by their acts." *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners, Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

"The issues we deal with involve the application of traditional principles of agency law. Two basic rules are involved: (1) ratification by a person of an act purportedly done on his behalf not only creates the relationship of principal and agent but also constitutes approval by the ratifier of the purported agent's act, relieving such agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby relieving the wrongdoer agent of liability to the principal. "

"The first rule is embodied in Civil Code section 2307 which provides: 'An agency may be created, and an authority may be conferred, by a precedent

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

authorization or a subsequent ratification.'"… 'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' (Ballard v. Nye (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App. 420, 428, 267 P. 356; Rest.2d Agency, § 83.)

"Generally, the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act. (Ballard v. Nye, supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100" *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

"Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be adopted expressly or ... by implication based on conduct of the purported principal from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

*Relevant* information may be discoverable if it "appears *reasonably calculated to lead* to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added). Plaintiff has the *right* to discover non-privileged information "relevant to the claim or defense of *any party,* including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed R. Civ. P. 26(b)(1), (emphasis added). This includes information that Plaintiff may use to support its claims or defenses of Defendant, including the *identity* of any *witness or document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

to Fed. R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if there is <u>any</u> possibility that the information sought may be relevant to the subject matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

**Duty to Inquire:** DMG contends that with respect to Defendant's agents, partners and affiliates, Defendant has a duty to "secure all information available to" the corporation, including "information within the personal knowledge of former ... employees, employed ... at the time this action commenced [and even] information possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such information as is available from the corporation itself or from sources under its control ... [i]f the corporation can obtain the information from sources under its control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all responsive information available from [it] or from sources under [its] control." *Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D. Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified

sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection.

### C.   Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims.

In response to DMG's long-winded, rambling and disjointed contentions regarding its self-styled "Issue No. 7" concerning its Request No. 20, Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel production of; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

### 1.   Discovery At Issue

On its face, DMG's Request No. 20 seeks "all" documents "relative to the nature and business relationship of AD to Lookintom Consolidated Limited and/or Alfred Victor Brewster."

DMG's motion to compel should be denied because:

- DMG seeks documents that are not relevant to any claim or defense in the present action;
- the request is unduly burdensome, especially since a Rule 30(b)(2) request should be limited to a few and simple documents;
- the request is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and
- the documents DMG now seeks to compel are not reasonably responsive to this request.

To avoid unnecessary repetition, Anastasia refers back to the section covering

1   DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of

2   discovery which led to this discovery request.

3           **2.**     **Legal Standards**

4        Again, as previously discussed in connection with DMG's "Issue No. 1,"

5   DMG's portion of the joint stipulation consists of abstract legal arguments that are

6   not linked to the specific request or topics that are the subject of DMG's motion to

7   compel. DMG's motion fails to make any case for the relevance of the documents it

8   now seeks to the claims or defenses at issue in the litigation. DMG instead seems to

9   merely assume their relevance, and thus has failed to meet its burden.

10           **(a)**     **Rule 26(b)**

11        As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and

12   requires the party requesting discovery to establish the relevancy of the requested

13   discovery sought to the claims or defenses in the action. If a party's request for

14   relevant information is overly broad or otherwise objectionable on its face, the burden

15   is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D.

16   581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to

17   the party resisting discovery. *Id.*

18           **(b)**     **Rule 30(b)(2)**

19        Rule 30(b)(2) is intended to be used when seeking a few and simple documents.

20   Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for

21   Documents at a deposition are appropriate where "the documents are few and

22   simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and

23   ambiguous requests seek far more than a few and simple documents.

24        Moreover, as the party seeking production of documents not in the possession

25   or custody of Anastasia, DMG bears the burden of proving that Anastasia has control

26   or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d

27   1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not

28   have the legal right to obtain will oftentimes be futile, precisely because the party has

1   no certain way of getting those documents."). "[P]roof of theoretical control is

2   insufficient; a showing of actual control is required." *Id.* at 1107.

3   ### 3.   DMG's Rule 30(b)(2) Document Request No. 20

4   As previously discussed, DMG's Request No. 20 seeks "all" documents relative

5   to the business relationship between Stolitza and IT Online.

6   DMG's motion does not even try to explain away the numerous ambiguities

7   inherent in this request. Indeed, the actual wording of the request as written is never

8   discussed in DMG's section.

9   There is no reasonable interpretation of this request that would be

10  commensurate with the eight specific demands for production being made by DMG

11  in this motion and discussed below.

12  Anastasia has already produced documents (AD108-129 and AD689-938) in

13  response to this request. DMG's motion to compel additional production should

14  therefore be denied.

15  ### (a)   DMG Has Not Established That Request No. 20

16  ### Seeks Relevant Discovery

17  As the party seeking to compel production, DMG has the burden of

18  establishing that the requested discovery is relevant to a claim or defense in this

19  action. During the meet-and-confer process for this motion, DMG erroneously stated

20  that it was "not required to educate [Anastasia] on the relevancy" of the discovery it

21  was seeking. Exh. J.

22  In its first joint stipulation (Exh. L), DMG's only relevancy argument was that

23  "sales information requested is clearly relevant in a trademark claim." But DMG's

24  Request No. 20 is not directed in any meaningful way to sales information relating to

25  the use of the allegedly infringed mark, but generally to "any person or entity that

26  provides services of generating revenue." A trademark claim does not give *carte blanche*

27  to discovery of a party's sales. Moreover, Anastasia has already produced documents

28  regarding the sales associated with the websites that DMG has accused of infringing

170

1   its trademark, in response to other requests.

2       After reading Anastasia's portion of the joint stipulation, DMG realized that it

3   had utterly failed to address the relevancy of the documents it was now seeking. DMG

4   then revised its portion of the joint stipulation to add a legal discussion of agency

5   theory, and to delete its failed "trademark" argument. But DMG's revised relevancy

6   argument still misses the mark because it remains untethered to the two narrow claims

7   asserted by DMG in this action.

8       As discussed in Anatasia's Introductory Statement, DMG has assserted

9   essentially two claims—(1) a trademark claim based on the registration and use of a

10  dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA

11  claim based on alleged attempts to make unauthorized access to the dream-

12  marriage.com website and to harass the women who had profiles on that website.

13  Notably, the anastasiadate.com website and the operation of that website are not at

14  issue.

15      In dropping the trademark argument, DMG has effectively conceded that the

16  discovery its seeks to compel is not relevant to the trademark claim (which is

17  consistent with the fact that none of the discovery requests at issue are directed to

18  DMG's trademark). That leaves the claim based on unauthorized access and

19  harassment. DMG has alleged that these activities were undertaken by persons acting

20  in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for

21  production is not limited to the facts surrounding these particular claims. Instead, it is

22  broadly directed toward Anastasia's business in general. DMG fails to show how the

23  specific information it seeks is relevant to DMG's claims. It also fails to explain how

24  the information sought will lead to admissible evidence.

25      DMG misrepresents the record in an attempt to support its belated agency

26  argument.

27      For example, DMG claims that it needs discovery regarding the business

28  relationship between Anastasia and the Moscow Entities because of an "implication"

1  that they provide "exclusive services" to Anastasia. In addition to the dubious

2  relevancy of this allegation, the fact is that Anastasia already has produced copies of

3  its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

4  and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

5  ranging discovery. While DMG cites a large number of cases for abstract principles of

6  agency law, DMG fails to apply any of those principles to the facts of this case.

7  DMG's legal theories appear to be nothing more than post-hoc rationalizations to

8  justify intrusive discovery into a competitor's business.

9         DMG also attempts to suggest that one is an agent "at all times," but one "may

10  be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

11  *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

12  part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

13  Ct. 1380, 143 L. Ed. 2d 462 (1999).

14         In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

15  DMG has refused to provide Anastasia with even basic information concerning the

16  formation, ownership and management structure of various DMG-related entities

17  who also have claimed ownership of the DREAM MARRIAGE trademark and

18  website that DMG now claims to own. For example, in response to Anastasia's

19  requests for production of documents concerning DMG's relationship with a

20  company called Dream Marriage, Inc. that previously owned the DREAM-

21  MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

22  dream-marriage.com website, DMG has either refused to produce any documents at

23  all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

24  has only produced license agreements or assignments. Yet DMG hypocritically finds

25  that Anastasia's production of similar documents concerning the relationship with the

26  Moscow Entities somehow inadequate.

27         DMG also claims that Anastasia "pays the Moscow entities a percentage of all

28  revenues," in an apparent attempt by DMG to create the illusion of a partnership.

1    This allegation is completely false. The Moscow entity sends invoices to Anastasia for

2    services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

3    invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

4    produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is

5    now seeking the attachments to these invoices which give details of the work

6    underlying the invoices, even though such attachments would not be necessary if

7    Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG.

8    Even if DMG's allegation were true, which it is not, it does nothing to support the

9    relevancy of the overly broad and intrusive discovery that DMG now seeks.

10        Nor do the deposition transcript pages cited by DMG support its wild

11   accusations.

12        For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by

13   DMG for the proposition that the Moscow entities are Anastasia's agents, actually

14   establish that Anastasia does not control the activities of the Moscow Entities, and

15   this lack of control is contrary to DMG's agency theory.

16        Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship

17   with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies

18   and women, while Anastasia handles the US customer relationships. This contradicts

19   DMG's assertion that Anastasia "cannot assess or distinguish the division of

20   [business]" between Anastasia and the Moscow Entities.

21        Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on

22   page 162 (Exh. E), suggests that employees of the Moscow Entities occasionally

23   represent themselves to be part of "Anastasia Date" in media publications and for

24   customer relations purposes, and that this sometimes leads to confusion as to who

25   "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4)

26   cited by DMG also concern similar issues.

27        Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-

28   25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its

1    GoDaddy registration account in order to manage of the websites as authorized under

2    the service agreement.

3        Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices

4    Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's

5    periodically sends money to other Moscow entities as requested by Stoliza as general

6    payments for amounts owed to Stolitza. DMG attempts to mischaracterize these

7    payments as "making disbursements at the direction of the Moscow Entities" in its

8    Introductory Statement to suggest erroneously that the Moscow Entities controlled

9    Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's

10   request under its Service Agreement is not relevant to any of the acts alleged in

11   DMG's complaint.

12       At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the

13   services we have received from the Russian entity." She did not say, as DMG suggests,

14   that she condoned or even had knowledge of the acts alleged in the complaint.

15       At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same

16   building" as the Moscow Entities, but not that he shares the same office with the

17   Moscow Entities as DMG erroneously implies.

18       DMG also relies on deposition testimony that certain documents may exist,

19   and appears to suggest that "relevance" is established merely because DMG has

20   demanded their production. By DMG's circular reasoning, a document is relevant if

21   DMG demands its production, and that document must be produced if DMG can

22   establish its existence. But this is not the law. As the party requesting discovery, DMG

23   bears the burden of establishing relevancy of the requested discovery to the claims or

24   defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

25       To the extent DMG may later try to argue that other entities such as IT Online,

26   Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's

27   Complaint, DMG's request for production is not limited to DMG's claims, but is

28   broadly directed toward all documents concerning an individual or entity who

provides "services of generating revenue." There is simply no basis for DMG, a competitor, to demand that Anastasia provide such sweeping information, including information having nothing to do with DMG's claims.

### (b)    Anastastia's Objections To DMG's Request No. 20

Anastasia's objections to DMG's Request No. 20 were particularized, well-founded, and reasonable.

### (i)    DMG's Improper Rule 30(b)(2) Requests

Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2) requests as being improper because a request for documents at a deposition is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an overly broad and excessively numerous production of documents at a deposition was an abuse of Rule 30(b)(2).

Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production requests appear to be part of a ploy by DMG to demand so many documents at the 30(b)(6) deposition, in a vague and incomprehensible manner, that it would impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an opportunity to demand that the deposition be resumed to ask about additional documents. Such a ploy is contrary to the rules.

### (ii)    Privilege

Anastasia made a general objection to each of DMG's document production requests that placing documents generated after the filing of DMG's Complaint on a privilege log would be unduly burdensome. Clearly, requiring that every communication between Anastasia and its counsel, or between counsel and expert consultants be recorded on a privilege log would be unreasonable and unduly burdensome.

DMG has made a similar objection in response to Anastasia document requests

(Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one would have expected DMG to have generated many attorney-client privileged or work product documents prior to filing suit.

In any event, neither DMG nor Anastasia have produced a privilege log identifying any post-filing documents. This is a non-issue.

### (iii)    Request No. 20 Is Oppressive And Burdensome

As previously discussed, a request for production of documents at a deposition under Rule 30(b)(2) is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL 817853, at *5.

Rather than seek a few and simple documents, DMG's Request No. 20 seeks production of "All DOCUMENTS" on a wide range. Such a request is overly broad and unduly burdensome, and therefore objectionable where, as here, the request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist. LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in making a similar objection to Anastasia's request for production of "all" documents. Exh. F at 5 et al.

### (iv)    Request No. 20 Is Overly Broad

On its face, DMG's Request No. 20 is overly broad in seeking the entire business relationship between Anastasia and Lookintom without limitation to relevant information to the claims and defenses in this action. Production to a competitor of all documents "relative to" this business relationship in response to such an overly broad request would be oppressive and unduly burdensome.

### (v)    Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of

the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.    DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;

- All emails between Defendant and Andrey Ryabichikov from January 2009 to present;

- All emails between Defendant and Oleg Nochka from January 2009 to present;

- All emails between Defendant and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;

- All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and

- All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's claims in this action, nor responsive to Request No. 20. DMG has demanded these documents in connection with this particular request, but has made no effort to establish how those documents are allegedly responsive to this request. Nevertheless, Anastasia will address each in turn.

### (a)   All Invoice Attachments From Stolitza and IT Online

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

DMG's demand for these attachments appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

BH8255.1
1003-30730

**(b)     All emails with Andrey Ryabichikov**

None of the requests for production that DMG seeks to compel refers to Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr. Ryabichikov without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Ryabichikov.

In short, DMG has made another overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

**(c)     All emails with Oleg Nochka**

DMG also is demanding production of all emails with Oleg Nochka without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Nochka.

Again, DMG has made an overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

**(d)     All emails with Alexey Eremin**

None of the requests for production that DMG seeks to compel refers to Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's former President, Mr. Eremin, without any subject matter limitation over a three-year period of time. Mr. Eremin was not even President of Anastasia until November 2010, and he had no involvement in Anastasia's business activities prior to that time. Exh. D (Tr. 99, and 329).

Again, DMG has made an overly broad demand for production of documents

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

BH8255.1
1003-30730

1   without making any attempt to establish their relevancy to this action. Testimony was

2   given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters

3   raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover,

4   testimony was given that there were no email communications between Anastasia and

5   Mr. Eremin except for a few litigation-related matters that are immune from discovery

6   as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)   All wire transfers to Lookintom

8   DMG also is demanding "[a]ll documents, invoices, emails, bank records,

9   accounting records that relate to any funds or wire transfers from Defendant to

10   Lookintom from January 2009 to present." DMG has made no showing why such a

11   broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of*

12   *P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

13   financial condition was not relevant to issues of whether contractor was fully

14   compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

15   ed.).

16   At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been

17   made to Lookintom at the request of Stolitza in order to satisfy amounts due to

18   Stolitza. These payments were not linked to any specific Stolitza invoice, but were

19   applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr.

20   296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no

21   invoices from Lookintom to Anastasia, and no invoices requesting payment to

22   Lookintom.

23   The history of payments made by Anastasia to Lookintom to satisfy amounts

24   owed to Stolitza is not relevant to any claim or defense in this action, and DMG has

25   made no attempt to establish any. The fact that Anastasia made payments to

26   Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to

27   any claim or defense in this action. Nor would the specific amounts paid as reflected

28   in bank statements be relevant.

**(f)      All wire transfers to [sic] Krypton**

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to [sic] Krypton from January 2009 to present," but has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's financial condition was not relevant to issues of whether contractor was fully compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d ed.).

As an initial matter, Anastasia has made no payments to "Krypton." At Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The

1   fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts

2   owed to Stolitza is not relevant to any claim or defense in this action. Nor would the

3   specific amounts paid as reflected in bank statements be relevant.

### (g)   All Phone Billing Records For Any (800) Number

5   DMG has given no reason why "[a]ll phone billing records for any (800)

6   number used by Defendant or with reference to Defendant's business activities from

7   January 2009 to present, and to the extent that no billing records exist, exemplars of

8   bills dating back to January 2006" are relevant to this action. Moreover, these phone

9   records are not responsive to DMG's Request No. 20. In any event, Anastasia has

10  already informed DMG that Anastasia has no relevant phone billing records to

11  produce.

### (f)   All invoices for Google Accounts

13  DMG also has given no reason why "[a]ll invoices for Google accounts

14  2961669 and 1020911" are relevant to this action. Google was not involved in the acts

15  alleged in its Complaint, and these invoices are not relevant to the claims or defenses

16  in this action. Moreover, these Google documents do not appear responsive to

17  DMG's Request No. 20.

### 5.   Concluding Statement Re DMG's Issue No. 7

19  As has become its custom in this action, DMG's counsel opens his declaration

20  in support of DMG's motion to compel with a diatribe against what he claims to be

21  Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery

22  conduct. Anastasia has actually produced more documents to DMG than DMG has

23  produced to Anastasia in this action (not including computer logs that DMG

24  produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's

25  requests for production, DMG stated that "DMG will not produce documents

26  responsive to this request." Exh F.

27  DMG's motion to compel production in response to its Request No. 20 should

28  be denied because the additional documents that DMG seeks are not relevant to any

claim or defense in the present action. These documents have already been produced
by Anastasia, and DMG's relevancy argument does not apply to the additional
documents that it now seeks.

## IX.    ISSUE NO. 8: REQUEST NO. 21 FOR PRODUCTION OF DOCUMENTS AT DEPOSITION

### A.    Disputed Request for Production and Defendant's Response

REQUEST FOR PRODUCTION NO. 21

All DOCUMENTS relative to the history and business relationship of AD to
Hellenic Bank, Larnaca, Cyprus.

RESPONSE TO REQUEST NO. 21

In addition to its General Objections incorporated herein, Anastasia objects to
this request on the grounds that the terms and phrases "all DOCUMENTS," "relative
to," "the history and business relationship," and "AD to Hellenic Bank, Lamaca,
Cyprus," are vague, ambiguous, overly broad, unduly burdensome, and not reasonably
calculated to lead to the discovery of admissible evidence. Anastasia will interpret this
this request as being limited to documents describing a business relationship with
Hellenic Bank. Anastasia further objects to the extent that this request is directed to
documents outside the subject matter or temporal scope of the acts alleged in the
Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead
to the discovery of admissible evidence. Anastasia further objects to the extent that
this request is directed to activities by third parties, to information and documents not
within the possession, custody or control of Anastasia, or to matters for which
Anastasia has no relevant knowledge. Subject to and without waiver of its General
Objections and the immediately preceding specific objections, Anastasia answers as
follows: Anastasia has no documents to produce.

### B.    DMG's Contentions and Points and Authorities

At the deposition, Plaintiff requested specific documents responsive to several

document requests to be produced that were not produced at the deposition. The documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. Ms. Sykes further indicated that the wire transfers were sent to Lookintom's account with Hellenic Bank. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition.

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;
- All emails between your client and Andrey Ryabichikov from January 2009 to present;
- All emails between your client and Oleg Nochka from January 2009 to present;
- All emails between your client and Alexey Eremin from January 2009 to present;
- All documents, invoices, emails, bank records, accounting records

1     that relate to any funds or wire transfers from your client to

2     Lookintom from January 2009 to present;

3     • All documents, invoices, emails, bank records, accounting records

4     that relate to any funds or wire transfers from your client to

5     Krypton from January 2009 to present; and

6     • All phone billing records for any (800) number used by your client

7     from January 2009 to present.

8     (Ex. 7.)

9     Plaintiff's counsel did not receive a response to the requests and a meet and

10   confer was conducted on November 16, 2011 with respect to the documents

11   requested. The meet and confer was memorialized in part as follows:

12

13     With respect to all the other documents requested, you advised that the

14     documents will be produced by November 30, 2011. With respect to the

15     invoices requested, amounts can be redacted except as to the amounts

16     that relate to infringing websites identified in our 3rd Amended

17     Complaint and with respect to payments to Lookintom and Kyrpton.

18     (Ex. 9.)

19     Defendant's counsel did not respond as requested, other than forwarding some

20   redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent

21   an email on 12-2-11 advising that AI failed to produce all documents requested as

22   agreed by November 30, 2011 and a further meet and confer was requested with

23   respect to the PMK deposition. (Ex. 10.)

24     Plaintiff's counsel again sent an email on December 8, 2011, reminding

25   Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

26     Defendant's counsel did not meet and confer within (10) days as requested.

27     Defendant's objections are also disingenuous:

28     **Privilege**: Parties withholding documents as privileged should identify and

describe the documents in sufficient detail to enable the demanding party to contest the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena); *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.* 185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege log for documents withheld on grounds of privilege or work product). Defendant has not provided a privilege log, nor has it identified documents with sufficient detail or stated the specific privilege applicable to each identified document that was withheld. *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996). Defendant's generalized, nonspecific claims of privilege constitute an implied waiver of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem. Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges are not permitted to provide mere 'blanket objections' to discovery requests." *Am. Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July 14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that this Request is "overbroad" and "burdensome", where a party resists a discovery request claiming that it is unduly burdensome, the burden rests on the party raising the objection to show that responding would be *unduly* burdensome. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137 F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection must be supported by affidavits or other evidence which demonstrates the burden. *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate

1   attempts to obtain discovery and prepare this case. This objection was improperly

2   asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193

3   F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon

4   burdensomeness the objecting party must particularize the basis for the objection as

5   generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289

6   (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

7        **Vague and Ambiguous**: "The party objecting to discovery as vague or

8   ambiguous has the burden to show such vagueness or ambiguity . . . Respondents

9   should exercise reason and common sense to attribute ordinary definitions to terms

10   and phrases utilized in interrogatories. To clarify their answers, respondents may

11   include any necessary, reasonable definition of such terms or phrases." *Santana Row*

12   *Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677

13   (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D.

14   295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is

15   unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an

16   intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

17        **Relevance**: AI and the Moscow entities formed the internet business together.

18   Since the internet business was formed, AI has known and has authorized the

19   Moscow entities represent to the public that the Moscow entities were and are AI.

20   There is an implication that the Moscow entities provide exclusive services for AI. AI

21   cannot assess or distinguish the division of ownership of business assets or the rights

22   of ownership thereto. AI pays the Moscow entities a percentage of all revenues and

23   AI accepts the benefits of all services provided by the Moscow entities. AI has given

24   carte blanche to the Moscow entities to manage all internet and agency activities. AI

25   never objected to the Moscow entities activities, including the activities that form the

26   basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See

27   Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20,

28   334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-

187

25, 296:6-298:14, 325:5-24)

Further, The PMK witness testified that records exist or may exist with respect to many of the documents that have been requested to be produced. See Exh. 6 (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24, 360:5-21)

Plaintiff's investigation has revealed that the Moscow entities have conducted the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the discovery sought herein to establish a partnership between AI and the Moscow entities, or alternatively, that AI ratified the activities of the Moscow relative to Plaintiff's complaint, which is relevant.

"Under California Corporations Code section 16202(a), 'the association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a). 'Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973). 'Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.' *Connolly,* 111 Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to have been organized from a reasonable deduction from the acts and declarations of the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a] joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing & Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a

188

1   relationship such as that of partners has been created, the courts are guided not only

2   by the spoken or written words of the contracting parties, but also by their acts."

3   *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners,*

4   *Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

5       "The issues we deal with involve the application of traditional principles of

6   agency law. Two basic rules are involved: (1) ratification by a person of an act

7   purportedly done on his behalf not only creates the relationship of principal and agent

8   but also constitutes approval by the ratifier of the purported agent's act, relieving such

9   agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby

10  relieving the wrongdoer agent of liability to the principal. "

11      "The first rule is embodied in Civil Code section 2307 which provides: 'An

12  agency may be created, and an authority may be conferred, by a precedent

13  authorization or a subsequent ratification.'"… 'A purported agent's act may be

14  adopted expressly or it may be adopted by implication based on conduct of the

15  purported principal from which an intention to consent to or adopt the act may be

16  fairly inferred, including conduct which is 'inconsistent with any reasonable intention

17  on his part, other than that he intended approving and adopting it.' (Ballard v. Nye

18  (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App.

19  420, 428, 267 P. 356; Rest.2d Agency, § 83.)

20      "Generally, the effect of a ratification is that the authority which is given to the

21  purported agent relates back to the time when he performed the act. (Ballard v. Nye,

22  supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100"

23  *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

24      "Where the acts by the agent were not within the scope of the agency

25  relationship, if they are not disavowed by the principal, failure to disavow may

26  constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187

27  Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be

28  adopted expressly or ... by implication based on conduct of the purported principal

1    from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto*

2    *v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see

3    *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

4         *Relevant* information may be discoverable if it "appears *reasonably calculated to lead*

5    to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added).

6    Plaintiff has the *right* to discover non-privileged information "relevant to the claim or

7    defense of *any party,* including the existence, description, nature, custody, condition

8    and location of any books, documents, or other tangible things and the identity and

9    location of persons having knowledge of any discoverable matter." Fed R. Civ. P.

10   26(b)(1), (emphasis added). This includes information that Plaintiff may use to

11   support its claims or defenses of Defendant, including the *identity* of any *witness or*

12   *document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

13   to Fed. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if

14   there is <u>any</u> possibility that the information sought may be relevant to the subject

15   matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D.

16   52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

17        **Duty to Inquire:** DMG contends that with respect to Defendant's agents,

18   partners and affiliates, Defendant has a duty to "secure all information available to"

19   the corporation, including "information within the personal knowledge of former ...

20   employees, employed ... at the time this action commenced [and even] information

21   possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d

22   1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*,

23   709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such

24   information as is available from the corporation itself or from sources under its

25   control ... [i]f the corporation can obtain the information from sources under its

26   control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki*

27   *Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all

28   responsive information available from [it] or from sources under [its] control."

*Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D. Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently held that documents are deemed to be within [a party's] 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

**Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

Based on the foregoing, the court should order Defendant to provide a further response and produce documents without objection.

## C.   Anastasia's Contentions and Points and Authorities

DMG served twenty-three document production requests under Rule 30(b)(2) as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and vague that one has to question whether they were designed more for harassment than to seek information relevant to DMG's two narrow claims.

In response to DMG's long-winded, rambling and disjointed contentions regarding its self-styled "Issue No. 8" concerning its Request No. 21, Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the documents that DMG seeks to compel production of; and then (4) discuss DMG's original request which does not appear to support production of the documents that DMG is now seeking.

### 1.   Discovery At Issue

On its face, DMG's Request No. 21 seeks "all" documents "relative to" the

nature and business relationship "of AD to Hellenic Bank."

DMG's motion to compel should be denied because:

- DMG seeks documents that are not relevant to any claim or defense in the present action;

- the request is unduly burdensome, especially since a Rule 30(b)(2) request should be limited to a few and simple documents;

- the request is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and

- the documents DMG now seeks to compel are not reasonably responsive to this request.

To avoid unnecessary repetition, Anastasia refers back to the section covering DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of discovery which led to this discovery request. .

## 2.   Legal Standards

Again, as previously discussed in connection with DMG's "Issue No. 1," DMG's portion of the joint stipulation consists of abstract legal arguments that are not linked to the specific request or topics that are the subject of DMG's motion to compel. DMG's motion fails to make any case for the relevance of the documents it now seeks to the claims or defenses at issue in the litigation. DMG instead seems to merely assume their relevance, and thus has failed to meet its burden.

### (a)   Rule 26(b)

As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and requires the party requesting discovery to establish the relevancy of the requested discovery sought to the claims or defenses in the action. If a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

192

**(b)     Rule 30(b)(2)**

Rule 30(b)(2) is intended to be used when seeking a few and simple documents. Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for Documents at a deposition are appropriate where "the documents are few and simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and ambiguous requests seek far more than a few and simple documents.

Moreover, as the party seeking production of documents not in the possession or custody of Anastasia, DMG bears the burden of proving that Anastasia has control or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d 1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents."). "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

**3.     DMG's Rule 30(b)(2) Document Request No. 21**

As previously discussed, DMG's Request No. 21 seeks "all" documents relative to the business relationship between Stolitza and IT Online.

DMG's motion does not even try to explain away the numerous ambiguities inherent in this request. Indeed, the actual wording of the request as written is never discussed in DMG's section.

There is no reasonable interpretation of this request that would be commensurate with the eight specific demands for production being made by DMG in this motion and discussed below.

Anastasia has already produced documents (AD108-129 and AD689-938) in response to this request. DMG's motion to compel additional production should therefore be denied.

**(a)     DMG Has Not Established That Request No. 21
Seeks Relevant Discovery**

As the party seeking to compel production, DMG has the burden of

193

establishing that the requested discovery is relevant to a claim or defense in this action. During the meet-and-confer process for this motion, DMG erroneously stated that it was "not required to educate [Anastasia] on the relevancy" of the discovery it was seeking. Exh. J.

In its first joint stipulation (Exh. L), DMG's only relevancy argument was that "sales information requested is clearly relevant in a trademark claim." But DMG's Request No. 21 is not directed in any meaningful way to sales information relating to the use of the allegedly infringed mark, but generally to "any person or entity that provides services of generating revenue." A trademark claim does not give *carte blanche* to discovery of a party's sales. Moreover, Anastasia has already produced documents regarding the sales associated with the websites that DMG has accused of infringing its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

In dropping the trademark argument, DMG has effectively conceded that the discovery its seeks to compel is not relevant to the trademark claim (which is consistent with the fact that none of the discovery requests at issue are directed to

194

1   DMG's trademark). That leaves the claim based on unauthorized access and

2   harassment. DMG has alleged that these activities were undertaken by persons acting

3   in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for

4   production is not limited to the facts surrounding these particular claims. Instead, it is

5   broadly directed toward Anastasia's business in general. DMG fails to show how the

6   specific information it seeks is relevant to DMG's claims. It also fails to explain how

7   the information sought will lead to admissible evidence.

8       DMG misrepresents the record in an attempt to support its belated agency

9   argument.

10      For example, DMG claims that it needs discovery regarding the business

11  relationship between Anastasia and the Moscow Entities because of an "implication"

12  that they provide "exclusive services" to Anastasia. In addition to the dubious

13  relevancy of this allegation, the fact is that Anastasia already has produced copies of

14  its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

15  and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

16  ranging discovery. While DMG cites a large number of cases for abstract principles of

17  agency law, DMG fails to apply any of those principles to the facts of this case.

18  DMG's legal theories appear to be nothing more than post-hoc rationalizations to

19  justify intrusive discovery into a competitor's business.

20      DMG also attempts to suggest that one is an agent "at all times," but one "may

21  be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

22  *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

23  part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

24  Ct. 1380, 143 L. Ed. 2d 462 (1999).

25      In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

26  DMG has refused to provide Anastasia with even basic information concerning the

27  formation, ownership and management structure of various DMG-related entities

28  who also have claimed ownership of the DREAM MARRIAGE trademark and

website that DMG now claims to own. For example, in response to Anastasia's requests for production of documents concerning DMG's relationship with a company called Dream Marriage, Inc. that previously owned the DREAM-MARRIAGE mark and Dream World Partners, Inc. which appears to operate the dream-marriage.com website, DMG has either refused to produce any documents at all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or has only produced license agreements or assignments. Yet DMG hypocritically finds that Anastasia's production of similar documents concerning the relationship with the Moscow Entities somehow inadequate.

DMG also claims that Anastasia "pays the Moscow entities a percentage of all revenues," in an apparent attempt by DMG to create the illusion of a partnership. This allegation is completely false. The Moscow entity sends invoices to Anastasia for services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is now seeking the attachments to these invoices which give details of the work underlying the invoices, even though such attachments would not be necessary if Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG. Even if DMG's allegation were true, which it is not, it does nothing to support the relevancy of the overly broad and intrusive discovery that DMG now seeks.

Nor do the deposition transcript pages cited by DMG support its wild accusations.

For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by DMG for the proposition that the Moscow entities are Anastasia's agents, actually establish that Anastasia does not control the activities of the Moscow Entities, and this lack of control is contrary to DMG's agency theory.

Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies

and women, while Anastasia handles the US customer relationships. This contradicts DMG's assertion that Anastasia "cannot assess or distinguish the division of [business]" between Anastasia and the Moscow Entities.

Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on page 162 (Exh. E), suggests that employees of the Moscow Entities occassionally represent themselves to be part of "Anastasia Date" in media publications and for customer relations purposes, and that this sometimes leads to confusion as to who "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4) cited by DMG also concern similar issues.

Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its GoDaddy registration account in order to manage of the websites as authorized under the service agreement.

Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's periodically sends money to other Moscow entities as requested by Stoliza as general payments for amounts owed to Stolitza. DMG attempts to mischaracterize these payments as "making disbursements at the direction of the Moscow Entities" in its Introductory Statement to suggest erroneously that the Moscow Entities controlled Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's request under its Service Agreement is not relevant to any of the acts alleged in DMG's complaint.

At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the services we have received from the Russian entity." She did not say, as DMG suggests, that she condoned or even had knowledge of the acts alleged in the complaint.

At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same building" as the Moscow Entities, but not that he shares the same office with the Moscow Entities as DMG erroneously implies.

1    DMG also relies on deposition testimony that certain documents may exist,

2    and appears to suggest that "relevance" is established merely because DMG has

3    demanded their production. By DMG's circular reasoning, a document is relevant if

4    DMG demands its production, and that document must be produced if DMG can

5    establish its existence. But this is not the law. As the party requesting discovery, DMG

6    bears the burden of establishing relevancy of the requested discovery to the claims or

7    defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

8    To the extent DMG may later try to argue that other entities such as IT Online,

9    Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's

10   Complaint, DMG's request for production is not limited to DMG's claims, but is

11   broadly directed toward all documents concerning an individual or entity who

12   provides "services of generating revenue." There is simply no basis for DMG, a

13   competitor, to demand that Anastasia provide such sweeping information, including

14   information having nothing to do with DMG's claims.

15   **(b)   Anastastia's Objections To DMG's Request No. 21**

16   Anastasia's objections to DMG's Request No. 21 were particularized, well-

17   founded, and reasonable.

18   **(i)   DMG's Improper Rule 30(b)(2) Requests**

19   Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2)

20   requests as being improper because a request for documents at a deposition is

21   appropriate only where "the documents are few and simple." Advisory Committee's

22   Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No.

23   98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an

24   overly broad and excessively numerous production of documents at a deposition was

25   an abuse of Rule 30(b)(2).

26   Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production

27   requests appear to be part of a ploy by DMG to demand so many documents at the

28   30(b)(6) deposition, in a vague and incomprehensible manner, that it would

198

1   impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an

2   opportunity to demand that the deposition be resumed to ask about additional

3   documents. Such a ploy is contrary to the rules.

### (ii)   Privilege

5       Anastasia made a general objection to each of DMG's document production

6   requests that placing documents generated after the filing of DMG's Complaint on a

7   privilege log would be unduly burdensome. Clearly, requiring that every

8   communication between Anastasia and its counsel, or between counsel and expert

9   consultants be recorded on a privilege log would be unreasonable and unduly

10  burdensome.

11      DMG has made a similar objection in response to Anastasia document requests

12  (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one

13  would have expected DMG to have generated many attorney-client privileged or work

14  product documents prior to filing suit.

15      In any event, neither DMG nor Anastasia have produced a privilege log

16  identifying any post-filing documents. This is a non-issue.

### (iii)   Request No. 21 Is Oppressive And Burdensome

18      As previously discussed, a request for production of documents at a deposition

19  under Rule 30(b)(2) is appropriate only where "the documents are few and simple."

20  Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL

21  817853, at *5.

22      Rather than seek a few and simple documents, DMG's Request No. 21 seeks

23  production of "All DOCUMENTS" regarding a banking relationship. Such a request

24  is overly broad and unduly burdensome, and therefore objectionable where, as here,

25  the request does not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S.

26  Dist. LEXIS 18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on

27  *Scruggs* in making a similar objection to Anastasia's request for production of "all"

28  documents. Exh. F at 5 et al.

BH8255.1
1003-30730

### (iv)   Request No. 21 Is Overly Broad

On its face, DMG's Request No. 21 is overly broad in seeking the entire business relationship between Anastasia and a third party bank, without limitation to relevant information to the claims and defenses in this action. Production of all documents "relative to" this business relationship in response to such an overly broad request clearly would be oppressive and unduly burdensome.

### (v)   Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.   DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;

- All emails between Defendant and Andrey Ryabichikov from January 2009 to present;

- All emails between Defendant and Oleg Nochka from January 2009 to present;

- All emails between Defendant and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;

- All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and

- All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's claims in this action, nor responsive to Request No. 21. DMG has demanded these documents in connection with this particular request, but has made no effort to establish how those documents are allegedly responsive to this request. Nevertheless, Anastasia will address each in turn.

### (a)    All Invoice Attachments From Stolitza and IT Online

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's

claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

DMG's demand for these attachments appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

### (b)     All emails with Andrey Ryabichikov

None of the requests for production that DMG seeks to compel refers to Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr. Ryabichikov without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Ryabichikov.

In short, DMG has made another overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

### (c)     All emails with Oleg Nochka

DMG also is demanding production of all emails with Oleg Nochka without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Nochka.

Again, DMG has made an overly broad demand for production of documents

1  without making any attempt to establish relevancy. DMG's demand appears to be

2  designed for harassment and to seek information regarding the operation of a

3  competitor's business unrelated to the claims DMG is asserting in this action.

### (d)   All emails with Alexey Eremin

5  None of the requests for production that DMG seeks to compel refers to

6  Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's

7  former President, Mr. Eremin, without any subject matter limitation over a three-year

8  period of time. Mr. Eremin was not even President of Anastasia until November

9  2010, and he had no involvement in Anastasia's business activities prior to that time.

10  Exh. D (Tr. 99, and 329).

11  Again, DMG has made an overly broad demand for production of documents

12  without making any attempt to establish their relevancy to this action. Testimony was

13  given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters

14  raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover,

15  testimony was given that there were no email communications between Anastasia and

16  Mr. Eremin except for a few litigation-related matters that are immune from discovery

17  as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)   All wire transfers to Lookintom

19  DMG also is demanding "[a]ll documents, invoices, emails, bank records,

20  accounting records that relate to any funds or wire transfers from Defendant to

21  Lookintom from January 2009 to present." DMG has made no showing why such a

22  broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of*

23  *P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

24  financial condition was not relevant to issues of whether contractor was fully

25  compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

26  ed.).

27  At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been

28  made to Lookintom at the request of Stolitza in order to satisfy amounts due to

1   Stolitza. These payments were not linked to any specific Stolitza invoice, but were

2   applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr.

3   296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no

4   invoices from Lookintom to Anastasia, and no invoices requesting payment to

5   Lookintom.

6        The history of payments made by Anastasia to Lookintom to satisfy amounts

7   owed to Stolitza is not relevant to any claim or defense in this action, and DMG has

8   made no attempt to establish any. The fact that Anastasia made payments to

9   Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to

10   any claim or defense in this action. Nor would the specific amounts paid as reflected

11   in bank statements be relevant.

12        **(f)   All wire transfers to [sic] Krypton**

13        DMG also is demanding "[a]ll documents, invoices, emails, bank records,

14   accounting records that relate to any funds or wire transfers from Defendant to [sic]

15   Krypton from January 2009 to present," but has made no showing why such a broad

16   demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W.*

17   *Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

18   financial condition was not relevant to issues of whether contractor was fully

19   compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

20   ed.).

21        As an initial matter, Anastasia has made no payments to "Krypton." At

22   Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been

23   made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to

24   Stolitza. These payments were not linked to any specific Stolitza invoice, but were

25   applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr.

26   296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no

27   invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

28        Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (g)   All Phone Billing Records For Any (800) Number

DMG has given no reason why "[a]ll phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006" are relevant to this action. Moreover, these phone records are not responsive to DMG's Request No. 21. In any event, Anastasia has already informed DMG that Anastasia has no relevant phone billing records to produce.

### (f)   All invoices for Google Accounts

DMG also has given no reason why "[a]ll invoices for Google accounts 2961669 and 1020911" are relevant to this action. Google was not involved in the acts alleged in its Complaint, and these invoices are not relevant to the claims or defenses in this action. Moreover, these Google documents do not appear responsive to DMG's Request No. 21.

### 5.   Concluding Statement Re DMG's Issue No. 8

As has become its custom in this action, DMG's counsel opens his declaration in support of DMG's motion to compel with a diatribe against what he claims to be Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery conduct. Anastasia has actually produced more documents to DMG than DMG has produced to Anastasia in this action (not including computer logs that DMG produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's requests for production, DMG stated that "DMG will not produce documents responsive to this request." Exh F.

DMG's motion to compel production in response to its Request No. 21 should be denied because the additional documents that DMG seeks are not relevant to any claim or defense in the present action. These documents have already been produced by Anastasia, and DMG's relevancy argument does not apply to the additional documents that it now seeks.

## X.   ISSUE NO. 9: REQUEST NO. 23 FOR PRODUCTION OF DOCUMENTS AT DEPOSITION

### A.   Disputed Request for Production and Defendant's Response

<u>REQUEST FOR PRODUCTION NO. 23</u>

All DOCUMENTS relative to details and information on what servers or companies are delegated to send email on AI's behalf.

<u>RESPONSE TO REQUEST NO. 23</u>

In addition to its General Objections incorporated herein, Anastasia objects to this request on the grounds that the terms and phrases "all DOCUMENTS," "relative to," "details and information," and "what servers or companies are delegated to send email on AD's behalf," are vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Anastasia will interpret this this request as being limited to agreements authorizing such

delegation with respect to anastasiadate.com. Anastasia further objects to the extent that this request is directed to documents outside the subject matter or temporal scope of the acts alleged in the Complaint, and is therefore overly broad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. Anastasia further objects to the extent that this request is directed to activities by third parties, to information and documents not within the possession, custody or control of Anastasia, or to matters for which Anastasia has no relevant knowledge. Subject to and without waiver of its General Objections and the immediately preceding specific objections, Anastasia answers as follows: Other than documents already produced, Anastasia has no documents within its possession, custody or control, that are responsive and non-privileged.

### B.    DMG's Contentions and Points and Authorities

The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms. Sykes testified that the companies in Moscow known as Stolitza and IT-Online (together referenced by the witness as the "Moscow Entities") have carte blanche to perform any service on behalf of AI, knows that these two companies hold themselves out as being AI, that they created and manage all internet activities and business activities of AI including and not limited to AI's primary website Anastasiadate as well as all of AI's affiliates, that all customer service calls are answered at their offices, that AI receives all revenues and makes disbursements at their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

At the deposition, Plaintiff requested specific documents responsive to several document requests to be produced that were not produced at the deposition. The

documents also were relevant to the witnesses' testimony. This included invoices requesting wire transfers and bank records showing wire transfers to companies Kirpton, LTD and Lookintom. Plaintiff's investigation ties these two entities to interference with contractual relations between Plaintiff and Plaintiff's agencies as well as unauthorized access to Plaintiff's website and the screen scraping thereof. The witness confirmed that wire transfers were made to these entities by AI at the request of the Moscow entities as reflected in the invoices. (Ex. 6, 123:17-125:12; 296:3-299:11; 325:1-326:2; 360:1-21.) It is important to note that the witness testified that she has provided invoices to her counsel, but no invoices were produced at the deposition. (Ex. 6, 123:17-125:12.) Plaintiff's counsel also requested phone records for (800) numbers relative to AI's business to establish that AI was paying for the phone bills for the customer service of AI which was being handled out of the Moscow offices. (Ex. 6, 281:22-283:13.) Email correspondence was also requested with respect to communications between Elena Sykes and Andrey Ryabchikov and Oleg Nochka who managed the Moscow office. (Ex. 6, 212:4-25; 249:12-250:13, 256:16-258:3.) Additionally emails between Elena Sykes and Lydia Kara of the Moscow office were requested because Ms. Sykes testified that Ms. Kara requested assistance with placing ads in the United States. (Ex. 6, 243-22-245:4, 247:9-248:3.) Again, AI gave carte blanche to IT-Online (Moscow entity) to handle all of its internet activities, including complete access to it Google Analytics accounts. At the deposition Plaintiff's counsel also requested copies of the invoices and payment records with respect to the Google Analytic accounts 2981669 and 1020911 because the accounts are presumed to be in AI's name. (Ex. 6, 290:17-20; 291:9-293:19.)

Following the deposition, on November 7, 2011 Plaintiff sent a letter to Defendant's counsel with the following request:

To follow up the PMK deposition document requests, as referenced at the deposition of your client, specific documents responsive to the

document categories were requested to be produced, most relating to your client's relationship to Stolitza and IT-Online as follows:

- All invoices from Stolitza and IT-Online from January 2009 to present;

- All emails between your client and Andrey Ryabichikov from January 2009 to present;

- All emails between your client and Oleg Nochka from January 2009 to present;

- All emails between your client and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from your client to Krypton from January 2009 to present; and

- All phone billing records for any (800) number used by your client from January 2009 to present.

(Ex. 7.)

On November 9, 2011, Plaintiff's counsel again requested copies of the invoices for Google accounts 2961669 and 1020911 to be produced responsive to the PMK document requests. (Ex. 8.)

Plaintiff's counsel did not receive a response to the requests and a meet and confer was conducted on November 16, 2011 with respect to the documents requested. The meet and confer was memorialized in part as follows:

With respect to production of the Person Most Knowledgeable ("PMK") documents that were requested at the deposition of your client

and further identified in my November 7, 2011 letter and November 9, 2011 email, you advised that you will have to confer with your client with respect all the business emails between your client and Andrey Ryabichikov, Oleg Nochka and Alexey Eremin between January 1, 2009 to present, as well as with regard to the (800) phone number records. As we discussed, if there are no records of (800) phone bills to your client from January 2009 to present, we will accept exemplars of bills dating back to January 2006, as we have your client's internet website pages dating back to 2006 that are relevant in this case. We do need verification from you that your client does not have the (800) phone number records requested. You advised that you will advise me by November 21, 2011 regarding the above.

With respect to all the other documents requested, you advised that the documents will be produced by November 30, 2011. With respect to the invoices requested, amounts can be redacted except as to the amounts that relate to infringing websites identified in our 3rd Amended Complaint and with respect to payments to Lookintom and Kyrpton.
(Ex. 9.)

Defendant's counsel did not respond as requested, other than forwarding some redacted invoices, mostly unresponsive to Plaintiff's requests. Plaintiff's counsel sent an email on 12-2-11 advising that AI failed to produce all documents requested as agreed by November 30, 2011 and a further meet and confer was requested with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested. Defendant's objections are also disingenuous:

**Privilege**: Parties withholding documents as privileged should identify and describe the documents in sufficient detail to enable the demanding party to contest the claim. *See*, FRCP 45(d)(2) (applicable to documents withheld under subpoena); *Horton v. United States*, 204 FRD 670, 673 (D.CO. 2002); *Etienne v. Wolverine Tube, Inc.* 185 FRD 653, 656 (D.KS. 1999) (Rule 26(b)(5) requires parties to provide privilege log for documents withheld on grounds of privilege or work product). Defendant has not provided a privilege log, nor has it identified documents with sufficient detail or stated the specific privilege applicable to each identified document that was withheld. *United States v. Construction Products Research, Inc.*, 73 F3d 464, 473 (2nd Cir. 1996). Defendant's generalized, nonspecific claims of privilege constitute an implied waiver of any otherwise applicable privilege. *See*, *Eureka Fin'l Corp. v. Hartford Acc. & Indem. Co.*, 136 FRD 179, 182 (E.D.Cal. 1991). "[P]arties seeking to invoke such privileges are not permitted to provide mere 'blanket objections' to discovery requests." *Am. Dental Ass'n v. Khorrami*, CV 02-3853 DT(CTX), 2003 WL 24141019 (C.D. Cal. July 14, 2003).

**Oppressive and Burdensome**: With respect to Defendant's objection that this Request is "overbroad" and "burdensome", where a party resists a discovery request claiming that it is unduly burdensome, the burden rests on the party raising the objection to show that responding would be *unduly* burdensome. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 332 (D. Kan. 1991); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033-34 (E.D. Cal. 2010). Simply raising the objection is not a sufficient basis to prevent discovery of otherwise discoverable material. *Snowden,* supra, 137 F.R.D. at 333. Furthermore, Defendant has failed to demonstrate how this request is overly broad, despite having the burden to do so. *Walker v. Lakewood Condominium Owners Association.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999). An undue burden objection must be supported by affidavits or other evidence which demonstrates the burden. *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such showing was made by Defendant. Defendant's objection

lacks the necessary specificity and represents an effort to obstruct Plaintiff's legitimate attempts to obtain discovery and prepare this case. This objection was improperly asserted, as it lacks any particularity. FRCP 33(b)(4); *Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y. 2000) ("to support an objection based upon burdensomeness the objecting party must particularize the basis for the objection as generalized assertions are inadequate"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D.Cal.1996). The objecting party bears the burden to explain its objections.

**Vague and Ambiguous**: "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity . . . Respondents should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories. To clarify their answers, respondents may include any necessary, reasonable definition of such terms or phrases." *Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, C05-00198 JW HRL, 2007 WL 1168677 (N.D. Cal. Apr. 18, 2007) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 310 (D.Kan.1996)). It is not proper ground for objection that the request is unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994).

**Relevance**: AI and the Moscow entities formed the internet business together. Since the internet business was formed, AI has known and has authorized the Moscow entities represent to the public that the Moscow entities were and are AI. There is an implication that the Moscow entities provide exclusive services for AI. AI cannot assess or distinguish the division of ownership of business assets or the rights of ownership thereto. AI pays the Moscow entities a percentage of all revenues and AI accepts the benefits of all services provided by the Moscow entities. AI has given carte blanche to the Moscow entities to manage all internet and agency activities. AI never objected to the Moscow entities activities, including the activities that form the basis of Plaintiff's Complaint filed in this case, even after the Complaint was filed. See Exh.4 (64:1-65:12, 147:6-151:5, 163:1-8, 201:14-202:15, 227:25-228:14, 290:17-20,

334:22-25, 335:8-14, 351:18-354:2); Exh.6 (12:20-23, 87:20-88:3, 123:11-125:6, 212:4-25, 296:6-298:14, 325:5-24)

Further, The PMK witness testified that records exist or may exist with respect to many of the documents that have been requested to be produced. See Exh. 6 (247:23-248:24, 256:16-257:19, 281:25-283:23, 293:20-24, 296:6-298:20, 325:5-24, 360:5-21)

Plaintiff's investigation has revealed that the Moscow entities have conducted the activities asserted in Plaintiff's complaint and continue to so. Plaintiff has alleged that the Moscow entities were at all times acting as AI's agent. Plaintiff seeks the discovery sought herein to establish a partnership between AI and the Moscow entities, or alternatively, that AI ratified the activities of the Moscow relative to Plaintiff's complaint, which is relevant.

"Under California Corporations Code section 16202(a), 'the association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership.' Cal. Corp. Code § 16202(a). 'Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.' *Bank of Cal. v. Connolly,* 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973). 'Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.' *Connolly,* 111 Cal. Rptr. at 477. "A joint venture or partnership may be formed orally or assumed to have been organized from a reasonable deduction from the acts and declarations of the parties." *Weiner,* 54 Cal. 3d at 482-83 (internal citations omitted). Likewise, "[a] joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.'" *Connolly,* 111 Cal. Rptr. at 477 (quoting *Holtz v. United Plumbing &*

*Heating Co.,* 49 Cal. 2d 501, 506-507 (Cal. 1957)). "In determining whether a relationship such as that of partners has been created, the courts are guided not only by the spoken or written words of the contracting parties, but also by their acts." *Singleton v. Fuller,* 118 Cal. App. 2d 733, 740 (Cal. Ct. App. 1953). *Kahn Creative Partners, Inc. v. Nth Degree, Inc.* 2011 WL 1195680, 6-7 (C.D.Cal. 2011))

"The issues we deal with involve the application of traditional principles of agency law. Two basic rules are involved: (1) ratification by a person of an act purportedly done on his behalf not only creates the relationship of principal and agent but also constitutes approval by the ratifier of the purported agent's act, relieving such agent of liability to the ratifier for the act; and (2) forgeries can be ratified thereby relieving the wrongdoer agent of liability to the principal. "

"The first rule is embodied in Civil Code section 2307 which provides: 'An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification.'"… 'A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' (Ballard v. Nye (1903) 138 Cal. 588, 597, 72 P. 156, 159; see also Bissell v. King (1928) 91 Cal.App. 420, 428, 267 P. 356; Rest.2d Agency, § 83.)

"Generally, the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act. (Ballard v. Nye, supra, 138 Cal. 588, 597, 72 P. 156; Civ.Code, § 2307; Rest.2d Agency, § 100" *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-76;

"Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification. *Schultz Steel Co. v. Hartford Accident & Indemnity Co.,* 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)("A purported agent's act may be

1   adopted expressly or ... by implication based on conduct of the purported principal

2   from which an intention to consent or adopt the act may be fairly inferred.")" *Bowoto*

3   *v. Chevron Texaco Corp.* 312 F.Supp.2d 1229, 1247-1248 (N.D. Cal. 2004); Also see

4   *Garcia v. Clovis Unified School Dist.* 627 F.Supp.2d 1187, 1202 (E.D Cal. 2009);

5       *Relevant* information may be discoverable if it "appears *reasonably calculated to lead*

6   to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added).

7   Plaintiff has the *right* to discover non-privileged information "relevant to the claim or

8   defense of *any party,* including the existence, description, nature, custody, condition

9   and location of any books, documents, or other tangible things and the identity and

10  location of persons having knowledge of any discoverable matter." Fed R. Civ. P.

11  26(b)(1), (emphasis added). This includes information that Plaintiff may use to

12  support its claims or defenses of Defendant, including the *identity* of any *witness or*

13  *document* that may support such denials. *See,* Adv. Comm. Notes to 2000 Amendment

14  to Fed R. Civ. P. 26(b)(1). "A request for discovery should be considered relevant if

15  there is <u>any</u> possibility that the information sought may be relevant to the subject

16  matter of the action." *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D.

17  52, 58 (D.D.C. 1984) (internal quotation omitted; emphasis added).

18      **Duty to Inquire:** DMG contends that with respect to Defendant's agents,

19  partners and affiliates, Defendant has a duty to "secure all information available to"

20  the corporation, including "information within the personal knowledge of former ...

21  employees, employed ... at the time this action commenced [and even] information

22  possessed by its corporate counsel." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d

23  1204, 1210-11 (8th Cir. 1973) (cited with approval in *Wyle v. R.J. Reynolds Indus., Inc.*,

24  709 F.2d 585, 590 (9th Cir. 1983)). Indeed, a corporation is required to "furnish such

25  information as is available from the corporation itself or from sources under its

26  control ... [i]f the corporation can obtain the information from sources under its

27  control, it may not avoid answering by alleging ignorance." *Brunswick Corp. v. Suzuki*

28  *Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis. 1983). An entity "must provide all

1   responsive information available from [it] or from sources under [its] control."

2   *Goodrich Corp. v. Emhart Indus., Inc.*, EDCV0400759VAPSSX, 2005 WL 6440828 (C.D.

3   Cal. June 10, 2005) (internal citations omitted). "[F]ederal courts have consistently

4   held that documents are deemed to be within [a party's] 'possession, custody or

5   control' for purposes of Rule 34 if the party has actual possession, custody, or control,

6   or has the legal right to obtain the documents on demand." *Nat'l Acad. of Recording

7   Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) (citing

8   In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir.1995)).

9       **Matters not produced must be identified:** The responding party must

10   identify, by category or type, the sources containing potentially responsive

11   information that it is neither searching nor producing. Enough detail should be

12   provided to enable the requesting party to evaluate the burdens and costs of providing

13   the discovery and the likelihood of finding responsive information on the identified

14   sources. Adv. Comm. Note to 2006 Amendment to FRCP 26(b)(2).

15       Based on the foregoing, the court should order Defendant to provide a further

16   response and produce documents without objection.

17   **C.    Anastasia's Contentions and Points and Authorities**

18       DMG served twenty-three document production requests under Rule 30(b)(2)

19   as part of its Rule 30(b)(6) deposition notice. Most of the requests were so broad and

20   vague that one has to question whether they were designed more for harassment than

21   to seek information relevant to DMG's two narrow claims.

22       In response to DMG's long-winded, disconnected and rambling contentions

23   regarding its self-styled "Issue No. 9" concerning its Request No. 23 under Rule

24   30(b)(2), Anastasia will (1) briefly outline the relevant discovery served, and then (2)

25   set forth the appropriate legal standards. Next, Anastasia will (3) discuss the

26   documents that DMG seeks to compel production of; and then (4) discuss DMG's

27   original request which does not appear to support production of the documents that

28   DMG is now seeking.

### 1.    Discovery At Issue

On its face, DMG's Request No. 23 seeks "all" documents "relative to" the servers or companies delegated to send mail on behalf of Anastasia.

DMG's motion to compel should be denied because:

- DMG seeks documents that are not relevant to any claim or defense in the present action;
- the request is unduly burdensome, especially since a Rule 30(b)(2) request should be limited to a few and simple documents;
- the request is confusingly framed and not reasonably particularized so as to give fair notice of the documents being sought; and
- the documents DMG now seeks to compel are not reasonably responsive to this request.

To avoid unnecessary repetition, Anastasia refers back to the section covering DMG's "Issue No. 1" (Request No. 2), for its summary of the relevant sequence of discovery which led to this discovery request. .

### 2.    Legal Standards

Again, as previously discussed in connection with DMG's "Issue No. 1," DMG's portion of the joint stipulation consists of abstract legal arguments that are not linked to the specific request or topics that are the subject of DMG's motion to compel. DMG's motion fails to make any case for the relevance of the documents it now seeks to the claims or defenses at issue in the litigation. DMG instead seems to merely assume their relevance, and thus has failed to meet its burden.

#### (a)    Rule 26(b)

As previously discussed, Rule 26(b)(1) was narrowed substantively in 2000, and requires the party requesting discovery to establish the relevancy of the requested discovery sought to the claims or defenses in the action. If a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D.

217

1   581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to

2   the party resisting discovery. *Id.*

3   ### (b)   Rule 30(b)(2)

4   Rule 30(b)(2) is intended to be used when seeking a few and simple documents.

5   Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for

6   Documents at a deposition are appropriate where "the documents are few and

7   simple"); *Canal Barge*, 2001 WL 817853, at *5. DMG's twenty-three overly broad and

8   ambiguous requests seek far more than a few and simple documents.

9   Moreover, as the party seeking production of documents not in the possession

10   or custody of Anastasia, DMG bears the burden of proving that Anastasia has control

11   or the legal right to obtain the documents on demand. *In re Citric Acid Litig.*, 191 F.3d

12   1090, 1108 (9th Cir. 1999) ("Ordering a party to produce documents that it does not

13   have the legal right to obtain will oftentimes be futile, precisely because the party has

14   no certain way of getting those documents."). "[P]roof of theoretical control is

15   insufficient; a showing of actual control is required." *Id.* at 1107.

16   ### 3.   DMG's Rule 30(b)(2) Document Request No. 23

17   As previously discussed, DMG's Request No. 23 seeks "all" documents relative

18   to servers or companies are delegated to send email on Anastasia's behalf.

19   DMG's motion does not even try to explain away the numerous ambiguities

20   inherent in this request. Indeed, the actual wording of the request as written is never

21   discussed in DMG's section.

22   There is no reasonable interpretation of this request that would be

23   commensurate with the eight specific demands for production being made by DMG

24   in this motion and discussed below.

25   Anastasia has already produced documents (AD108-129 and AD689-938) in

26   response to this request. DMG's motion to compel additional production should

27   therefore be denied.

28

           **(a)**       **DMG Has Not Established That Request No. 23 Seeks Relevant Discovery**

As the party seeking to compel production, DMG has the burden of establishing that the requested discovery is relevant to a claim or defense in this action. During the meet-and-confer process for this motion, DMG erroneously stated that it was "not required to educate [Anastasia] on the relevancy" of the discovery it was seeking. Exh. J.

In its first joint stipulation (Exh. L), DMG's only relevancy argument was that "sales information requested is clearly relevant in a trademark claim." But DMG's Request No. 23 is not directed in any meaningful way to sales information relating to the use of the allegedly infringed mark, but generally to "any person or entity that provides services of generating revenue." A trademark claim does not give *carte blanche* to discovery of a party's sales. Moreover, Anastasia has already produced documents regarding the sales associated with the websites that DMG has accused of infringing its trademark, in response to other requests.

After reading Anastasia's portion of the joint stipulation, DMG realized that it had utterly failed to address the relevancy of the documents it was now seeking. DMG then revised its portion of the joint stipulation to add a legal discussion of agency theory, and to delete its failed "trademark" argument. But DMG's revised relevancy argument still misses the mark because it remains untethered to the two narrow claims asserted by DMG in this action.

As discussed in Anatasia's Introductory Statement, DMG has assserted essentially two claims—(1) a trademark claim based on the registration and use of a dozen specific domain names (none of which are anastasiadate.com), and (2) a CFAA claim based on alleged attempts to make unauthorized access to the dream-marriage.com website and to harass the women who had profiles on that website. Notably, the anastasiadate.com website and the operation of that website are not at issue.

1    In dropping the trademark argument, DMG has effectively conceded that the

2    discovery its seeks to compel is not relevant to the trademark claim (which is

3    consistent with the fact that none of the discovery requests at issue are directed to

4    DMG's trademark). That leaves the claim based on unauthorized access and

5    harassment. DMG has alleged that these activities were undertaken by persons acting

6    in their role as agents of Anastasia. [Dkt. 52 at ¶¶ 19-22]. But DMG's request for

7    production is not limited to the facts surrounding these particular claims. Instead, it is

8    broadly directed toward Anastasia's business in general. DMG fails to show how the

9    specific information it seeks is relevant to DMG's claims. It also fails to explain how

10   the information sought will lead to admissible evidence.

11   DMG misrepresents the record in an attempt to support its belated agency

12   argument.

13   For example, DMG claims that it needs discovery regarding the business

14   relationship between Anastasia and the Moscow Entities because of an "implication"

15   that they provide "exclusive services" to Anastasia. In addition to the dubious

16   relevancy of this allegation, the fact is that Anastasia already has produced copies of

17   its Service Agreements with the Moscow Entity. DMG has ignored these agreements,

18   and instead seeks to rely on inuendo and misrepresentation as a pretense to seek wide-

19   ranging discovery. While DMG cites a large number of cases for abstract principles of

20   agency law, DMG fails to apply any of those principles to the facts of this case.

21   DMG's legal theories appear to be nothing more than post-hoc rationalizations to

22   justify intrusive discovery into a competitor's business.

23   DMG also attempts to suggest that one is an agent "at all times," but one "may

24   be considered an agent . . . for some purposes but not for others." *Ward v. Mgmt.*

25   *Analysis Co. Employee Disability Ben. Plan*, 135 F.3d 1276, 1289 (9th Cir. 1998) aff'd in

26   part, rev'd in part sub nom. *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 119 S.

27   Ct. 1380, 143 L. Ed. 2d 462 (1999).

28   In contrast to the wide-ranging discovery DMG is seeking from Anastasia,

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1    DMG has refused to provide Anastasia with even basic information concerning the

2    formation, ownership and management structure of various DMG-related entities

3    who also have claimed ownership of the DREAM MARRIAGE trademark and

4    website that DMG now claims to own. For example, in response to Anastasia's

5    requests for production of documents concerning DMG's relationship with a

6    company called Dream Marriage, Inc. that previously owned the DREAM-

7    MARRIAGE mark and Dream World Partners, Inc. which appears to operate the

8    dream-marriage.com website, DMG has either refused to produce any documents at

9    all (Exh. F (e.g., DMG's responses to Anastasia RFP Nos. 25, 30, 31, and 66-78) or

10   has only produced license agreements or assignments. Yet DMG hypocritically finds

11   that Anastasia's production of similar documents concerning the relationship with the

12   Moscow Entities somehow inadequate.

13        DMG also claims that Anastasia "pays the Moscow entities a percentage of all

14   revenues," in an apparent attempt by DMG to create the illusion of a partnership.

15   This allegation is completely false. The Moscow entity sends invoices to Anastasia for

16   services rendered under their Service Agreement. Tr. 124:6-25 (Exh. 6). Copies of the

17   invoices (AD689-AD938) and the Service Agreement (AD123-AD129) have been

18   produced to DMG. This is the antithesis of a partnership arrangement. Yet DMG is

19   now seeking the attachments to these invoices which give details of the work

20   underlying the invoices, even though such attachments would not be necessary if

21   Anastasia was merely paying a percentage of revenue to Moscow as asserted by DMG.

22   Even if DMG's allegation were true, which it is not, it does nothing to support the

23   relevancy of the overly broad and intrusive discovery that DMG now seeks.

24        Nor do the deposition transcript pages cited by DMG support its wild

25   accusations.

26        For example, deposition pages 64:1-65:12 and 290:17-20 (Exh. 4) cited by

27   DMG for the proposition that the Moscow entities are Anastasia's agents, actually

28   establish that Anastasia does not control the activities of the Moscow Entities, and

1    this lack of control is contrary to DMG's agency theory.

2          Pages 147:6-1515:5 (Exh. 4) pertains to the history of Anastasia's relationship

3    with the Moscow Entities, and how the Moscow Entities handle the Russian Agencies

4    and women, while Anastasia handles the US customer relationships. This contradicts

5    DMG's assertion that Anastasia "cannot assess or distinguish the division of

6    [business]" between Anastasia and the Moscow Entities.

7          Pages 163:1-8 (Exh. 4), when viewed in full context of the lead-in questions on

8    page 162 (Exh. E), suggests that employees of the Moscow Entities occassionally

9    represent themselves to be part of "Anastasia Date" in media publications and for

10   customer relations purposes, and that this sometimes leads to confusion as to who

11   "belongs to who." Pages 151:1-5, 227:25-228:14, 334:22-25, and 351:18-354:2 (Exh. 4)

12   cited by DMG also concern similar issues.

13         Pages 201:14-202:15 and 335:8-14 (Exh. 4) and 12:20-23, 87:20-88:3, and 212:4-

14   25 (Exh. 6) establish that Anastasia had allowed the Moscow Entities access to its

15   GoDaddy registration account in order to manage of the websites as authorized under

16   the service agreement.

17         Pages 123:11-125:6, 296:6-298:14 and 325:5-24 (Exh. 6) concern the invoices

18   Anastasia receives under Stoliza's Service Agreement, and the fact that Anastasia's

19   periodically sends money to other Moscow entities as requested by Stoliza as general

20   payments for amounts owed to Stolitza. DMG attempts to mischaracterize these

21   payments as "making disbursements at the direction of the Moscow Entities" in its

22   Introductory Statement to suggest erroneously that the Moscow Entities controlled

23   Anastasia's finances. The fact that Anastasia sent payments to third parties at Stoliza's

24   request under its Service Agreement is not relevant to any of the acts alleged in

25   DMG's complaint.

26         At page 353 (Exh. 4), Ms. Sykes testifies that she had "no complaints to the

27   services we have received from the Russian entity." She did not say, as DMG suggests,

28   that she condoned or even had knowledge of the acts alleged in the complaint.

1    At page 98:3-5 (Exh. 5), she testified that Mr. Eremin's "office is at the same

2  building" as the Moscow Entities, but not that he shares the same office with the

3  Moscow Entities as DMG erroneously implies.

4    DMG also relies on deposition testimony that certain documents may exist,

5  and appears to suggest that "relevance" is established merely because DMG has

6  demanded their production. By DMG's circular reasoning, a document is relevant if

7  DMG demands its production, and that document must be produced if DMG can

8  establish its existence. But this is not the law. As the party requesting discovery, DMG

9  bears the burden of establishing relevancy of the requested discovery to the claims or

10 defenses in the action. *McBride*, 250 F.R.D. at 586. DMG has not met its burden.

11   To the extent DMG may later try to argue that other entities such as IT Online,

12 Stolitza, Lookingtom, or Kirpton, are involved with the activity alleged in DMG's

13 Complaint, DMG's request for production is not limited to DMG's claims, but is

14 broadly directed toward all documents concerning an individual or entity who

15 provides "services of generating revenue." There is simply no basis for DMG, a

16 competitor, to demand that Anastasia provide such sweeping information, including

17 information having nothing to do with DMG's claims.

18         **(b)**    **Anastastia's Objections To DMG's Request No. 23**

19   Anastasia's objections to DMG's Request No. 23 were particularized, well-

20 founded, and reasonable.

21         **(i)**    **DMG's Improper Rule 30(b)(2) Requests**

22   Anastasia made a general objection to DMG's twenty-three Rule 30(b)(2)

23 requests as being improper because a request for documents at a deposition is

24 appropriate only where "the documents are few and simple." Advisory Committee's

25 Notes to predecessor Rule 30(b)(5); *Canal Barge Co. v. Commonwealth Edison Co.*, No.

26 98-0509, 2001 WL 817853, at *5 (N.D. Ill. July 19, 2001). DMG's attempt to seek an

27 overly broad and excessively numerous production of documents at a deposition was

28 an abuse of Rule 30(b)(2).

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1    Indeed, DMG's overly broad and unduly burdensome Rule 30(b)(2) production

2    requests appear to be part of a ploy by DMG to demand so many documents at the

3    30(b)(6) deposition, in a vague and incomprehensible manner, that it would

4    impossible for Anastasia to respond to DMG's satisfaction, and thereby give DMG an

5    opportunity to demand that the deposition be resumed to ask about additional

6    documents. Such a ploy is contrary to the rules.

7                              **(ii)     Privilege**

8    Anastasia made a general objection to each of DMG's document production

9    requests that placing documents generated after the filing of DMG's Complaint on a

10   privilege log would be unduly burdensome. Clearly, requiring that every

11   communication between Anastasia and its counsel, or between counsel and expert

12   consultants be recorded on a privilege log would be unreasonable and unduly

13   burdensome.

14   DMG has made a similar objection in response to Anastasia document requests

15   (Exh. F at 3), and has never produced a privilege log even though, as the plaintiff, one

16   would have expected DMG to have generated many attorney-client privileged or work

17   product documents prior to filing suit.

18   In any event, neither DMG nor Anastasia have produced a privilege log

19   identifying any post-filing documents. This is a non-issue.

20                    **(iii)     Request No. 23 Is Oppressive And Burdensome**

21   As previously discussed, a request for production of documents at a deposition

22   under Rule 30(b)(2) is appropriate only where "the documents are few and simple."

23   Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL

24   817853, at *5.

25   Rather than seek a few and simple documents, DMG's Request No. 23 seeks

26   production of "All DOCUMENTS" on a wide range. Such a request is overly broad

27   and unduly burdensome, and therefore objectionable where, as here, the request does

28   not limit its scope. See, e.g., *Scruggs v. Vance*, No. 06-0633, 2009 U.S. Dist. LEXIS

18520, at *3 (E.D. Cal. Mar. 9, 2009). Indeed, DMG itself relied on *Scruggs* in making a similar objection to Anastasia's request for production of "all" documents. Exh. F at 5 et al.

### (iv)  Request No. 23 Is Overly Broad

DMG's Request No. 23 is vague and ambiguous, and there appears to be no reasonable limit to the phrase "what servers or companies are delegated to send email." On its face, DMG's Request No. 23 is overly broad in seeking information regarding every server and every company that may be involved in the sending of email for Anastasia without limitation to relevant information to the claims and defenses in this action. Production of all such documents in response to such an overly broad request would be oppressive and unduly burdensome.

### (v)  Duty To Inquire

DMG argues that Anastasia has a duty to inquire "sources under its control" for available information in response to a request for production. But that does not discount Anastasia's valid objection to producing documents that are not in the possession, custody or control of Anastasia. Moreover, Anastasia did make inquiry of the Moscow Entities, but documents were not obtained because Anastasia does not control the Moscow Entities. Exh. D (Tr. 13-15).

### 4.  DMG's Disconnected Demand For Production

While denominated as a motion to compel responses to DMG's 30(b)(2) document production requests, a review of DMG's contentions, as well as in DMG's proposed order, indicates that DMG is actually seeking production of the following eight categories of documents (which were requested in a letter sent to Anastasia after the 30(b)(6) deposition).

- All invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting;

- All emails between Defendant and Andrey Ryabichikov from January 2009

225

to present;

- All emails between Defendant and Oleg Nochka from January 2009 to present;

- All emails between Defendant and Alexey Eremin from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present;

- All documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present;

- All phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and

- All invoices for Google accounts 2961669 and 1020911.

These overly broad categories of documents are neither relevant to DMG's claims in this action, nor responsive to Request No. 23. DMG has demanded these documents in connection with this particular request, but has made no effort to establish how those documents are allegedly responsive to this request. Nevertheless, Anastasia will address each in turn.

### (a)     All Invoice Attachments From Stolitza and IT Online

In an attempt to resolve a dispute over the production of Stolitza's invoices, Anastasia had agreed to produce redacted invoices from Stolitza to Anastasia (there are no invoices from IT Online), even though Anastasia believed that the invoices were not relevant to any of DMG's claims in this action. But after Anastasia made its good faith production of documents (AD689-938, see also Exh. K) based on this compromise, DMG turned around and demanded production of all the attachments

that had been redacted by agreement of the parties.

The attachments for programming services are detailed itemizations of programming work performed for the anastasiadate.com website. There is no reference to the accused domain names or websites, or to any monitoring or screen scraping of a competitor's website. Thus, these documents are not relevant to DMG's claims, and DMG has made no attempt to establish their relevancy to this action. This is highly sensitive technical information that would be of great value to a competitor.

The invoice attachments for analytical services and customer service likewise contain no reference to the accused domain names or websites or to any monitoring or screen scraping of a competitor's website (there are no attachments to the invoices for server leasing and hosting). Again, DMG has not established the relevancy of these commercially sensitive documents to this action.

DMG's demand for these attachments appears to be motivated more by a desire to seek sensitive commercial information regarding the operation of a competitor's business and websites than to seek information actually relevant to the claims DMG is asserting in this action.

### (b)     All emails with Andrey Ryabichikov

None of the requests for production that DMG seeks to compel refers to Andrey Ryabichikov, yet DMG is demanding production of all emails with Mr. Ryabichikov without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Ryabichikov.

In short, DMG has made another overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

BH8255.1
1003-30730

### (c)      All emails with Oleg Nochka

DMG also is demanding production of all emails with Oleg Nochka without any subject matter limitation over a three-year period of time.

During the 30(b)(6) deposition, there were no questions or answers establishing any relevant email communication between Anastasia and Mr. Nochka.

Again, DMG has made an overly broad demand for production of documents without making any attempt to establish relevancy. DMG's demand appears to be designed for harassment and to seek information regarding the operation of a competitor's business unrelated to the claims DMG is asserting in this action.

### (d)      All emails with Alexey Eremin

None of the requests for production that DMG seeks to compel refers to Alexey Eremin, yet DMG is demanding production of all emails with Anastasia's former President, Mr. Eremin, without any subject matter limitation over a three-year period of time. Mr. Eremin was not even President of Anastasia until November 2010, and he had no involvement in Anastasia's business activities prior to that time. Exh. D (Tr. 99, and 329).

Again, DMG has made an overly broad demand for production of documents without making any attempt to establish their relevancy to this action. Testimony was given at the 30(b)(6) deposition that Mr. Eremin has no knowledge of the matters raised by DMG in this action. Exh. D (Tr. at 14-15, 258-259 and 261-262). Moreover, testimony was given that there were no email communications between Anastasia and Mr. Eremin except for a few litigation-related matters that are immune from discovery as work product and the attorney-client privilege. Exh. D (Tr. 104).

### (e)      All wire transfers to Lookintom

DMG also is demanding "[a]ll documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present." DMG has made no showing why such a broad demand for financial documents is relevant to this action. *U.S. for Use and Ben. of*

228

1 *P.W. Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

2 financial condition was not relevant to issues of whether contractor was fully

3 compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

4 ed.).

5      At Anastasia's 30(b)(6) deposition, Ms. Sykes testified that payments had been

6 made to Lookintom at the request of Stolitza in order to satisfy amounts due to

7 Stolitza. These payments were not linked to any specific Stolitza invoice, but were

8 applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr.

9 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no

10 invoices from Lookintom to Anastasia, and no invoices requesting payment to

11 Lookintom.

12      The history of payments made by Anastasia to Lookintom to satisfy amounts

13 owed to Stolitza is not relevant to any claim or defense in this action, and DMG has

14 made no attempt to establish any. The fact that Anastasia made payments to

15 Lookintom at Stolitza's request to satisfy amounts due to Stolitza is not relevant to

16 any claim or defense in this action. Nor would the specific amounts paid as reflected

17 in bank statements be relevant.

18      **(f)    All wire transfers to [sic] Krypton**

19      DMG also is demanding "[a]ll documents, invoices, emails, bank records,

20 accounting records that relate to any funds or wire transfers from Defendant to [sic]

21 Krypton from January 2009 to present," but has made no showing why such a broad

22 demand for financial documents is relevant to this action. *U.S. for Use and Ben. of P.W.*

23 *Berry Co., Inc. v. General Elec. Co.*, 158 F.R.D. 161 (D. Or. 1994) (A contractor's

24 financial condition was not relevant to issues of whether contractor was fully

25 compensated for work it performed. ); see also 8 Fed. Prac. & Proc. Civ. § 2008.4 (3d

26 ed.).

27      As an initial matter, Anastasia has made no payments to "Krypton." At

28 Anastasia's 30(b)(6) deposition, however, Ms. Sykes testified that payments had been

BH8255.1
1003-30730

made to "Kirpton" at the request of Stolitza in order to satisfy amounts due to Stolitza. These payments were not linked to any specific Stolitza invoice, but were applied against the outstanding balances due Stoliza by Anastasia's accountant. Tr. 296-297 and 325 (Exh. 6). Contrary to DMG's assertion in its motion, there are no invoices from Kirpton to Anastasia, and no invoices requesting payments to Kirpton.

Moreover, during the 30(b)(6) deposition, DMG introduced an unsigned copy of a contract bearing the name "Kirpton" as an exhibit. Exh. C. Ms. Sykes testified that she did not recall seeing that particular document before. Nevertheless, it shows that DMG had possession of this document identifying Kirpton prior to the deposition, but did not serve any discovery requests directed towards Kirpton apparently in an attempt to catch Anastasia by surprise at the deposition. Having failed to obtain anything significant at the deposition, DMG is now seeking to shoehorn its present demand for production into one of its prior requests without any attempt to establish the relevancy of the documents to any claim or defense in this action. None of DMG's 30(b)(2) asserted document requests refers to Kirpton.

The history of payments made to Kirpton by Anastasia is not relevant to any claim or defense in this action, and DMG has made no attempt to establish any. The fact that Anastasia made payments to Kirpton at Stolitza's request to satisfy amounts owed to Stolitza is not relevant to any claim or defense in this action. Nor would the specific amounts paid as reflected in bank statements be relevant.

### (g)      All Phone Billing Records For Any (800) Number

DMG has given no reason why "[a]ll phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006" are relevant to this action. Moreover, these phone records are not responsive to DMG's Request No. 23. In any event, Anastasia has already informed DMG that Anastasia has no relevant phone billing records to produce.

1

### (f)   All invoices for Google Accounts

2   DMG also has given no reason why "[a]ll invoices for Google accounts

3   2961669 and 1020911" are relevant to this action. Google was not involved in the acts

4   alleged in its Complaint, and these invoices are not relevant to the claims or defenses

5   in this action. Moreover, these Google documents do not appear responsive to

6   DMG's Request No. 23.

7   ### 5.   Concluding Statement Re DMG's Issue No. 9

8   As has become its custom in this action, DMG's counsel opens his declaration

9   in support of DMG's motion to compel with a diatribe against what he claims to be

10   Anastasia'a discovery failures. What he ignores, of course, is DMG's own discovery

11   conduct. Anastasia has actually produced more documents to DMG than DMG has

12   produced to Anastasia in this action (not including computer logs that DMG

13   produced on a DVD). Moreover, in response to no less than thirty-six of Anastasia's

14   requests for production, DMG stated that "DMG will not produce documents

15   responsive to this request." Exh F.

16   DMG's motion to compel production in response to its Request No. 23 should

17   be denied because the additional documents that DMG seeks are not relevant to any

18   claim or defense in the present action. These documents have already been produced

19   by Anastasia, and DMG's relevancy argument does not apply to the additional

20   documents that it now seeks.

21

22   ## XI.   ISSUE NO. 10: MATTERS FOR EXAMINATION AT DEPOSITION,

23   ### CATEGORY NO. 2

24   ### A.   Disputed Matter for Examination at Deposition

25   <u>CATEGORY NO. 2</u>

26   Communications and means of communications with any person or entity that

27   provides services of generating revenue, monitoring competitors and competitors'

28   websites, registering domain names on behalf of AI or as a source of referral

231

1    customers for AI from January 1, 2009 to present.

2    RESPONSE TO CATEGORY NO. 2

3            Anastasia objects generally to the notice as calling for the deposition of the

4    "person most knowledgeable" with respect to the enumerated topics. A party has no

5    obligation under the Federal Rules to produce the person "most knowledgeable"

6    about the matters designated. Rather, Anastasia will designate a witness to testify on

7    its behalf in accordance with Rule 30(b) (6) based on the information known to

8    Anastasia. Anastasia further objects generally to each topic that refers to entities acting

9    "on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases

10   make the topics overly broad, unduly burdensome, and of an undetermined scope

11   which does not afford any reasonable means of witness preparation. The witness

12   produced will testify as to matters that are within the possession, custody, or control

13   of Anastasia, as required by the Federal Rules. The phrases also are objected to the

14   extent they seek to improperly include individuals and entities not under the control

15   of Anastasia. Anastasia also objects generally to the notice as being unduly

16   burdensome and repetitive to the extent that DMG seeks to depose the same witness

17   for one day as an individual and for two additional days as a 30(b) (6) witness. Topic 2

18   is objected to as being vague, ambiguous, overly broad, unduly burdensome,

19   confusingly written, and not reasonably particularized. The Topic has unlimited

20   subject matter scope and is not particularized to afford any reasonable means of

21   witness preparation. The Topic also is objected to as being directed to information

22   not within the possession, custody or control of Anastasia and are directed to actions,

23   communication, and information that Anastasia has no relevant knowledge of. The

24   witness produced will attempt to be prepared to offer a general overview of the

25   matters requested to the extent information is within the possession, custody or

26   control of Anastasia.

27   **B.    DMG's Contentions and Points and Authorities**

28           Regarding the assertion that Anastasia has "no obligation under the Federal

Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and counsel routinely use that term:

- "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b) (6) deposition, requesting defendant to designate a person most knowledgeable ("PMK") to testify on 33 subjects on January 26, 2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

- "In response to Hoye's notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department Captain Toribio as the person most knowledgeable…" *Hoye v. City of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)

- "Magedson was deposed as the person most knowledgeable for Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)." *Asia Econ. Inst. v. Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX, 2010 WL 4977054 (C.D. Cal. July 19, 2010)

- "On July 14, 2008, this Court granted plaintiff's motion to compel the continued Rule 30(b)(6) deposition of Beverlly (through Beverlly's person most knowledgeable ("PMK"), Theresa Lee)…" *Tacori Enterprises v. Beverlly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579 (C.D. Cal. 2008)

With respect to the above, "Rule 30(b)(6) provides for the deposition of the corporation by notice setting forth 'with reasonable particularity' the matters on which the examination of the corporation's most knowledgeable person will take place." *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal citations omitted).

As to Defendant's assertion that the witness will "testify as to matters that are within the possession, custody, or control of Anastasia" is potentially an evasive tactic

by your client and your client will be subject to sanctions relative to its involvement
with persons and entities that have been involved with the matters that are the subject
of our client's claims in this case, especially those persons that it has held out as
having a partnership with, persons directly, indirectly or even intricately linked, its
affiliates as well as person or entities known to share offices. The legal obligations
regarding your client's Rule 30(b)(6) witness includes and is not limited to the
following:

"'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its
behalf as to all matters known or reasonably available to it and, therefore, implicitly
requires persons to review all matters known or reasonably available to it in
preparation for the 30(b)(6) deposition. This interpretation is necessary in order to
make the deposition a meaningful one and to prevent the "sandbagging" of an
opponent by conducting a half-hearted inquiry before the deposition but a thorough
and vigorous one before the trial. This would totally defeat the purpose of the
discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome.
However, this is merely the result of the concomitant obligation from the privilege of
being able to use the corporate form in order to conduct business....[A company] does
not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no
knowledge or position with respect to a set of facts or area of inquiry within its
knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362
(M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v.
Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition,
the corporation has an obligation to investigate and identify and if necessary prepare a
designee for each listed subject area and produce that designee as noticed."); *Dravo
Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union
Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons
designated by the corporation do not possess personal knowledge of the matters set
out in the deposition notice, the corporation is obligated to prepare the designees so

that they may give knowledgeable and binding answers for the corporation."); *Buycks-Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.); *Securities and Exchange Commission v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y., 1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93 F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f) ("Counsel for the [corporation] should prepare the designated witness to be able to provide meaningful information about any designated area(s) of inquiry.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36-37 (D. Mass. 2001)

Further, "The party responding to a 30(b)(6) deposition notice "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997) (deponent must be prepared "to the extent matters are reasonably available, whether from documents, past employees, or other sources."). Even if the documents are voluminous and the review of those documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed. See *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation that is involved in litigation, can be fully and fairly explored."). Such preparation is necessary

1  because the "individuals so deposed are required to testify to the knowledge of the

2  corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*,

3  supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may

4  give complete, knowledgeable and binding answers on behalf of the corporation.");

5  *Taylor*, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts within

6  the corporation's knowledge, but also its subjective beliefs and opinions....The

7  corporation must provide its interpretation of documents and events.")." *Calzaturficio*

8  *S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 37 (D. Mass. 2001)

9       "Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty

10  in advance of the 30(b)(6) deposition to review all documents, including tax returns

11  and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself

12  nor the Advisory Notes nor reported case law addressing the rule define the

13  terminology "reasonably available." However, in a similar context-the production of

14  documents pursuant to Fed.R.Civ.P. 34-responding parties are required to produce all

15  documents that are in their control. "Control is defined not only as possession, but as

16  the legal right to obtain the documents requested upon demand." *Searock v. Stripling*,

17  736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194

18  F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined

19  not as possession, but as the legal right to obtain documents on demand, is the test as

20  to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule

21  34, 'control' does not require that the party have legal ownership or actual physical

22  possession of the documents at issue; rather, documents are considered to be under a

23  party's control when that party has the right, authority, or practical ability, to obtain

24  the documents from a non-party to the action.") It therefore seems logical that the

25  documents that are reasonably available are those documents that are in a party's

26  control. In the instant case, this means that the Fabiano sons were required to review

27  all documents (that had any bearing on the 30(b)(6) topics) that were in their control.

28  By definition, such documents would include the tax-related documents because those

documents, even if they were in the possession of Fabiano's accountant, were still in Fabiano's control because Fabiano had the legal right and the practical ability to obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in preparing to be deposed as 30(b)(6) representatives of the company, had the obligation to review all documents that were in their control, including the tax returns and related documents that were in the physical possession of Fabiano's accountant." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass. 2001)

Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery. [citations omitted] The responding party simply cannot invoke generalized objections; rather, with respect to each of the propounding party's discovery requests, the responding party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is ... overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

Additionally, "the party opposing discovery on the grounds of burdensomeness has an obligation to provide sufficient detail in terms of time, money and procedure required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

Finally, "If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29,

1    2010) (internal citations omitted)

2          With respect to terms that Defendant contends are vague, ambiguous or not

3    intelligible, Defendant has the obligation to use its best efforts to prepare and answer

4    the question. A party who objects to a discovery request as "vague and ambiguous"

5    has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card*

6    *Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection

7    that the request is unclear unless it is so ambiguous that Defendant cannot, "in good

8    faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th

9    Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain

10   which portion of the category or the language within is allegedly so vague as to

11   preclude any intelligent reply.

12         The Defendant's Person Most Knowledgeable Elena Sykes, its founder and the

13   sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms. Sykes

14   testified that the companies in Moscow known as Stolitza and IT-Online (together

15   referenced by the witness as the "Moscow Entities") have carte blanche to perform

16   any service on behalf of AI, knows that these two companies hold themselves out as

17   being AI, that they created and manage all internet activities and business activities of

18   AI including and not limited to AI's primary website Anastasiadate as well as all of

19   AI's affiliates, that all customer service calls are answered at their offices, that AI

20   receives all revenues and makes disbursements at their direction and that she has

21   never had a problem with their conduct or objected to their activities, even after AI

22   was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-

23   88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-

24   228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

25         Further, at the deposition, Ms. Sykes was not prepared to respond to questions

26   governing a time period from November 2010 through the date of the deposition,

27   which is the time period when the newly elected President, Alexey Eremin was acting

28   on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the

BH8255.1
1003-30730

same building with IT-Online, that he was to act as AI's liaison with IT-Online and that she did not consult with Mr. Eremin with respect to any PMK subjects, which included and was not limited to the business relationship between AI and the Moscow Entities, and her reasoning was that she was aware that Plaintiff was going to depose Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was not disclosed by the witness at the PMK deposition. Ms. Sykes further was not prepared to respond to specific categories noticed and did not do so at the instruction of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15; 258:22-262:5.)

Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with respect to the PMK Deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Based on the foregoing, the court should order Defendant to appear for deposition in Los Angeles to provide a further response to this category.

## C.   Anastasia's Contentions and Points and Authorities

All of DMG's arguments in support of its motion to compel additional 30(b)(6) deposition testimony suffer from three common flaws.

First, the deposition categories at issue mostly repeat almost verbatim the document production requests already discussed earlier in this joint stipulation. To the extent the document production requests are objectionable as being overly broad and for seeking information not relevant to the claims and defenses in this action, the deposition categories are also objectionable for the same reason. They are also objectionable for seeking information not within the possession, custody or control of Anastasia.

Second, the deposition categories were so unclear, cryptically worded, and overly broad that no reasonable means of witness preparation was possible. A witness

cannot possibly be prepared to answer every conceivable question in reference to a deposition topic that is not reasonably particularized.

Third, and perhaps most important, a 30(b)(6) deposition is not a homework exercise as DMG appears to believe. If a witness is already familiar with a particular topic that has been clearly articulated in the notice, additional preparation or review may not be necessary. A witness is not subject to being recalled simply because opposing counsel feels that the witness did not review enough documents. Rather, unless the opposing party can point to a specific question that was asked and not answered by the witness even though the information was within the possession, custody or control of the corporate party being deposed, there is no basis to re-open the deposition. DMG has failed to make such a showing.

Like its contentions concerning the document production requests, DMG's contentions concerning the deposition testimony of Ms. Sykes are based on numerous misrepresentations of her testimony.

No effort was made in DMG's motion to identify any question Ms. Sykes was unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage in an academic debate over some pre-deposition objections that were made for the record by Anastasia. There is no basis to grant a motion to compel further deposition testimony.

In response to DMG's long-winded and disjointed contentions regarding its self-styled "Issue No. 10" concerning Deposition Category No. 2 under Rule 30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category in dispute and show that Anastasia's witness gave proper testimony.

### 1. Discovery At Issue

On its face, DMG's Category No. 2 is nearly identical to its Document Request No. 2 (or "Issue No. 1"), and many of the same objections to Request No. 2 also apply to Deposition Category No. 2. DMG's demand for a meet-and-confer on the

1   deposition topics appeared to be a reiteration of the meet-and-confer for Rule

2   30(b)(2) document production, and counsel for Anastasia inadvertantly did not

3   respond to DMG's request for a separate meet-and-confer. Counsel for DMG did not

4   follow up with a telephone inquiry before preparing the joint statement. In any event,

5   DMG can claim no prejudice because when DMG revised its portion of the joint

6   statement to address relevancy for its document production requests, DMG made no

7   changes to its contentions in connection with this Issue No. 10 regarding the

8   deposition.

9       To provide context for DMG's Deposition Category No. 2, Anastasia will

10  briefly outline the relevant discovery served.

### (a)    DMG's Original Notice of Deposition

12      On July 28, 2011, DMG served a notice of deposition for Anastasia under Rule

13  30(b)(6) to take place in Bangor, Maine on August 31, 2011. The notice also included

14  twenty-two requests for production of documents under Rule 30(b)(2) with

15  production to take place at the deposition.[3] Anastasia later served its objections to the

16  Rule 30(b)(6) categories and to the Rule 30(b)(2) requests.

17      Prior to the deposition, the Court had issued an order allowing DMG a total of

18  two days to conduct the 30(b)(6) deposition, even though DMG had been notified

19  that a single witness (Elena Sykes) would be produced. (Dkt. 64).

20      On August 28, 2011, while in route to Bangor for the deposition, Plaintiff's

21  counsel Bruce Fields and Defendant's counsel Craig Bailey became stranded in

22  Detroit, Michigan because the connecting flight from Detroit to Bangor had been

23  cancelled due to Hurricane Irene. Counsel were unable to secure alternative

24  transportation to Bangor to proceed with the scheduled deposition, so the parties

25  agreed to reschedule the deposition for October 26th and 27th in Bangor, Maine.

26

27  [3] DMG previously had served a first set of requests for production of documents under Rule 34 on Anastasia on March 15, 2011, and Anastasia responded to those requests. Instead of serving a second set of requests for production under Rule 34, DMG chose to serve requests under Rule 30(b)(2) for production at the 30(b)(6) deposition.

28

241

(Dkt. 76).

### (b)   DMG's New Notice of Deposition

On September 27, 2011, DMG served a new notice for the deposition. Again, the new notice also included twenty-three requests for production of documents under Rule 30(b)(2) with production to take place at the deposition in Bangor, Maine. The deposition categories and requests for production were nearly identical to DMG's original notice. Anastasia later served objections to both the Rule 30(b)(6) topics and to the Rule 30(b)(2) requests. Exh. A. As noted earlier, Anastasia previously had served objections to the Rule 30(b)(6) categories and to the Rule 30(b)(2) requests set forth in DMG's original notice of deposition.

### (c)   Elena Sykes, Anastasia's Designated 30(b)(6) Witness

At the deposition, Elena Sykes, the founder of Anastasia, testified as Anastasia's designated 30(b)(6) witness. Ms. Sykes has been with Anastasia from the very beginning until she sold the company in September 2011. Furthermore, Ms. Sykes served as President of Anastasia until November 2010. Ms. Sykes considered herself to be the most knowledgeable person at Anastasia based on her long involvement with the company from its founding. Moreover, contrary to DMG's assertions, Ms. Sykes contacted both Mr. Oleg Nochka of the Moscow Entities and Mr. Alexey Eremin (Anastasia's President from November 2010 to September 2011) in preparation for the 30(b)(6) deposition. Neither provided any substantive information to Ms. Sykes—Mr. Nochka simply refused to provide any information, and Mr. Eremin stated that he did not have any substantive information to provide. Exh. D (Tr. at 14-15 and 258-259).

Because Anastasia had long ago entered into agreements with Stolitza LLC as an independent contractor to handle the new internet-based business, there is little institutional knowledge at Anastasia regarding the internet-based operations in Russia. The creation of web content, as well as interactions with the Russian and Ukrainian Agencies, have all been handled autonomously by Stolitza and the Moscow Entities

242

BH8255.1
1003-30730

for many years. Anastasia only has access to information that the Moscow Entities are willing to share. And when Ms. Sykes contacted Mr. Nochka with the Moscow Entities for information in preparation of the 30(b)(6) deposition, he refused.

Thus, Ms. Sykes prepared for the 30(b)(6) deposition based on the reasonably available information that was within Anastasia's possession, custody or control.

### (d)     The 30(b)(6) Deposition

The 30(b)(6) deposition of Anastasia was taken on October 26 and 27. After having her personal deposition taken by DMG on October 25, Ms. Sykes was deposed for two more days as Anastasia's designated 30(b)(6) witness. In fact, the second day of the deposition started early, and DMG used up the entire two days previously granted by the court. After having had three whole days to depose Ms. Sykes, DMG is now seeking yet another, fourth day to depose her further.

However, DMG has not identified any specific question calling for non-privileged information at the 30(b)(6) deposition that Ms. Sykes refused to answer. DMG's main gripe appears to be that Anastasia lacks detailed information about the business functions that have been contracted out to the Moscow Entities.[4] But Anastasia only has access to information that the Moscow Entities are willing to share, and the Moscow Entities refused to provide such information to Ms. Sykes in preparation for the 30(b)(6) deposition. Exh. D (Tr. at 14-15 and 339).

### 2.     Legal Standards

### (a)     Rule 26(b)

Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses," and not merely the "subject matter" of the case. Only relevant information can be discovered—not all information that might lead to the discovery of admissible evidence. Advisory

---

[4] DMG appears to speculate that the Moscow Entities are merely an alter ego of Anastasia, but the testimony of Ms. Sykes clearly establishes that Anastasia has been dealing with the Moscow Entities as independent contractors for many years. Anastasia has little understanding of, and no control over, the internal operation of the Moscow Entities.

Committee notes to Fed. R. Civ. P. 26(b)(1) (2000). With the 2000 amendments to Rule 26(b)(1), the Advisory Committee acknowledged that concerns among the bench and bar over cost, delay, and "over-discovery" in general had become persistent. Indeed, Rule 26 expressly prohibits discovery that is overly broad, unduly burdensome, costly, duplicative or unnecessary.

The party requesting discovery bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses in the action. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Where a discovery request is overly broad or otherwise objectionable on its face, the party resisting discovery has no need to support its objection. *Id.* Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

DMG's motion fails to make any case for the relevance of the discovery it now seeks to the claims or defenses at issue in the litigation. Instead, DMG seems to merely assume their relevance, and thus has failed to meet its burden.

### (b)    Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents. Advisory Committee's Notes to predecessor Rule 30(b)(5) (noting that Request for Documents at a deposition are appropriate where "the documents are few and simple"); *Canal Barge*, 2001 WL 817853, at *5.

Anastasia objected to DMG's 30(b)(2) requests for seeking far more than a few and simple documents, and made specific objections to DMG's twenty-three overly broad and ambiguous requests. DMG had sufficient time to serve requests for production under Rule 34 to obtain documents before the Rule 30(b)(6) deposition, but instead chose to seek documents under Rule 30(b)(2) for production at the deposition instead.

Rule 30(b)(2) should not be used as an excuse to extend a deposition when the documents could have been requested and obtained before the deposition. Moreover, DMG cannot supplement its prior Rule 30(b)(2) requests with the separate, more

1  particularized oral requests for documents made during the 30(b)(6) deposition, and

2  then use those requests as an excuse to re-open the deposition.

3  **(c)    Rule 30(b)(6)**

4  Rule 30(b)(6) permits a party to name a corporation as a deponent. The party

5  seeking an organization's testimony "must describe with reasonable particularity the

6  matters for examination," but the organization is only required to "testify about

7  information known or reasonably available to the organization." There is nothing in

8  Rule 30 that requires a party to testify about information over which it does not have

9  access and control. *See In re Ski Train Fire of November 11, 2000 Kaprun-Austria*, 2006

10  WL 1328259, at *9 (S.D.N.Y. May 16, 2006) (declining "to require a corporate parent

11  to acquire all of the knowledge of the subsidiary on matters in which the parent was

12  not involved, and to testify to those matters in a manner which binds the parent, a

13  separate legal entity."). Not surprising, most of the case law on this issue concerns

14  "related" entities, not unrelated parties to a contract as is the case here. Nonetheless,

15  even where the parties are related, courts still require a showing that the entity being

16  deposed has access and control with respect to the information sought. *Id.*

17  Moreover, DMG bears the burden of proving that Anastasia has control or the

18  right to obtain the information on demand. *In re Citric Acid Litig.*, 191 F.3d 1090, 1108

19  (9th Cir. 1999). "[P]roof of theoretical control is insufficient; a showing of actual

20  control is required." *Id.* at 1107; see also *Zenith Elecs. LLC v. Vizio, Inc.*, 2009 U.S.

21  Dist. LEXIS 90896, at *3-6 (S.D.N.Y. Sept. 21, 2009) (denying motion to compel

22  document production where "Samsung America did not have access to Samsung

23  Korea's documents in the normal operation of business because it does not design,

24  manufacture, or sell the chipsets, and did not participate in developing the source

25  code" at issue).

26  DMG repeatedly asserts that Anastasia did not produce the "person most

27  knowledgeable" at the 30(b)(6) deposition. But the phrase the "person most

28  knowledgeable" is merely a label placed on the designated corporate witness. *Mattel,*

245

*Inc. v. Walking Mountain Productions*, 353 F.3d 792, 798 (9th Cir. 2003). Anastasia may designate any person who can be prepared to testify with respect to properly noticed topics. Indeed, a 30(b)(6) witness need not have first-hand or personal knowledge. Instead, the witness need only be prepared to testify on behalf of the corporation based on knowledge reasonably available to the corporation. Fed. R. Civ. P. 30(b)(6) ("The persons designated must testify about information known or reasonably available to the organization."); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'" (citing Fed. R. Civ. P. 30(b)(6)); *see also* David Fietze, The Unreasonable Interpretation of "Reasonable Particularity" in Federal Rule of Civil Procedure 30(b)(6), 4 Suffolk J. Trial & App. Advoc. 73, 77 (1999) ("The corporation is not obligated to produce the most knowledgeable person to address each issue outlined in the deposition subpoena and can even prepare one witness to testify on all of the issues."). Furthermore, the areas of inquiry for a 30(b)(6) deposition must be set forth with reasonable particularity. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 584 (D. Kan. 2008) (noting that for Rule 30(b)(6) to function properly, the topics must be designated with "painstaking specificity").

### 3.   30(b)(6) Category No. 2

As previously discussed, Anastasia does not communicate with agencies, create profiles, develop profile databases, maintain servers or create web content. Anastasia has provided DMG with its knowledge on the topics noticed based on the reasonably available information within Anastasia's possession, custody or control.

DMG seems to believe that Anastasia should possess the knowledge of each entity with whom it contracts and the entities with whom they contract, but DMG has not developed any basis to support its belief other than idle speculation. Anastasia has no ability to acquire additional information beyond that provided by Ms. Sykes at her

deposition. Anastasia does not own any of the Moscow Entities, and Anastasia has no right of access or control over the information possessed by any of the Moscow Entities.

### (a)    Ms. Sykes' Testimony

DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities created and manage the internet activities associated with the anastasiadate.com website. However, DMG makes no attempt to establish that Anastasia has control over the Moscow Entities, and in fact suggests that Anastasia does not have such control.

Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow Entities to request information in preparation for the 30(b)(6) deposition, but he refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October 2011), but Mr. Eremin stated that he did not have any substantive information to provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and 261-262).

Thus, Ms. Sykes was properly prepared based on knowledge reasonably available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'" (citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107 ("[P]roof of theoretical control is insufficient; a showing of actual control is required.").

DMG claims that Ms. Sykes admitted at her deposition that she "was not prepared to respond to questions governing a time period from November 2010 through the date of the deposition [when] Alexey Eremin was acting on AI's behalf."

This is patently false. No such testimony was ever given. Moreover, as discussed above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr. Eremin responded that he "knows nothing," or "doesn't know anything" about those issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's assertions, Ms. Sykes affirmed that she was the person most knowledgeable about Anastasia, including during Mr. Eremin's time at the company. Exh. D (Tr. at 259-260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation of Anastasia—he would only address problems that Ms. Sykes would raise with him, and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had not been passed to Mr. Eremin, as DMG contends.

DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not confer with Mr. Eremin to prepare her for deposition because "she was aware that Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in litigation, and he had responded that he knew "nothing." As a result, she had no further need to confer with him again prior to the deposition. Ms. Sykes acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully suggested that there was no point to that because she had already asked and he had no relevant information to provide. In any event, Ms. Sykes stated on at least three instances during her deposition that she had conferred with Mr. Eremin, and that he had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the deposition "at the instruction of her counsel." This is totally false. DMG has no basis for making such an assertion. DMG apparently relies on the fact that Anastasia lodged timely and well-founded objections to the categories in DMG's 30(b)(6) notice as vague, ambiguous, confusing, and not reasonably particularized. The deposition

testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-opened every time counsel made objections for the record, the deposition would never end (which apparently is what DMG is seeking to do in this instance). DMG had more than sufficient opportunity to clarify its noticed categories with particularity in advance of the deposition, but chose not to do so. DMG also had two full days to question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no question (other than a single question calling for attorney-client privileged information) that Ms. Sykes was instructed by counsel not to answer.

In short, DMG identifies no relevant question that was asked and not answered based on the reasonably available information within Anastasia's possession, custody or control.

### (b)   Other Objections To Category No. 2

As stated in the objections Anastasia served on DMG prior to the deposition, this category was, on its face, vague, ambiguous, overly broad, unduly burdensome, confusingly written, and not reasonably particularized. The category was of an undetermined scope which did not afford any reasonable means of witness preparation. Indeed, the Category was broadly directed to Anastasia's entire business operation, revenue, and customers without regard to the claims or defenses being asserted in this action. As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses, and if a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

The Category also was objected to for seeking to improperly include individuals and entities not under the control of Anastasia, for seeking information not within the possession, custody or control of Anastasia, and for being directed to actions, communication, and information that Anastasia has no relevant knowledge of. Anastasia stated that the witness produced will testify as to matters that are within the

possession, custody, or control of Anastasia, as required by the Federal Rules, and the witness will attempt to be prepared to offer a general overview of the matters requested to the extent information is within the possession, custody or control of Anastasia.

### (c)      Deposition Pages Cited By DMG

As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes that she was adequately prepared and gave proper responses to the questions that were asked. The transcript excerpts cited by DMG do not alter that conclusion.

Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and information from both. Mr. Eremin had no information or documents. Mr. Nochka also did not provide any information or documents to Ms. Sykes.

Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms. Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's health problems, and that Ms. Sykes "did not perceive this job as being anything really stressful." (Tr. 105:18-19).

Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6 as overly broad as it was unreasonable to expect a witness to come prepared to address every bit of information that has ever been on a website and all changes in content over a two-year period of time. Ms. Sykes reviewed the home page because no specific part of the website was identified by DMG. When counsel for DMG attempted to inquire whether this was at the instruction of counsel, an objection and instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20 (Exh. 5).

Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that

she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin responded that he knew "nothing." Ms. Sykes also testified that she was the person most knowledgeable about Anastasia, which is consistent with her inquiry of Mr. Eremin. Tr. 259:22-260:6.

In any event, DMG identifies no relevant question that was asked and not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

### 4.   Concluding Statement Re DMG's Issue No. 10

DMG's motion to compel a further 30(b)(6) deposition regarding Category No. 2 must be denied. DMG's motion is little more than an academic debate over a pre-deposition exchange of letters between counsel. In fact, DMG's motion is simply a copy of its own pre-deposition letter with no effort make to particularize the arguments made to the testimony actually given at the deposition. Exh. I. DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

## XII.   ISSUE NO. 11: MATTERS FOR EXAMINATION AT DEPOSITION, CATEGORY NO. 5

### A.   Disputed Matter for Examination at Deposition

CATEGORY NO. 5

The nature of the business and business model of AI.

RESPONSE TO CATEGORY NO. 5

Anastasia objects generally to the notice as calling for the deposition of the "person most knowledgeable" with respect to the enumerated topics. A party has no obligation under the Federal Rules to produce the person "most knowledgeable" about the matters designated. Rather, Anastasia will designate a witness to testify on its behalf in accordance with Rule 30(b) (6) based on the information known to Anastasia. Anastasia further objects generally to each topic that refers to entities acting

251

"on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases make the topics overly broad, unduly burdensome, and of an undetermined scope which does not afford any reasonable means of witness preparation. The witness produced will testify as to matters that are within the possession, custody, or control of Anastasia, as required by the Federal Rules. The phrases also are objected to the extent they seek to improperly include individuals and entities not under the control of Anastasia. Anastasia also objects generally to the notice as being unduly burdensome and repetitive to the extent that DMG seeks to depose the same witness for one day as an individual and for two additional days as a 30(b)(6) witness. Topic 5 is objected to as being overly broad, unduly burdensome and not reasonably particularized. The Topic has unlimited temporal and subject matter scope and is not particularized to afford any reasonable means of witness preparation. The Topic also is vague and ambiguous and not reasonably particularized as to the term "business model." The witness produced will attempt to be prepared to offer a general overview of the business.

### B.    DMG's Contentions and Points and Authorities

Regarding the assertion that Anastasia has "no obligation under the Federal Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and counsel routinely use that term:

- "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b)(6) deposition, requesting defendant to designate a person most knowledgeable ("PMK") to testify on 33 subjects on January 26, 2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

- "In response to Hoye's notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department Captain Toribio as the person most knowledgeable…" *Hoye v. City*

*of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)

- "Magedson was deposed as the person most knowledgeable for Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)." *Asia Econ. Inst. v. Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX, 2010 WL 4977054 (C.D. Cal. July 19, 2010)

- "On July 14, 2008, this Court granted plaintiff's motion to compel the continued Rule 30(b)(6) deposition of Beverlly (through Beverlly's person most knowledgeable ("PMK"), Theresa Lee)…" *Tacori Enterprises v. Beverly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579 (C.D. Cal. 2008)

With respect to the above, "Rule 30(b)(6) provides for the deposition of the corporation by notice setting forth 'with reasonable particularity' the matters on which the examination of the corporation's most knowledgeable person will take place." *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal citations omitted).

As to Defendant's assertion that the witness will "testify as to matters that are within the possession, custody, or control of Anastasia" is potentially an evasive tactic by your client and your client will be subject to sanctions relative to its involvement with persons and entities that have been involved with the matters that are the subject of our client's claims in this case, especially those persons that it has held out as having a partnership with, persons directly, indirectly or even intricately linked, its affiliates as well as person or entities known to share offices. The legal obligations regarding your client's Rule 30(b)(6) witness includes and is not limited to the following:

"'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition. This interpretation is necessary in order to

1  make the deposition a meaningful one and to prevent the "sandbagging" of an

2  opponent by conducting a half-hearted inquiry before the deposition but a thorough

3  and vigorous one before the trial. This would totally defeat the purpose of the

4  discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome.

5  However, this is merely the result of the concomitant obligation from the privilege of

6  being able to use the corporate form in order to conduct business....[A company] does

7  not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no

8  knowledge or position with respect to a set of facts or area of inquiry within its

9  knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362

10 (M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v.*

11 *Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition,

12 the corporation has an obligation to investigate and identify and if necessary prepare a

13 designee for each listed subject area and produce that designee as noticed."); *Dravo*

14 *Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union*

15 *Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons

16 designated by the corporation do not possess personal knowledge of the matters set

17 out in the deposition notice, the corporation is obligated to prepare the designees so

18 that they may give knowledgeable and binding answers for the corporation."); *Buycks-*

19 *Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that

20 the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters

21 personally known to that designee or to matters in which that designee was personally

22 involved.); *Securities and Exchange Commission v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y.,

23 1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93

24 F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a

25 conscientious good-faith endeavor to designate the persons having knowledge of the

26 matters sought by [the party noticing the deposition] and to prepare those persons in

27 order that they can answer fully, completely, unevasively, the questions posed ... as to

28 the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f)

("Counsel for the [corporation] should prepare the designated witness to be able to provide meaningful information about any designated area(s) of inquiry.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36-37 (D. Mass. 2001)

Further, "The party responding to a 30(b)(6) deposition notice "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997) (deponent must be prepared "to the extent matters are reasonably available, whether from documents, past employees, or other sources."). Even if the documents are voluminous and the review of those documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed. See *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation that is involved in litigation, can be fully and fairly explored."). Such preparation is necessary because the "individuals so deposed are required to testify to the knowledge of the corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*, supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may give complete, knowledgeable and binding answers on behalf of the corporation."); Taylor, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts within the corporation's knowledge, but also its subjective beliefs and opinions ...The corporation must provide its interpretation of documents and events.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 37 (D. Mass. 2001)

"Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty in advance of the 30(b)(6) deposition to review all documents, including tax returns and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself

1  nor the Advisory Notes nor reported case law addressing the rule define the

2  terminology "reasonably available." However, in a similar context-the production of

3  documents pursuant to Fed.R.Civ.P. 34-responding parties are required to produce all

4  documents that are in their control. "Control is defined not only as possession, but as

5  the legal right to obtain the documents requested upon demand." *Searock v. Stripling*,

6  736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194

7  F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined

8  not as possession, but as the legal right to obtain documents on demand, is the test as

9  to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule

10  34, 'control' does not require that the party have legal ownership or actual physical

11  possession of the documents at issue; rather, documents are considered to be under a

12  party's control when that party has the right, authority, or practical ability, to obtain

13  the documents from a non-party to the action.") It therefore seems logical that the

14  documents that are reasonably available are those documents that are in a party's

15  control. In the instant case, this means that the Fabiano sons were required to review

16  all documents (that had any bearing on the 30(b)(6) topics) that were in their control.

17  By definition, such documents would include the tax-related documents because those

18  documents, even if they were in the possession of Fabiano's accountant, were still in

19  Fabiano's control because Fabiano had the legal right and the practical ability to

20  obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in

21  preparing to be deposed as 30(b)(6) representatives of the company, had the

22  obligation to review all documents that were in their control, including the tax returns

23  and related documents that were in the physical possession of Fabiano's accountant."

24  *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass.

25  2001)

26      Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-

27  established that the burden is on the objecting party to show grounds for failing to

28  provide the requested discovery. [citations omitted] The responding party simply

1  cannot invoke generalized objections; rather, with respect to each of the propounding

2  party's discovery requests, the responding party must show specifically how, despite

3  the broad and liberal construction afforded the federal discovery rules, each [request]

4  is ... overly broad, burdensome or oppressive by submitting affidavits or offering

5  evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair &*

6  *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL

7  4942645 (C.D. Cal. July 29, 2010)

8        Additionally, "the party opposing discovery on the grounds of burdensomeness

9  has an obligation to provide sufficient detail in terms of time, money and procedure

10  required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair &*

11  *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL

12  4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

13        Finally, "If the persons designated by the corporation do not possess personal

14  knowledge of the matters set out in the deposition notice, the corporation is obligated

15  to prepare the designees so that they may give knowledgeable and binding answers for

16  the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act*

17  *(FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29,

18  2010) (internal citations omitted)

19        With respect to terms that Defendant contends are vague, ambiguous or not

20  intelligible, Defendant has the obligation to use its best efforts to prepare and answer

21  the question. A party who objects to a discovery request as "vague and ambiguous"

22  has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card*

23  *Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection

24  that the request is unclear unless it is so ambiguous that Defendant cannot, "in good

25  faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th

26  Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain

27  which portion of the category or the language within is allegedly so vague as to

28  preclude any intelligent reply.

1   The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

2   the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.

3   Sykes testified that the companies in Moscow known as Stolitza and IT-Online

4   (together referenced by the witness as the "Moscow Entities") have carte blanche to

5   perform any service on behalf of AI, knows that these two companies hold

6   themselves out as being AI, that they created and manage all internet activities and

7   business activities of AI including and not limited to AI's primary website

8   Anastasiadate as well as all of AI's affiliates, that all customer service calls are

9   answered at their offices, that AI receives all revenues and makes disbursements at

10  their direction and that she has never had a problem with their conduct or objected to

11  their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9;

12  64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-

13  202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-**

14  **354:2**.)

15       Further, at the deposition, Ms. Sykes was not prepared to respond to questions

16  governing a time period from November 2010 through the date of the deposition,

17  which is the time period when the newly elected President, Alexey Eremin was acting

18  on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the

19  same building with IT-Online, that he was to act as AI's liaison with IT-Online and

20  that she did not consult with Mr. Eremin with respect to any PMK subjects, which

21  included and was not limited to the business relationship between AI and the Moscow

22  Entities, and her reasoning was that she was aware that Plaintiff was going to depose

23  Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was

24  not disclosed by the witness at the PMK deposition. Ms. Sykes further was not

25  prepared to respond to specific categories noticed and did not do so at the instruction

26  of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15;

27  258:22-262:5.)

28       Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with

258

1    respect to the PMK deposition. (Ex. 10.)

2         Plaintiff's counsel again sent an email on December 8, 2011, reminding

3    Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

4         Defendant's counsel did not meet and confer within (10) days as requested.

5         Based on the foregoing, the court should order Defendant to appear for

6    deposition in Los Angeles to provide a further response to this category.

7         **C.    Anastasia's Contentions and Points and Authorities**

8         All of DMG's arguments in support of its motion to compel additional 30(b)(6)

9    deposition testimony suffer from three common flaws.

10        First, the deposition categories at issue mostly repeat almost verbatim the

11   document production requests already discussed earlier in this joint stipulation. To the

12   extent the document production requests are objectionable as being overly broad and

13   for seeking information not relevant to the claims and defenses in this action, the

14   deposition categories are also objectionable for the same reason. They are also

15   objectionable for seeking information not within the possession, custody or control of

16   Anastasia.

17        Second, the deposition categories were so unclear, cryptically worded, and

18   overly broad that no reasonable means of witness preparation was possible. A witness

19   cannot possibly be prepared to answer every conceivable question in reference to a

20   deposition topic that is not reasonably particularized.

21        Third, and perhaps most important, a 30(b)(6) deposition is not a homework

22   exercise as DMG appears to believe. If a witness is already familiar with a particular

23   topic that has been clearly articulated in the notice, additional preparation or review

24   may not be necessary. A witness is not subject to being recalled simply because

25   opposing counsel feels that the witness did not review enough documents. Rather,

26   unless the opposing party can point to a specific question that was asked and not

27   answered by the witness even though the information was within the possession,

28   custody or control of the corporate party being deposed, there is no basis to re-open

259

1    the deposition. DMG has failed to make such a showing.

2         Like its contentions concerning the document production requests, DMG's

3    contentions concerning the deposition testimony of Ms. Sykes are based on numerous

4    misrepresentations of her testimony.

5         No effort was made in DMG's motion to identify any question Ms. Sykes was

6    unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage

7    in an academic debate over some pre-deposition objections that were made for the

8    record by Anastasia. There is no basis to grant a motion to compel further deposition

9    testimony.

10        In response to DMG's long-winded and disjointed contentions regarding its

11   self-styled "Issue No. 11" concerning its Deposition Category No. 5 under Rule

12   30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2)

13   set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category

14   in dispute and show that Anastasia' witness gave proper testimony.

15              **1.    Discovery At Issue**

16        DMG's Deposition Category No. 5 is broadly directed toward "[t]he nature of

17   the business and business model of AI." On its face, DMG's Deposition Category

18   No. 5 is nearly identical to its Document Request No. 5 (or "Issue No. 3"), and many

19   of the same objections to Document Request No. 5 also apply to Deposition

20   Category No. 5. DMG's demand for a meet-and-confer on the deposition topics

21   appeared to be a reiteration of the meet-and-confer for Rule 30(b)(2) document

22   production, and counsel for Anastasia inadvertantly did not respond to DMG's

23   request for a separate meet-and-confer. Counsel for DMG did not follow up with a

24   telephone inquiry before preparing the joint statement. In any event, DMG can claim

25   no prejudice because when DMG revised its portion of the joint statement to address

26   relevancy for its document production requests, DMG made no changes to its

27   contentions in connection with this Issue No. 11 regarding the deposition.

28        To provide context for DMG's deposition notice, please refer to Anastasia's

summary of the relevant discovery set forth in its response to DMG's "Issue No. 10."

## 2. Legal Standards

A more detailed discussion of the law may be found in Anastasia's contentions in connection with DMG's "Issue No. 10."

### (a) Rule 26(b)

As previously discussed, Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses" of the case. If a party's request is overly broad or otherwise objectionable on its face, the party resisting discovery has no need to support its objection. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

### (b) Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents, but DMG appears to be using Rule 30(b)(2) as an excuse to extend a deposition even though the documents could have been requested and obtained before the deposition.

### (c) Rule 30(b)(6)

Rule 30(b)(6) permits a party to name a corporation as a deponent. The party seeking an organization's testimony "must describe with reasonable particularity the matters for examination," but the organization is only required to "testify about information known or reasonably available to the organization." There is nothing in Rule 30 that requires a party to testify about information over which it does not have access and control. *See In re Ski Train Fire*, 2006 WL 1328259, at *9 (declining "to require a corporate parent to acquire all of the knowledge of the subsidiary on matters in which the parent was not involved"). Moreover, DMG bears the burden of proving that Anastasia has control or the right to obtain the information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1108. "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

The designated witness need only be prepared to testify on behalf of the

1    corporation based on knowledge reasonably available to the corporation. *Dravo Corp.*,

2    164 F.R.D. at 76 ("If [the corporation] does not possess such knowledge as to so

3    prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously

4    cease, since the rule requires testimony only as to 'matters known or reasonably

5    available to the organization.'"); *cf. Walking Mountain*, 353 F.3d at 798 (noting that the

6    phrase the "person most knowledgeable" is merely a label placed on the designated

7    corporate witness). Furthermore, the areas of inquiry for a 30(b)(6) deposition must

8    be set forth with reasonable particularity. *McBride*, 250 F.R.D. at 584.

9            **2.      30(b)(6) Category No. 5**

10           As previously discussed, Anastasia does not communicate with agencies, create

11   profiles, develop profile databases, maintain servers or create web content. Anastasia

12   has provided DMG with its knowledge on the topics noticed based on the reasonably

13   available information with Anastasia's possession, custody or control.

14           DMG seems to believe that Anastasia should possess the knowledge of each

15   entity it contracts with and the entities they contract with, but DMG has not

16   developed any basis to support its belief other than idle speculation. Anastasia has no

17   ability to acquire additional information beyond that provided by Ms. Sykes at her

18   deposition.  Anastasia does not own any of the Moscow Entities. Anastasia has no

19   right of access or control over the information possessed by any of the Moscow

20   Entities.

21           **(a)      Ms. Sykes' Testimony**

22           DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities

23   created and manage the internet activities associated with the anastasiadate.com

24   website. However, DMG makes no attempt to establish that Anastasia has control

25   over the Moscow Entities, and in fact suggests that Anastasia does not have such

26   control.

27           Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow

28   Entities to request information in preparation for the 30(b)(6) deposition, but he

1   refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also

2   contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October

3   2011), but Mr. Eremin stated that he did not have any substantive information to

4   provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and

5   261-262).

6        Thus, Ms. Sykes was properly prepared based on knowledge reasonably

7   available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the

8   corporation] does not possess such knowledge as to so prepare [a designated witness],

9   then its obligations under Rule 30(b)(6) obviously cease, since the rule requires

10  testimony only as to 'matters known or reasonably available to the organization.'"

11  (citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control

12  to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107

13  ("[P]roof of theoretical control is insufficient; a showing of actual control is

14  required.").

15       DMG claims that Ms. Sykes admitted at her deposition that she "was not

16  prepared to respond to questions governing a time period from November 2010

17  through the date of the deposition [when] Alexey Eremin was acting on AI's behalf."

18  This is patently false. No such testimony was ever given. Moreover, as discussed

19  above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin

20  regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr.

21  Eremin responded that he "knows nothing," or "doesn't know anything" about those

22  issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's

23  assertions, <u>Ms. Sykes affirmed that she was the person most knowledgeable about</u>

24  <u>Anastasia, including during Mr. Eremin's time at the company</u>. Exh. D (Tr. at 259-

25  260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation

26  of Anastasia—he would only address problems that Ms. Sykes would raise with him,

27  and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-

28  262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had

1    not been passed to Mr. Eremin, as DMG contends.

2         DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not

3    confer with Mr. Eremin to prepare her for deposition because "she was aware that

4    Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times

5    that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in

6    litigation, and he had responded that he knew "nothing." As a result, she had no

7    further need to confer with him again prior to the deposition. Ms. Sykes

8    acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully

9    suggested that there was no point to that because she had already asked and he had no

10   relevant information to provide. In any event, Ms. Sykes stated on at least three

11   instances during her deposition that she had conferred with Mr. Eremin, and that he

12   had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

13        DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the

14   deposition "at the instruction of her counsel." This is totally false. DMG has no basis

15   for making such an assertion. DMG apparently relies on the fact that Anastasia lodged

16   timely and well-founded objections to the categories in DMG's 30(b)(6) notice as

17   vague, ambiguous, confusing, and not reasonably particularized. The deposition

18   testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-

19   opened every time counsel made objections for the record, the deposition would

20   never end (which apparently is what DMG is seeking to do in this instance). DMG

21   had more than sufficient opportunity to clarify its noticed categories with particularity

22   in advance of the deposition, but chose not to do so. DMG also had two full days to

23   question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no

24   question (other than a single question calling for attorney-client privileged

25   information) that Ms. Sykes was instructed by counsel not to answer.

26        In short, DMG identifies no relevant question that was asked and not answered

27   based on the reasonably available information within Anastasia's possession, custody

28   or control.

BH8255.1
1003-30730

### (b)   Objections To Category No. 5

As stated in Anastasia objections previously served on DMG, this category was not reasonably particularized to afford any reasonable means of witness preparation. Indeed, the Category was broadly directed to Anastasia's entire business without regard to the claims or defenses being asserted in this action. Because of DMG's failure to notice a reasonably particularized category, Anastasia stated that the designated witness will attempt to be prepared to offer a general overview of the business.

As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses, and if a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

Again, DMG identifies no relevant question that was asked and not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

### (c)   Deposition Pages Cited By DMG

As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes that she was adequately prepared and gave proper responses to the questions that were asked. The transcript excerpts cited by DMG do not alter that conclusion.

Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and information from both. Mr. Eremin had no information or documents. Mr. Nochka also did not provide any information or documents to Ms. Sykes.

Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms. Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's

health problems, and that Ms. Sykes "did not perceive this job as being anything really stressful." (Tr. 105:18-19).

Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6 as overly broad as it was unreasonable to expect a witness to come prepared to address every bit of information that has ever been on a website and all changes in content over a two-year period of time. Ms. Sykes reviewed the home page because no specific part of the website was identified by DMG. When counsel for DMG attempted to inquire whether this was at the instruction of counsel, an objection and instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20 (Exh. 5).

Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin responded that he knew "nothing." Ms. Sykes also testified that she was the person most knowledgeable about Anastasia, which is consistent with her inquiry of Mr. Eremin. Tr. 259:22-260:6.

### 4.    Concluding Statement Re DMG's Issue No. 11

DMG's motion to compel a further 30(b)(6) deposition regarding Category No. 5 must be denied. DMG's motion is little more than an academic debate over a pre-deposition exchange of letters between counsel. In fact, DMG's motion is simply a copy of its own pre-deposition letter with no effort make to particularize the arguments made to the testimony actually given at the deposition. Exh. I. DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

BH8255.1
1003-30730

# XIII.   ISSUE NO. 12: MATTERS FOR EXAMINATION AT DEPOSITION, CATEGORY NO. 6

### A.      Disputed Matter for Examination at Deposition

CATEGORY NO. 6

All content (information conveyed and depicted therein) that appears on the website www.anastasiadate.com for January 1, 2009 to present.

RESPONSE TO CATEGORY NO. 6

Anastasia objects generally to the notice as calling for the deposition of the "person most knowledgeable" with respect to the enumerated topics. A party has no obligation under the Federal Rules to produce the person "most knowledgeable" about the matters designated. Rather, Anastasia will designate a witness to testify on its behalf in accordance with Rule 30(b) (6) based on the information known to Anastasia. Anastasia further objects generally to each topic that refers to entities acting "on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases make the topics overly broad, unduly burdensome, and of an undetermined scope which does not afford any reasonable means of witness preparation. The witness produced will testify as to matters that are within the possession, custody, or control of Anastasia, as required by the Federal Rules. The phrases also are objected to the extent they seek to improperly include individuals and entities not under the control of Anastasia. Anastasia also objects generally to the notice as being unduly burdensome and repetitive to the extent that DMG seeks to depose the same witness for one day as an individual and for two additional days as a 30(b) (6) witness. Topics 6-11 are objected to as being overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as it seeks information outside of the temporal and subject matter scope of any acts alleged in the Complaint. The Topics also are not reasonably particularized to afford any reasonable means of witness preparation. Anastasia also objects to topics directed to content that has not been created or controlled by Anastasia, or for which Anastasia has no relevant

1  knowledge.

2  **B.    DMG's Contentions and Points and Authorities**

3  Regarding the assertion that Anastasia has "no obligation under the Federal

4  Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and

5  counsel routinely use that term:

6

7  • "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b)

8  (6) deposition, requesting defendant to designate a person most

9  knowledgeable ("PMK") to testify on 33 subjects on January 26,

10  2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair*

11  *& Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980

12  MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

13  • "In response to Hoye's notice of deposition pursuant to

14  Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department

15  Captain Toribio as the person most knowledgeable…" *Hoye v. City*

16  *of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)

17  • "Magedson was deposed as the person most knowledgeable for

18  Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)."

19  *Asia Econ. Inst. v. Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX,

20  2010 WL 4977054 (C.D. Cal. July 19, 2010)

21  • "On July 14, 2008, this Court granted plaintiff's motion to compel

22  the continued Rule 30(b)(6) deposition of Beverlly (through

23  Beverlly's person most knowledgeable ("PMK"), Theresa Lee)…"

24  *Tacori Enterprises v. Beverlly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579

25  (C.D. Cal. 2008)

26  With respect to the above, "Rule 30(b)(6) provides for the deposition of the

27  corporation by notice setting forth 'with reasonable particularity' the matters on which

28  the examination of the corporation's most knowledgeable person will take place."

1     *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal

2     citations omitted).

3         As to Defendant's assertion that the witness will "testify as to matters that are

4     within the possession, custody, or control of Anastasia" is potentially an evasive tactic

5     by your client and your client will be subject to sanctions relative to its involvement

6     with persons and entities that have been involved with the matters that are the subject

7     of our client's claims in this case, especially those persons that it has held out as

8     having a partnership with, persons directly, indirectly or even intricately linked, its

9     affiliates as well as person or entities known to share offices. The legal obligations

10    regarding your client's Rule 30(b)(6) witness includes and is not limited to the

11    following:

12         "'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its

13    behalf as to all matters known or reasonably available to it and, therefore, implicitly

14    requires persons to review all matters known or reasonably available to it in

15    preparation for the 30(b)(6) deposition. This interpretation is necessary in order to

16    make the deposition a meaningful one and to prevent the "sandbagging" of an

17    opponent by conducting a half-hearted inquiry before the deposition but a thorough

18    and vigorous one before the trial. This would totally defeat the purpose of the

19    discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome.

20    However, this is merely the result of the concomitant obligation from the privilege of

21    being able to use the corporate form in order to conduct business....[A company] does

22    not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no

23    knowledge or position with respect to a set of facts or area of inquiry within its

24    knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362

25    (M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v.*

26    *Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition,

27    the corporation has an obligation to investigate and identify and if necessary prepare a

28    designee for each listed subject area and produce that designee as noticed."); *Dravo*

1   *Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union*

2   *Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons

3   designated by the corporation do not possess personal knowledge of the matters set

4   out in the deposition notice, the corporation is obligated to prepare the designees so

5   that they may give knowledgeable and binding answers for the corporation."); *Buycks-*

6   *Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that

7   the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters

8   personally known to that designee or to matters in which that designee was personally

9   involved.); *Securities and Exchange Commission v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y.,

10  1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93

11  F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a

12  conscientious good-faith endeavor to designate the persons having knowledge of the

13  matters sought by [the party noticing the deposition] and to prepare those persons in

14  order that they can answer fully, completely, unevasively, the questions posed ... as to

15  the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f)

16  ("Counsel for the [corporation] should prepare the designated witness to be able to

17  provide meaningful information about any designated area(s) of inquiry.")."

18  *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36-37 (D. Mass.

19  2001)

20          Further, "The party responding to a 30(b)(6) deposition notice "must prepare

21  deponents by having them review prior fact witness deposition testimony as well as

22  documents and deposition exhibits." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633,

23  639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New*

24  *York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997)

25  (deponent must be prepared "to the extent matters are reasonably available, whether

26  from documents, past employees, or other sources."). Even if the documents are

27  voluminous and the review of those documents would be burdensome, the deponents

28  are still required to review them in order to prepare themselves to be deposed. See

1   *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare

2   a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware

3   of any less onerous means of assuring that the position of a corporation that is

4   involved in litigation, can be fully and fairly explored."). Such preparation is necessary

5   because the "individuals so deposed are required to testify to the knowledge of the

6   corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*,

7   supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may

8   give complete, knowledgeable and binding answers on behalf of the corporation.");

9   Taylor, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts

10  within the corporation's knowledge, but also its subjective beliefs and opinions....The

11  corporation must provide its interpretation of documents and events.")." *Calzaturficio*

12  *S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 37 (D. Mass. 2001)

13       "Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty

14  in advance of the 30(b)(6) deposition to review all documents, including tax returns

15  and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself

16  nor the Advisory Notes nor reported case law addressing the rule define the

17  terminology "reasonably available." However, in a similar context-the production of

18  documents pursuant to Fed. R. Civ. P. 34-responding parties are required to produce

19  all documents that are in their control. "Control is defined not only as possession, but

20  as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*,

21  736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194

22  F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined

23  not as possession, but as the legal right to obtain documents on demand, is the test as

24  to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule

25  34, 'control' does not require that the party have legal ownership or actual physical

26  possession of the documents at issue; rather, documents are considered to be under a

27  party's control when that party has the right, authority, or practical ability, to obtain

28  the documents from a non-party to the action.") It therefore seems logical that the

1   documents that are reasonably available are those documents that are in a party's

2   control. In the instant case, this means that the Fabiano sons were required to review

3   all documents (that had *any* bearing on the 30(b)(6) topics) that were in their control.

4   By definition, such documents would include the tax-related documents because those

5   documents, even if they were in the possession of Fabiano's accountant, were still in

6   Fabiano's control because Fabiano had the legal right and the practical ability to

7   obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in

8   preparing to be deposed as 30(b)(6) representatives of the company, had the

9   obligation to review all documents that were in their control, including the tax returns

10   and related documents that were in the physical possession of Fabiano's accountant."

11   *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass.

12   2001)

13        Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-

14   established that the burden is on the objecting party to show grounds for failing to

15   provide the requested discovery. [citations omitted] The responding party simply

16   cannot invoke generalized objections; rather, with respect to each of the propounding

17   party's discovery requests, the responding party must show specifically how, despite

18   the broad and liberal construction afforded the federal discovery rules, each [request]

19   is ... overly broad, burdensome or oppressive by submitting affidavits or offering

20   evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair &*

21   *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL

22   4942645 (C.D. Cal. July 29, 2010)

23        Additionally, "the party opposing discovery on the grounds of burdensomeness

24   has an obligation to provide sufficient detail in terms of time, money and procedure

25   required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair &*

26   *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL

27   4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

28        Finally, "If the persons designated by the corporation do not possess personal

1  knowledge of the matters set out in the deposition notice, the corporation is obligated

2  to prepare the designees so that they may give knowledgeable and binding answers for

3  the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act*

4  *(FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29,

5  2010) (internal citations omitted)

6        With respect to terms that Defendant contends are vague, ambiguous or not

7  intelligible, Defendant has the obligation to use its best efforts to prepare and answer

8  the question. A party who objects to a discovery request as "vague and ambiguous"

9  has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card*

10  *Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection

11  that the request is unclear unless it is so ambiguous that Defendant cannot, "in good

12  faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th

13  Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain

14  which portion of the category or the language within is allegedly so vague as to

15  preclude any intelligent reply.

16        The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

17  the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.

18  Sykes testified that the companies in Moscow known as Stolitza and IT-Online

19  (together referenced by the witness as the "Moscow Entities") have carte blanche to

20  perform any service on behalf of AI, knows that these two companies hold

21  themselves out as being AI, that they created and manage all internet activities and

22  business activities of AI including and not limited to AI's primary website

23  Anastasiadate as well as all of AI's affiliates, that all customer service calls are

24  answered at their offices, that AI receives all revenues and makes disbursements at

25  their direction and that she has never had a problem with their conduct or objected to

26  their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9;

27  64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-

28  202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-**

273

1   **354:2**; Ex. 6, 12:20-23.)

2   Further, at the deposition, Ms. Sykes was not prepared to respond to questions

3   governing a time period from November 2010 through the date of the deposition,

4   which is the time period when the newly elected President, Alexey Eremin was acting

5   on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the

6   same building with IT-Online, that he was to act as AI's liaison with IT-Online and

7   that she did not consult with Mr. Eremin with respect to any PMK subjects, which

8   included and was not limited to the business relationship between AI and the Moscow

9   Entities, and her reasoning was that she was aware that Plaintiff was going to depose

10  Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was

11  not disclosed by the witness at the PMK deposition. Ms. Sykes further was not

12  prepared to respond to specific categories noticed and did not do so at the instruction

13  of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15;

14  258:22-262:5.)

15  Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with

16  respect to the PMK deposition. (Ex. 10.)

17  Plaintiff's counsel again sent an email on December 8, 2011, reminding

18  Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

19  Defendant's counsel did not meet and confer within (10) days as requested.

20  Based on the foregoing, the court should order Defendant to appear for

21  deposition in Los Angeles to provide a further response to this category.

22  **C.    Anastasia's Contentions and Points and Authorities**

23  All of DMG's arguments in support of its motion to compel additional 30(b)(6)

24  deposition testimony suffer from three common flaws.

25  First, the deposition categories at issue mostly repeat almost verbatim the

26  document production requests already discussed earlier in this joint stipulation. To the

27  extent the document production requests are objectionable as being overly broad and

28  for seeking information not relevant to the claims and defenses in this action, the

deposition categories are also objectionable for the same reason. They are also objectionable for seeking information not within the possession, custody or control of Anastasia.

Second, the deposition categories were so unclear, cryptically worded, and overly broad that no reasonable means of witness preparation was possible. A witness cannot possibly be prepared to answer every conceivable question in reference to a deposition topic that is not reasonably particularized.

Third, and perhaps most important, a 30(b)(6) deposition is not a homework exercise as DMG appears to believe. If a witness is already familiar with a particular topic that has been clearly articulated in the notice, additional preparation or review may not be necessary. A witness is not subject to being recalled simply because opposing counsel feels that the witness did not review enough documents. Rather, unless the opposing party can point to a specific question that was asked and not answered by the witness even though the information was within the possession, custody or control of the corporate party being deposed, there is no basis to re-open the deposition. DMG has failed to make such a showing.

Like its contentions concerning the document production requests, DMG's contentions concerning the deposition testimony of Ms. Sykes are based on numerous misrepresentations of her testimony.

No effort was made in DMG's motion to identify any question Ms. Sykes was unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage in an academic debate over some pre-deposition objections that were made for the record by Anastasia. There is no basis to grant a motion to compel further deposition testimony.

In response to DMG's long-winded and disjointed contentions regarding its self-styled "Issue No. 12" concerning its Deposition Category No. 6 under Rule 30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category

1  in dispute and show that Anastasia' witness gave proper testimony.

2  ### 1.   Discovery At Issue

3  DMG's Deposition Category No. 6 is broadly directed toward "all" content

4  that appears on anastasiadate.com from January 1, 2009 to present. DMG's demand

5  for a meet-and-confer on the deposition topics appeared to be a reiteration of the

6  meet-and-confer for Rule 30(b)(2) document production, and counsel for Anastasia

7  inadvertently did not respond to DMG's request for a separate meet-and-confer.

8  Counsel for DMG did not follow up with a telephone inquiry before preparing the

9  joint statement. In any event, DMG can claim no prejudice because when DMG

10  revised its portion of the joint statement to address relevancy for its document

11  production requests, DMG made no changes to its contentions in connection with

12  this Issue No. 12 regarding the deposition.

13  To provide context for DMG's deposition notice, please refer to Anastasia's

14  summary of the relevant discovery set forth in its response to DMG's "Issue No. 10."

15  ### 2.   Legal Standards

16  A more detailed discussion of the law also may be found in Anastasia's

17  contentions in connection with DMG's "Issue No. 10."

18  ### (a)   Rule 26(b)

19  As previously discussed, Rule 26(b)(1), which was narrowed substantively in

20  2000, limits the scope of discovery to what is relevant to the "claims and defenses" of

21  the case. If a party's request is overly broad or otherwise objectionable on its face, the

22  party resisting discovery has no need to support its objection. *McBride v. Medicalodges,*

23  *Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the

24  burden shift to the party resisting discovery. *Id.*

25  ### (b)   Rule 30(b)(2)

26  Rule 30(b)(2) is intended to be used when seeking a few and simple documents,

27  but DMG appears to be using Rule 30(b)(2) as an excuse to extend a deposition even

28  though the documents could have been requested and obtained before the deposition.

276

1

### (c)   Rule 30(b)(6)

2    Rule 30(b)(6) permits a party to name a corporation as a deponent. The party

3    seeking an organization's testimony "must describe with reasonable particularity the

4    matters for examination," but the organization is only required to "testify about

5    information known or reasonably available to the organization." There is nothing in

6    Rule 30 that requires a party to testify about information over which it does not have

7    access and control. *See In re Ski Train Fire*, 2006 U.S. Dist. LEXIS 29987, at *28

8    (declining "to require a corporate parent to acquire all of the knowledge of the

9    subsidiary on matters in which the parent was not involved"). Moreover, DMG bears

10   the burden of proving that Anastasia has control or the right to obtain the

11   information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1108. "[P]roof of

12   theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

13   The designated witness need only be prepared to testify on behalf of the

14   corporation based on knowledge reasonably available to the corporation. *Dravo Corp.*,

15   164 F.R.D. at 76 ("If [the corporation] does not possess such knowledge as to so

16   prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously

17   cease, since the rule requires testimony only as to 'matters known or reasonably

18   available to the organization.'"); *cf. Walking Mountain*, 353 F.3d at 798 (noting that the

19   phrase the "person most knowledgeable" is merely a label placed on the designated

20   corporate witness). Furthermore, the areas of inquiry for a 30(b)(6) deposition must

21   be set forth with reasonable particularity. *McBride*, 250 F.R.D. at 584.

22   ### 2.   30(b)(6) Category No. 5

23   As previously discussed, Anastasia does not communicate with agencies, create

24   profiles, develop profile databases, maintain servers or create web content. Anastasia

25   has provided DMG with its knowledge on the topics noticed based on the reasonably

26   available information with Anastasia's possession, custody or control.

27   DMG seems to believe that Anastasia should possess the knowledge of each

28   entity it contracts with and the entities they contract with, but DMG has not

1   developed any basis to support its belief other than idle speculation. Anastasia has no

2   ability to acquire additional information beyond that provided by Ms. Sykes at her

3   deposition.  Anastasia does not own any of the Moscow Entities. Anastasia has no

4   right of access or control over the information possessed by any of the Moscow

5   Entities.

6           **(a)   Ms. Sykes' Testimony**

7           DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities

8   created and manage the internet activities associated with the anastasiadate.com

9   website. However, DMG makes no attempt to establish that Anastasia has control

10  over the Moscow Entities, and in fact suggests that Anastasia does not have such

11  control.

12          Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow

13  Entities to request information in preparation for the 30(b)(6) deposition, but he

14  refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also

15  contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October

16  2011), but Mr. Eremin stated that he did not have any substantive information to

17  provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and

18  261-262).

19          Thus, Ms. Sykes was properly prepared based on knowledge reasonably

20  available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the

21  corporation] does not possess such knowledge as to so prepare [a designated witness],

22  then its obligations under Rule 30(b)(6) obviously cease, since the rule requires

23  testimony only as to 'matters known or reasonably available to the organization.'"

24  (citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control

25  to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107

26  ("[P]roof of theoretical control is insufficient; a showing of actual control is

27  required.").

28          DMG claims that Ms. Sykes admitted at her deposition that she "was not

prepared to respond to questions governing a time period from November 2010

through the date of the deposition [when] Alexey Eremin was acting on AI's behalf."

This is patently false. No such testimony was ever given. Moreover, as discussed

above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin

regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr.

Eremin responded that he "knows nothing," or "doesn't know anything" about those

issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's

assertions, <u>Ms. Sykes affirmed that she was the person most knowledgeable about</u>

<u>Anastasia, including during Mr. Eremin's time at the company</u>. Exh. D (Tr. at 259-

260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation

of Anastasia—he would only address problems that Ms. Sykes would raise with him,

and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-

262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had

not been passed to Mr. Eremin, as DMG contends.

     DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not

confer with Mr. Eremin to prepare her for deposition because "she was aware that

Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times

that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in

litigation, and he had responded that he knew "nothing." As a result, she had no

further need to confer with him again prior to the deposition. Ms. Sykes

acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully

suggested that there was no point to that because she had already asked and he had no

relevant information to provide. In any event, Ms. Sykes stated on at least three

instances during her deposition that she had conferred with Mr. Eremin, and that he

had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

     DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the

deposition "at the instruction of her counsel." This is totally false. DMG has no basis

for making such an assertion. DMG apparently relies on the fact that Anastasia lodged

279

timely and well-founded objections to the categories in DMG's 30(b)(6) notice as vague, ambiguous, confusing, and not reasonably particularized. The deposition testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-opened every time counsel made objections for the record, the deposition would never end (which apparently is what DMG is seeking to do in this instance). DMG had more than sufficient opportunity to clarify its noticed categories with particularity in advance of the deposition, but chose not to do so. DMG also had two full days to question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no question (other than a single question calling for attorney-client privileged information) that Ms. Sykes was instructed by counsel not to answer.

In short, DMG identifies no relevant question that was asked and not answered based on the reasonably available information within Anastasia's possession, custody or control.

### (b)   Other Objections To Category No. 6

As stated in Anastasia objections previously served on DMG, this category was overly broad, unduly burdensome, irrelevant, and not reasonably particularized to afford any reasonable means of witness preparation. On its face, the category appears to require a review of every page and every change made over the past three years.

As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses, and if a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

Again, DMG identifies no relevant question that was asked and not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

### (c)   Deposition Pages Cited By DMG

As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes

1  that she was adequately prepared and gave proper responses to the questions that

2  were asked. The transcript excerpts cited by DMG do not alter that conclusion.

3      Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with

4  both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and

5  information from both. Mr. Eremin had no information or documents. Mr. Nochka

6  also did not provide any information or documents to Ms. Sykes.

7      Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms.

8  Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where

9  counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as

10  President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's

11  health problems, and that Ms. Sykes "did not perceive this job as being anything really

12  stressful." (Tr. 105:18-19).

13      Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the

14  anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6

15  as overly broad as it was unreasonable to expect a witness to come prepared to

16  address every bit of information that has ever been on a website and all changes in

17  content over a two-year period of time. Ms. Sykes reviewed the home page because

18  no specific part of the website was identified by DMG. When counsel for DMG

19  attempted to inquire whether this was at the instruction of counsel, an objection and

20  instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20

21  (Exh. 5).

22      Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that

23  she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin

24  responded that he knew "nothing." Ms. Sykes also testified that she was the person

25  most knowledgeable about Anastasia, which is consistent with her inquiry of Mr.

26  Eremin. Tr. 259:22-260:6.

27  **4.    Concluding Statement Re DMG's Issue No. 12**

28  DMG's motion to compel a further 30(b)(6) deposition regarding Category No.

6 should be denied because DMG has failed to meet its burden to establish that this information is relevant to any claim or defense in the present action. Moreover, DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control. DMG's motion to compel should be denied.

## XIV.   ISSUE NO. 13: MATTERS FOR EXAMINATION AT DEPOSITION, CATEGORY NO. 12

### A.   Disputed Matter for Examination at Deposition

CATEGORY NO. 12

The nature of the history and business relationship between AI and IT Online.

RESPONSE TO CATEGORY NO. 12

Anastasia objects generally to the notice as calling for the deposition of the "person most knowledgeable" with respect to the enumerated topics. A party has no obligation under the Federal Rules to produce the person "most knowledgeable" about the matters designated. Rather, Anastasia will designate a witness to testify on its behalf in accordance with Rule 30(b)(6) based on the information known to Anastasia. Anastasia further objects generally to each topic that refers to entities acting "on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases make the topics overly broad, unduly burdensome, and of an undetermined scope which does not afford any reasonable means of witness preparation. The witness produced will testify as to matters that are within the possession, custody, or control of Anastasia, as required by the Federal Rules. The phrases also are objected to the extent they seek to improperly include individuals and entities not under the control of Anastasia. Anastasia also objects generally to the notice as being unduly burdensome and repetitive to the extent that DMG seeks to depose the same witness for one day as an individual and for two additional days as a 30(b)(6) witness. Topics 12-18 and 25-27 are objected to as being overly broad, unduly burdensome and not

1   reasonably particularized. These Topics have unlimited temporal and subject matter

2   scope and are not particularized to afford any reasonable means of witness

3   preparation. Anastasia also objects to the extent the Topics are directed to matters

4   Anastasia has no knowledge of, or to relationships that do not exist. The witness

5   produced will be prepared to offer a general overview of the matters requested to the

6   extent information is within the possession, custody or control of Anastasia.

7   **B.    DMG's Contentions and Points and Authorities**

8       Regarding the assertion that Anastasia has "no obligation under the Federal

9   Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and

10  counsel routinely use that term:

11      • "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b)

12          (6) deposition, requesting defendant to designate a person most

13          knowledgeable ("PMK") to testify on 33 subjects on January 26,

14          2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair*

15          *& Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980

16          MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

17      • "In response to Hoye's notice of deposition pursuant to

18          Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department

19          Captain Toribio as the person most knowledgeable…" *Hoye v. City*

20          *of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)

21      • "Magedson was deposed as the person most knowledgeable for

22          Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)."

23          *Asia Econ. Inst. v. Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX,

24          2010 WL 4977054 (C.D. Cal. July 19, 2010)

25      • "On July 14, 2008, this Court granted plaintiff's motion to compel

26          the continued Rule 30(b)(6) deposition of Beverlly (through

27          Beverlly's person most knowledgeable ("PMK"), Theresa Lee)…"

28          *Tacori Enterprises v. Beverly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579

1   (C.D. Cal. 2008)

2   With respect to the above, "Rule 30(b)(6) provides for the deposition of the

3   corporation by notice setting forth 'with reasonable particularity' the matters on which

4   the examination of the corporation's most knowledgeable person will take place."

5   *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal

6   citations omitted).

7   As to Defendant's assertion that the witness will "testify as to matters that are

8   within the possession, custody, or control of Anastasia" is potentially an evasive tactic

9   by your client and your client will be subject to sanctions relative to its involvement

10   with persons and entities that have been involved with the matters that are the subject

11   of our client's claims in this case, especially those persons that it has held out as

12   having a partnership with, persons directly, indirectly or even intricately linked, its

13   affiliates as well as person or entities known to share offices. The legal obligations

14   regarding your client's Rule 30(b)(6) witness includes and is not limited to the

15   following:

16   "'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its

17   behalf as to all matters known or reasonably available to it and, therefore, implicitly

18   requires persons to review all matters known or reasonably available to it in

19   preparation for the 30(b)(6) deposition. This interpretation is necessary in order to

20   make the deposition a meaningful one and to prevent the "sandbagging" of an

21   opponent by conducting a half-hearted inquiry before the deposition but a thorough

22   and vigorous one before the trial. This would totally defeat the purpose of the

23   discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome.

24   However, this is merely the result of the concomitant obligation from the privilege of

25   being able to use the corporate form in order to conduct business....[A company] does

26   not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no

27   knowledge or position with respect to a set of facts or area of inquiry within its

28   knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362

BH8255.1
1003-30730

1   (M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v.*

2   *Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition,

3   the corporation has an obligation to investigate and identify and if necessary prepare a

4   designee for each listed subject area and produce that designee as noticed."); *Dravo*

5   *Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union*

6   *Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons

7   designated by the corporation do not possess personal knowledge of the matters set

8   out in the deposition notice, the corporation is obligated to prepare the designees so

9   that they may give knowledgeable and binding answers for the corporation."); *Buycks-*

10  *Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that

11  the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters

12  personally known to that designee or to matters in which that designee was personally

13  involved.); *Securities and Exchange Commission v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y.,

14  1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93

15  F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a

16  conscientious good-faith endeavor to designate the persons having knowledge of the

17  matters sought by [the party noticing the deposition] and to prepare those persons in

18  order that they can answer fully, completely, unevasively, the questions posed ... as to

19  the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f)

20  ("Counsel for the [corporation] should prepare the designated witness to be able to

21  provide meaningful information about any designated area(s) of inquiry.")."

22  *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36-37 (D. Mass.

23  2001)

24      Further, "The party responding to a 30(b)(6) deposition notice "must prepare

25  deponents by having them review prior fact witness deposition testimony as well as

26  documents and deposition exhibits." *Prokosch* v. Catalina Lighting, Inc., 193 F.R.D.

27  633, 639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New*

28  *York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997)

1  (deponent must be prepared "to the extent matters are reasonably available, whether

2  from documents, past employees, or other sources."). Even if the documents are

3  voluminous and the review of those documents would be burdensome, the deponents

4  are still required to review them in order to prepare themselves to be deposed. See

5  *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare

6  a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware

7  of any less onerous means of assuring that the position of a corporation that is

8  involved in litigation, can be fully and fairly explored."). Such preparation is necessary

9  because the "individuals so deposed are required to testify to the knowledge of the

10  corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*,

11  supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may

12  give complete, knowledgeable and binding answers on behalf of the corporation.");

13  *Taylor*, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts within

14  the corporation's knowledge, but also its subjective beliefs and opinions....The

15  corporation must provide its interpretation of documents and events.")." *Calzaturficio*

16  *S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 37 (D. Mass. 2001)

17       "Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty

18  in advance of the 30(b)(6) deposition to review all documents, including tax returns

19  and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself

20  nor the Advisory Notes nor reported case law addressing the rule define the

21  terminology "reasonably available." However, in a similar context-the production of

22  documents pursuant to Fed.R.Civ.P. 34-responding parties are required to produce all

23  documents that are in their control. "Control is defined not only as possession, but as

24  the legal right to obtain the documents requested upon demand." *Searock v. Stripling*,

25  736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194

26  F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined

27  not as possession, but as the legal right to obtain documents on demand, is the test as

28  to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule

34, 'control' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability, to obtain the documents from a non-party to the action.") It therefore seems logical that the documents that are reasonably available are those documents that are in a party's control. In the instant case, this means that the Fabiano sons were required to review all documents (that had any bearing on the 30(b)(6) topics) that were in their control. By definition, such documents would include the tax-related documents because those documents, even if they were in the possession of Fabiano's accountant, were still in Fabiano's control because Fabiano had the legal right and the practical ability to obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in preparing to be deposed as 30(b)(6) representatives of the company, had the obligation to review all documents that were in their control, including the tax returns and related documents that were in the physical possession of Fabiano's accountant." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass. 2001)

Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery. [citations omitted] The responding party simply cannot invoke generalized objections; rather, with respect to each of the propounding party's discovery requests, the responding party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is ... overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

Additionally, "the party opposing discovery on the grounds of burdensomeness has an obligation to provide sufficient detail in terms of time, money and procedure

1  required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair &*
2  *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL
3  4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

4      Finally, "If the persons designated by the corporation do not possess personal
5  knowledge of the matters set out in the deposition notice, the corporation is obligated
6  to prepare the designees so that they may give knowledgeable and binding answers for
7  the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act*
8  *(FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29,
9  2010) (internal citations omitted)

10     With respect to terms that Defedant contends are vague, ambiguous or not
11  intelligible, Defendant has the obligation to use its best efforts to prepare and answer
12  the question. A party who objects to a discovery request as "vague and ambiguous"
13  has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card*
14  *Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection
15  that the request is unclear unless it is so ambiguous that Defendant cannot, "in good
16  faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th
17  Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain
18  which portion of the category or the language within is allegedly so vague as to
19  preclude any intelligent reply.

20     The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and
21  the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.
22  Sykes testified that the companies in Moscow known as Stolitza and IT-Online
23  (together referenced by the witness as the "Moscow Entities") have carte blanche to
24  perform any service on behalf of AI, knows that these two companies hold
25  themselves out as being AI, that they created and manage all internet activities and
26  business activities of AI including and not limited to AI's primary website
27  Anastasiadate as well as all of AI's affiliates, that all customer service calls are
28  answered at their offices, that AI receives all revenues and makes disbursements at

288

their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

Further, at the deposition, Ms. Sykes was not prepared to respond to questions governing a time period from November 2010 through the date of the deposition, which is the time period when the newly elected President, Alexey Eremin was acting on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the same building with IT-Online, that he was to act as AI's liaison with IT-Online and that she did not consult with Mr. Eremin with respect to any PMK subjects, which included and was not limited to the business relationship between AI and the Moscow Entities, and her reasoning was that she was aware that Plaintiff was going to depose Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was not disclosed by the witness at the PMK deposition. Ms. Sykes further was not prepared to respond to specific categories noticed and did not do so at the instruction of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15; 258:22-262:5.)

Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

Based on the foregoing, the court should order Defendant to appear for deposition in Los Angeles to provide a further response to this category.

## C.     Anastasia's Contentions and Points and Authorities

All of DMG's arguments in support of its motion to compel additional 30(b)(6) deposition testimony suffer from three common flaws.

First, the deposition categories at issue mostly repeat almost verbatim the document production requests already discussed earlier in this joint stipulation. To the extent the document production requests are objectionable as being overly broad and for seeking information not relevant to the claims and defenses in this action, the deposition categories are also objectionable for the same reason. They are also objectionable for seeking information not within the possession, custody or control of Anastasia.

Second, the deposition categories were so unclear, cryptically worded, and overly broad that no reasonable means of witness preparation was possible. A witness cannot possibly be prepared to answer every conceivable question in reference to a deposition topic that is not reasonably particularized.

Third, and perhaps most important, a 30(b)(6) deposition is not a homework exercise as DMG appears to believe. If a witness is already familiar with a particular topic that has been clearly articulated in the notice, additional preparation or review may not be necessary. A witness is not subject to being recalled simply because opposing counsel feels that the witness did not review enough documents. Rather, unless the opposing party can point to a specific question that was asked and not answered by the witness even though the information was within the possession, custody or control of the corporate party being deposed, there is no basis to re-open the deposition. DMG has failed to make such a showing.

Like its contentions concerning the document production requests, DMG's contentions concerning the deposition testimony of Ms. Sykes are based on numerous misrepresentations of her testimony.

No effort was made in DMG's motion to identify any question Ms. Sykes was unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage in an academic debate over some pre-deposition objections that were made for the record by Anastasia. There is no basis to grant a motion to compel further deposition testimony.

In response to DMG's long-winded and disjointed contentions regarding its self-styled "Issue No. 13" concerning its Deposition Category No. 12 under Rule 30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category in dispute and show that Anastasia' witness gave proper testimony.

### 1.    Discovery At Issue

DMG's Deposition Category No. 12 is broadly directed toward "all" content that appears on anastasiadate.com from January 1, 2009 to present.  On its face, DMG's Deposition Category No. 12 is nearly identical to its Document Request No. 6 (or "Issue No. 4"), and many of the same objections to Document Request No. 6 also apply to Deposition Category No. 12. DMG's demand for a meet-and-confer on the deposition topics appeared to be a reiteration of the meet-and-confer for Rule 30(b)(2) document production, and counsel for Anastasia inadvertantly did not respond to DMG's request for a separate meet-and-confer. Counsel for DMG did not follow up with a telephone inquiry before preparing the joint statement. In any event, DMG can claim no prejudice because when DMG revised its portion of the joint statement to address relevancy for its document production requests, DMG made no changes to its contentions in connection with this Issue No. 13 regarding the deposition.

To provide context for DMG's deposition notice, please refer to Anastasia's summary of the relevant discovery set forth in its response to DMG's "Issue No. 10."

### 2.    Legal Standards

A more detailed discussion of the law also may be found in Anastasia's contentions in connection with DMG's "Issue No. 10."

### (a)    Rule 26(b)

As previously discussed, Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses" of the case. If a party's request is overly broad or otherwise objectionable on its face, the

1   party resisting discovery has no need to support its objection. *McBride v. Medicalodges,*

2   *Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the

3   burden shift to the party resisting discovery. *Id.*

### (b)   Rule 30(b)(2)

5       Rule 30(b)(2) is intended to be used when seeking a few and simple documents,

6   but DMG appears to be using Rule 30(b)(2) as an excuse to extend a deposition even

7   though the documents could have been requested and obtained before the deposition.

### (c)   Rule 30(b)(6)

9       Rule 30(b)(6) permits a party to name a corporation as a deponent. The party

10  seeking an organization's testimony "must describe with reasonable particularity the

11  matters for examination," but the organization is only required to "testify about

12  information known or reasonably available to the organization." There is nothing in

13  Rule 30 that requires a party to testify about information over which it does not have

14  access and control. *See In re Ski Train Fire*, 2006 U.S. Dist. LEXIS 29987, at *28

15  (declining "to require a corporate parent to acquire all of the knowledge of the

16  subsidiary on matters in which the parent was not involved"). Moreover, DMG bears

17  the burden of proving that Anastasia has control or the right to obtain the

18  information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1108. "[P]roof of

19  theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

20      The designated witness need only be prepared to testify on behalf of the

21  corporation based on knowledge reasonably available to the corporation. *Dravo Corp.*,

22  164 F.R.D. at 76 ("If [the corporation] does not possess such knowledge as to so

23  prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously

24  cease, since the rule requires testimony only as to 'matters known or reasonably

25  available to the organization.'"); *cf. Walking Mountain*, 353 F.3d at 798 (noting that the

26  phrase the "person most knowledgeable" is merely a label placed on the designated

27  corporate witness). Furthermore, the areas of inquiry for a 30(b)(6) deposition must

28  be set forth with reasonable particularity. *McBride*, 250 F.R.D. at 584.

292

## 2.   30(b)(6) Category No. 5

As previously discussed, Anastasia does not communicate with agencies, create profiles, develop profile databases, maintain servers or create web content. Anastasia has provided DMG with its knowledge on the topics noticed based on the reasonably available information with Anastasia's possession, custody or control.

DMG seems to believe that Anastasia should possess the knowledge of each entity it contracts with and the entities they contract with, but DMG has not developed any basis to support its belief other than idle speculation. Anastasia has no ability to acquire additional information beyond that provided by Ms. Sykes at her deposition.  Anastasia does not own any of the Moscow Entities. Anastasia has no right of access or control over the information possessed by any of the Moscow Entities.

### (a)   Ms. Sykes' Testimony

DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities created and manage the internet activities associated with the anastasiadate.com website. However, DMG makes no attempt to establish that Anastasia has control over the Moscow Entities, and in fact suggests that Anastasia does not have such control.

Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow Entities to request information in preparation for the 30(b)(6) deposition, but he refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October 2011), but Mr. Eremin stated that he did not have any substantive information to provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and 261-262).

Thus, Ms. Sykes was properly prepared based on knowledge reasonably available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness],

293

1   then its obligations under Rule 30(b)(6) obviously cease, since the rule requires

2   testimony only as to 'matters known or reasonably available to the organization.'"

3   (citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control

4   to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107

5   ("[P]roof of theoretical control is insufficient; a showing of actual control is

6   required.").

7       DMG claims that Ms. Sykes admitted at her deposition that she "was not

8   prepared to respond to questions governing a time period from November 2010

9   through the date of the deposition [when] Alexey Eremin was acting on AI's behalf."

10  This is patently false. No such testimony was ever given. Moreover, as discussed

11  above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin

12  regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr.

13  Eremin responded that he "knows nothing," or "doesn't know anything" about those

14  issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's

15  assertions, <u>Ms. Sykes affirmed that she was the person most knowledgeable about</u>

16  <u>Anastasia, including during Mr. Eremin's time at the company</u>. Exh. D (Tr. at 259-

17  260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation

18  of Anastasia—he would only address problems that Ms. Sykes would raise with him,

19  and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-

20  262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had

21  not been passed to Mr. Eremin, as DMG contends.

22      DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not

23  confer with Mr. Eremin to prepare her for deposition because "she was aware that

24  Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times

25  that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in

26  litigation, and he had responded that he knew "nothing." As a result, she had no

27  further need to confer with him again prior to the deposition. Ms. Sykes

28  acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully

1   suggested that there was no point to that because she had already asked and he had no

2   relevant information to provide. In any event, Ms. Sykes stated on at least three

3   instances during her deposition that she had conferred with Mr. Eremin, and that he

4   had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

5        DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the

6   deposition "at the instruction of her counsel." This is totally false. DMG has no basis

7   for making such an assertion. DMG apparently relies on the fact that Anastasia lodged

8   timely and well-founded objections to the categories in DMG's 30(b)(6) notice as

9   vague, ambiguous, confusing, and not reasonably particularized. The deposition

10  testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-

11  opened every time counsel made objections for the record, the deposition would

12  never end (which apparently is what DMG is seeking to do in this instance). DMG

13  had more than sufficient opportunity to clarify its noticed categories with particularity

14  in advance of the deposition, but chose not to do so. DMG also had two full days to

15  question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no

16  question (other than a single question calling for attorney-client privileged

17  information) that Ms. Sykes was instructed by counsel not to answer.

18       In short, DMG identifies no relevant question that was asked and not answered

19  based on the reasonably available information within Anastasia's possession, custody

20  or control.

21

22            **(b)    Other Objections To Category No. 12**

23       As stated in Anastasia's objections previously served on DMG, this category

24  was overly broad, unduly burdensome, and not reasonably particularized to afford any

25  reasonable means of witness preparation. Indeed, the Category is broadly directed to

26  the Anastasia's entire business relationship with IT Online without regard to the

27  claims or defenses in this action, or any temporal limitation.

28       As the party requesting discovery, DMG bears the burden of establishing

1   relevancy of the requested discovery sought to the claims or defenses, and if a party's

2   request for relevant information is overly broad or otherwise objectionable on its face,

3   the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

4         In view of the lack of particularity in this noticed category, Anastasia stated that

5   the designated witness will be prepared to offer a general overview based on the

6   reasonably available information within Anastasia's possession, custody or control.

7         Again, DMG identifies no relevant question that was asked and not answered

8   by Ms. Sykes as the designated 30(b)(6) witness.

9              **(c)**     **Deposition Pages Cited By DMG**

10       As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes

11   that she was adequately prepared and gave proper responses to the questions that

12   were asked. The transcript excerpts cited by DMG do not alter that conclusion.

13       Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with

14   both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and

15   information from both. Mr. Eremin had no information or documents. Mr. Nochka also

16   also did not provide any information or documents to Ms. Sykes.

17       Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms.

18   Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where

19   counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as

20   President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's

21   health problems, and that Ms. Sykes "did not perceive this job as being anything really

22   stressful." (Tr. 105:18-19).

23       Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the

24   anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6

25   as overly broad as it was unreasonable to expect a witness to come prepared to

26   address every bit of information that has ever been on a website and all changes in

27   content over a two-year period of time. Ms. Sykes reviewed the home page because

28   no specific part of the website was identified by DMG. When counsel for DMG

attempted to inquire whether this was at the instruction of counsel, an objection and instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20 (Exh. 5).

Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin responded that he knew "nothing." Ms. Sykes also testified that she was the person most knowledgeable about Anastasia, which is consistent with her inquiry of Mr. Eremin. Tr. 259:22-260:6.

### 4.   Concluding Statement Re DMG's Issue No. 13

DMG's motion to compel a further 30(b)(6) deposition regarding Category No. 2 must be denied. DMG's motion is little more than an academic debate over a pre-deposition exchange of letters between counsel. In fact, DMG's motion is simply a copy of its own pre-deposition letter with no effort make to particularize the arguments made to the testimony actually given at the deposition. Exh. I. DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

## XV.   ISSUE NO. 14: MATTERS FOR EXAMINATION AT DEPOSITION, CATEGORY NO. 15

### A.   Disputed Matter for Examination at Deposition

CATEGORY NO. 15

The nature of the history and business relationship between AI and Stolitza, LLC.

RESPONSE TO CATEGORY NO. 15

Anastasia objects generally to the notice as calling for the deposition of the "person most knowledgeable" with respect to the enumerated topics. A party has no obligation under the Federal Rules to produce the person "most knowledgeable" about the matters designated. Rather, Anastasia will designate a witness to testify on

1   its behalf in accordance with Rule 30(b) (6) based on the information known to

2   Anastasia. Anastasia further objects generally to each topic that refers to entities acting

3   "on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases

4   make the topics overly broad, unduly burdensome, and of an undetermined scope

5   which does not afford any reasonable means of witness preparation. The witness

6   produced will testify as to matters that are within the possession, custody, or control

7   of Anastasia, as required by the Federal Rules. The phrases also are objected to the

8   extent they seek to improperly include individuals and entities not under the control

9   of Anastasia. Anastasia also objects generally to the notice as being unduly

10  burdensome and repetitive to the extent that DMG seeks to depose the same witness

11  for one day as an individual and for two additional days as a 30(b) (6) witness. Topics

12  12-18 and 25-27 are objected to as being overly broad, unduly burdensome and not

13  reasonably particularized. These Topics have unlimited temporal and subject matter

14  scope and are not particularized to afford any reasonable means of witness

15  preparation. Anastasia also objects to the extent the Topics are directed to matters

16  Anastasia has no knowledge of, or to relationships that do not exist. The witness

17  produced will be prepared to offer a general overview of the matters requested to the

18  extent information is within the possession, custody or control of Anastasia.

19  **B.   DMG's Contentions and Points and Authorities**

20  Regarding the assertion that Anastasia has "no obligation under the Federal

21  Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and

22  counsel routinely use that term:

23  • "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b)

24  (6) deposition, requesting defendant to designate a person most

25  knowledgeable ("PMK") to testify on 33 subjects on January 26,

26  2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair*

27  *& Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980

28  MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

- "In response to Hoye's notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department Captain Toribio as the person most knowledgeable…" *Hoye v. City of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)
- "Magedson was deposed as the person most knowledgeable for Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)." *Asia Econ. Inst. v. Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX, 2010 WL 4977054 (C.D. Cal. July 19, 2010)
- "On July 14, 2008, this Court granted plaintiff's motion to compel the continued Rule 30(b)(6) deposition of Beverlly (through Beverlly's person most knowledgeable ("PMK"), Theresa Lee)…" *Tacori Enterprises v. Beverly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579 (C.D. Cal. 2008)

With respect to the above, "Rule 30(b)(6) provides for the deposition of the corporation by notice setting forth 'with reasonable particularity' the matters on which the examination of the corporation's most knowledgeable person will take place." *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal citations omitted).

As to Defendant's assertion that the witness will "testify as to matters that are within the possession, custody, or control of Anastasia" is potentially an evasive tactic by your client and your client will be subject to sanctions relative to its involvement with persons and entities that have been involved with the matters that are the subject of our client's claims in this case, especially those persons that it has held out as having a partnership with, persons directly, indirectly or even intricately linked, its affiliates as well as person or entities known to share offices. The legal obligations regarding your client's Rule 30(b)(6) witness includes and is not limited to the following:

"'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its

behalf as to all matters known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial. This would totally defeat the purpose of the discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome. However, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business....[A company] does not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no knowledge or position with respect to a set of facts or area of inquiry within its knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition, the corporation has an obligation to investigate and identify and if necessary prepare a designee for each listed subject area and produce that designee as noticed."); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation."); *Buycks-Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.); *Securities and Exchange Commission v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y., 1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93 F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the

matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f) ("Counsel for the [corporation] should prepare the designated witness to be able to provide meaningful information about any designated area(s) of inquiry.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc*., 201 F.R.D. 33, 36-37 (D. Mass. 2001)

Further, "The party responding to a 30(b)(6) deposition notice "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997) (deponent must be prepared "to the extent matters are reasonably available, whether from documents, past employees, or other sources."). Even if the documents are voluminous and the review of those documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed. See *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation that is involved in litigation, can be fully and fairly explored."). Such preparation is necessary because the "individuals so deposed are required to testify to the knowledge of the corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*, supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may give complete, knowledgeable and binding answers on behalf of the corporation."); *Taylor*, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts within the corporation's knowledge, but also its subjective beliefs and opinions....The corporation must provide its interpretation of documents and events.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 37 (D. Mass. 2001)

1    "Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty

2    in advance of the 30(b)(6) deposition to review all documents, including tax returns

3    and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself

4    nor the Advisory Notes nor reported case law addressing the rule define the

5    terminology "reasonably available." However, in a similar context-the production of

6    documents pursuant to Fed. R. Civ. P. 34-responding parties are required to produce

7    all documents that are in their control. "Control is defined not only as possession, but

8    as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*,

9    736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194

10   F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined

11   not as possession, but as the legal right to obtain documents on demand, is the test as

12   to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule

13   34, 'control' does not require that the party have legal ownership or actual physical

14   possession of the documents at issue; rather, documents are considered to be under a

15   party's control when that party has the right, authority, or practical ability, to obtain

16   the documents from a non-party to the action.") It therefore seems logical that the

17   documents that are reasonably available are those documents that are in a party's

18   control. In the instant case, this means that the Fabiano sons were required to review

19   all documents (that had any bearing on the 30(b)(6) topics) that were in their control.

20   By definition, such documents would include the tax-related documents because those

21   documents, even if they were in the possession of Fabiano's accountant, were still in

22   Fabiano's control because Fabiano had the legal right and the practical ability to

23   obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in

24   preparing to be deposed as 30(b)(6) representatives of the company, had the

25   obligation to review all documents that were in their control, including the tax returns

26   and related documents that were in the physical possession of Fabiano's accountant."

27   *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass.

28   2001)

Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery. [citations omitted] The responding party simply cannot invoke generalized objections; rather, with respect to each of the propounding party's discovery requests, the responding party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is ... overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

Additionally, "the party opposing discovery on the grounds of burdensomeness has an obligation to provide sufficient detail in terms of time, money and procedure required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

Finally, "If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

With respect to terms that Defendant contends are vague, ambiguous or not intelligible, Defendant has the obligation to use its best efforts to prepare and answer the question. A party who objects to a discovery request as "vague and ambiguous" has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection that the request is unclear unless it is so ambiguous that Defendant cannot, "in good faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th

1    Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain

2    which portion of the category or the language within is allegedly so vague as to

3    preclude any intelligent reply.

4         The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

5    the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.

6    Sykes testified that the companies in Moscow known as Stolitza and IT-Online

7    (together referenced by the witness as the "Moscow Entities") have carte blanche to

8    perform any service on behalf of AI, knows that these two companies hold

9    themselves out as being AI, that they created and manage all internet activities and

10   business activities of AI including and not limited to AI's primary website

11   Anastasiadate as well as all of AI's affiliates, that all customer service calls are

12   answered at their offices, that AI receives all revenues and makes disbursements at

13   their direction and that she has never had a problem with their conduct or objected to

14   their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9;

15   64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-

16   202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-**

17   **354:2**.)

18        Further, at the deposition, Ms. Sykes was not prepared to respond to questions

19   governing a time period from November 2010 through the date of the deposition,

20   which is the time period when the newly elected President, Alexey Eremin was acting

21   on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the

22   same building with IT-Online, that he was to act as AI's liaison with IT-Online and

23   that she did not consult with Mr. Eremin with respect to any PMK subjects, which

24   included and was not limited to the business relationship between AI and the Moscow

25   Entities, and her reasoning was that she was aware that Plaintiff was going to depose

26   Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was

27   not disclosed by the witness at the PMK deposition. Ms. Sykes further was not

28   prepared to respond to specific categories noticed and did not do so at the instruction

1   of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15;

2   258:22-262:5.)

3       Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with

4   respect to the PMK deposition. (Ex. 10.)

5       Plaintiff's counsel again sent an email on December 8, 2011, reminding

6   Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

7       Defendant's counsel did not meet and confer within (10) days as requested.

8       Based on the foregoing, the court should order Defendant to appear for

9   deposition in Los Angeles to provide a further response to this category.

10  ## C.    Anastasia's Contentions and Points and Authorities

11      All of DMG's arguments in support of its motion to compel additional 30(b)(6)

12  deposition testimony suffer from three common flaws.

13      First, the deposition categories at issue mostly repeat almost verbatim the

14  document production requests already discussed earlier in this joint stipulation. To the

15  extent the document production requests are objectionable as being overly broad and

16  for seeking information not relevant to the claims and defenses in this action, the

17  deposition categories are also objectionable for the same reason. They are also

18  objectionable for seeking information not within the possession, custody or control of

19  Anastasia.

20      Second, the deposition categories were so unclear, cryptically worded, and

21  overly broad that no reasonable means of witness preparation was possible. A witness

22  cannot possibly be prepared to answer every conceivable question in reference to a

23  deposition topic that is not reasonably particularized.

24      Third, and perhaps most important, a 30(b)(6) deposition is not a homework

25  exercise as DMG appears to believe. If a witness is already familiar with a particular

26  topic that has been clearly articulated in the notice, additional preparation or review

27  may not be necessary. A witness is not subject to being recalled simply because

28  opposing counsel feels that the witness did not review enough documents. Rather,

BH8255.1
1003-30730

1   unless the opposing party can point to a specific question that was asked and not

2   answered by the witness even though the information was within the possession,

3   custody or control of the corporate party being deposed, there is no basis to re-open

4   the deposition. DMG has failed to make such a showing.

5        Like its contentions concerning the document production requests, DMG's

6   contentions concerning the deposition testimony of Ms. Sykes are based on numerous

7   misrepresentations of her testimony.

8        No effort was made in DMG's motion to identify any question Ms. Sykes was

9   unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage

10  in an academic debate over some pre-deposition objections that were made for the

11  record by Anastasia. There is no basis to grant a motion to compel further deposition

12  testimony.

13       In response to DMG's long-winded and disjointed contentions regarding its

14  self-styled "Issue No. 14" concerning its Deposition Category No. 15 under Rule

15  30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2)

16  set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category

17  in dispute and show that Anastasia' witness gave proper testimony.

18              **1.    Discovery At Issue**

19       DMG's Deposition Category No. 15 is broadly directed toward the business

20  relationship between Anastasia and Stolitza. On its face, DMG's Deposition Category

21  No. 15 is nearly identical to its Document Request No. 9 (or "Issue No. 5"), and

22  many of the same objections to Document Request No. 9 also apply to Deposition

23  Category No. 15. DMG's demand for a meet-and-confer on the deposition topics

24  appeared to be a reiteration of the meet-and-confer for Rule 30(b)(2) document

25  production, and counsel for Anastasia inadvertantly did not respond to DMG's

26  request for a separate meet-and-confer. Counsel for DMG did not follow up with a

27  telephone inquiry before preparing the joint statement. In any event, DMG can claim

28  no prejudice because when DMG revised its portion of the joint statement to address

relevancy for its document production requests, DMG made no changes to its contentions in connection with this Issue No. 14 regarding the deposition.

To provide context for DMG's deposition notice, please refer to Anastasia's summary of the relevant discovery set forth in its response to DMG's "Issue No. 10."

### 2. Legal Standards

A more detailed discussion of the law also may be found in Anastasia's contentions in connection with DMG's "Issue No. 10."

#### (a) Rule 26(b)

As previously discussed, Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses" of the case. If a party's request is overly broad or otherwise objectionable on its face, the party resisting discovery has no need to support its objection. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

#### (b) Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents, but DMG appears to be using Rule 30(b)(2) as an excuse to extend a deposition even though the documents could have been requested and obtained before the deposition.

#### (c) Rule 30(b)(6)

Rule 30(b)(6) permits a party to name a corporation as a deponent. The party seeking an organization's testimony "must describe with reasonable particularity the matters for examination," but the organization is only required to "testify about information known or reasonably available to the organization." There is nothing in Rule 30 that requires a party to testify about information over which it does not have access and control. *See In re Ski Train Fire*, 2006 U.S. Dist. LEXIS 29987, at *28 (declining "to require a corporate parent to acquire all of the knowledge of the subsidiary on matters in which the parent was not involved"). Moreover, DMG bears the burden of proving that Anastasia has control or the right to obtain the

information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1108. "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

The designated witness need only be prepared to testify on behalf of the corporation based on knowledge reasonably available to the corporation. *Dravo Corp.*, 164 F.R.D. at 76 ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'"); *cf. Walking Mountain*, 353 F.3d at 798 (noting that the phrase the "person most knowledgeable" is merely a label placed on the designated corporate witness). Furthermore, the areas of inquiry for a 30(b)(6) deposition must be set forth with reasonable particularity. *McBride*, 250 F.R.D. at 584.

### 2. 30(b)(6) Category No. 5

As previously discussed, Anastasia does not communicate with agencies, create profiles, develop profile databases, maintain servers or create web content. Anastasia has provided DMG with its knowledge on the topics noticed based on the reasonably available information with Anastasia's possession, custody or control.

DMG seems to believe that Anastasia should possess the knowledge of each entity it contracts with and the entities they contract with, but DMG has not developed any basis to support its belief other than idle speculation. Anastasia has no ability to acquire additional information beyond that provided by Ms. Sykes at her deposition. Anastasia does not own any of the Moscow Entities. Anastasia has no right of access or control over the information possessed by any of the Moscow Entities.

### (a) Ms. Sykes' Testimony

DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities created and manage the internet activities associated with the anastasiadate.com website. However, DMG makes no attempt to establish that Anastasia has control over the Moscow Entities, and in fact suggests that Anastasia does not have such

control.

Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow Entities to request information in preparation for the 30(b)(6) deposition, but he refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October 2011), but Mr. Eremin stated that he did not have any substantive information to provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and 261-262).

Thus, Ms. Sykes was properly prepared based on knowledge reasonably available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'" (citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107 ("[P]roof of theoretical control is insufficient; a showing of actual control is required.").

DMG claims that Ms. Sykes admitted at her deposition that she "was not prepared to respond to questions governing a time period from November 2010 through the date of the deposition [when] Alexey Eremin was acting on AI's behalf." This is patently false. No such testimony was ever given. Moreover, as discussed above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr. Eremin responded that he "knows nothing," or "doesn't know anything" about those issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's assertions, <u>Ms. Sykes affirmed that she was the person most knowledgeable about Anastasia, including during Mr. Eremin's time at the company.</u> Exh. D (Tr. at 259-260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation

1  of Anastasia—he would only address problems that Ms. Sykes would raise with him,

2  and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-

3  262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had

4  not been passed to Mr. Eremin, as DMG contends.

5      DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not

6  confer with Mr. Eremin to prepare her for deposition because "she was aware that

7  Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times

8  that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in

9  litigation, and he had responded that he knew "nothing." As a result, she had no

10 further need to confer with him again prior to the deposition. Ms. Sykes

11 acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully

12 suggested that there was no point to that because she had already asked and he had no

13 relevant information to provide. In any event, Ms. Sykes stated on at least three

14 instances during her deposition that she had conferred with Mr. Eremin, and that he

15 had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

16     DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the

17 deposition "at the instruction of her counsel." This is totally false. DMG has no basis

18 for making such an assertion. DMG apparently relies on the fact that Anastasia lodged

19 timely and well-founded objections to the categories in DMG's 30(b)(6) notice as

20 vague, ambiguous, confusing, and not reasonably particularized. The deposition

21 testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-

22 opened every time counsel made objections for the record, the deposition would

23 never end (which apparently is what DMG is seeking to do in this instance). DMG

24 had more than sufficient opportunity to clarify its noticed categories with particularity

25 in advance of the deposition, but chose not to do so. DMG also had two full days to

26 question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no

27 question (other than a single question calling for attorney-client privileged

28 information) that Ms. Sykes was instructed by counsel not to answer.

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

In short, DMG identifies no relevant question that was asked and not answered based on the reasonably available information within Anastasia's possession, custody or control.

### (b)   Other Objections To Category No. 15

As stated in Anastasia's objections previously served on DMG, this category was overly broad, unduly burdensome, and not reasonably particularized to afford any reasonable means of witness preparation. Indeed, the Category is broadly directed to the Anastasia's entire business relationship with Stolitza without regard to the claims or defenses being asserted in this action, or any temporal limitation.

As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses, and if a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

In view of the lack of particularity in this noticed category, Anastasia stated that the designated witness will be prepared to offer a general overview based on the reasonably available information within Anastasia's possession, custody or control.

Again, DMG identifies no relevant question that was asked and not answered by Ms. Sykes as the designated 30(b)(6) witness.

### (c)   Deposition Pages Cited By DMG

As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes that she was adequately prepared and gave proper responses to the questions that were asked. The transcript excerpts cited by DMG do not alter that conclusion.

Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and information from both. Mr. Eremin had no information or documents. Mr. Nochka also did not provide any information or documents to Ms. Sykes.

Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms. Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where

BH8255.1
1003-30730

counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's health problems, and that Ms. Sykes "did not perceive this job as being anything really stressful." (Tr. 105:18-19).

Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6 as overly broad as it was unreasonable to expect a witness to come prepared to address every bit of information that has ever been on a website and all changes in content over a two-year period of time. Ms. Sykes reviewed the home page because no specific part of the website was identified by DMG. When counsel for DMG attempted to inquire whether this was at the instruction of counsel, an objection and instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20 (Exh. 5).

Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin responded that he knew "nothing." Ms. Sykes also testified that she was the person most knowledgeable about Anastasia, which is consistent with her inquiry of Mr. Eremin. Tr. 259:22-260:6.

### 4.     Concluding Statement Re DMG's Issue No. 14

DMG's motion to compel a further 30(b)(6) deposition regarding Category No. 2 must be denied. DMG's motion is little more than an academic debate over a pre-deposition exchange of letters between counsel. In fact, DMG's motion is simply a copy of its own pre-deposition letter with no effort make to particularize the arguments made to the testimony actually given at the deposition. Exh. I. DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

BH8255.1
1003-30730

# XVI. ISSUE NO. 15: MATTERS FOR EXAMINATION AT DEPOSITION, CATEGORY NO. 16

### A. Disputed Matter for Examination at Deposition

CATEGORY NO. 16

The nature of the history and business relationship between Stolitza, LLC and IT Online.

RESPONSE TO CATEGORY NO. 16

Anastasia objects generally to the notice as calling for the deposition of the "person most knowledgeable" with respect to the enumerated topics. A party has no obligation under the Federal Rules to produce the person "most knowledgeable" about the matters designated. Rather, Anastasia will designate a witness to testify on its behalf in accordance with Rule 30(b) (6) based on the information known to Anastasia. Anastasia further objects generally to each topic that refers to entities acting "on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases make the topics overly broad, unduly burdensome, and of an undetermined scope which does not afford any reasonable means of witness preparation. The witness produced will testify as to matters that are within the possession, custody, or control of Anastasia, as required by the Federal Rules. The phrases also are objected to the extent they seek to improperly include individuals and entities not under the control of Anastasia. Anastasia also objects generally to the notice as being unduly burdensome and repetitive to the extent that DMG seeks to depose the same witness for one day as an individual and for two additional days as a 30(b) (6) witness. Topics 12-18 and 25-27 are objected to as being overly broad, unduly burdensome and not reasonably particularized. These Topics have unlimited temporal and subject matter scope and are not particularized to afford any reasonable means of witness preparation. Anastasia also objects to the extent the Topics are directed to matters Anastasia has no knowledge of, or to relationships that do not exist. The witness produced will be prepared to offer a general overview of the matters requested to the

BH8255.1
1003-30730

extent information is within the possession, custody or control of Anastasia.

**B.   DMG's Contentions and Points and Authorities**

Regarding the assertion that Anastasia has "no obligation under the Federal Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and counsel routinely use that term:

- "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b) (6) deposition, requesting defendant to designate a person most knowledgeable ("PMK") to testify on 33 subjects on January 26, 2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

- "In response to Hoye's notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department Captain Toribio as the person most knowledgeable..." *Hoye v. City of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)

- "Magedson was deposed as the person most knowledgeable for Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)." *Asia Econ. Inst. v. Xcentric Ventures, LLC,* CV 10-1360 SVW PJWX, 2010 WL 4977054 (C.D. Cal. July 19, 2010)

- "On July 14, 2008, this Court granted plaintiff's motion to compel the continued Rule 30(b)(6) deposition of Beverlly (through Beverlly's person most knowledgeable ("PMK"), Theresa Lee)..." *Tacori Enterprises v. Beverlly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579 (C.D. Cal. 2008)

With respect to the above, "Rule 30(b)(6) provides for the deposition of the corporation by notice setting forth 'with reasonable particularity' the matters on which the examination of the corporation's most knowledgeable person will take place." *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal

314

citations omitted).

As to Defendant's assertion that the witness will "testify as to matters that are within the possession, custody, or control of Anastasia" is potentially an evasive tactic by your client and your client will be subject to sanctions relative to its involvement with persons and entities that have been involved with the matters that are the subject of our client's claims in this case, especially those persons that it has held out as having a partnership with, persons directly, indirectly or even intricately linked, its affiliates as well as person or entities known to share offices. The legal obligations regarding your client's Rule 30(b)(6) witness includes and is not limited to the following:

"'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial. This would totally defeat the purpose of the discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome. However, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business....[A company] does not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no knowledge or position with respect to a set of facts or area of inquiry within its knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition, the corporation has an obligation to investigate and identify and if necessary prepare a designee for each listed subject area and produce that designee as noticed."); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union*

1  *Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons

2  designated by the corporation do not possess personal knowledge of the matters set

3  out in the deposition notice, the corporation is obligated to prepare the designees so

4  that they may give knowledgeable and binding answers for the corporation."); *Buycks-*

5  *Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that

6  the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters

7  personally known to that designee or to matters in which that designee was personally

8  involved.); *Securities and Exchange Commission v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y.,

9  1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93

10  F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a

11  conscientious good-faith endeavor to designate the persons having knowledge of the

12  matters sought by [the party noticing the deposition] and to prepare those persons in

13  order that they can answer fully, completely, unevasively, the questions posed ... as to

14  the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f)

15  ("Counsel for the [corporation] should prepare the designated witness to be able to

16  provide meaningful information about any designated area(s) of inquiry.")."

17  *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36-37 (D. Mass.

18  2001)

19       Further, "The party responding to a 30(b)(6) deposition notice "must prepare

20  deponents by having them review prior fact witness deposition testimony as well as

21  documents and deposition exhibits." *Prokosch* v. Catalina Lighting, Inc., 193 F.R.D.

22  633, 639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New*

23  *York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997)

24  (deponent must be prepared "to the extent matters are reasonably available, whether

25  from documents, past employees, or other sources."). Even if the documents are

26  voluminous and the review of those documents would be burdensome, the deponents

27  are still required to review them in order to prepare themselves to be deposed. See

28  *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare

316

a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation that is involved in litigation, can be fully and fairly explored."). Such preparation is necessary because the "individuals so deposed are required to testify to the knowledge of the corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*, supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may give complete, knowledgeable and binding answers on behalf of the corporation."); *Taylor*, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts within the corporation's knowledge, but also its subjective beliefs and opinions....The corporation must provide its interpretation of documents and events.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 37 (D. Mass. 2001)

"Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty in advance of the 30(b)(6) deposition to review all documents, including tax returns and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself nor the Advisory Notes nor reported case law addressing the rule define the terminology "reasonably available." However, in a similar context-the production of documents pursuant to Fed.R.Civ.P. 34-responding parties are required to produce all documents that are in their control. "Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194 F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined not as possession, but as the legal right to obtain documents on demand, is the test as to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule 34, 'control' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability, to obtain the documents from a non-party to the action.") It therefore seems logical that the documents that are reasonably available are those documents that are in a party's

1   control. In the instant case, this means that the Fabiano sons were required to review

2   all documents (that had any bearing on the 30(b)(6) topics) that were in their control.

3   By definition, such documents would include the tax-related documents because those

4   documents, even if they were in the possession of Fabiano's accountant, were still in

5   Fabiano's control because Fabiano had the legal right and the practical ability to

6   obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in

7   preparing to be deposed as 30(b)(6) representatives of the company, had the

8   obligation to review all documents that were in their control, including the tax returns

9   and related documents that were in the physical possession of Fabiano's accountant."

10   *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass.

11   2001)

12          Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-

13   established that the burden is on the objecting party to show grounds for failing to

14   provide the requested discovery. [citations omitted] The responding party simply

15   cannot invoke generalized objections; rather, with respect to each of the propounding

16   party's discovery requests, the responding party must show specifically how, despite

17   the broad and liberal construction afforded the federal discovery rules, each [request]

18   is ... overly broad, burdensome or oppressive by submitting affidavits or offering

19   evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair &*

20   *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL

21   4942645 (C.D. Cal. July 29, 2010)

22          Additionally, "the party opposing discovery on the grounds of burdensomeness

23   has an obligation to provide sufficient detail in terms of time, money and procedure

24   required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair &*

25   *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL

26   4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

27          Finally, "If the persons designated by the corporation do not possess personal

28   knowledge of the matters set out in the deposition notice, the corporation is obligated

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1   to prepare the designees so that they may give knowledgeable and binding answers for

2   the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act*

3   *(FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29,

4   2010) (internal citations omitted)

5        With respect to terms that Defedant contends are vague, ambiguous or not

6   intelligible, Defendant has the obligation to use its best efforts to prepare and answer

7   the question. A party who objects to a discovery request as "vague and ambiguous"

8   has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card*

9   *Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection

10   that the request is unclear unless it is so ambiguous that Defendant cannot, "in good

11   faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th

12   Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain

13   which portion of the category or the language within is allegedly so vague as to

14   preclude any intelligent reply.

15        The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and

16   the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.

17   Sykes testified that the companies in Moscow known as Stolitza and IT-Online

18   (together referenced by the witness as the "Moscow Entities") have carte blanche to

19   perform any service on behalf of AI, knows that these two companies hold

20   themselves out as being AI, that they created and manage all internet activities and

21   business activities of AI including and not limited to AI's primary website

22   Anastasiadate as well as all of AI's affiliates, that all customer service calls are

23   answered at their offices, that AI receives all revenues and makes disbursements at

24   their direction and that she has never had a problem with their conduct or objected to

25   their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9;

26   64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-

27   202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-**

28   **354:2**.)

1    Further, at the deposition, Ms. Sykes was not prepared to respond to questions

2    governing a time period from November 2010 through the date of the deposition,

3    which is the time period when the newly elected President, Alexey Eremin was acting

4    on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the

5    same building with IT-Online, that he was to act as AI's liaison with IT-Online and

6    that she did not consult with Mr. Eremin with respect to any PMK subjects, which

7    included and was not limited to the business relationship between AI and the Moscow

8    Entities, and her reasoning was that she was aware that Plaintiff was going to depose

9    Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was

10   not disclosed by the witness at the PMK deposition. Ms. Sykes further was not

11   prepared to respond to specific categories noticed and did not do so at the instruction

12   of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15;

13   258:22-262:5.)

14   Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with

15   respect to the PMK deposition. (Ex. 10.)

16   Plaintiff's counsel again sent an email on December 8, 2011, reminding

17   Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

18   Defendant's counsel did not meet and confer within (10) days as requested.

19   Based on the foregoing, the court should order Defendant to appear for

20   deposition in Los Angeles to provide a further response to this category.

21   **C.    Anastasia's Contentions and Points and Authorities**

22   All of DMG's arguments in support of its motion to compel additional 30(b)(6)

23   deposition testimony suffer from three common flaws.

24   First, the deposition categories at issue mostly repeat almost verbatim the

25   document production requests already discussed earlier in this joint stipulation. To the

26   extent the document production requests are objectionable as being overly broad and

27   for seeking information not relevant to the claims and defenses in this action, the

28   deposition categories are also objectionable for the same reason. They are also

BH8255.1
1003-30730

1  objectionable for seeking information not within the possession, custody or control of

2  Anastasia.

3      Second, the deposition categories were so unclear, cryptically worded, and

4  overly broad that no reasonable means of witness preparation was possible. A witness

5  cannot possibly be prepared to answer every conceivable question in reference to a

6  deposition topic that is not reasonably particularized.

7      Third, and perhaps most important, a 30(b)(6) deposition is not a homework

8  exercise as DMG appears to believe. If a witness is already familiar with a particular

9  topic that has been clearly articulated in the notice, additional preparation or review

10  may not be necessary. A witness is not subject to being recalled simply because

11  opposing counsel feels that the witness did not review enough documents. Rather,

12  unless the opposing party can point to a specific question that was asked and not

13  answered by the witness even though the information was within the possession,

14  custody or control of the corporate party being deposed, there is no basis to re-open

15  the deposition. DMG has failed to make such a showing.

16      Like its contentions concerning the document production requests, DMG's

17  contentions concerning the deposition testimony of Ms. Sykes are based on numerous

18  misrepresentations of her testimony.

19      No effort was made in DMG's motion to identify any question Ms. Sykes was

20  unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage

21  in an academic debate over some pre-deposition objections that were made for the

22  record by Anastasia. There is no basis to grant a motion to compel further deposition

23  testimony.

24      In response to DMG's long-winded and disjointed contentions regarding its

25  self-styled "Issue No. 15" concerning its Deposition Category No. 16 under Rule

26  30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2)

27  set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category

28  in dispute and show that Anastasia' witness gave proper testimony.

### 1.      Discovery At Issue

DMG's Deposition Category No. 16 is broadly directed toward the business relationship between Stolitza and IT Online. On its face, DMG's Deposition Category No. 16 is nearly identical to its Document Request No. 10 (or "Issue No. 6"), and many of the same objections to Document Request No. 10 also apply to Deposition Category No. 16. DMG's demand for a meet-and-confer on the deposition topics appeared to be a reiteration of the meet-and-confer for Rule 30(b)(2) document production, and counsel for Anastasia inadvertently did not respond to DMG's request for a separate meet-and-confer. Counsel for DMG did not follow up with a telephone inquiry before preparing the joint statement. In any event, DMG can claim no prejudice because when DMG revised its portion of the joint statement to address relevancy for its document production requests, DMG made no changes to its contentions in connection with this Issue No. 15 regarding the deposition.

To provide context for DMG's deposition notice, please refer to Anastasia's summary of the relevant discovery set forth in its response to DMG's "Issue No. 10."

### 2.      Legal Standards

A more detailed discussion of the law also may be found in Anastasia's contentions in connection with DMG's "Issue No. 10."

#### (a)      Rule 26(b)

As previously discussed, Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses" of the case. If a party's request is overly broad or otherwise objectionable on its face, the party resisting discovery has no need to support its objection. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

#### (b)      Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents, but DMG appears to be using Rule 30(b)(2) as an excuse to extend a deposition even

1   though the documents could have been requested and obtained before the deposition.

2   ### (c)   Rule 30(b)(6)

3   Rule 30(b)(6) permits a party to name a corporation as a deponent. The party

4   seeking an organization's testimony "must describe with reasonable particularity the

5   matters for examination," but the organization is only required to "testify about

6   information known or reasonably available to the organization." There is nothing in

7   Rule 30 that requires a party to testify about information over which it does not have

8   access and control. *See In re Ski Train Fire*, 2006 U.S. Dist. LEXIS 29987, at *28

9   (declining "to require a corporate parent to acquire all of the knowledge of the

10   subsidiary on matters in which the parent was not involved"). Moreover, DMG bears

11   the burden of proving that Anastasia has control or the right to obtain the

12   information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1108. "[P]roof of

13   theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

14   The designated witness need only be prepared to testify on behalf of the

15   corporation based on knowledge reasonably available to the corporation. *Dravo Corp.*,

16   164 F.R.D. at 76 ("If [the corporation] does not possess such knowledge as to so

17   prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously

18   cease, since the rule requires testimony only as to 'matters known or reasonably

19   available to the organization.'"); *cf. Walking Mountain*, 353 F.3d at 798 (noting that the

20   phrase the "person most knowledgeable" is merely a label placed on the designated

21   corporate witness). Furthermore, the areas of inquiry for a 30(b)(6) deposition must

22   be set forth with reasonable particularity. *McBride*, 250 F.R.D. at 584.

23   ### 2.   30(b)(6) Category No. 5

24   As previously discussed, Anastasia does not communicate with agencies, create

25   profiles, develop profile databases, maintain servers or create web content. Anastasia

26   has provided DMG with its knowledge on the topics noticed based on the reasonably

27   available information with Anastasia's possession, custody or control.

28   DMG seems to believe that Anastasia should possess the knowledge of each

323

entity it contracts with and the entities they contract with, but DMG has not

developed any basis to support its belief other than idle speculation. Anastasia has no

ability to acquire additional information beyond that provided by Ms. Sykes at her

deposition.  Anastasia does not own any of the Moscow Entities. Anastasia has no

right of access or control over the information possessed by any of the Moscow

Entities.

### (a)    Ms. Sykes' Testimony

DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities

created and manage the internet activities associated with the anastasiadate.com

website. However, DMG makes no attempt to establish that Anastasia has control

over the Moscow Entities, and in fact suggests that Anastasia does not have such

control.

Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow

Entities to request information in preparation for the 30(b)(6) deposition, but he

refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also

contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October

2011), but Mr. Eremin stated that he did not have any substantive information to

provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and

261-262).

Thus, Ms. Sykes was properly prepared based on knowledge reasonably

available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the

corporation] does not possess such knowledge as to so prepare [a designated witness],

then its obligations under Rule 30(b)(6) obviously cease, since the rule requires

testimony only as to 'matters known or reasonably available to the organization.'"

(citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control

to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107

("[P]roof of theoretical control is insufficient; a showing of actual control is

required.").

DMG claims that Ms. Sykes admitted at her deposition that she "was not prepared to respond to questions governing a time period from November 2010 through the date of the deposition [when] Alexey Eremin was acting on AI's behalf." This is patently false. No such testimony was ever given. Moreover, as discussed above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr. Eremin responded that he "knows nothing," or "doesn't know anything" about those issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's assertions, <u>Ms. Sykes affirmed that she was the person most knowledgeable about Anastasia, including during Mr. Eremin's time at the company</u>. Exh. D (Tr. at 259-260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation of Anastasia—he would only address problems that Ms. Sykes would raise with him, and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had not been passed to Mr. Eremin, as DMG contends.

DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not confer with Mr. Eremin to prepare her for deposition because "she was aware that Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in litigation, and he had responded that he knew "nothing." As a result, she had no further need to confer with him again prior to the deposition. Ms. Sykes acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully suggested that there was no point to that because she had already asked and he had no relevant information to provide. In any event, Ms. Sykes stated on at least three instances during her deposition that she had conferred with Mr. Eremin, and that he had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the deposition "at the instruction of her counsel." This is totally false. DMG has no basis

for making such an assertion. DMG apparently relies on the fact that Anastasia lodged timely and well-founded objections to the categories in DMG's 30(b)(6) notice as vague, ambiguous, confusing, and not reasonably particularized. The deposition testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-opened every time counsel made objections for the record, the deposition would never end (which apparently is what DMG is seeking to do in this instance). DMG had more than sufficient opportunity to clarify its noticed categories with particularity in advance of the deposition, but chose not to do so. DMG also had two full days to question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no question (other than a single question calling for attorney-client privileged information) that Ms. Sykes was instructed by counsel not to answer.

In short, DMG identifies no relevant question that was asked and not answered based on the reasonably available information within Anastasia's possession, custody or control.

### (b)   Other Objections To Category No. 16

As stated in Anastasia's objections previously served on DMG, this category was overly broad, unduly burdensome, and not reasonably particularized to afford any reasonable means of witness preparation. Indeed, the Category is broadly directed to the business relationship between two third parties, Stolitza and with IT Online, without regard to the claims or defenses being asserted in this action, or any temporal limitation.

As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses, and if a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

In view of the lack of particularity in this noticed category, Anastasia stated that the designated witness will be prepared to offer a general overview. Again, DMG identifies no relevant question that was asked and not answered by Ms. Sykes as the

designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

### (c)    Deposition Pages Cited By DMG

As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes that she was adequately prepared and gave proper responses to the questions that were asked. The transcript excerpts cited by DMG do not alter that conclusion.

Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and information from both. Mr. Eremin had no information or documents. Mr. Nochka also did not provide any information or documents to Ms. Sykes.

Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms. Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's health problems, and that Ms. Sykes "did not perceive this job as being anything really stressful." (Tr. 105:18-19).

Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6 as overly broad as it was unreasonable to expect a witness to come prepared to address every bit of information that has ever been on a website and all changes in content over a two-year period of time. Ms. Sykes reviewed the home page because no specific part of the website was identified by DMG. When counsel for DMG attempted to inquire whether this was at the instruction of counsel, an objection and instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20 (Exh. 5).

Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin responded that he knew "nothing." Ms. Sykes also testified that she was the person

most knowledgeable about Anastasia, which is consistent with her inquiry of Mr. Eremin. Tr. 259:22-260:6.

### 4. Concluding Statement Re DMG's Issue No. 15

DMG's motion to compel a further 30(b)(6) deposition regarding Category No. 2 must be denied. DMG's motion is little more than an academic debate over a pre-deposition exchange of letters between counsel. In fact, DMG's motion is simply a copy of its own pre-deposition letter with no effort make to particularize the arguments made to the testimony actually given at the deposition. Exh. I. DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

## XVII. ISSUE NO. 16: MATTERS FOR EXAMINATION AT DEPOSITION, CATEGORY NO. 30

### A. Disputed Matter for Examination at Deposition

CATEGORY NO. 30

Details and information on what servers or companies are delegated to send email on AD's behalf.

RESPONSE TO CATEGORY NO. 30

Anastasia objects generally to the notice as calling for the deposition of the "person most knowledgeable" with respect to the enumerated topics. A party has no obligation under the Federal Rules to produce the person "most knowledgeable" about the matters designated. Rather, Anastasia will designate a witness to testify on its behalf in accordance with Rule 30(b) (6) based on the information known to Anastasia. Anastasia further objects generally to each topic that refers to entities acting "on behalf of" or "for the benefit of" Anastasia. Those vague and ambiguous phrases make the topics overly broad, unduly burdensome, and of an undetermined scope which does not afford any reasonable means of witness preparation. The witness

produced will testify as to matters that are within the possession, custody, or control of Anastasia, as required by the Federal Rules. The phrases also are objected to the extent they seek to improperly include individuals and entities not under the control of Anastasia. Anastasia also objects generally to the notice as being unduly burdensome and repetitive to the extent that DMG seeks to depose the same witness for one day as an individual and for two additional days as a 30(b) (6) witness. Topics 28 and 30 are objected to as being overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as they seek information outside the temporal and subject matter scope of the acts alleged in the Complaint. The Topics also are directed to matters which Anastasia has no relevant knowledge of or to information not within the possession, custody or control of Anastasia.

## B.     DMG's Contentions and Points and Authorities

Regarding the assertion that Anastasia has "no obligation under the Federal Rules to produce the person 'most knowledgeable,'" is mistaken. The Courts and counsel routinely use that term:

- "On December 31, 2009, plaintiffs noticed a Fed.R.Civ.P. 30(b) (6) deposition, requesting defendant to designate a person most knowledgeable ("PMK") to testify on 33 subjects on January 26, 2010 ("PMK Depo. Notice")." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29, 2010)

- "In response to Hoye's notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6), Oakland produced Police Department Captain Toribio as the person most knowledgeable…" *Hoye v. City of Oakland*, 09-16753, 2011 WL 3198233 (9th Cir. July 28, 2011)

- "Magedson was deposed as the person most knowledgeable for Xcentric, LLC under Federal Rule of Civil Procedure 30(b)(6)." *Asia Econ. Inst. v.*

*Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX, 2010 WL 4977054 (C.D. Cal. July 19, 2010)

- "On July 14, 2008, this Court granted plaintiff's motion to compel the continued Rule 30(b)(6) deposition of Beverlly (through Beverlly's person most knowledgeable ("PMK"), Theresa Lee)…" *Tacori Enterprises v. Beverlly Jewellery Co. Ltd.*, 253 F.R.D. 577, 579 (C.D. Cal. 2008)

With respect to the above, "Rule 30(b)(6) provides for the deposition of the corporation by notice setting forth 'with reasonable particularity' the matters on which the examination of the corporation's most knowledgeable person will take place." *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005) (internal citations omitted).

As to Defendant's assertion that the witness will "testify as to matters that are within the possession, custody, or control of Anastasia" is potentially an evasive tactic by your client and your client will be subject to sanctions relative to its involvement with persons and entities that have been involved with the matters that are the subject of our client's claims in this case, especially those persons that it has held out as having a partnership with, persons directly, indirectly or even intricately linked, its affiliates as well as person or entities known to share offices. The legal obligations regarding your client's Rule 30(b)(6) witness includes and is not limited to the following:

"'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial. This would totally defeat the purpose of the discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome.

However, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business....[A company] does not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no knowledge or position with respect to a set of facts or area of inquiry within its knowledge or reasonably available....' *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C., 1996), aff'd 166 F.R.D. 367 (M.D.N.C., 1996). See also *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md., 2000) ("Upon notification of a deposition, the corporation has an obligation to investigate and identify and if necessary prepare a designee for each listed subject area and produce that designee as noticed."); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb., 1995) (citing *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C., 1989)) ("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation."); *Buycks-Roberson v. Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill., 1995) (stating that the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.); *Securities and Exchange Commission v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y., 1992) (citing *Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Authority*, 93 F.R.D. 62, 67 (D.P.R., 1981)) ("under Rule 30(b)(6), the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters.' "); ABA Civil Discovery Standards (Aug. 1999), § 19(f) ("Counsel for the [corporation] should prepare the designated witness to be able to provide meaningful information about any designated area(s) of inquiry.")." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36-37 (D. Mass. 2001)

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

Further, "The party responding to a 30(b)(6) deposition notice "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 639 (D.Minn., 2000) (citing *Taylor*, supra, 166 F.R.D. at 361); see also *Bank of New York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y., 1997) (deponent must be prepared "to the extent matters are reasonably available, whether from documents, past employees, or other sources."). Even if the documents are voluminous and the review of those documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed. See *Prokosch*, supra, 193 F.R.D. at 638 ("the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation that is involved in litigation, can be fully and fairly explored."). Such preparation is necessary because the "individuals so deposed are required to testify to the knowledge of the corporation, not the individual." *Poole*, supra, 192 F.R.D. at 504; see also *Prokosch*, supra, 193 F.R.D. at 638 (a corporation must prepare its deponents "so that they may give complete, knowledgeable and binding answers on behalf of the corporation."); *Taylor*, supra, 166 F.R.D. at 361 ("the designee must not only testify about facts within the corporation's knowledge, but also its subjective beliefs and opinions....The corporation must provide its interpretation of documents and events.")." *Calzaturificio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 37 (D. Mass. 2001)

"Thus, it seems clear that Fabiano, through its 30(b)(6) deponents, had a duty in advance of the 30(b)(6) deposition to review all documents, including tax returns and related tax papers, that were "reasonably available." Neither Rule 30(b)(6) itself nor the Advisory Notes nor reported case law addressing the rule define the terminology "reasonably available." However, in a similar context-the production of documents pursuant to Fed. R. Civ. P. 34-responding parties are required to produce all documents that are in their control. "Control is defined not only as possession, but

as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11 Cir., 1984); see also *Alexander v. Federal Bureau of Investigation*, 194 F.R.D. 299, 301 (D.D.C., 2000) ("It is well-established that 'control', which is defined not as possession, but as the legal right to obtain documents on demand, is the test as to whether production is required."); *Prokosch*, supra, 193 F.R.D. at 636 ("Under Rule 34, 'control' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability, to obtain the documents from a non-party to the action.") It therefore seems logical that the documents that are reasonably available are those documents that are in a party's control. In the instant case, this means that the Fabiano sons were required to review all documents (that had any bearing on the 30(b)(6) topics) that were in their control. By definition, such documents would include the tax-related documents because those documents, even if they were in the possession of Fabiano's accountant, were still in Fabiano's control because Fabiano had the legal right and the practical ability to obtain the documents from the accountant. Therefore, I find that the Fabiano sons, in preparing to be deposed as 30(b)(6) representatives of the company, had the obligation to review all documents that were in their control, including the tax returns and related documents that were in the physical possession of Fabiano's accountant." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 38-39 (D. Mass. 2001)

Also, the law relative to discovery in federal cases is quite clear and "[I]t is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery. [citations omitted] The responding party simply cannot invoke generalized objections; rather, with respect to each of the propounding party's discovery requests, the responding party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is ... overly broad, burdensome or oppressive by submitting affidavits or offering

1   evidence revealing the nature of the burden." *In re Toys R Us-Delaware, Inc. Fair &*
2   *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL
3   4942645 (C.D. Cal. July 29, 2010)

4        Additionally, "the party opposing discovery on the grounds of burdensomeness
5   has an obligation to provide sufficient detail in terms of time, money and procedure
6   required to produce the requested documents." *In re Toys R Us-Delaware, Inc. Fair &*
7   *Accurate Credit Transactions Act (FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL
8   4942645 (C.D. Cal. July 29, 2010) (internal citations omitted)

9        Finally, "If the persons designated by the corporation do not possess personal
10  knowledge of the matters set out in the deposition notice, the corporation is obligated
11  to prepare the designees so that they may give knowledgeable and binding answers for
12  the corporation." *In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act*
13  *(FACTA) Litig.*, ML 08-1980 MMM FMOX, 2010 WL 4942645 (C.D. Cal. July 29,
14  2010) (internal citations omitted)

15       With respect to terms that Defendant contends are vague, ambiguous or not
16  intelligible, Defendant has the obligation to use its best efforts to prepare and answer
17  the question. A party who objects to a discovery request as "vague and ambiguous"
18  has the burden to show such vagueness or ambiguity. *Pulsecard, Inc. v. Discover Card*
19  *Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996). It is not proper ground for objection
20  that the request is unclear unless it is so ambiguous that Defendant cannot, "in good
21  faith," frame an intelligent reply. *Marchand v. Mercy Medical Center*, 22 F.3d 933, 938 (9th
22  Cir. 1994). Here, Defendant's objection fails to adequately and specifically explain
23  which portion of the category or the language within is allegedly so vague as to
24  preclude any intelligent reply.

25       The Defendant's Person Most Knowledgeable Elena Sykes, its Founder and
26  the sole owner until September 1, 2011, was deposed on October 26-27, 2011. Ms.
27  Sykes testified that the companies in Moscow known as Stolitza and IT-Online
28  (together referenced by the witness as the "Moscow Entities") have carte blanche to

perform any service on behalf of AI, knows that these two companies hold themselves out as being AI, that they created and manage all internet activities and business activities of AI including and not limited to AI's primary website Anastasiadate as well as all of AI's affiliates, that all customer service calls are answered at their offices, that AI receives all revenues and makes disbursements at their direction and that she has never had a problem with their conduct or objected to their activities, even after AI was sued with two separate actions. (Ex. 4, 44:14-45:9; 64:13-65:12; 72:17-19; 87:17-88:11; 93:25-95:6; 139:16-140:15; 147:6-151:5; 201:17-202:15; 216:17-217:4; 227:15-228:14; 281:22-282:21; **290:17-20**; 334:22-335:4; **351:24-354:2**.)

Further, at the deposition, Ms. Sykes was not prepared to respond to questions governing a time period from November 2010 through the date of the deposition, which is the time period when the newly elected President, Alexey Eremin was acting on AI's behalf. Ms. Sykes further testified that Mr. Eremin maintained an office in the same building with IT-Online, that he was to act as AI's liaison with IT-Online and that she did not consult with Mr. Eremin with respect to any PMK subjects, which included and was not limited to the business relationship between AI and the Moscow Entities, and her reasoning was that she was aware that Plaintiff was going to depose Mr. Eremin. In October, 2011, Mr. Eremin resigned from the company, which was not disclosed by the witness at the PMK deposition. Ms. Sykes further was not prepared to respond to specific categories noticed and did not do so at the instruction of her counsel. (Ex. 5, 13:10-15:8; 96:23-98:5; 99:10-100:24; 104:9-107:2; 223:6-225:15; 258:22-262:5.)

Plaintiff's counsel sent an email on 12-2-11 requesting a meet and confer with respect to the PMK deposition. (Ex. 10.)

Plaintiff's counsel again sent an email on December 8, 2011, reminding Defendant's counsel that a meet and confer had been requested. (Ex. 11.)

Defendant's counsel did not meet and confer within (10) days as requested.

1    Based on the foregoing, the court should order Defendant to appear for

2    deposition in Los Angeles to provide a further response to this category.

3    **C.    Anastasia's Contentions and Points and Authorities**

4    All of DMG's arguments in support of its motion to compel additional 30(b)(6)

5    deposition testimony suffer from three common flaws.

6    First, the deposition categories at issue mostly repeat almost verbatim the

7    document production requests already discussed earlier in this joint stipulation. To the

8    extent the document production requests are objectionable as being overly broad and

9    for seeking information not relevant to the claims and defenses in this action, the

10   deposition categories are also objectionable for the same reason. They are also

11   objectionable for seeking information not within the possession, custody or control of

12   Anastasia.

13   Second, the deposition categories were so unclear, cryptically worded, and

14   overly broad that no reasonable means of witness preparation was possible. A witness

15   cannot possibly be prepared to answer every conceivable question in reference to a

16   deposition topic that is not reasonably particularized.

17   Third, and perhaps most important, a 30(b)(6) deposition is not a homework

18   exercise as DMG appears to believe. If a witness is already familiar with a particular

19   topic that has been clearly articulated in the notice, additional preparation or review

20   may not be necessary. A witness is not subject to being recalled simply because

21   opposing counsel feels that the witness did not review enough documents. Rather,

22   unless the opposing party can point to a specific question that was asked and not

23   answered by the witness even though the information was within the possession,

24   custody or control of the corporate party being deposed, there is no basis to re-open

25   the deposition. DMG has failed to make such a showing.

26   Like its contentions concerning the document production requests, DMG's

27   contentions concerning the deposition testimony of Ms. Sykes are based on numerous

28   misrepresentations of her testimony.

No effort was made in DMG's motion to identify any question Ms. Sykes was unable to answer as a basis to re-open the deposition. Instead, DMG seeks to engage in an academic debate over some pre-deposition objections that were made for the record by Anastasia. There is no basis to grant a motion to compel further deposition testimony.

In response to DMG's long-winded and disjointed contentions regarding its self-styled "Issue No. 16" concerning its Deposition Category No. 30 under Rule 30(b)(6), Anastasia will (1) briefly outline the relevant discovery served, and then (2) set forth the appropriate legal standards. Next, Anastasia will (3) discuss the category in dispute and show that Anastasia' witness gave proper testimony.

### 1.   Discovery At Issue

DMG's Deposition Category No. 30 is broadly directed toward servers or companies delegated to send email on Anastasia's behalf. On its face, DMG's Deposition Category No. 30 is nearly identical to its Document Request No. 23 (or "Issue No. 9"), and many of the same objections to Document Request No. 23 also apply to Deposition Category No. 30. DMG's demand for a meet-and-confer on the deposition topics appeared to be a reiteration of the meet-and-confer for Rule 30(b)(2) document production, and counsel for Anastasia inadvertently did not respond to DMG's request for a separate meet-and-confer. Counsel for DMG did not follow up with a telephone inquiry before preparing the joint statement. In any event, DMG can claim no prejudice because when DMG revised its portion of the joint statement to address relevancy for its document production requests, DMG made no changes to its contentions in connection with this Issue No. 16 regarding the deposition.

To provide context for DMG's deposition notice, please refer to Anastasia's summary of the relevant discovery set forth in its response to DMG's "Issue No. 10."

### 2.   Legal Standards

A more detailed discussion of the law also may be found in Anastasia's

Joint Stmt re Plaintiff's Mtn to Compel Further Testimony and Production of Documents

contentions in connection with DMG's "Issue No. 10."

### (a)      Rule 26(b)

As previously discussed, Rule 26(b)(1), which was narrowed substantively in 2000, limits the scope of discovery to what is relevant to the "claims and defenses" of the case. If a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). Only after relevancy is established does the burden shift to the party resisting discovery. *Id.*

### (b)      Rule 30(b)(2)

Rule 30(b)(2) is intended to be used when seeking a few and simple documents, but DMG appears to be using Rule 30(b)(2) as an excuse to extend a deposition even though the documents could have been requested and obtained before the deposition.

### (c)      Rule 30(b)(6)

Rule 30(b)(6) permits a party to name a corporation as a deponent. The party seeking an organization's testimony "must describe with reasonable particularity the matters for examination," but the organization is only required to "testify about information known or reasonably available to the organization." There is nothing in Rule 30 that requires a party to testify about information over which it does not have access and control. *See In re Ski Train Fire*, 2006 U.S. Dist. LEXIS 29987, at *28 (declining "to require a corporate parent to acquire all of the knowledge of the subsidiary on matters in which the parent was not involved"). Moreover, DMG bears the burden of proving that Anastasia has control or the right to obtain the information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1108. "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* at 1107.

The designated witness need only be prepared to testify on behalf of the corporation based on knowledge reasonably available to the corporation. *Dravo Corp.*, 164 F.R.D. at 76 ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously

cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'"); *cf. Walking Mountain*, 353 F.3d at 798 (noting that the phrase the "person most knowledgeable" is merely a label placed on the designated corporate witness). Furthermore, the areas of inquiry for a 30(b)(6) deposition must be set forth with reasonable particularity. *McBride*, 250 F.R.D. at 584.

## 2.    30(b)(6) Category No. 5

As previously discussed, Anastasia does not communicate with agencies, create profiles, develop profile databases, maintain servers or create web content. Anastasia has provided DMG with its knowledge on the topics noticed based on the reasonably available information with Anastasia's possession, custody or control.

DMG seems to believe that Anastasia should possess the knowledge of each entity it contracts with and the entities they contract with, but DMG has not developed any basis to support its belief other than idle speculation. Anastasia has no ability to acquire additional information beyond that provided by Ms. Sykes at her deposition.  Anastasia does not own any of the Moscow Entities. Anastasia has no right of access or control over the information possessed by any of the Moscow Entities.

### (a)    Ms. Sykes' Testimony

DMG relies on Ms. Sykes' testimony to establish that the Moscow Entities created and manage the internet activities associated with the anastasiadate.com website. However, DMG makes no attempt to establish that Anastasia has control over the Moscow Entities, and in fact suggests that Anastasia does not have such control.

Ms. Sykes testified that she contacted Mr. Oleg Nochka of the Moscow Entities to request information in preparation for the 30(b)(6) deposition, but he refused to provide such information. Exh. D (Tr. at 14-15 and 339). She also contacted Mr. Alexey Eremin (Anastasia's President from November 2010 to October 2011), but Mr. Eremin stated that he did not have any substantive information to

provide regarding the issues raised by the litigation. Exh. D (Tr. at 14-15, 258-259 and 261-262).

Thus, Ms. Sykes was properly prepared based on knowledge reasonably available to Anastasia. *Dravo Corp.*, 164 F.R.D. at 76 (D. Neb. 1995) ("If [the corporation] does not possess such knowledge as to so prepare [a designated witness], then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'" (citing Fed. R. Civ. P. 30(b)(6)). DMG has not established that Anastasia has control to obtain additional information on demand. *In re Citric Acid Litig.*, 191 F.3d at 1107 ("[P]roof of theoretical control is insufficient; a showing of actual control is required.").

DMG claims that Ms. Sykes admitted at her deposition that she "was not prepared to respond to questions governing a time period from November 2010 through the date of the deposition [when] Alexey Eremin was acting on AI's behalf." This is patently false. No such testimony was ever given. Moreover, as discussed above, Ms. Sykes testified at least three times that she had conferred with Mr. Eremin regarding the 30(b)(6) topics, and when asked about the issues in this litigation, Mr. Eremin responded that he "knows nothing," or "doesn't know anything" about those issues. Exh. D (Tr. at 14, 258-259 and 261-262). Indeed, contrary to DMG's assertions, <u>Ms. Sykes affirmed that she was the person most knowledgeable about Anastasia, including during Mr. Eremin's time at the company</u>. Exh. D (Tr. at 259-260). Ms. Sykes also testified that Mr. Eremin was not involved in the daily operation of Anastasia—he would only address problems that Ms. Sykes would raise with him, and "there haven't been any problems" for Mr. Eremin to address. Exh. D (Tr. at 261-262). "Control of Anastasia" (a small closely-held company owned by Ms. Sykes) had not been passed to Mr. Eremin, as DMG contends.

DMG also mischaracterizes Ms. Sykes' testimony to suggest that she did not confer with Mr. Eremin to prepare her for deposition because "she was aware that

1  Plaintiff was going to depose Mr. Eremin." To clarify, Ms. Sykes said multiple times

2  that she had made inquiry of Mr. Eremin regarding the 30(b)96) topics and issues in

3  litigation, and he had responded that he knew "nothing." As a result, she had no

4  further need to confer with him again prior to the deposition. Ms. Sykes

5  acknowledged that DMG was seeking Mr. Eremin's deposition, but inartfully

6  suggested that there was no point to that because she had already asked and he had no

7  relevant information to provide. In any event, Ms. Sykes stated on at least three

8  instances during her deposition that she had conferred with Mr. Eremin, and that he

9  had no relevant information. Exh. D (Tr. at 14, 258-259 and 261-262).

10      DMG also incorrectly asserts that Ms. Sykes was not properly prepared for the

11  deposition "at the instruction of her counsel." This is totally false. DMG has no basis

12  for making such an assertion. DMG apparently relies on the fact that Anastasia lodged

13  timely and well-founded objections to the categories in DMG's 30(b)(6) notice as

14  vague, ambiguous, confusing, and not reasonably particularized. The deposition

15  testimony was taken subject to those objections. If a 30(b)(6) deposition could be re-

16  opened every time counsel made objections for the record, the deposition would

17  never end (which apparently is what DMG is seeking to do in this instance). DMG

18  had more than sufficient opportunity to clarify its noticed categories with particularity

19  in advance of the deposition, but chose not to do so. DMG also had two full days to

20  question Ms. Sykes on all of the noticed deposition topics, yet DMG can point to no

21  question (other than a single question calling for attorney-client privileged

22  information) that Ms. Sykes was instructed by counsel not to answer.

23      In short, DMG identifies no relevant question that was asked and not answered

24  based on the reasonably available information within Anastasia's possession, custody

25  or control.

26          **(b)    Other Objections To Category No. 30**

27      As stated in Anastasia's objections previously served on DMG, this category

28  was overly broad, unduly burdensome, and not reasonably particularized to afford any

341

reasonable means of witness preparation. Indeed, the Category is broadly directed to the Anastasia's entire email infrastructure without regard to the claims or defenses in this action, or any temporal limitation.

As the party requesting discovery, DMG bears the burden of establishing relevancy of the requested discovery sought to the claims or defenses, and if a party's request for relevant information is overly broad or otherwise objectionable on its face, the burden is not shifted to the party resisting discovery. *McBride*, 250 F.R.D. at 586.

In view of the lack of particularity in this noticed category, Anastasia stated that the designated witness will be prepared to offer a general overview. Again, DMG identifies no relevant question that was asked and not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

### (c)    Deposition Pages Cited By DMG

As previously discussed, Ms. Sykes' 30(b)(6) deposition testimony establishes that she was adequately prepared and gave proper responses to the questions that were asked. The transcript excerpts cited by DMG do not alter that conclusion.

Transcript pages 13:10-15:8 (Exh. 5) establishes that Ms. Sykes conferred with both Alexey Eremin and Oleg Nochka in Moscow, and sought documents and information from both. Mr. Eremin had no information or documents. Mr. Nochka also did not provide any information or documents to Ms. Sykes.

Pages 96:23-98:5 (Exh. 5) is a discussion of Mr. Eremin's relationship with Ms. Sykes, and his function at Anastasia. Pages 99:10-100:24 (Exh. 5) is a discussion where counsel for DMG make irrelevant inquires regarding Mr. Eremin's compensation as President of Anastasia. Pages 104:9-107:2 (Exh. 5) is a discussion of Mr. Eremine's health problems, and that Ms. Sykes "did not perceive this job as being anything really stressful." (Tr. 105:18-19).

Pages 223:6-225:15 (Exh. 5) cited by DMG contains a discussion of the anastasiadate.com website, and Anastasia's prior objection to DMG's Category No. 6

342

as overly broad as it was unreasonable to expect a witness to come prepared to address every bit of information that has ever been on a website and all changes in content over a two-year period of time. Ms. Sykes reviewed the home page because no specific part of the website was identified by DMG. When counsel for DMG attempted to inquire whether this was at the instruction of counsel, an objection and instruction not to answer was made based on attorney-client privilege. Tr. 225:7-20 (Exh. 5).

Pages 258:22-262:5 (Exh. 5) cited by DMG contains Ms. Sykes' testimony that she had asked Mr. Eremin about the issues in litigation, to which Mr. Eremin responded that he knew "nothing." Ms. Sykes also testified that she was the person most knowledgeable about Anastasia, which is consistent with her inquiry of Mr. Eremin. Tr. 259:22-260:6.

### 4.    Concluding Statement Re DMG's Issue No. 16

DMG's motion to compel a further 30(b)(6) deposition regarding Category No. 2 must be denied. DMG's motion is little more than an academic debate over a pre-deposition exchange of letters between counsel. In fact, DMG's motion is simply a copy of its own pre-deposition letter with no effort make to particularize the arguments made to the testimony actually given at the deposition. Exh. I. DMG identifies no question that was not answered by Ms. Sykes as the designated 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody or control.

## XVIII. SANCTIONS

### A.    DMG's Contentions and Points and Authorities

Defendant's regular use of improper objections and regular failure to even respond to many of the discovery items set forth herein justifies an award of expenses to Plaintiff as a result of being forced to bring the instant Motion. There is absolutely no legitimate excuse for Defendant not to produce documents that it is obligated to produce. One can only conclude that Defendant is intentionally obstructing and

1    evading Plaintiff's rights to discovery in this case.

2         The party who prevails on a motion to compel is entitled to an award of

3    expenses, including reasonable attorney fees, absent substantial justification in

4    opposing the motion (or other circumstances make such an award unjust). *See,* Fed. R.

5    Civ. P. 37(a)(4); *H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115,

6    1124-1125 (6th Cir. 1976). An award of expenses does not require a showing of

7    willfulness or improper intent; rather, the standard is whether there was *substantial*

8    *justification* for Defendant's conduct. *See,* Fed. R. Civ. P. 37(a)(4); *Reygo Pac. Corp. v.*

9    *Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982). Thus, the burden is on Defendant

10   to affirmatively demonstrate that its position was *substantially justified. See*, Fed. R. Civ.

11   P. 37(a)(4), Adv. Comm. Notes (1970). The court may award expenses against the

12   Defendant and Defendant's attorney. *See*, Fed. R. Civ. P. 37(a)(4). The degree of

13   involvement of each is considered: e.g., if the discovery abuse is limited to tactics

14   carried out by the attorney, an award solely against the attorney is appropriate. *See*,

15   *Carlucci v. Piper Aircraft Corp.*, 775 F2d 1440 (11th Cir. 1985). Refusing to answer

16   discovery and to provide documents, especially when there has been an agreement to

17   do so, is an abuse of the discovery process. Refusing to conduct a reasonable

18   investigation into its business operations while denying knowledge is obstructive and

19   sanctionable. Refusing to produce any document setting forth detailed sales figures

20   when various claims of unfair competition/trade dress infringement are asserted is

21   wholly improper. Asserting baseless objections filled with cursory boilerplate language

22   is improper. For all of these reasons an award of expenses to Plaintiff is proper. The

23   expenses requested by Plaintiff are set forth in the Declaration of Bruce A. Fields,

24   filed concurrently herewith. Based thereon, Plaintiff requests $1750.00 as expenses

25   incurred in the filing of this Motion. *See*, Fields' Decl., ¶ 11.

26        **B.    Anastasia's Contentions and Points and Authorities**

27        Anastasia's objections were reasonable, well-founded, and justified. For

28   example, a request for "all" documents is unduly burdensome, especially since Rule

30(b)(2) should be limited to a few and simple documents. Notwithstanding Anastasia's objections, Anastasia produced responsive documents and properly prepared its 30(b)(6) witness based on the reasonably available information within Anastasia's possession, custody, or control.

Moreover, the additional documents that DMG now seeks to compel are not relevant to any claim or defense in the present action. Indeed, DMG has the burden under Rule 26(b) to establish the relevancy of the discovery it seeks, but has failed to do so. DMG at first refused to "educate" Anastasia regarding the relevancy of DMG's discovery requests during the meet-and-confer. Then, in DMG's initial joint statement, DMG attempted to establish relevancy in connection with sales information regarding trademark infringement, even though those documents have already been produced and were not responsive to DMG's discovery requests in any event. After Anastasia served its portion of the joint stipulation, DMG then revised its joint statement to remove the "trademark" argument, and instead asserted relevancy on a theory of agency. But even with its multiple bites at the discovery apple, DMG still has not met its burden to show relevancy because the additional eight categories of documents that DMG now seeks to compel are unrelated to any alleged claim in this action. Nor were the documents reasonably called out with any particularity in DMG's 30(b)(2) document production requests.

DMG's twenty-three overly broad Rule 30(b)(2) requests were improper from the outset because a request for documents at a deposition is appropriate only where "the documents are few and simple." Advisory Committee's Notes to predecessor Rule 30(b)(5); *Canal Barge*, 2001 WL 817853, at *5. DMG's Rule 30(b)(2) requests appear to have been part of a ploy by DMG to demand additional documents at the 30(b)(6) deposition, and then demand that the deposition be resumed to ask questions about those additional documents. DMG's approach to the discovery it now seeks was improper, and DMG should not be awarded any monetary sanctions in connection with this motion.

## XIX. CONCLUSION

### A.    DMG's Conclusion

For the foregoing reasons, Plaintiff requests that this Court grant Plaintiff's Motion as follows: Defendant to produce all invoices from Stolitza and IT-Online from January 2009 to present together with all attachments to invoices referencing analytical service, customer service, programming service and server lease and hosting; all emails between Defendant and Andrey Ryabichikov from January 2009 to present; all emails between Defendant and Oleg Nochka from January 2009 to present; all emails between Defendant and Alexey Eremin from January 2009 to present; all documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Lookintom from January 2009 to present; all documents, invoices, emails, bank records, accounting records that relate to any funds or wire transfers from Defendant to Krypton from January 2009 to present; all phone billing records for any (800) number used by Defendant or with reference to Defendant's business activities from January 2009 to present, and to the extent that no billing records exist, exemplars of bills dating back to January 2006; and all invoices for Google accounts 2961669 and 1020911. Defendant to produce its Person Most Knowledgeable for deposition to further respond to Categories 2, 5, 6, 12, 15, 16 & 30 and to respond to questions with respect to the documents referenced herein on or before 2-24-12. Plaintiff requests that the Person Most Knowledgeable to appear at the offices of Bruce A. Fields, A Professional Law Corporation 1801 Century Park East 24th Floor, Los Angeles, CA 90067 on or before March 2, 2012 at 10:00 AM. Defendant to pay for all expense associated with travel to the deposition. Plaintiff further requests attorneys fees for the necessity of having to bring this motion.

### B.    Anastasia's Conclusion

For Issues 1 through 9, Anastasia has already produced responsive documents.

346

BH8255.1
1003-30730

1  Thus far, Anastasia and DMG have produced a comparable number of documents.

2  But for each of its self-styled issues, DMG repeats the same arguments over and over

3  again in seeking to compel production of additional documents that are not

4  reasonably responsive to any of the requests for production made by DMG in

5  advance of the 30(b)(6) deposition of Anastasia. Nor are those additional documents

6  are relevant to any of DMG's claims in this action. DMG has the burden under Rule

7  26(b) to establish the relevancy of the discovery it seeks, but has failed to do so. At

8  first, DMG refused to "educate" Anastasia regarding the relevancy of DMG's

9  discovery requests during the meet-and-confer. Then, in DMG's initial joint

10  statement, DMG attempted to establish relevancy was in connection with sales

11  information regarding trademark infringement, but then later revised its joint

12  statement to abandon its "trademark" argument, and instead asserted relevancy on a

13  theory of agency. Yet DMG still has not met its burden to show relevancy because the

14  additional eight categories of documents that DMG now seeks to compel are overly

15  broad and unrelated to DMG's claims. Nor are they responsive to the discovery

16  requests that DMG seeks to compel.

17  For Issues 10 through 16, DMG also just repeats the same argument over and

18  over for each in seeking to compel further deposition testimony from Elena Sykes as

19  a 30(b)(6) witness, even though DMG already had two full days to conduct a 30(b)(6)

20  deposition. Ms. Sykes was properly prepared on all deposition topics, and DMG

21  identifies no relevant question that was asked and not answered based on the

22  reasonably available information within Anastasia's possession, custody or control.

23  To the extent that DMG's motion to compel a further 30(b)(6) deposition is

24  based on DMG's new demand to produce additional documents in response to its

25  Rule 30(b)(2) requests for production, DMG could have served regular requests for

26  production under Rule 34 for production and attempted to resolve the alleged

27  deficiencies in production prior to the deposition. Instead, DMG relied on numerous

28  and overly broad requests under Rule 30(b)(2), which is intended for only production

JOINT STMT RE PLAINTIFF'S MTN TO COMPEL FURTHER TESTIMONY AND PRODUCTION OF DOCUMENTS

1   of a few and simple documents at a deposition, so that DMG could demand

2   additional documents at the 30(b)(6) deposition, and then use that demand as an

3   excuse to resume the deposition later. DMG's abuse of the Rules should not be

4   condoned.

5   Dated this 24th day of January, 2012.             Respectfully submitted,

6                                                  BRUCE A. FIELDS, APC

7

8                                 By:/s/ Bruce A. Fields

                                     Bruce Fields, Esq.

9                                      Attorneys for Plaintiff

10

11   Dated this 24th day of January, 2012.             Respectfully submitted,

12                                           FULWIDER PATTON LLP

13                                By:/s/ James Juo (signed by agm't)

14                                      James Juo

                                     Craig Bailey

15                                      Attorneys for Defendant

16

17

18

19

20

21

22

23

24

25

26

27

28

BH8255.1
1003-30730